## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JENNER & BLOCK LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001

     *Plaintiff*,

v.

U.S. DEPARTMENT OF JUSTICE
950 Pennsylvania Avenue, NW
Washington, DC 20530

FEDERAL COMMUNICATIONS
COMMISSION
45 L Street, NE
Washington, DC 20554

OFFICE OF MANAGEMENT AND
BUDGET
725 17th Street, NW
Washington, DC 20503

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION
131 M Street, NE
Washington, DC 20507

OFFICE OF PERSONNEL MANAGEMENT
1900 E Street, NW
Washington, DC 20415

GENERAL SERVICES ADMINISTRATION
1800 F Street, NW
Washington, DC 20405

OFFICE OF THE DIRECTOR OF
NATIONAL INTELLIGENCE
1500 Tysons McLean Drive
McLean, VA 22102

Civil Case No. _____

**COMPLAINT**

CONSUMER FINANCIAL PROTECTION
BUREAU
1700 G Street, NW
Washington, DC 20552


DEPARTMENT OF DEFENSE
1000 Defense Pentagon
Washington, DC 20301

ENVIRONMENTAL PROTECTION
AGENCY
1200 Pennsylvania Avenue, NW
Washington, DC 20460

FEDERAL ENERGY REGULATORY
COMMISSION
888 First Street, NE
Washington, DC 20426

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580

SECURITIES AND EXCHANGE
COMMISSION
100 F Street, NE
Washington, DC 20549

DEPARTMENT OF THE INTERIOR
1849 C Street, NW
Washington DC 20240

DEPARTMENT OF THE TREASURY
1500 Pennsylvania Avenue, NW
Washington, DC 20220

UNITED STATES POSTAL SERVICE
475 L'Enfant Plaza SW
Washington DC 20260

DEPARTMENT OF HEALTH AND
HUMAN SERVICES
200 Independence Avenue, SW
Washington, DC 20201

DEPARTMENT OF HOMELAND
SECURITY
2707 Martin Luther King Jr Avenue, SE
Washington, DC 20528

DEPARTMENT OF VETERANS AFFAIRS
810 Vermont Avenue, NW
Washington, DC 20420

OTHER AGENCIES SUBJECT TO
EXECUTIVE ORDER "ADDRESSING
RISKS FROM JENNER & BLOCK"

THE UNITED STATES OF AMERICA
U.S. Attorney's Office for DC
601 D Street, NW
Washington, DC 20530

PAMELA J. BONDI, in her official capacity
as Attorney General
950 Pennsylvania Avenue, NW
Washington, DC 20530

BRENDAN CARR, in his official capacity as
the Chairman of the Federal Communications
Commission
45 L Street, NE
Washington, DC 20554

GEOFFREY STARKS, in his official
capacity as the Commissioner of the Federal
Communications Commission
45 L Street, NE
Washington, DC 20554

NATHAN SIMINGTON, in his official
capacity as the Commissioner of the Federal
Communications Commission
45 L Street, NE
Washington, DC 20554

ANNA M. GOMEZ, in her official capacity
as the Commissioner of the Federal
Communications Commission
45 L Street, NE
Washington, DC 20554

RUSSELL T. VOUGHT, in his official
capacity as Director of the U.S. Office of
Management and Budget
725 17th Street, NW
Washington, DC 20503

ANDREA LUCAS, in her official capacity as
Acting Chair of the Equal Employment
Opportunity Commission
131 M Street, NE
Washington, DC 20507

CHARLES EZELL, in his official capacity as
Acting Director of the Office of Personnel
Management
1900 E Street, NW
Washington, DC 20415

STEPHEN EHEKIAN, in his official capacity
as Acting Administrator of the General
Services Administration
1800 F Street, NW
Washington, DC 20405

TULSI GABBARD, in her official capacity as
U.S. Director of National Intelligence,
Office of the Director of National Intelligence
1500 Tysons McLean Drive
McLean, VA 22102

SCOTT BESSENT, in his official capacity as
Acting Director of the Consumer Financial
Protection Bureau
1700 G Street, NW
Washington, DC 20552

PETE HEGSETH, in his official capacity as
Secretary of the Department of Defense
1000 Defense Pentagon
Washington, DC 20301

LEE ZELDIN, in his official capacity as
Administrator of the Environmental
Protection Agency
1200 Pennsylvania Avenue, NW

Washington, DC 20460

MARK C. CHRISTIE, in his official capacity
as Chairman of the Federal Energy
Regulatory Commission
888 First Street, NE
Washington, DC 20426

WILLIE L. PHILLIPS, in his official capacity
as Commissioner of the Federal Energy
Regulatory Commission
888 First Street, NE
Washington, DC 20426

DAVID ROSNER, in his official capacity as
Commissioner of the Federal Energy
Regulatory Commission
888 First Street, NE
Washington, DC 20426

LINDSAY S. SEE, in her official capacity as
Commissioner of the Federal Energy
Regulatory Commission
888 First Street, NE
Washington, DC 20426

JUDY W. CHANG, in her official capacity as
Commissioner of the Federal Energy
Regulatory Commission
888 First Street, NE
Washington, DC 20426

ANDREW N. FERGUSON, in his official
capacity as Chairman, Federal Trade
Commission
600 Pennsylvania Avenue, NW
Washington, DC 20580

MELISSA HOLYOAK, in her official
capacity as Commissioner, Federal Trade
Commission
600 Pennsylvania Avenue, NW
Washington, DC 20580

MARK T. UYEDA, in his official capacity as
Acting Chairman, Securities and Exchange
Commission
100 F Street, NE
Washington, DC 20549

HESTER M. PEIRCE, in her official capacity
as Commissioner, Securities and Exchange
Commission
100 F Street, NE
Washington, DC 20549

CAROLINE A. CRENSHAW, in her official
capacity as Commissioner, Securities and
Exchange Commission
100 F Street, NE
Washington, DC 20549

DOUG BURGUM, in his official capacity as
Secretary of the Interior
1849 C Street, NW
Washington DC 20240

SCOTT BESSENT, in his official capacity as
Secretary of the Treasury
1500 Pennsylvania Avenue, NW
Washington, DC 20220

DOUG TULINO, in his official capacity as
Postmaster General and Chief Executive
Officer of the United States Postal Service
475 L'Enfant Plaza SW
Washington DC 20260

ROBERT F. KENNEDY JR, in his official
capacity as Secretary of Health and Human
Services
200 Independence Avenue, SW
Washington, DC 20201

KRISTI NOEM, in her official capacity as
Secretary of the Department of Homeland
Security
2707 Martin Luther King Jr Avenue, SE
Washington, DC 20528

DOUGLAS A. COLLINS, in his official
capacity as Secretary of Veterans Affairs
810 Vermont Avenue, NW
Washington, DC 20420

*Defendants.*

## COMPLAINT

Plaintiff, the law firm of Jenner & Block LLP, brings this case against the U.S. Department of Justice, the Federal Communications Commission, the Office of Management and Budget, the Equal Employment Opportunity Commission, the Office of Personnel Management, the General Services Administration, the Office of the Director of National Intelligence, the Consumer Financial Protection Bureau, the Department of Defense, the Environmental Protection Agency, the Federal Energy Regulatory Commission, the Federal Trade Commission, the Securities and Exchange Commission, the Department of the Interior, the Department of the Treasury, the Department of Health and Human Services, the Department of Homeland Security, the Department of Veterans Affairs, the United States Postal Service, the United States of America, and, in their respective official capacities, Pamela J. Bondi, Brendan Carr, Geoffrey Starks, Nathan Simington, Anna M. Gomez, Russell T. Vought, Andrea Lucas, Charles Ezell, Stephen Ehekian, Tulsi Gabbard, Scott Bessent, Pete Hegseth, Lee Zeldin, Mark C. Christie, Willie L. Phillips, David Rosner, Lindsay S. See, Judy W. Chang, Andrew N. Ferguson, Melissa Holyoak, Mark T. Uyeda, Hester M. Peirce, Caroline A. Crenshaw, Doug Burgum, Scott Bessent, Robert F. Kennedy, Jr., Kristie Noem, Douglas A. Collins, and Doug Tulino, and states as follows:

## INTRODUCTION

1.      The March 25, 2025 Executive Order—entitled "Addressing Risks from Jenner & Block" (the "Order")—is an unconstitutional abuse of power against lawyers, their clients, and the legal system. It is intended to hamper the ability of individuals and businesses to have the lawyers

of their choice zealously represent them. And it is intended to coerce law firms and lawyers into renouncing the Administration's critics and ceasing certain representations adverse to the government.

2.      The Order is one of the latest in a series of materially identical executive orders—one of which has already been enjoined by a court in this District—targeting law firms without process based on their representation of clients in matters adverse to the President or his Administration and/or their associations with individuals who have criticized the President. The Wall Street Journal Editorial Board recognized that the President is taking these actions "to intimidate elite law firms from representing his opponents or plaintiffs who challenge his policies." *See* The Wall Street Journal Editorial Board, *Trump, Perkins Coie and John Adams*, WALL ST. J. (Mar. 11, 2025, 6:59 PM), https://www.wsj.com/opinion/donald-trump-perkins-coie-covington-and-burling-executive-order-4b285e8b. But a fundamental aspect of our constitutional system is that "[g]overnment officials cannot attempt to coerce private parties in order to punish or suppress views that the government disfavors." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 180 (2024). Indeed, "[i]f there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 892 (2018) (quoting *W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) (emphasis omitted)). The Constitution, top to bottom, protects against such attempts by the government to target citizens and lawyers based on the opinions they voice, the people with whom they associate, and the clients they represent.

3.      The Order's target is Jenner & Block LLP ("Jenner" or the "Firm"). Jenner is a preeminent law firm with more than 500 lawyers across the United States and the United Kingdom

who serve more than 1,950 clients. Jenner brings this lawsuit because "undivided allegiance and faithful, devoted service to client[s] are prized traditions of the American lawyer." *Von Moltke v. Gillies*, 332 U.S. 708, 725–26 (1948) (plurality opinion).

4.      Founded in 1914, the Firm is renowned for its exceptional representation of clients facing their most difficult challenges and most important opportunities. Its clients range from the top ranks of the Fortune 500, large privately held corporations and institutions of higher education to emerging companies, family-run businesses, and individuals. The Firm is also known for its unparalleled commitment to public service and pro bono work, ranking as the top pro bono firm in the United States 12 of the last 15 years. Its lawyers have served as general counsels to major corporations, in leadership at the Department of Justice, in the armed forces, as Commissioners and as General Counsels of federal agencies, and as U.S. ambassadors.  They have gone on to become Judges and Justices of District Courts, Courts of Appeals, and the Supreme Court of the United States—appointed by Presidents of both major parties. Jenner & Block fiercely pursues the interests of its clients at trial and on appeal, in investigations and regulatory matters, and in all manner of corporate transactions.

5.      For more than 100 years, Jenner has tirelessly advocated for its clients against all adversaries, including against unlawful government action. With this suit, the Firm takes up that charge once again. To do anything else would mean compromising Jenner's ability to zealously advocate for its clients and capitulating to unconstitutional government coercion.

6.      Like the prior executive orders targeting law firms, the Order singles out Jenner for sanction. Ex. 7 (Jenner Order). It purports to restrict access to federal buildings for every one of the Firm's more than 900 attorneys and staff. It instructs federal agencies not to meet, or even engage, with Jenner personnel. It orders agencies to immediately take steps to suspend the active

security clearances held by Jenner's employees. And it threatens the Firm's clients by requiring them to disclose their business with Jenner & Block regardless of "whether that business is related to the subject of [any] government" contract and by directing cancelation of "any contract … for which Jenner has been hired to perform any service." The Order also seeks to damage Jenner's reputation by calling the Firm "partisan" and "discriminatory," and questioning the Firm's "values and priorities" because of its association with, or representation of, individuals adverse to the Administration. The point of these measures is to cause clients to question their relationships with their chosen counsel at the Firm.

7.     Like the prior executive orders targeting law firms, the Order sanctions Jenner for its representation of clients in cases adverse to the government, for its prior association with an individual who has not worked at the Firm in four years but has been critical of the President, and for its hiring practices. Each of these grounds, standing alone, is a constitutionally impermissible basis to target Jenner. The Order violates the First Amendment by targeting Jenner for its protected speech; by discriminating based on viewpoint; by seeking to prevent Jenner from petitioning the government on behalf of itself and its clients, and by leveraging government controls to suppress protected speech and association. The Order violates the Due Process Clause of the Fifth Amendment by impairing the ability of Jenner and its attorneys to practice law; by creating a list of disfavored firms that is anathema to our scheme of ordered liberty; and by creating a vague set of prohibitions that invite arbitrary enforcement. The Order violates the right to counsel under the Sixth Amendment by impairing the Firm's ability to represent its clients in connection with government-facing work, including criminal matters, and by undermining the attorney-client relationship and clients' right to counsel of their choice. Indeed, the Order is entirely *ultra vires*: It goes beyond the President's constitutional power, is authorized by no statute, and unlawfully

seeks to adjudicate putative wrongdoing by the Firm without process of law.

8.     A federal court has already issued a temporary restraining order against a nearly identical executive order targeting another major American law firm, Perkins Coie LLP. Order, *Perkins Coie LLP v. U.S. Dep't of Just., et al.*, No. 25-cv-716 (D.D.C. Mar. 12, 2025). The government's argument in support of the executive order, the Court observed, sends "chills down my spine." Transcript of Hearing at 46:7-8, *Perkins Coie LLP v. U.S. Dep't of Just., et al.*, No. 25-716 (D.D.C. Mar. 12, 2025), ECF No. 22. The Court held that the executive order against Perkins Coie was a clear "means of retaliating against" the firm for its litigation positions, "which [the President] does not like," amounted to "viewpoint discrimination" "using taxpayer dollars and government resources … to pursue what is a wholly personal vendetta, advancing … political payback," and threatened to "significantly undermine the integrity of our entire legal system and the ability of all people and groups to access justice." *Id.* at 76:12-19, 78:20-21, 101:21-25, 103:11-13.

9.     These conclusions are equally true here, and the same result should follow. Every day the Order remains in effect, it causes Jenner escalating and irreparable harm to its reputation and finances. And more fundamentally, every day the Order remains in effect, it causes irreparable damage by seeking to coerce American businesses, lawyers, and citizens to conform with the Administration's views or be targeted for noncompliance, and to intimidate anyone who would associate with and represent clients adverse to the Administration's agenda. The Order must be enjoined.

## JURISICTION AND VENUE

10.     The Court has subject matter jurisdiction because the claims arise under the Constitution and laws of the United States, 28 U.S.C. § 1331, and because the individual Defendants are United States officials. 28 U.S.C. § 1346(a)(2).

11.    The Court has authority to enter a declaratory judgment and to provide temporary, preliminary and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure, 28 U.S.C. §§ 2201-2202, the All Writs Act, and the Court's inherent equitable powers.

12.    Venue is proper in this District because Plaintiff has offices here and each Defendant is an agency or officer of the United States sued in his or her official capacity. 28 U.S.C. § 1391(e)(1).

## THE PARTIES

### A.    Plaintiff

13.    Jenner & Block is a leading global law firm that was founded in Chicago in 1914. Jenner currently has offices in Chicago, Washington, D.C., New York, Los Angeles, Century City, San Francisco, and London. The Firm has over 500 lawyers and more than 900 total personnel.

14.    The Firm is known for its prominent and successful litigation practice, global investigations practice, regulatory and government controversies work, and experience handling sophisticated and high-profile corporate transactions. Its clients include Fortune 100 companies, technology companies, large privately held corporations, colleges and universities, emerging companies, Native American tribes, and venture capital and private equity investors. Jenner serves clients across a variety of industries, including aerospace and defense, energy, food and beverage, telecommunications, technology, hospitality and real estate, finance, transportation, education, and media and entertainment, among others. Jenner alumni have been and are serving as state and federal court judges, judicial law clerks, and high-ranking government officials, as well as founders, CEOs, and general counsels of some of the nation's largest and most important companies.

15.    Jenner's leaders have been drawn from the nation's most respected lawyers from

across the political spectrum. Name partner Albert E. Jenner, Jr. served as assistant counsel to the Warren Commission and later as Chief Minority Counsel to the Republican members of the House Judiciary Committee during its investigation of the Watergate affair. Jenner's Chairmen have included Anton Valukas, whom President Reagan appointed as United States Attorney for the Northern District of Illinois, and Thomas Perrelli, whom President Obama appointed as Associate Attorney General at the United States Department of Justice.

16.     Over its 111-year history, Jenner and its lawyers have represented clients, in federal and state courts across the nation and in tribunals throughout the world, helping them achieve their goals and standing by them in good times and bad. For example, the Firm represented MCI in the historic case that led to the break-up of AT&T. The Firm represented Theodore B. Olson—then President Reagan's Assistant Attorney General for the Office of Legal Counsel—in his challenge to the Independent Counsel statute. The Firm represented the recording industry in its landmark Supreme victory against Grokster. The Firm represented the examiner in the bankruptcy proceedings of Lehman Brothers Holdings, Inc., the largest bankruptcy in U.S. history.

17.     Jenner & Block's commitment to its clients extends to those who cannot afford top counsel. Jenner has been rated the #1 law firm for pro bono work by *The American Lawyer* for 12 of the past 15 years. Jenner lawyers provide pro bono representation in a wide range of matters, including defending individuals in the criminal justice system; advocating for veterans; protecting constitutional rights; assisting victims of domestic violence and sex trafficking; assisting individuals denied social security benefits; and pursuing religious liberty while fighting religious discrimination.

18.     Jenner has a preeminent Appellate & Supreme Court practice. It has been regularly recognized on *The National Law Journal*'s Appellate Hot List and rated a top practice by

*Chambers USA*. The Firm has won important Supreme Court precedents in cases such as *Haaland v. Brackeen*, 599 U.S. 255 (2023) (upholding the constitutionality of the Indian Child Welfare Act); *Kokesh v. SEC*, 581 U.S. 455 (2017) (holding that a five-year statute of limitations applies to the SEC's disgorgement penalty); *Puerto Rico v. Sanchez Valle*, 579 U.S. 59 (2016) (holding that the federal government and Puerto Rican government are the same sovereign for the purpose of the Double Jeopardy Clause); *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005) (holding that companies that distribute and promote software to infringe copyrights are liable for the resulting acts of infringement); *Lawrence v. Texas*, 539 U.S. 558 (2003) (holding unconstitutional a Texas law criminalizing consensual, sexual conduct between individuals of the same sex); *Wiggins v. Smith*, 539 U.S. 510 (2003) (holding that defense counsel's failure to conduct a reasonable investigation of mitigating facts violated a defendant's Sixth Amendment right to effective assistance of counsel); and *Witherspoon v. Illinois*, 391 U.S. 510 (1968) (holding death sentence unconstitutional where jurors who opposed the death penalty were dismissed in violation of the Sixth and Fourteenth Amendments). The Firm's clients have included major corporations, state governments, and Indian tribes, as well as targets of government enforcement actions, criminal defendants, and civil rights plaintiffs, among many others. In the Court's current term, Jenner & Block has already argued and won *Williams v. Reed*, 145 S. Ct. 465 (2025), wherein the Court held in an opinion by Justice Kavanaugh that Alabama may not enforce a state exhaustion requirement that would effectively immunize state officials from federal Section 1983 claims.

19.     Representing clients before the Supreme Court requires Jenner lawyers to access federal buildings and to engage with federal personnel not only on the day of the argument itself but also for meetings with the Office of the Solicitor General in the Department of Justice, a critical strategic moment in many Supreme Court cases where the parties have an opportunity to discuss

the matter with key stakeholders in the federal government and attempt to persuade United States to take particular positions in the case.

20.     Jenner also features one of the strongest Government Controversies and Public Policy Litigation practices in the country. Attorneys in that group guide businesses and other large organizations through highly complex crises presenting a mix of litigation, regulatory, public policy, legislative and communications challenges. These challenges can include Congressional hearings, federal law enforcement investigations, and management of regulatory scrutiny. Examples of the types of matters handled by these lawyers include representing major companies in congressional investigations, preparing senior executives for their testimony in Congress, and representing companies in litigation brought by federal agencies including the Consumer Financial Protection Bureau and the Federal Trade Commission. This practice group also includes an experienced settlement master who is currently serving as a court-appointed Settlement Master in complex litigation involving veterans exposed to contaminated water at Camp LeJeune.

21.     Matters handled by the Government Controversies and Public Policy Litigation group frequently require regular interaction with the federal government and entrance into federal buildings for important meetings, interviews, and negotiations. Many of these meetings are only offered in person where parties can speak candidly with federal officials about sensitive matters.

22.     Jenner also offers clients one of the top Investigations, Compliance, and Defense ("ICD") practices in the country. Featuring 16 former federal prosecutors, this team helps clients gather key facts, fully evaluate their situation, and consider their options based on the likely outcomes. When appropriate, they can quickly facilitate productive, dispositive interactions with authorities including the US Department of Justice, Securities and Exchange Commission, the Commodity Futures Trading Commission, the Consumer Financial Protection Bureau, and the

Financial Crimes Enforcement Network, among other government agencies. Jenner's ICD lawyers have led hundreds of jury and bench trials, drawing on decades of first-chair experience to fight for their clients.

23.    Jenner's ICD team is currently representing large corporate clients and former employees in, among others, criminal and civil investigations carried out by the U.S. Department of Justice; ongoing dialogue with the U.S. Securities & Exchange Commission; and investigations conducted by the U.S. Postal Service Inspector General and other federal agencies. The ICD team also partners with the Firm's Antitrust and Competition group, which is currently representing clients in five separate antitrust investigations pursued by the Department of Justice.

24.    Matters handled by the ICD team require regular interaction with the federal government and entrance into federal buildings for important meetings, interviews, and negotiations. Many of these meetings are only offered in person where parties can speak candidly with federal officials about sensitive matters. Many of these matters also involve classified information that can only be viewed, discussed, or electronically processed in a Sensitive Compartmented Information Facility ("SCIF").

25.    Jenner's Government Contracts and Grants practice, which also features Chambers-rated lawyers, is the destination for many of the nation's leading government contractors for sophisticated legal advice as they navigate the complex government contracting landscape. Jenner lawyers draw on a wealth of industry, government, and litigation experience to help companies avoid or resolve contract disputes with the US government. They also leverage the leadership and unique experience of former government officials, representing the Air Force General Counsel's Office and Government Accountability Office, to help develop effective solutions for clients as they face potential or ongoing investigations, seek an experienced approach to combat bid protests,

or navigate subcontractor issues.

26.     By definition, nearly every matter handled by the Firm's Government Contracts and Grants practice involves work with government contractors. These matters likewise involve frequent interaction with the federal government, entrance into federal buildings, and handling of classified information—all of which is threatened by the Executive Order.

27.     Jenner has a nationally recognized Litigation Department. The firm litigates on behalf of clients in their most important matters, regularly appearing in federal courts. Thus far in every week of 2025, Jenner lawyers have appeared for hearings or oral argument in federal court at least once, and often multiple times. The Firm's lawyers appear in federal court for all kinds of matters for all kinds of clients. Some prominent examples from the last few years include: a trial win in the Northern District of Illinois holding the nation's largest egg producers and industry groups liable for conspiring to inflate egg prices; a groundbreaking win in the Second Circuit on behalf of the family of an American citizen killed when Malaysia Airlines Flight 17 was shot down over eastern Ukraine in 2014; a trial win in a trademark infringement suit against a European company that unlawfully pirated the products of its former business partner; and a successful interlocutory appeal in the Fourth Circuit reversing a class certification order on behalf of a major hospitality company.

28.     Jenner also features a number of high-caliber regulatory practices, with particularly strong practices in Energy, Communications, and Native American law. The Firm's Energy group litigates cases at trial and appeal for energy companies at every level of the federal and state court systems, including before the U.S. Supreme Court. They handle cases at the Federal Energy Regulatory Commission ("FERC") and at state commissions and represent clients in regulatory enforcement matters. They also represent and counsel clients engaged in energy transactions and

many of the nation's largest electric and gas utilities, which service tens of millions of Americans, and the nation's largest nuclear power generator.

29.    Jenner's Communications, Internet and Technology ("CIT") practice represents cable/broadband, wireless, Internet, satellite, and technology companies, as well as private equity investors. The CIT group has negotiated industry-leading transactions and prevailed in wide-ranging litigation, regulatory proceedings, and agency enforcement actions, pursuing large mergers and other transactions, entering new industries, navigating new regulations and government enforcement, and creating new products and services. The Firm's CIT practice is known for tackling particularly difficult problems and bet-the-company matters that require a unique combination of top legal skills, hands-on experience with the Federal Communications Commission ("FCC"), and commitment to work wherever and whenever needed to achieve clients' goals.

30.    Jenner's nationally recognized Native American Law practice is consistently at the forefront of the most significant issues facing Indian Country. The team draws on its deep legal and government experience to provide unparalleled service to Native American tribes navigating the complex government-to-government relationship that Indian Country holds with the United States.

31.    Each of these regulatory practices—Energy, CIT, and Native American Law—requires near-constant communication with federal regulators about clients' most important matters. Jenner & Block's electrical utility clients own or operate facilities used in transmission or wholesale of electric energy in interstate commerce, which FERC closely regulates. The Firm's CIT clients in telecommunications and media call on Jenner lawyers to secure regulatory approval for their transactions, to advocate for their interests in rulemaking and policymaking, to handle

spectrum allocation, assignment, auctions, licensing, and relocation, and to defend against FCC enforcement actions. Jenner's Native American law clients value the Firm's ability to advocate for tribal interests before a variety of federal regulators, including the Department of the Interior, FERC, and the FCC, among others. The Executive Order threatens clients' ability to select Jenner for all these types of matters and many others.

      **B.**     **Defendants**

     32.    The U.S. Department of Justice is a federal agency headquartered in Washington, D.C.

     33.    Pamela J. Bondi is the Attorney General of the United States. She is sued in her official capacity.

     34.    The Federal Communications Commission is a federal agency headquartered in Washington, D.C.

     35.    Brendan Carr is Chairman of the Federal Communications Commission. He is sued in his official capacity.

     36.    Geoffrey Starks is a Commissioner of the Federal Communications Commission. He is sued in his official capacity.

     37.    Nathan Simington is a Commissioner of the Federal Communications Commission. He is sued in his official capacity.

     38.    Anna M. Gomez is a Commissioner of the Federal Communications Commission. She is sued in her official capacity.

     39.    The U.S. Office of Management & Budget is a federal agency headquartered in Washington, D.C.

     40.    Russell T. Vought is Director of the U.S. Office of Management & Budget. He is sued in his official capacity.

41.    The Equal Employment Opportunity Commission is a federal agency headquartered in Washington, D.C.

42.    Andrea R. Lucas is Acting Chair of the Equal Employment Opportunity Commission. She is sued in her official capacity.

43.    The Office of Personnel Management is a federal agency headquartered in Washington, D.C.

44.    Charles Ezell is Acting Director of the Office of Personnel Management. He is sued in his official capacity.

45.    The General Services Administration is a federal agency headquartered in Washington, D.C.

46.    Stephen Ehikian is the Acting Director of the General Services Administration. He is sued in his official capacity.

47.    The Office of the Director of National Intelligence is a federal agency headquartered in Washington, D.C.

48.    Tulsi Gabbard is U.S. Director of National Intelligence. She is sued in her official capacity.

49.    The Consumer Financial Protection Bureau is a federal agency headquartered in Washington, D.C.

50.    Scott Bessent is the Acting Director of the Consumer Financial Protection Bureau. He is sued in his official capacity.

51.    The Department of Defense is a federal agency headquartered in Washington, D.C.

52.    Pete Hegseth is the Secretary of Defense. He is sued in his official capacity.

53.    The Environmental Protection Agency is a federal agency headquartered in

Washington, D.C.

54.    Lee Zeldin is the Administrator of the Environmental Protection Agency. He is sued in his official capacity.

55.    The Federal Energy Regulatory Commission is a federal agency headquartered in Washington, D.C.

56.    Mark C. Christie is the Chairman and a Commissioner of the Federal Energy Regulatory Commission. He is sued in his official capacity.

57.    Willie L. Phillips is a Commissioner of the Federal Energy Regulatory Commission. He is sued in his official capacity.

58.    David Rosner is a Commissioner of the Federal Energy Regulatory Commission. He is sued in his official capacity.

59.    Lindsay See is a Commissioner of the Federal Energy Regulatory Commission. She is sued in her official capacity.

60.    Judy W. Chang is a Commissioner of the Federal Energy Regulatory Commission. She is sued in her official capacity.

61.    The Federal Trade Commission is a federal agency headquartered in Washington, D.C.

62.    Andrew N. Ferguson is the Chairman and a Commissioner of the Federal Trade Commission. He is sued in his official capacity.

63.    Melissa Holyoak is a Commissioner of the Federal Trade Commission. She is sued in her official capacity.

64.    The Securities and Exchange Commission is a federal agency headquartered in Washington, D.C.

65.     Mark T. Uyeda is the Chairman and a Commissioner of the Securities and Exchange Commission. He is sued in his official capacity.

66.     Hester M. Peirce is a Commissioner of the Securities and Exchange Commission. She is sued in her official capacity.

67.     Caroline A. Chrenshaw is a Commissioner of the Securities and Exchange Commission. She is sued in her official capacity.

68.     The Department of the Interior is a federal agency headquartered in Washington, D.C.

69.     Doug Burgum is the Secretary of the Interior. He is sued in his official capacity.

70.     The Department of the Treasury is a federal agency headquartered in Washington, D.C.

71.     Scott Bessent is the Secretary of the Treasury. He is sued in his official capacity.

72.     The Postal Service is a federal agency headquartered in Washington, D.C.

73.     Doug Tulino is the Acting Postmaster General and CEO of the Postal Service. He is sued in his official capacity.

74.     The Department of Health and Human Services is a federal agency headquartered in Washinton, D.C.

75.     Robert F. Kennedy, Jr. is the Secretary of Health and Human Services. He is sued in his official capacity.

76.     The Department of Homeland Security is a federal agency headquartered in Washinton, D.C.

77.     Kristi Noem is the Secretary of the Department of Homeland Security. She is sued in her official capacity.

78.    All other agencies subject to the Executive Order "Addressing Risks from Jenner & Block" are also named as Defendants, to ensure that the relief ordered by the Court will apply on a government-wide basis, including to federal agencies that are not specifically listed as Defendants.

79.    The United States of America is responsible for the exercise of executive action by the named Defendants and all other agencies that are directed by the Order to take action respecting Jenner & Block. In light of the fact that Jenner attorneys interact with and appear before numerous federal agencies, and the Order at issue is directed generally to "heads of agencies," the United States of America is included as a Defendant to ensure that the relief ordered by the Court will apply on a government-wide basis, including to federal agencies that are not specifically listed as Defendants.

## BACKGROUND

## I.    The President Has Targeted And Sanctioned Law Firms Based On Their Associations And Client Representations.

80.    During the campaign, the President promised to retaliate against his political opponents, including the attorneys who represented them. In a June 2024 interview, the President said, "Look, when this election is over, based on what they've done, I would have every right to go after them …."[1]   In September 2024, he warned that "WHEN I WIN, those people that CHEATED will be prosecuted to the fullest extent of the Law…. Please beware that this legal exposure extends to Lawyers…."[2]   By October, one outlet counted "100 threats to investigate,

---

[1] Kate Sullivan & Kristen Holmes, *Trump Again Suggests He Would Try to Prosecute His Political Opponents If Reelected*, CNN (updated June 5, 2024, 11:43 PM EDT), https://perma.cc/FJ6C-F9HG.
[2] Maggie Haberman, *Trump Threatens Lawyers, Donors and Others With Prosecution After Election*, N.Y. TIMES (Sept. 7, 2024), https://perma.cc/2WSY-TLWS.

prosecute, imprison or otherwise punish his perceived opponents."[3]

81.    The President has made good on that promise, targeting law firms who have represented or had affiliation with those he views as his political opponents.

82.    On February 25, 2025, the White House targeted Covington & Burling LLP, which had represented former Special Counsel Jack Smith pro bono.[4]  The memorandum directed the Secretaries of State and Defense, the Attorney General, the Director of National Intelligence, and other agency heads to suspend any active security clearances held by "all members, partners, and employees of Covington & Burling LLP who assisted . . . Jack Smith during his time as Special Counsel."  That memorandum also directed the same persons "to terminate any engagement of Covington & Burling LLP by any agency to the maximum extent permitted by law."

83.    On March 6, 2025, the President signed an Executive Order titled "Addressing Risks from Perkins Coie LLP" ( "Perkins Coie Order"). Exec. Order No. 14,230, *Addressing Risks from Perkins Coie LLP* (Mar. 6, 2025); Ex. 3 (Perkins Coie Order). In it, the President targeted the law firm of Perkins Coie, branding the firm "dishonest and dangerous" because it had "represent[ed] failed Presidential candidate Hillary Clinton" and had "worked with activist donors" to challenge (often successfully) certain "election laws." *Id.* § 1. The Order also cited the firm's work, conducted almost a decade ago by former Perkins Coie partners on behalf of former clients, and faulted Perkins Coie for the firm's hiring practices six years ago—practices that the Order acknowledged were no longer operative. *Id.* The Administration's "Fact Sheet" asserted that Perkins Coie's transgressions included "fil[ing] lawsuits against the Trump Administration,

---

[3] Tom Dreisbach, *Trump Has Made More than 100 Threats to Prosecute or Punish Perceived Enemies*, NPR (Oct. 22, 2024, 7:00 AM ET), https://perma.cc/KGZ5-DKNT.

[4] Presidential Memorandum, *Suspension of Security Clearances and Evaluation of Government Contracts* (Feb. 25, 2025), https://perma.cc/FZX8-APJA.

including one designed to reduce military readiness," referring to a challenge to an Executive Order that would discharge transgender military personnel. The Perkins Coie Order not only directed agencies to suspend the security clearances of all Perkins Coie employees, but also purported to restrict access to federal buildings for all Perkins Coie employees, instructed federal agencies to refuse to meet or even engage with Perkins Coie lawyers and staff, and purported to terminate federal contracts held by firm clients for the express purpose of causing clients to sever relationships with their Perkins Coie lawyers. When he signed the Order, the President indicated that the administration intended to pursue additional law firms.[5] .

84.     On March 12, 2025, Judge Beryl A. Howell issued a temporary restraining order enjoining implementation and enforcement of Sections 1, 3, and 5 of the Perkins Coie Order, directing the defendant agencies to rescind any guidance implementing the order, and requiring them to communicate with entities who had been asked to disclose any relationships with Perkins Coie that such request was rescinded pending further order of the Court. Order, *Perkins Coie LLP v. U.S. Department of Justice, et al.*, No. 25-716 (D.D.C. Mar. 12, 2025).

85.     On March 14, 2025, the President issued a similar Executive Order against Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul Weiss") premised on that firm's having hired (1) a "former leading prosecutor in the office of Special Counsel Robert Mueller" who "brought a pro bono suit against individuals alleged to have participated in the events that occurred at or near the United States Capitol on January 6, 2021, on behalf of the District of Columbia Attorney General"; and (2) a lawyer who left Paul, Weiss to join the Manhattan District Attorney's office, allegedly "solely" to prosecute the President. Exec. Order No. 14,237, *Addressing Risks from Paul Weiss* (Mar. 14, 2025) ("Paul Weiss Order"); Ex. . 5 (Paul Weiss Order). This Order too alleges that Paul

---

[5] *See* ANI News, Trump Revokes Security Clearances for Perkins Coie Over DEI Policies at 1:20, YOUTUBE (Mar. 6, 2025), https://www.youtube.com/watch?v=lY6ougLkFsc

Weiss discriminates against its employees on the basis of race and sex, *id.* § 1, but states no basis for that assertion. The Paul Weiss Order imposes the same restrictions and consequences as the Perkins Coie Order, including on federal contracts. *Id.* § 3.

86.     On March 20, 2025, on Truth Social, the President announced that, as part of a Paul Weiss "settlement," "Paul, Weiss will dedicate the equivalent of $40 million in pro bono legal services over the course of President Trump's term *to support the Administration's initiatives*."[6]  . The President stated that he "is agreeing to this action in light of a meeting with Paul, Weiss Chairman, Brad Karp, during which Mr. Karp acknowledged the wrongdoing of former Paul, Weiss partner, Mark Pomerantz." *Id.* Mr. Karp, Paul, Weiss's Chairman, stated: "We are gratified that the President has agreed to withdraw the Executive Order concerning Paul, Weiss. We look forward to an engaged and constructive relationship with the President and his Administration." *Id.*

87.     The Paul Weiss settlement demonstrates that the President's national security concerns do not justify the executive actions against law firms. Nothing in Paul Weiss's actions introduces new security measures or alleviates any colorable national security concerns.

88.     On March 22, 2025, the President issued another Presidential Memorandum, charging the Attorney General, among other things, "to review conduct by attorneys or their law firms in litigation against the Federal Government over the last 8 years" and "to recommend to the President … additional steps …, including reassessment of security clearances held by the attorney, termination of any contract for which the relevant attorney or law firm has been hired to perform services, or any other appropriate actions."[7]  The Memorandum cited attorney Marc Elias

---

[6] Donald J. Trump (@realDonaldTrump), Truth Social (Mar. 20, 2025, 6:10 PM) https://perma.cc/78M3-JPHY.
[7] Presidential Memorandum, "Preventing Abuses of the Legal System and the Federal Court," (Mar. 22, 2025), https://perma.cc/U9TV-N5UW..

as a "[r]ecent example[]" of misconduct.

89.    The President indicated that he would continue to issue similar executive orders against law firms. Interviewed on March 9, 2025, the President said (and repeated), "We have a lot of law firms that we're going to be going after."[8]  . And at a March 24, 2025 Cabinet meeting, the President explained that these executive orders are warranted because "[t]he law firms have to behave themselves. They behave very badly, very wrongly." Michael Birnbaum, *Law Firms Refuse to Represent Trump Opponents in the Wake of His Attacks*, Wash. Post (Mar. 25, 2025, 4:39 PM), https://www.washingtonpost.com/politics/2025/03/25/trump-law-firms/ (quoting the President).

90.    The President did not stop with Jenner & Block, either. Two days after the Jenner & Block Order, on March 27, 2025, the President issued an executive order targeting a *fifth* law firm, Wilmer Cutler Pickering Hale and Dorr LLP ("WilmerHale").    Exec. Order No.[], *Addressing Risks from WilmerHale* (Mar. 27, 2025) ("WilmerHale Order"); Ex. 9 (WilmerHale Order). _This order, titled "Addressing Risks from WilmerHale," likewise attacked WilmerHale for its pro bono representations, asserted that WilmerHale's employment practices are racially discriminatory, and emphasized WilmerHale's association with Former Special Counsel Mueller and two other attorneys who had been part of the Mueller investigation. The WilmerHale order specifically criticized the firm for expressing that Mueller "embodies the highest value of our firm and profession." *Id.* § 1. Like the previous orders, the WilmerHale order directs immediate steps to suspend security clearances from all WilmerHale employees, restricted WilmerHale personnel from government buildings, barred executive agencies from hiring from WilmerHale, and

---

[8] Erin Mulvaney, *Fear of Trump Has Elite Law Firms in Retreat*, WALL ST. J. (Mar. 9, 2025, 1:19 PM), https://www.wsj.com/us-news/law/fear-of-trump-has-elite-law-firms-in-retreat-6f251dec

terminated all contracts involving WilmerHale.

91.    The intent is clear. The Washington Post Editorial Board commented that the President "sent a chill through the legal profession with his executive orders designed to cripple three big law firms that have represented or employed his perceived enemies."[9]  The Associated Press wrote of two previous orders by the President targeted at law firms that "the actions appear designed not only to settle scores from years past but also to deter both government officials and private sector workers from participating in new inquiries into his conduct." Eric Tucker, *Trump Targets Security Clearances of Law Firm Over Actions Related to 2016 Russia Investigation*, ASSOCIATED PRESS (Mar. 6, 2025, 7:04 PM CDT), https://apnews.com/article/trump-fbi-russia-security-clearances-0d3693f0ec1bfb8e380b3c21d5ea5016. Steve Bannon summed it up: "There's major law firms in Washington, D.C. and . . . what we are trying to do is put you out of business and bankrupt you."[10]

### A.    The Executive Order and Accompanying "Fact Sheet"

92.    On March 25, 2025, the President issued the Executive Order titled "Addressing Risks from Jenner & Block." Ex. 7 (Jenner Order).

93.    Section 1 of the Order purports to provide justifications for the President's targeting of Jenner & Block. The Order alludes to Jenner & Block's former association with Andrew Weissmann, a lawyer the Order claims is "unethical." Order § 1. Per the Order, Mr. Weissmann's "overt demand that the Federal Government pursue a political agenda against me[] is a concerning indictment of Jenner's values and priorities." *Id.* A second justification makes clear that Jenner is

---

[9] The Washington Post Editorial Board, *Trump's Efforts to Intimidate the Legal Profession Cannot Stand*, WASH. POST (Mar. 18, 2025), https://www.washingtonpost.com/opinions/2025/03/18/trump-law-firms-revenge/.

[10] Amanda O'Brien & Patrick Smith, *Paul Weiss—and Big Law—Face 'An Existential Threat' Amid Intensifying Trump Administration Pressure*, AM. LAW. (Mar. 18, 2025), https://perma.cc/QZ3M-KVG3 (quoting Bannon television appearance).

being targeted for its representations in certain matters adverse to the current Administration. The Order states that "Jenner engages in obvious partisan representations to achieve political ends, supports attacks against women and children based on a refusal to accept the biological reality of sex, and backs the obstruction of efforts to prevent illegal aliens from committing horrific crimes and trafficking deadly drugs within our borders." *Id.* The third justification relates to unsupported allegations of employment discrimination, including "through the use of race-based 'targets.'" *Id.*

94.     On these bases, the remainder of the Order sanctions Jenner & Block, its attorneys and staff, and its clients.

95.     Section 2 of the Order creates a "Security Clearance Review" process that immediately "suspend[s] any active security clearances held by individuals at Jenner pending a review of whether such clearances are consistent with the national interest." *Id.* § 2.

96.     Section 3 of the Order directs "Government contracting agencies," to the extent permissible by law, to "require Government contractors to disclose any business they do with Jenner and whether that business is related to the subject of the Government contract. *Id.* § 3. Section 3 further directs the "heads of agencies" to "review all contracts with Jenner or with entities that disclose doing business with Jenner" and "take appropriate steps to terminate any contract ... for which Jenner has been hired to perform any service." *Id.*

97.     Section 4, entitled "Racial Discrimination," refers to the Perkins Coie Order and states that "[n]othing in this order shall be construed to limit the action authorized by section 4" of that order. Section 4 of the Perkins Coie Order instructs the Chair of the Equal Employment Opportunity Commission (EEOC) to target "representative large, influential, or industry leading law firms"—like Jenner & Block—to determine if large law firms hire and promote individuals; permit client access; or provide access to events, trainings, or travel "on a discriminatory basis."

Section 4 further instructs the Attorney General, in coordination with the Chair of the EEOC, to investigate large law firms who do business with federal entities "for compliance with race-based and sex-based non-discrimination laws and take any additional actions the Attorney General deems appropriate in light of the evidence uncovered." Ex. 3 (Perkins Coie Order) § 4.

98.    Section 5 of the Order further directs that the "heads of agencies shall ... provide guidance limiting official access from Federal Government buildings to employees of Jenner when such access would threaten the national security of or otherwise be inconsistent with the interests of the United States." Ex. 7 (Jenner Order) § 5. In addition, the Order directs the "heads of all agencies" to "provide guidance limiting Government employees acting in their official capacity from engaging with Jenner employees." *Id.* § 5(a). And the Order directs "[a]gency officials" to "refrain from hiring employees of Jenner" unless the head of the agency issues a waiver in consultation with the Director of the Office of Personnel Management finding that "such hire will not threaten the national security of the United States." *Id.* § 5(b).

99.    On the same day that the White House issued the Order, it also issued an accompanying "Fact Sheet" entitled "President Donald J. Trump Addresses Risks from Jenner & Block." *See* Ex. 8 (Jenner Fact Sheet). That Fact Sheet states that "[s]ecurity clearances held by Jenner employees will be immediately suspended"; that the "Federal Government will halt all material and services, including [SCIF] access provided to Jenner and restrict its employees' access to government buildings"; that the "Federal Government will terminate contracts that involve Jenner"; and that "Jenner has been accused of discriminating against its own employees on the basis of race and other categories prohibited by civil rights laws." *Id.*

100.    Neither the Order nor the Fact Sheet contains anything beyond conclusory allegations of impropriety by Jenner & Block or its attorneys and staff. Rather, the Order's

directives and disparaging statements are intended to—and do—constitute retaliation for the Firm's prior association Mr. Weissmann, whom the Order falsely suggests is presently employed at the Firm; its vigorous advocacy on behalf clients with cases adverse to the federal government, which the Order falsely suggests has been funded with client money; and the Firm's lawful hiring practices.

### 1. *Andrew Weissmann*

101.    The Order repeatedly references Andrew Weissmann, who has not been employed by Jenner since 2021. Section 1 of the Order states that "Jenner was 'thrilled' to re-hire the unethical Andrew Weissmann after his time engaging in partisan prosecution as part of Robert Mueller's entirely unjustified investigation"; refers to his involvement in the Arthur Andersen LLP case; and asserts that there are "numerous reports of Weissman's [sic] dishonesty," including the "overt demand that the Federal Government pursue a political agenda against me." Ex. 7 (Jenner Order) § 1. Section 5 also purports to limit Weissmann's access to federal buildings and eligibility for federal employment, apparently on the mistaken belief that Weissmann is a current employee of Jenner. *Id.* § 5.

102.    When introducing the Order for the President's signature, the President clarified that "Andrew Weissmann is the main culprit." [11]. When an aide asserted that Weissmann is just "one of a number of reasons" the order was being issued, the President reiterated that he's a "bad guy" before signing the Order. *Id.*

103.    Mr. Weissmann served as a Partner at Jenner from March 27, 2006, to October 24, 2011, and again from June 7, 2020, to July 16, 2021. Mr. Weissmann worked in the Firm's investigations and financial services practices. Prior to coming to Jenner & Block in 2006, Mr.

---

[11] Brett Samuels, *Trump Signs Order Targeting Law Firm that Employed Mueller Team Prosecutor*, THE HILL (Mar. 25, 2025, 3:12 PM), https://perma.cc/6234-SBMW.

Weissmann had significant experience as a federal prosecutor. He had successfully tried more than 25 cases, including many against notorious New York crime families. He was also appointed by President George W. Bush to serve as Deputy Director and then Director of the Department of Justice's Enron Task Force.

104.    After completing his first stint at Jenner, Mr. Weissmann served as the General Counsel at the Federal Bureau of Investigation, the chief of the Criminal Fraud Section of the U.S. Department of Justice, and as a member of the team led by Special Counsel Robert S. Mueller, III, who was appointed by Rod Rosenstein, President Trump's Deputy Attorney General, to investigate Russian interference in the 2016 election.

105.    Following his work with Special Counsel Mueller, Mr. Weissmann penned a book, *Where Law Ends: Inside the Mueller Investigation*, published by Random House on September 29, 2020. The book sets out in detail Mr. Weissmann's first-person account of the investigation, its strengths, and its perceived shortcomings. *Where Law Ends* was highly critical of the President.

106.    Mr. Weissmann also became a legal analyst for MSNBC after his work for Special Counsel Mueller. Since 2023, he has co-hosted an MSNBC podcast called *Prosecuting Donald Trump*. During his television and podcast appearances, Mr. Weissmann has been highly critical of the President.

107.    As a result of Mr. Weissmann's participation in the Special Counsel team, the publication of his book, and his political commentary, Mr. Weissmann has become a frequent political target of the President.

108.    In a Truth Social Post in 2022, the President reposted a comment describing Mr. Weissmann as "the Scum of the Earth!!!"  !!!"[12]

---

[12] Donald J. Trump (@realDonaldTrump), TRUTH SOCIAL (Sept. 5, 2022, 6:07 PM), https://perma.cc/DC3Z-TJMP.

109. On February 8, 2025, the President gave an interview to the *New York Post* in which he identified Mr. Weissmann as among the individuals whose security clearances he intended to strip.[13]

110. On March 14, 2025, during a speech at the Department of Justice, the President accused Mr. Weissmann and others, including Jack Smith, of participating in a coordinated campaign against him, referring to him and others as "horrible people" and "scum."[14] . He also accused "crooked law firms," referring to "violent, vicious lawyers that we have all over." *Id.*

111. On March 21, 2025, the President issued a memorandum revoking any active security clearances held by Mr. Weissmann and other individuals. Presidential Memorandum, *Rescinding Security Clearances and Access to Classified Information from Specified Individuals* (Mar. 22, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/rescinding-security-clearances-and-access-to-classified-information-from-specified-individuals.

112. The Order is based principally on the false premise that Mr. Weissmann is a "Jenner employee[]." Ex. 7 (Jenner Order) § 5(a). But Mr. Weissmann has not performed legal work for Jenner & Block since his departure on July 16, 2021. All payments associated with his time at Jenner have been completed. The Firm has no current financial obligations to Mr. Weissmann. The purported security concerns based on Mr. Weissmann's association with Jenner & Block cannot justify the Order.

### 2. *Jenner's pro bono representations*

113. Section 1 of the Order also falsely declares that Jenner "has abandoned the

---

[13] *See* Miranda Devine, *Trump Stripping the Security Clearances of Numerous Antagonists—Including NY AG Letitia James, DA Alvin Bragg*, N.Y. POST (Feb. 8, 2025, 4:12 PM), https://perma.cc/RJX5-XHJZ
[14] Roll Call, "Speech: Donald Trump Addresses the Staff at the Department of Justice – March 14, 2025" (Mar. 14, 2025), https://perma.cc/5JVA-J9E7

profession's highest ideals, condoned partisan 'lawfare,' and abused its pro bono practice"—apparently by "earmarking hundreds of millions of their clients' dollars for destructive causes." Ex. 7 (Jenner Order) § 1. In particular, Section 1 asserts that "Jenner engages in obvious partisan representations to achieve political ends, supports attacks against women and children based on a refusal to accept the biological reality of sex, and backs the obstruction of efforts to prevent illegal aliens from committing horrific crimes and trafficking deadly drugs within our borders." *Id.*

114.    Consistent with its history of zealous advocacy for its clients, Jenner has been involved in litigation on behalf of clients affected by actions of the current Administration, just as it has during prior administration, including the Biden Administration. Section 1 singles out Jenner & Block based on specific recent pro bono representations in matters relating to immigration and transgender rights.

115.    Working with co-counsel, the Firm is representing several nonprofits and individual noncitizens challenging the Executive Order entitled *Guaranteeing the States Protection Against Invasion*, which invokes Section 212(f) of the Immigration and Nationality Act ("INA") and the President's constitutional powers to abrogate the protections from removal that Congress created by statute, including the asylum statute. Proclamation No. 10,888, 90 Fed. Reg. 8333 (Jan. 20, 2025); *see Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*, 1:25-cv-00306 (D.D.C. filed Feb. 3, 2025). In 1984, then-Assistant Attorney General for the Office of Legal Counsel, Theodore B. Olson, rejected the argument that Section 212(f) permitted the President to "eliminate the asylum rights of noncitizens" in the United States. Securing the Border, 89 Fed. Reg. 81,156, 81,163 n.53 (Oct. 7, 2024). In 2018, during President Trump's first term, his Administration recognized that a proclamation under Section 212(f) did not affect asylum rights. Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for

Protection Claims, 83 Fed. Reg. 55,934, 55,940 (Nov. 9, 2018). Jenner & Block's representation of clients challenging this executive order is part a long tradition of advocacy for noncitizens' asylum rights: Representing several of the same clients, Jenner & Block also challenged an executive order and rulemaking by the Biden-Harris Administration that sought to impose lesser restrictions on asylum and other forms of protection. *Las Americas Immigrant Advoc. Ctr. v. U.S. DHS*, No. 1:24-cv-01702 (D.D.C. filed June 12, 2024)).

116.    Working with co-counsel, the Firm is representing two advocacy groups, six transgender people under 19, and four parents of minor Plaintiffs who brought suit on February 4, 2025 against the President, the Secretary of HHS, HHS, and various HHS subagencies to enjoin enforcement of a January 28, 2025 Executive Order, "*Protecting Children from Chemical and Surgical Mutilation.*" That Executive Order directs all federal agencies to "immediately" withhold federal funds from healthcare institutions and entities that provide gender-affirming care to people under age nineteen. Exec. Order No. 14,187, 90 Fed. Reg. 8771 (Jan. 28, 2025). *See PFLAG, Inc. v. Trump*, 8:25-cv-00337 (D. Md. filed Feb. 4, 2025). After expedited briefing, the district court issued a temporary restraining order restraining Defendants from conditioning or withholding federal funding based on the fact that a healthcare entity or health professional provides gender affirming medical care to a patient under the age of nineteen. *PFLAG, Inc. v. Trump*, No. 25-cv-337, __ F. Supp. 3d __, 2025 WL 510050, at *1 (D. Md. Feb. 14, 2025) (opinion memorializing TRO). Plaintiffs then moved for a nationwide preliminary injunction on February 18, 2025, which the district court granted on March 4, 2025. *See PFLAG, Inc. v. Trump*, No. 25-cv-337, __ F. Supp. 3d __, 2025 WL 685124 (D. Md. Mar. 4, 2025).

### 3.    *Jenner's employment practices*

117.    Section 1 of the Order also declares that "Jenner discriminates against its employees

based on race and other categories prohibited by civil rights laws, including through the use of race-based 'targets.'"  Ex. 7 (Jenner Order) § 1.

118.    Jenner & Block complies with all applicable antidiscrimination law in its recruiting and hiring practices and prohibits the unlawful consideration of race, ethnicity, or any other protected trait in employment actions.

119.    Aside from its vague reference to rase-based targets, the Order provides no details or evidence of Jenner's alleged employment discrimination. Nor did the Administration undertake any investigation of Jenner & Block before making its unsubstantiated conclusions as to the Firm's employment practices.

120.    The executive orders targeted at Perkins Coie and Paul Weiss also contained claims that each firm has unspecified, racially discriminatory employment practices. On information and belief, the Administration did not actually investigate the employment practices at those target firms, either.

## II.    <u>The Irreparable Harm to Jenner & Block</u>

121.    The Order does more than disparage Jenner & Block by declaring that the Firm "has abandoned the profession's highest ideals, condoned partisan 'lawfare,' and abused its pro bono practice to engage in activities that undermine justice and the interests of the United States." Ex. 7 (Jenner Order) § 1. It is also designed to put immediate pressure on clients to sever their relationship with the Firm. It seeks to accomplish that outcome in three ways.

122.    First, the Order directs the "heads of agencies" to limit the access of Jenner & Block attorneys and employees to federal buildings when access would be "inconsistent with the interests of the United States" (as decided by the Executive Branch ); to limit Government employees "from engaging with Jenner employees, including but not limited to Andrew Weissmann, to ensure

consistency with the national security and other interests of the United States" (again, as defined

by the Executive Branch itself); and to "refrain from hiring employees of Jenner, including but not

limited to Andrew Weissmann, absent a waiver from the head of the agency, made in consultation

with the Director of the Office of Personnel Management." *Id.* § 5.

123.    Because the Order could be interpreted to ban Jenner's access to federal

courthouses, Jenner & Block will continue incurring such harm if the Order's enforcement is not

enjoined. The Firm's attorneys have numerous upcoming appearances before federal courts and

agencies. Indeed, Jenner has around 540 active matters before federal courts, and numerous

matters before agencies that require access to federal government buildings and officials.

Continued refusals by federal officials to meet with Jenner lawyers, or denying Jenner lawyers

access to federal agencies and buildings, would be devastating to both Jenner's legal practice and

its clients' interests.

124.    The Order is already being implemented. For example, one client has informed

Jenner that the Department of Justice notified the client on March 26, 2025 that the client may not

bring their counsel from Jenner & Block to a meeting with the Department of Justice that is

scheduled for April 3. That client therefore will either need to attend the meeting without outside

counsel or would need to retain new outside counsel before April 3.

125.    Because of Jenner & Block's ICD, regulatory, and Government Controversies

practices' history of advocacy, clients rely on the Firm to engage with federal government agencies

and officials, a previously routine activity of the Firm's attorneys that is now at risk. Clients have

expressed concern about whether the Order could impair the firm's ability to attend upcoming

meetings with government agencies.

126.    The Order also required Jenner & Block attorneys to expend significant time to

discuss the impacts with our clients and develop a mutually acceptable solution, an evolving situation requiring frequent communications that burdens both the Firm and our clients. Partners at the Firm have spent hundreds of hours, collectively, speaking with clients about the Order and its implications.

127.    Second, the Order requires clients that are government contractors to disclose "any business they do with Jenner," regardless of whether that business relates to the client's federal contracting work, where the consequence of such disclosure will be that "the heads of agencies shall[] … take appropriate steps to terminate any contract, to the maximum extent permitted by applicable law … for which Jenner has been hired to perform any service." Ex. 7 (Jenner Order) § 3. The Fact Sheet further states that the "Federal Government will terminate contracts that involve Jenner."

128.    Many of Jenner & Block's largest clients, or their affiliates, are known either to have, or to compete for, contracts or subcontracts with the federal government, and many of those companies are represented by the Firm for legal matters completely unrelated to government-contracting matters. For many of Jenner & Block's clients, the fact that the Firm gives them legal advice is not public information. Accordingly, if implemented, the Order will seek to require clients to divulge confidential information regarding consultation of counsel to the federal government, at risk that the Administration will then terminate the clients' government contracts.

129.    Over the last five years, more than 40% of the Firm's revenue has come from clients who are government contractors, subcontractors, or affiliates thereof. Last year, again, more than 40% of the firm's revenue came from government contractors, subcontractors, or affiliates.

130.    Due to the restrictions that the Order imposes on Jenner & Block, and the disclosure and termination provisions directed to the firm's federal contractor clients, several clients have

expressed concerns about government-mandated disclosure of their relationship with the Firm to federal agencies and the impact that may have on the contractor's own relationships with the federal government.

131.    Third, the Order directs the Attorney General, the Director of National Intelligence, and the "relevant heads of executive departments and agencies" to create a new review security-clearance review procedure, applicable only to Jenner & Block and other law firms whose activities are deemed disfavored, immediately to suspend any security clearances of Jenner & Block attorneys pending a review of whether such clearances "are consistent with the national interest." Ex. 7 (Jenner Order) § 2; Ex. 8 (Jenner Fact Sheet). The Order thus seeks to give clients, like defense contractors, reason to sever ties with Jenner & Block and other disfavored law firms by threatening arbitrary suspensions and denials of security clearances.

132.    Multiple Jenner & Block attorneys and personnel possess active security clearances, including a staff member who is also a member of the Illinois Army National Guard and an attorney who is an active drilling reservist and Captain (Major select) in the U.S. Marine Corps Reserve. These employees and partners have active security clearances the Order threatens. The Order therefore coerces them to choose between their jobs and serving their country and compromises their ability to do both. In addition, the Firm has active matters for clients that require security clearances.

133.    Because of the uncertainty created by the Order, Jenner & Block has had to regularly update its clients and field questions about whether Jenner & Block can continue to represent them. The time that Jenner attorneys spend attending to these inquiries is a present and irreparable cost to Jenner & Block, because its lawyers (like most lawyers) are compensated by clients for their time. Every hour spent responding to the Order is an hour that an attorney cannot

spend serving his or her clients on their cases and other matters. Both Jenner & Block's clients and its bottom line are harmed every day the Order is left undisturbed. The Firm's largest clients want to maintain their relationships, but are reviewing government contracts and other government interactions, and have indicated that they will need to make decisions shortly.

134.    To be sure, the Firm has received a tremendous amount of support and encouragement from its clients. But, upon information and belief, if the Order is not enjoined, Jenner & Block will lose existing and prospective clients and/or matters.

135.    The Order also threatens the right of Jenner & Block attorneys to practice their chosen profession. That threat is not only to revenue-generating practice, but also to the Firm's pro bono practice, as Jenner & Block attorneys frequently appear in federal court and before federal agencies in criminal, civil, or administrative matters on pro bono matters.

136.    The Order also interferes with Jenner & Block's employer–employee relationships because the restrictions are broadly written to include Jenner & Block's employees.

137.    The Order has also harmed and will harm Jenner & Block's reputation in the market through its false and disparaging characterizations of the Firm and its attorneys.

138.    In short: the Order is intended to have, and has had, its intended effect already— and that irreparable impact will only continue to grow. The disparagement of the firm, combined with the threat of termination of clients' government contracts and suspension of security clearances, has caused financial and reputational harm to the firm.

139.    The Order has had, and will continue to have, a chilling effect on whether and how Jenner & Block will litigate on behalf of certain clients, and is having a chilling effect on attorneys and other persons considering employment with the firm. These consequences will continue to mount if the Order is allowed to stand.

## CLAIMS FOR RELIEF

### COUNT I
**(Against All Defendants)**
***Unconstitutional Retaliation in Violation of the First Amendment***

140.    Plaintiff repeats and realleges the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

141.    The First Amendment "prohibits government officials from subjecting individuals to 'retaliatory actions' after the fact for having engaged in" First Amendment-protected conduct. *Hous. Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022) (quoting *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019)).

142.    The Order and Fact Sheet unlawfully retaliate against Jenner & Block because they single out and punish Jenner & Block for its protected speech, reflected in its advocacy for clients challenging policies of the current Administration.

143.    The Order and Fact Sheet also unlawfully retaliate against Jenner & Block in response to the speech of a former partner who has criticized and investigated the President, and in response to Jenner's association with that former partner.

144.    This is not just protected speech, but "core political speech" and association receiving the First Amendment's highest protections. *FEC v. Cruz*, 596 U.S. 289, 313 (2022); *see Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 546, 548-49 (2001) (First Amendment violated by laws that attempt to "draw lines around" those arguments that the government "finds unacceptable but which by their nature are within the province of the courts to consider"). Indeed, the Order does not even attempt to hide that it has targeted Jenner & Block for its protected activity: Section 1 invokes Jenner & Block's "partisan representations to achieve political ends," Ex. 7 (Jenner Order), § 1—a phrase synonymous with "pure political expression absolutely protected by the First Amendment."

145.    The Order also invokes, as a justification for targeting Jenner & Block, specific cases in which the Firm, on behalf of its clients, has challenged Administration actions. In at least one of those cases, Jenner & Block obtained a preliminary injunction on behalf of its clients. In short, the Order retaliates against Jenner for successfully representing its clients against the government.

146.    In targeting Jenner & Block for its protected representations and associations, the Order follows the President's pattern of targeting law firms who have undertaken representations adverse to the Administration and who have associated (at any point) with the President's personal and political enemies. The Order's pretext is plain from the fact that it purports to justify sanction based on the false premise that Mr. Weissmann is presently employed at Jenner & Block. In fact, he has not worked at the Firm in four years.

147.    The Order's claim that Jenner & Block discriminates against its employees based on race and other protected characteristics provides no support for the Order's sanctions. The Administration has not conducted any investigation into Jenner & Block's employment practices and has no good-faith basis for its accusations. The Order provides no evidence whatsoever to support these claims. And the pretextual nature of the claims is proven by the fact that the President has leveled the same accusations against the other law firms he has targeted—each time with no evidence and without any inquiry into the facts.

148.    As punishment for Jenner & Block's protected activity, the Order imposes onerous burdens and restrictions on Jenner & Block and its clients.

149.    The Order creates a new security-clearance review procedure, applicable only to Jenner & Block and other law firms whose activities are deemed disfavored, "suspend[ing]" clearances and threatening arbitrary revocations, as part of a pattern of retaliation against law firms

whose activities are deemed disfavored, *id.* § 2; requires clients to "disclose any business they do with Jenner & Block" and directs agencies to "terminate any contract[] … for which Jenner has been hired to perform any service," *id.* § 3(a)-(b); and directs agencies to "limit[] access from Federal Government buildings to employees of Jenner," to limit "Government employees acting in their official capacity from engaging with [Jenner] employees," and to "refrain from hiring employees of Jenner," absent a waiver from the agency head and the Director of the Office of Personnel Management," *id.* § 5(a)-(b).

150.    In addition, Section 4 of the Executive Order (which references Section 4 of the Perkins Coie Order) is a thinly veiled directive for the Chair of the Equal Employment Opportunity Commission to investigate "representative large, influential, or industry leading law firms"—like Jenner & Block—to determine whether discriminatory hiring and promotion practices exist, and for the Attorney General, in coordination with the Chair of the Equal Employment Opportunity Commission and the State Attorneys General, to conduct compliance investigations of any "large law firms"—like Jenner & Block—who do business with federal entities and to take "additional actions" deemed appropriate by the Attorney General "in light of the evidence uncovered." Ex. 7 (Jenner Order) § 4; Ex. 3 (Perkins Coie Order) (internal quotation marks omitted).

151.    The Executive Order's measures directed at Jenner & Block constitute a "retaliatory action sufficient to deter a person of ordinary firmness in [Jenner & Block's] position from speaking again" and thus violate the First Amendment. *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016); *see Smith v. Plati*, 258 F.3d 1167, 1176 (10th Cir. 2001) (retaliatory actions "that would chill a person of ordinary firmness" include "prosecution, threatened prosecution, bad faith investigation, and legal harassment" (internal quotation marks omitted)).

152.    No non-retaliatory ground suffices to justify the Executive Order's measures directed at Jenner & Block. The Order, and the other Executive Orders directed at law firms, target law firms that have engaged in protected speech, advocacy, and association deemed in opposition to the current Administration. That the Order targets Jenner based on the actions of its *former* partner and proceeds from the false premise that Mr. Weissmann is currently employed at the Firm, only underscores that the Order amounts to pure retaliation and cannot be justified based on supposed "[r]isks." Ex. 7 (Jenner Order) § 1.

153.    The Executive Order's unlawful retaliation causes ongoing and irreparable harm to Jenner & Block.

<u>**COUNT II**</u>
**(Against All Defendants)**
***Unconstitutional Denial of First Amendment Rights—Viewpoint Discrimination***

154.    Plaintiff repeats and realleges the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

155.    The First Amendment prohibits the regulation or censure of speech based on "the specific motivating ideology or the opinion or perspective of the speaker." *Reed v. Town of Gilbert*, 576 U.S. 155, 168-69 (2015) (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.,* 515 U.S. 819, 829 (1995)). Such government action is a "'blatant' and 'egregious form of content discrimination'" and is subject to strict scrutiny. *Reed*, 576 U.S. at 168, 171 (citation omitted).

156.    The Order and Fact Sheet discriminate based on viewpoint. By its plain terms, the Order punishes Jenner & Block for advocating in court on behalf of immigrants and transgender individuals, for engaging in "partisan representations," and for supporting what the President has determined are "destructive causes." But both Jenner & Block and its clients have an absolute First Amendment right to express and advocate for their personal and political interests, including by seeking to vindicate rights through the legal process.

157.    The Order and Fact Sheet do not distinguish between the client's viewpoint and the firm's zealous advocacy of that viewpoint, but attribute the viewpoint to the Firm and retaliate against the Firm on that basis.

158.    The Order's viewpoint discrimination is all the more egregious because it concerns speech that is at the core of First Amendment protection—i.e., speech concerning policies pursued by the national government.

159.    Viewpoint discrimination that is retaliatory cannot be justified by any government interest. Even if the Order were not retaliatory in purpose and in the public's perception, as it clearly is, no compelling interest can support the Order. The "bare ... desire to harm a politically unpopular group are not *legitimate* state interests," much less a compelling one. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 446 (1985) (alteration in original) (internal quotation marks omitted) (emphasis added). It is an understatement to say that the government's interest in punishing lawyers who challenge government actions in court is not a legitimate one. That interest—which clearly and explicitly underlies the Order—is a pernicious one that strikes at the core of our constitutional form of government.

160.    The Order's violations cause ongoing and irreparable harm to Jenner & Block.

### COUNT III
**(Against All Defendants)**
*Unconstitutional Denial of First Amendment Rights—Freedom of Association*

161.    Plaintiff repeats and realleges the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

162.    The First Amendment protects the "right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 647 (2000) (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984)). The government violates this right when it imposes penalties or disfavored treatment

based on protected association. *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 72 (1990)

163.    Here, the Order (and Fact Sheet explaining it) violate Jenner & Block's freedom of association because they single out and punish Jenner & Block for its past association with a former partner that the President deems has "pursue[d] a political agenda against [him]." Ex. 7 (Jenner Order) § 1; Ex. 8 (Jenner Fact Sheet). This former partner spoke and wrote critically of the President and worked as a lawyer on a team investigating the President. The President and his associates then threatened to retaliate against former partner. And now, the Order carries out that threat by penalizing Jenner & Block because of its past association with this former partner.

164.    The President has repeatedly targeted law firms that have associated with individuals who have participated in criminal and civil cases against the President and his interests, confirming that the Order here likewise targets Jenner & Block based on protected association.

165.    "Regulations that impose severe burdens on associational rights must be narrowly tailored to serve a compelling state interest." *Clingman v. Beaver*, 544 U.S. 581, 586 (2005). The government has no interest, much less a compelling one, in punishing a law firm of over 500 lawyers and more than 900 total personnel based on the firm's association with, and advocacy for, a former partner that the President deems his political and personal enemy.

166.    The Order's violations cause ongoing and irreparable harm to Jenner & Block.

## COUNT VI
### (Against All Defendants)
### *Unconstitutional Violation of First Amendment Petition Clause*

167.    Plaintiff repeats and realleges the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

168.    Under the First Amendment, the federal government may not make or enforce a law "abridging … the right of the people … to petition the Government for a redress of grievances." U.S. Const. amend. I. The "Petition Clause protects the right of individuals to appeal

to courts and other forums established by the government[.]" *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 387 (2011). A petition may "take[] the form of a lawsuit," as well as advocacy before executive agencies and their personnel. *Id.* at 390.

169.     The Order violates the Petition Clause by burdening Jenner & Block's right to file and defend lawsuits on behalf of clients. As is clear from the Order, the Fact Sheet, and the orders and fact sheets targeting other law firms, the Order penalizes Jenner & Block based on particular lawsuits it has filed and defended on behalf of clients, and seeks to coerce Jenner & Block to align with the President's policy agenda. The Order expressly penalizes Jenner & Block based on the cases it has litigated on behalf of its transgender and immigrant clients. And by penalizing Jenner & Block for its litigation, the Order burdens Jenner & Block's right to do so going forward.

170.     The Order also violates the Petition Clause by directing agencies to "limit[] … access from Federal Government buildings to employees of Jenner," and to limit "Government employees acting in their official capacity from engaging with Jenner employees," Ex. 7 (Jenner Order) § 5, thereby restricting Jenner and its clients from petitioning the executive branch and the courts.

171.     The Order's violations cause ongoing and irreparable harm to Jenner & Block.

## <u>COUNT V</u>
### (Against All Defendants)
*Unconstitutional Denial of First Amendment Free Speech and Associational Rights—*
*Compelled Disclosure*

172.     Plaintiff repeats and realleges the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

173.     The First Amendment limits the government's ability to compel individuals to disclose their "affiliation[s] with groups engaged in advocacy." *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958). Such compelled disclosures must satisfy "exacting scrutiny,"

a standard that requires the government to show that there is "a substantial relation between the disclosure requirement and a sufficiently important governmental interest." *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 607 (2021).

174.    Section 3 of the Order "require[s] [g]overnment contractors to disclose any business they do with Jenner and whether that business is related to the subject of the Government contract." Ex. 7 (Jenner Order) § 3.

175.    Jenner & Block may assert its own First Amendment rights to resist the compelled disclosure of information from its clients that is protected by attorney-client privilege and that the clients, but for the Executive Order, would not disclose.

176.    In addition, Jenner & Block has third-party standing to assert the First Amendment rights of its clients who are subject to Section 3 because (i) Jenner & Block's right to freedom of association is burdened by the disclosure requirements and the disclosure requirements will cause Jenner & Block to lose clients; (ii) Jenner & Block has a close relationship with its clients; and (iii) Jenner & Block's clients are hindered from challenging the disclosure requirements and protecting their First Amendment rights because the act of challenging the disclosure requirements would require the clients to disclose their relationship with Jenner & Block. *See Ctr. for Democracy & Tech. v. Trump*, 507 F. Supp. 3d 213, 223–24 (D.D.C. 2020); *accord Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 623 n.3 (1989); *U.S. Dep't of Lab. v. Triplett*, 494 U.S. 715, 720–21 (1990).

177.    The government's interest—retaliating against Jenner & Block for First-Amendment-protected activity of which the President disapproves—is not "sufficiently important" to withstand exacting scrutiny. All the more so due to the inaccurate purported factual predicates for the Order's sanctions, including that Mr. Weissmann presently works at Jenner.

178.    Requiring all "[g]overnment contractors to disclose any business they do with Jenner & Block" irrespective of "whether that business is related to the subject of the Government contract," Ex. 7 (Jenner Order) § 3, is not the kind of "narrow specificity" required by the First Amendment, *NAACP v. Button*, 371 U.S. 415, 433 (1963).

179.    Section 3 of the Order is facially unconstitutional.

180.    This constitutional violation causes ongoing and irreparable harm to Jenner & Block.

### COUNT VI
### (Against All Defendants)
***Unconstitutional Denial of First Amendment Free Speech and Associational Rights—***
***Unconstitutional Conditions***

181.    Plaintiff repeats and realleges the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

182.    The First Amendment forbids the government's creation of a patronage system whereby it conditions government benefits, such as contracts, access to government facilities or employment, or security clearances on political support or affiliation.

183.    In particular, although the federal government generally may "impose limits on the use of [government] funds to ensure they are used in the manner Congress intends," the government cannot "leverage funding to regulate speech" or other protected conduct "outside the contours of the [government] program itself." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 213–15 (2013). Put otherwise, the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected" rights "even if he has no entitlement to that benefit." *Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 59 (2006) (quoting *United States v. Am. Libr. Ass'n*, 539 U.S. 194, 210 (2003)).

184.    Here, the Executive Order requires the disclosure of "any business [government

contractors] do with Jenner & Block" even if "that business is related to the subject of the Government contract," Ex. 7 (Jenner Order) § 3. As alleged in Count V, such "compelled disclosure regimes" implicate the First Amendment. *Americans for Prosperity Found.*, 594 U.S. at 610.

185.    Then, the Order unlawfully requires agencies to "terminate any contract[] … for which Jenner has been hired to perform any service"; the Fact Sheet states that the "Federal Government will terminate contracts that involve Jenner" in order "[t]o ensure taxpayer dollars no longer go to contractors whose earnings subsidize activities not aligned with American interests." Ex. 7 (Jenner Order) § 3; Ex. 8 (Jenner Fact Sheet). Insofar as the Order directs agencies to terminate contracts for which Jenner & Block is not a contractor or subcontractor, based on a contractor's "earnings" going to Jenner & Block, the Order impermissibly "leverage[s] funding to regulate speech" and other protected conduct "outside the contours of the program itself." *Agency for Int'l Dev.*, 570 U.S. at 213–15.

186.    Finally, the Order purports to withhold from Jenner & Block access to government buildings and government officials. Ex. 7 (Jenner Order) § 5. The federal government has no authority to take these steps at all, and it certainly cannot do so based on constitutionally protected speech and conduct.

187.    Jenner & Block has standing to assert its own constitutional rights, including its First Amendment rights of association and against compelled disclosure. In addition, Jenner & Block has third-party standing to assert the First Amendment rights of its clients who are government contractors. *Caplin & Drysdale*, 491 U.S. at 623 n.3; *Triplett*, 494 U.S. at 720; *see also Carey v. Population Servs. Int'l*, 431 U.S. 678, 682-84 (1977); *Craig v. Boren*, 429 U.S. 190 (1976); *see generally June Med. Servs. L. L. C. v. Russo*, 591 U.S. 299, 318 (2020), *abrogated on*

*other grounds by Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022); *Patterson*, 357 U.S. 449 at 459-60.

## COUNT VII
**(Against All Defendants)**
***Unconstitutional Deprivation of Procedural Due Process***

188.    Plaintiff repeats and realleges the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

189.    The Due Process Clause of the Fifth Amendment to the U.S. Constitution guarantees that "[n]o person shall … be deprived of life, liberty, or property, without due process of law."

190.    The Order interferes with and impairs multiple liberty and property interests protected by the Due Process Clause. Jenner & Block represents clients in federal-court litigation and in matters before federal agencies. In order to provide legal services, Jenner & Block is required to access federal government buildings and engage with federal government employees. The Order impairs Jenner & Block's ability to follow its chosen profession by limiting its ability to practice law, including its ability to represent clients in court and before agencies, and to contract with the federal government. The Order also impairs Jenner & Block's private contracts with its clients. The Order harms Jenner & Block's constitutionally protected property interests by prohibiting Jenner & Block from participating in federal contracting and seeking to terminate private contractual relationships between Jenner & Block and its clients. The Order harms Jenner & Block's cognizable reputation interest by stigmatizing Jenner & Block as "abandon[ing] the profession's highest ideals," "engag[ing] in obvious partisan representations to achieve political ends," "support[ing] attacks against women and children based on a refusal to accept the biological reality of sex," and "back[ing] the obstruction of efforts to prevent illegal aliens from committing horrific crimes and trafficking deadly drugs within our borders." Ex. 7 (Jenner Order) § 1. The

Order also deprives Jenner & Block of its liberty interest in its First Amendment right to petition the government because it restricts access to governmental facilities and governmental personnel.

191.    Jenner & Block did not receive notice from Defendants prior to being subjected to the Order. Jenner & Block was not aware, prior to the issuance of the Order, of the conduct that the Order purports to subject to punishment, or of the severity of the potential punishment.

192.    Defendants did not provide Jenner & Block with any opportunity to challenge the purported factual findings or the sanctions in the Order prior to their announcement. Following the issuance of the Order, Jenner & Block has not been given an opportunity by Defendants to challenge the Executive Order.

193.    No compelling government interest justifies Defendants' violation of Jenner & Block's due process rights. The decision to adopt the Order was based on improper purposes. Among other improper purposes, the Order was adopted for retaliatory reasons, and in order to punish Jenner & Block for exercising rights protected by the First Amendment. The Order is based on false premises. But regardless, the sanctions it imposes are wildly disproportionate. Indeed, the President's choice to punish an entire law firm for the alleged misconduct of a single former Firm attorney the Order identifies clarifies the retaliatory nature and arbitrariness of the Order. So too its focus on singling out certain disfavored firms from among similarly situated firms. This improper purpose and absence of any legitimate justification demonstrates that the Order is an abusive, irrational abuse of power that shocks the conscience, such that it could not be justified by any level of process.

194.    As a result of Defendants' actions, Jenner & Block's Fifth Amendment right to due process has been violated.

195.    The Executive Order also violates due process because it effects a de facto

debarment.

196.    Due process also requires that, before the government effectively bars a contractor from all government work, "the contractor [must] be given notice of those charges as soon as possible and some opportunity to respond to the charges before adverse action is taken." *Old Dominion Dairy Prods., Inc. v. Sec'y of Defense*, 631 F.2d 953, 955–56 (D.C. Cir. 1980); *see also* 48 C.F.R. § 9.406-3 (federal regulations governing disbarment).

197.    Here, the Order violates due process by directing agencies to terminate any contract with Jenner & Block and to terminate any contract "for which Jenner & Block has been hired to perform any service."

198.    Jenner & Block may assert its own rights to due process and has third-party standing to assert the First Amendment rights of its clients whose contracts are subject to termination under this provision. Moreover, even if the government provided notice to Jenner & Block's clients before terminating their contracts, any opportunity to be heard would be illusory and would not satisfy due process — because the Executive Order has declared by fiat and without any genuine evidence at all that doing business with Jenner & Block does not accord with the "interests of the United States." Ex. 7 (Jenner Order) § 1.

199.    The Order's creation of a new security-clearance review procedure, applicable only to Jenner & Block and other law firms whose activities are deemed disfavored, "suspend[ing]" clearances and threatening arbitrary revocation, and threatening arbitrary enforcement based on the pretext that the holding of clearances by employees at disfavored first is not "consistent with the national interest," violates procedural due process. *Id.* § 1.

200.    Defendants' violation of due process has caused Jenner & Block to suffer ongoing and irreparable harm.

## COUNT VIII
### (Against All Defendants)
### *Unconstitutional Deprivation of Due Process—Substantive Due Process*

201.    Plaintiff repeats and realleges the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

202.    The Due Process Clause of the Fifth Amendment to the U.S. Constitution guarantees that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law."

203.    The Due Process Clause protects rights that are "fundamental to *our* scheme of ordered liberty," and "deeply rooted in this Nation's history and tradition." *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010) (internal quotation marks omitted)(emphasis in original); *see Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997).

204.    If any right is fundamental to our scheme of ordered liberty, it is that no government official—from the President on down—may target citizens for punishment or disfavored treatment based on their political views or a perception that their advocacy does not align with the government's preferences.

205.    Moreover, "[a] line of cases that reaches back to *Joint Anti–Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, … (1951), establishes that … a government blacklist, which when circulated or otherwise publicized to prospective employers effectively excludes the blacklisted individual from his occupation," violates the Due Process Clause. *Olivieri v. Rodriguez*, 122 F.3d 406, 407–08 (7th Cir. 1997).

206.    By targeting Jenner & Block for punishment and disfavored treatment based on the view that its client advocacy does not align with the current Administration's preferences, and by attempting to create what amounts to a blacklist, the Executive Order violates Jenner & Block's Fifth Amendment right to due process.

207.    Defendants' violation of due process has caused Jenner & Block to suffer ongoing and irreparable harm.

## COUNT IX
### (Against All Defendants)
### *Unconstitutional Deprivation of Due Process—Void for Vagueness*

208.    Plaintiff repeats and realleges the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

209.    A federal law is unconstitutionally vague and thus violates due process if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008) (citing *Hill v. Colorado*, 530 U.S. 703, 732 (2000)); *see also Johnson v. United States*, 576 U.S. 591, 595 (2015).

210.    The Order is unconstitutionally vague and violates the Due Process Clause of the Fifth Amendment to the U.S. Constitution. It does not provide Jenner & Block with a basis to understand what conduct is prohibited or how to avoid further sanctions in the future. The Order also does not provide any guidance on which interactions and buildings, and in what circumstances, its employees are restricted from, instead vaguely referencing the Executive Branch's own judgments about what access is consistent with the "interests of the United States." The Order's vagueness also permits Defendants to engage in arbitrary and discriminatory enforcement against Jenner & Block. Indeed, the threat of arbitrary enforcement is the point.

211.    The Order's threatened investigation and enforcement action by the EEOC and the Department of Justice against Jenner & Block because of the firm's vaguely defined "diversity, equity, and inclusion" policies makes it a violation of the firm's constitutional due process rights.

212.    The Order's creation of a new security-clearance review procedure, applicable only to Jenner & Block and other law firms whose activities are deemed disfavored, immediately

"suspend[ing]" clearances and threatening arbitrary revocation, and threatening arbitrary enforcement based on the pretext that the holding of clearances by employees at disfavored firms is not "consistent with the national interest," makes it a violation of the firm's constitutional due process rights. Ex. 7 (Jenner Order) § 2.

213.    The Order's threatened termination of contracts or funding with Jenner & Block or entities doing business with Jenner & Block because of the firm's vaguely defined "activities inconsistent with the interests of the United States," and vaguely defined "diversity, equity, and inclusion" policies, makes it a violation of the firm's constitutional due process rights. *Id.* § 5.

214.    The Order's threatened limitation of access to Federal property and engaging with government employees because of the firm's vaguely defined "activities inconsistent with the interests of the United States" make it a violation of the firm's constitutional due process rights. *Id.*

215.    The Order's threatened prevention of the hiring of Jenner & Block employees for Federal positions because of the firm's vaguely defined "[activities] inconsistent with the interests of the United States" makes it a violation of the firm's constitutional due process rights. *Id.*

216.    The decision to adopt the Order was based on improper purposes. Among other improper purposes, the Order was adopted for retaliatory reasons, and in order to punish Jenner & Block for exercising rights protected by the First Amendment. The Order is based on false premises, and regardless, the sanctions it imposes are wildly disproportionate. Indeed, the President's choice to punish an entire law firm—rather than the former Firm partner with whom he disagrees—clarifies the retaliatory nature and gross disproportionality of the Order. So too its focus on singling out certain disfavored firms from among similarly situated firms. This improper purpose and absence of any legitimate justification demonstrates that the Order is an abusive,

irrational abuse of power that shocks the conscience, such that it could not be justified by any level of process.

217.     As a result of Defendants' actions, Jenner & Block's Fifth Amendment right to due process has been violated.  Defendants' violation of due process has caused Jenner & Block to suffer ongoing and irreparable harm.

## COUNT X
### (Against All Defendants)
### *Unconstitutional Denial of Equal Protection*

218.     Plaintiff repeats and realleges the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

219.     The Equal Protection Clause as incorporated by the Fifth Amendment to the United States Constitution prohibits the federal government, its agencies, its officials, and its employees from denying persons the equal protection of the laws.

220.     Legislation "must be rationally related to a legitimate governmental purpose." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 446 (1985). The government "may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." *Id.* And "'a bare ... desire to harm a politically unpopular group'" is not a legitimate state interest. *Id.*

221.     The Order reflects a bare desire to harm Jenner & Block for its association with a former partner that the President and for the protected speech reflected in its advocacy for clients challenging policies of the current Administration.

222.     This desire to harm is evident from the statements of the President and his advisers.

223.     This desire to harm is evident how the Order's "relationship to [its] asserted goal is so attenuated as to render the distinction arbitrary or irrational." Although the Order asserts that Andrew Weissmann was "dishonest[]" and engaged in other purported misconduct, Ex. 7 (Jenner

Order) § 1, many lawyers and law firms face similar allegations. The President has targeted executive actions against Jenner & Block and a group of other law firms because they have associated with individuals whom the President deems his political and personal enemy, and that these executive orders seek to harm as a result.

224.    Moreover, the government lacks even a rational justification for the Order. Among other things, the Order targets a firm of more than 500 lawyers based on political conflicts with a lawyer who no longer works at Jenner—premised on the false suggestion that Mr. Weissmann is presently employed at the firm. The Order expressly seeks to punish Jenner & Block for representing clients in lawsuits that challenge Administration policies. There is not a shred of evidence of any national security threat from Jenner & Block, let alone one sufficient to justify barring Jenner & Block from engaging in government contracts, interacting with federal employees, and accessing federal buildings.

225.    The Order is therefore in violation of the Equal Protection Clause.

226.    The Order's violations cause ongoing and irreparable harm to Jenner & Block.

## COUNT X
### (Against All Defendants)
### *Unconstitutional Denial of Right to Counsel (Sixth Amendment)*

227.    Plaintiff repeats and realleges the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

228.    The Sixth Amendment to the United States Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right … to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. The Sixth Amendment affords criminal defendants the right to effective assistance provided by the counsel of one's choosing. *Strickland v. Washington*, 466 U.S. 668, 686 (1984); *Wheat v. United States*, 486 U.S. 153, 159 (1988). Actions that substantially interfere with, or deprive someone of, the right to counsel constitute a violation of the Sixth

Amendment.

229.    Lawyers have prudential, third-party standing to challenge violations of their clients' Sixth Amendment or Due Process rights to counsel that interfere with the lawyers' practice. *Caplin & Drysdale*, 491 U.S. at 623 n.3; *Triplett*, 494 U.S. at 720. In particular, because an attorney's duty to provide effective counsel "may not be fettered by harassment of government officials," a lawyer has "standing to challenge any act which interferes with his professional obligation to his client and thereby, through the lawyer, invades the client's constitutional right to counsel." *Wounded Knee Legal Def./Offense Comm. v. FBI*, 507 F.2d 1281, 1284 (8th Cir. 1974). Because the Firm represents criminal defendants and others in dealings with the government, it has standing to challenge the Order's attempted interference with its clients' rights to counsel.

230.    The Order violates the Firm's clients' Sixth Amendment rights to counsel because it directs "the heads of all agencies" without exception to "limit[] Government employees acting in their official capacity from engaging with Jenner & Block employees" and thus significantly impairs Jenner & Block's ability to advance clients' interests before the government.

231.    The Order violates the firm's clients' Sixth Amendment rights to counsel because it directs "the heads of all agencies" without exception to "limit[] official access from Federal Government buildings to employees of Jenner & Block" and thus significantly impairs Jenner & Block's ability to advance clients' interests before the government.

232.    The Order also violates the Firm's clients' Sixth Amendment rights to their preferred counsel because it "require[s] Government contractors to disclose any business they do with Jenner & Block" and thus compels clients to choose between their livelihood and their preferred counsel.

233.    The Order is therefore in violation of the Sixth Amendment.

234.    This violation causes ongoing and irreparable harm to Jenner & Block.

### COUNT XII
**(Against All Defendants)**
*Unconstitutional Denial of Right to Counsel (Fifth Amendment)*

235.    Plaintiff repeats and realleges the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

236.    Lawyers and clients have due process interests in their contractual and professional relationships.

237.    The Order's sanctions interfere with and chill all of those representations and relationships.  Like the Firm's other due process interests, the Order failed to provide adequate process before interfering with the Firm's and clients' due process rights to counsel. And because these sanctions — which punish a Firm for successful lawsuits and threaten the Firm's clients — are not rationally related to a legitimate government interest, they cannot stand.

238.    The Order's violations cause ongoing and irreparable harm to Jenner & Block and its clients.

### COUNT XIII
**(Against All Defendants)**
*Ultra Vires Presidential Action And Violation Of The Separation Of Powers*

239.    Plaintiff repeats and realleges the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

240.    The President's authority to act must "stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952).

241.    Neither any act of Congress, nor the Constitution itself, authorizes the Executive Order, which penalizes an entire law firm and all of its clients that do business with the government

based on its association with a former partner and its zealous representation of clients in cases against the government.

242.    In particular, Section 1 of the Order finds that Jenner was "'thrilled' to re-hire" Andrew Weissmann and "engages in obvious partisan representations to achieve political ends," including specifically with respect to certain challenges to the Administrations transgender and immigration policies.

243.    Section 3 of the Order relies on Section 1 to penalize Jenner & Block and its clients for Jenner & Block's legal advocacy by instructing "Government contracting agencies … [to] require Government contractors to disclose any business they do with Jenner," "to terminate any contract[] … for which Jenner has been hired to perform any service," and to report on actions taken with respect to "contracts with Jenner or with entities that do business with Jenner," all based on the assertion that Jenner's advocacy activities are not "aligned with American interests." Ex. 7 (Jenner Order) § 3.

244.    Likewise, based on Section 1, Section 5 of the Order restricts Jenner & Block employees' "access [to] Federal Government buildings," limits Jenner employees' ability to "engag[e]" with government personnel, and forbids agencies from "hiring employees of Jenner & Block" absent a waiver. *Id.* § 5.

245.    The Executive Order cites no express or implied constitutional authority for these actions, and none exists. They are not part of the President's "core constitutional power[]." *Trump v. United States*, 603 U.S. 593, 606 (2024). Nor are they among his "incidental powers, belonging to the executive department, which are necessarily implied from the nature of the functions." *Nixon v. Fitzgerald*, 457 U.S. 731, 749 (1982) (quoting 3 Joseph Story, *Commentaries on the Constitution of the United States* § 1563 (1st ed. 1833)).

246.    The Executive Order cites no statute authorizing these actions, and none exists. The President's authority to issue directives governing federal procurement, contracting, and access to government property stems from the Federal Property and Administrative Services Act of 1949 ("FPASA"), 40 U.S.C. § 121; *see id.* § 101 *et seq.*, which does not authorize the Executive Order. Nor does FPASA or any other statute authorize the President to forbid disfavored groups from "engaging with" government officials and employees.

247.    Not only does the President lack authority to issue the Executive Order, but the Order in myriad respects unlawfully purports to exercise authorities vested elsewhere.

248.    Insofar as the Executive Order penalizes Jenner & Block based on (false) claims of misconduct in legal practice, the Judicial Branch, not the President, has the inherent authority to regulate the legal practice. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991). Such authority "includes the ability to fashion an appropriate sanction for conduct which abuses the judicial process." *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 107 (2017) (internal quotation marks omitted). Courts find facts to support punishments limiting private rights of liberty, property, and contract. *See Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 54–56 (1989). And they impose punishments only after ensuring due process. *See Joint Anti-Fascist Refugee Comm.*, 341 U.S. at 161 (Frankfurter, J., concurring).

249.    Insofar as the Executive Order penalizes Jenner & Block based on (false) claims that it engaged in "racial discrimination," it violates Title VII. Title VII creates a highly reticulated statutory and regulatory scheme that governs when and how the government may seek to pursue remedies for alleged racial discrimination—a scheme that, again, assures due process. *See, e.g.*, 42 U.S.C. § 2000e-5(b), (f) (requiring notice, an investigation, and attempts at informal resolution before the Equal Employment Opportunity Commission may bring a civil action); 29 C.F.R. pt.

1601 (detailing those requirements and more). The Order unlawfully penalizes Jenner & Block without complying with those procedures.

250.    Moreover, the President punishes Jenner & Block with an order that shares all the essential features of a bill of attainder. The Order thus invades judicial power by adjudicating facts to support a restriction of Plaintiff's private rights in a way the Constitution prohibits the legislature from doing. The Constitution prohibits presidents from arrogating judicial power unto themselves to "pronounce[] upon the guilt of [Plaintiff] … in accordance [solely] with [their] own notions." *Cummings v. Missouri*, 71 U.S. (4 Wall.) 277, 323 (1866).

251.    The Order violates the separation of powers by purporting to limit Jenner & Block's access to courts.

252.    The Order is therefore *ultra vires* and violates the separation of powers because it goes beyond the President's constitutional authorities, is authorized by no statute, and unlawfully seeks to exercise powers vested elsewhere.

253.    The *ultra vires* nature of the Order has already harmed, and continues to harm, Plaintiff.

## PRAYER FOR RELIEF

**WHEREFORE,** Jenner & Block respectfully requests that the Court:

A.    Declare the Executive Order unconstitutional as violative of the Separation of Powers and Article II of the United States Constitution and the First, Fifth and Sixth Amendments to the Constitution.

B.    Immediately enjoin implementation of the Order pending consideration of a motion for preliminary injunction.

C.    Preliminarily, then permanently, enjoin implementation of the Order.

D.    Grant such other relief as the Court deems just and proper.

Dated: March 28, 2025                         Respectfully submitted,


/s/ Michael A. Attanasio
Michael A. Attanasio
(mattanasio@cooley.com)
Cooley LLP
4401 Eastgate Mall
San Diego, CA  92121-1909
Telephone:    (858) 550-6000
Facsimile:    (858) 550-6420

David E. Mills (DC Bar #401979)
(dmills@cooley.com)
Cooley LLP
1299 Pennsylvania Ave. NW, Suite 700
Washington, D.C. 20004
Telephone:    (202) 842-5000
Facsimile:    (202) 842-7400

Kristine Forderer
(*pro hac vice* application forthcoming)
(kforderer@cooley.com)
Cooley LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111
Telephone:    (415) 693-2000
Facsimile:    (415) 693-2222

John Bostic
(*pro hac vice* application forthcoming)
(jbostic@cooley.com)
Cooley LLP
3175 Hanover Street
Palo Alto, CA 94304
Telephone:    (650) 843-5000
Facsimile:    (650) 849-7400


*Attorneys for Plaintiff Jenner & Block LLP*