**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JENNER & BLOCK LLP,<br><br>     *Plaintiff*,<br><br>v.<br><br>U.S. DEPARTMENT OF JUSTICE, *et al.*,<br><br>     *Defendants*. | Civil Case No. 1:25-cv-00916<br><br><br><br>**EMERGENCY HEARING**<br>**RESPECTFULLY REQUESTED** |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF JENNER & BLOCK LLP'S**
**MOTION FOR A TEMPORARY RESTRAINING ORDER**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ....................................................................................... iii

INTRODUCTION .................................................................................................... 1

BACKGROUND ..................................................................................................... 3

    A.    Jenner Is A Leading Global Law Firm. ..................................................... 3

    B.    The President Targets Law Firms For Their Representations Of Clients And Their Associations With Administration Critics. ................................. 5

    C.    The President Targets Jenner. ................................................................... 8

        1.    Andrew Weissmann ...................................................................... 10

        2.    Jenner's Litigation Against the Administration .......................... 11

        3.    Jenner's Hiring Practices ............................................................ 12

    D.    The Order Threatens Irreparable Harm To Jenner's Active Matters, Its Clients, And Its Business. ......................................................................... 13

        1.    Access To Federal Buildings And Government Personnel .......... 13

        2.    Threats to Jenner's Relationships With Government-Contractor Clients .......................................................................................... 14

    E.    Further Developments Following The Jenner Order ................................ 15

LEGAL STANDARD ............................................................................................. 16

ARGUMENT ........................................................................................................ 16

I.    JENNER IS LIKELY TO SUCCEED ON THE MERITS. ................................... 16

    A.    The Executive Order Violates the First Amendment. ............................. 16

        1.    The Order Unlawfully Retaliates. ............................................... 17

        2.    The Order Unlawfully Discriminates Based on Viewpoint. ........ 18

        3.    The Order Unlawfully Punishes Protected Association. .............. 20

        4.    The Order Unlawfully Abrogates The Right To Petition. ........... 21

        5.    The Order Unlawfully Compels Disclosures. ............................. 22

|  | 6. | The Order Unlawfully Conditions Government Benefits On Forgoing Protected Rights. | 23 |

| | B. | The Order Violates Due Process. | 24 |
| | | 1. | The Order Violates Procedural Due Process. | 24 |
| | | 2. | The Order Is Void For Vagueness. | 27 |
| | | 3. | The Order Violates Substantive Due Process. | 28 |
| | C. | The Order Violates Sixth Amendment and Due Process Rights to Counsel. | 28 |
| | D. | The Order Violates Equal Protection. | 30 |
| | E. | The Executive Order Is *Ultra Vires* and Violates the Separation of Powers. | 32 |

II. JENNER WILL SUFFER IRREPARABLE HARM ABSENT IMMEDIATE RELIEF. .............................................................................. 35

    A.    The Order Is Inflicting Irreparable Economic Injury .......................... 35

    B.    The Order Is Irreparably Depriving Jenner of Its Constitutional Rights. .............. 37

    C.    The Order Is Irreparably Injuring Jenner's Reputation ........................ 38

III. THE EQUITIES AND PUBLIC INTEREST TILT STRONGLY IN FAVOR OF EMERGENCY RELIEF. ....................................................... 39

CONCLUSION ................................................................................. 40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*303 Creative LLC v. Elenis*,
　600 U.S. 570 (2023)................................................................................19

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
　570 U.S. 205 (2013)................................................................................23

*\*Ams. for Prosperity Found. v. Bonta*,
　594 U.S. 595 (2021)........................................................................ *passim*

*Ass'n of Am. Univs. v. Dep't of Health & Human Servs.*,
　No. 25-cv-10346 (D. Mass. filed Feb. 10, 2025)..................................12

*Bailey v. Fed. Bureau of Prisons*,
　2024 WL 3219207 (D.D.C. June 28, 2024)...........................................38

*Bd. of Regents of State Colls. v. Roth*,
　408 U.S. 564 (1972)................................................................................25

*Borough of Duryea v. Guarnieri*,
　564 U.S. 379 (2011)................................................................................21

*Cal. Motor Transp. Co. v. Trucking Unlimited*,
　404 U.S. 508 (1972)................................................................................21

*Campbell v. District of Columbia*,
　894 F.3d 281 (D.C. Cir. 2018)...............................................................25

*Caplin & Drysdale, Chartered v. United States*,
　491 U.S. 617 (1989).........................................................................23, 30

*Chambers v. NASCO, Inc.*,
　501 U.S. 32 (1991)..................................................................................34

*Cigar Ass'n of Am. v. U.S. FDA*,
　317 F. Supp. 3d 555 (D.D.C. 2018).......................................................37

*\*City of Cleburne v. Cleburne Living Ctr.*,
　473 U.S. 432 (1985).....................................................................19, 30, 32

*Clingman v. Beaver*,
　544 U.S. 581 (2005)................................................................................19

*Ctr. for Democracy & Tech. v. Trump,*
   507 F. Supp. 3d 213 (D.D.C. 2020) .........................................................23

*Cummings v. Missouri,*
   71 U.S. (4 Wall.) 277 (1866) ...................................................................35

*Davis v. District of Columbia,*
   158 F.3d 1342 (D.C. Cir. 1998) ..............................................................37

*Doe v. District of Columbia,*
   697 F.2d 1115 (D.C. Cir. 1983) ..............................................................30

*Dunkin' Donuts Franchising, LLC v. 14th St. Eatery, Inc.,*
   102 F. Supp. 3d 334 (D.D.C. 2015) .........................................................39

*Engquist v. Oregon Dep't of Agric.,*
   478 F.3d 985 (9th Cir. 2007), *aff'd,* 553 U.S. 591 (2008) .......................28

*FCC v. Beach Communications, Inc.,*
   508 U.S. 307 (1993) .................................................................................32

*FCC v. Fox Television Stations, Inc.,*
   567 U.S. 239 (2012) ...........................................................................25, 26

*FEC v. Cruz,*
   596 U.S. 289 (2022) .................................................................................18

*Fla. EB5 Invs., LLC v. Wolf,*
   443 F. Supp. 3d 7 (D.D.C. 2020) .......................................................16, 39

*Georgia v. President of the U.S.,*
   46 F.4th 1283 (11th Cir. 2022) ...............................................................33

*Gordon v. Holder,*
   721 F.3d 638 (D.C. Cir. 2013) ................................................................38

*Grayned v. City of Rockford,*
   408 U.S. 104 (1972) .................................................................................28

*Honeywell, Inc. v. Consumer Prod. Safety Comm'n,*
   582 F. Supp. 1072 (D.D.C. 1984) ...........................................................38

*Joint Anti-Fascist Refugee Comm. v. McGrath,*
   341 U.S. 123 (1951) (Frankfurter, J., concurring) .................................3, 18, 24, 28

*Karem v. Trump,*
   960 F.3d 656 (D.C. Cir. 2020) ...........................................................37, 38

*Kentucky v. Biden,*
   23 F.4th 585 (6th Cir. 2022), *aff'd as modified*, 57 F.4th 545 (6th Cir. 2023) ........................33

*Korte v. Off. of Pers. Mgmt.,*
   797 F.2d 967 (Fed. Cir. 1986) .................................................................................................34

*Lafler v. Cooper,*
   566 U.S. 156 (2012) .................................................................................................................29

*League of Women Voters of the U.S. v. Newby,*
   838 F.3d 1 (D.C. Cir. 2016) .....................................................................................................39

*Legal Servs. Corp. v. Velazquez,*
   531 U.S. 533 (2001) ............................................................................................................3, 19

*Lewis v. Eufaula City Bd. of Educ.,*
   922 F. Supp. 2d 1291 (M.D. Ala. 2012) ................................................................................17

*Logan v. Zimmerman Brush Co.,*
   455 U.S. 422 (1982) .................................................................................................................25

*Luokung Tech. Corp. v. Dep't of Def.,*
   538 F. Supp. 3d 174 (D.D.C. 2021) .................................................................................35, 36

*Mann v. Wash. Metro. Area Transit Auth.,*
   185 F. Supp. 3d 189 (D.D.C. 2016) ......................................................................................35

*McCrea v. District of Columbia,*
   2021 WL 1216522 (D.D.C. Mar. 31, 2021) ..........................................................................31

*McDonald v. City of Chicago,*
   561 U.S. 742 (2010) .................................................................................................................28

*Ming Wei Liu v. Bd. of Trs. of Univ. of Ala.,*
   330 F. App'x 775 (11th Cir. 2009) .........................................................................................28

*Minnesota v. Mille Lacs Band of Chippewa Indians,*
   526 U.S. 172 (1999) .................................................................................................................32

*Murthy v. Missouri,*
   603 U.S. 43 (2024) (Alito, J., dissenting) .............................................................................20

*\*NAACP v. Alabama ex rel. Patterson,*
   357 U.S. 449 (1958) ...........................................................................................................22, 23

*NAACP v. Button,*
   371 U.S. 415 (1963) .................................................................................................................22

*Nalco Co. v. EPA*,
   786 F. Supp. 2d 177 (D.D.C. 2011) ...................................................................36

*Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*,
   __ F. Supp. 3d __, 2025 WL 573764 (D. Md. Feb. 21, 2025), *appeal docketed*,
   No. 25-1189 (4th Cir. Feb. 27, 2025) .................................................................18

*Nat'l Inst. of Fam. & Life Advocates v. Becerra*,
   585 U.S. 755 (2018).............................................................................................19

*Nat'l Rifle Ass'n v. Vullo*,
   602 U.S. 175 (2024).................................................................................2, 16, 20

*Nebraska v. Su*,
   121 F.4th 1 (9th Cir. 2024) .................................................................................33

*News Am. Publ'g, Inc. v. FCC*,
   844 F.2d 800 (D.C. Cir. 1988) ...........................................................................31

*Nieves v. Bartlett*,
   587 U.S. 391 (2019).............................................................................................17

*Nixon v. Adm'r of Gen. Servs.*,
   433 U.S. 425 (1977).............................................................................................34

*Old Dominion Dairy Prods., Inc. v. Sec'y of Defense*,
   631 F.2d 953 (D.C. Cir. 1980) ...........................................................................27

*Olivieri v. Rodriguez*,
   122 F.3d 406 (7th Cir. 1997) .............................................................................28

*Padilla v. Kentucky*,
   559 U.S. 356 (2010).............................................................................................29

*Perkins Coie LLP v. U.S. Dep't of Just.*,
   No. 25-cv-716 (D.D.C.), ECF No. 1 (Mar. 11, 2025)..........................................6

*Perry v. Sindermann*,
   408 U.S. 593 (1972).............................................................................................18

*PFLAG, Inc. v. Trump*,
   No. 25-cv-337 (D. Md. filed Feb. 4, 2025)........................................................12

*Powell v. Alabama*,
   287 U.S. 45 (1932)...............................................................................................30

*In re Primus*,
   436 U.S. 412 (1978).............................................................................................19

*Reed v. Town of Gilbert*,
 576 U.S. 155 (2015)....................................................................................18, 19

*Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*,
 No. 25-cv-306 (D.D.C. filed Feb. 3, 2025)........................................................12

*Robert Half Int'l Inc. v. Billingham*,
 315 F. Supp. 3d 419 (D.D.C. 2018)...................................................................38

*Roberts v. U.S. Jaycees*,
 468 U.S. 609 (1984).........................................................................................20

*Romer v. Evans*,
 517 U.S. 620 (1996) . Here, the Order..............................................................32

*Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*,
 547 U.S. 47 (2006)...........................................................................................23

*Rutan v. Republican Party of Ill.*,
 497 U.S. 62 (1990)...........................................................................................21

*Safex Found., Inc. v. Safeth, Ltd.*,
 531 F. Supp. 3d 285 (D.D.C. 2021)...................................................................39

*Seila Law LLC v. CFPB*,
 591 U.S. 197 (2020).........................................................................................33

*Shelley v. Am. Postal Workers Union*,
 775 F. Supp. 2d 197 (D.D.C. 2011)...................................................................16

*Sherrill v. Knight*,
 569 F.2d 124 (D.C. Cir. 1977). But this Order .................................................26

*Sioux Tribe of Indians v. United States*,
 316 U.S. 317 (1942).........................................................................................32

*Strickland v. Washington*,
 466 U.S. 668 (1984).........................................................................................28

*Swanson v. City of Chetek*,
 719 F.3d 780 (7th Cir. 2013) ............................................................................31

*TikTok, Inc. v. Trump*,
 490 F. Supp. 3d 73 (D.D.C. 2020).....................................................................37

*Trentadue v. Integrity Comm.*,
 501 F.3d 1215 (10th Cir. 2007) ........................................................................25

*United States v. Gonzalez-Lopez,*
    548 U.S. 140 (2006)................................................................................29

*United States v. Laura,*
    607 F.2d 52 (3d Cir. 1979)....................................................................30

*United States v. Midwest Oil Co.,*
    236 U.S. 459 (1915)..............................................................................33

*United States v. Williams,*
    553 U.S. 285 (2008)..............................................................................27

*Vill. of Willowbrook v. Olech,*
    528 U.S. 562 (2000)..............................................................................31

*Washington v. Glucksberg,*
    521 U.S. 702 (1997)..............................................................................28

*Wheat v. United States,*
    486 U.S. 153 (1988)..............................................................................28

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008)............................................................................16, 39

*Wis. Gas Co. v. FERC,*
    758 F.2d 669 (D.C. Cir. 1985)..............................................................37

*Wisconsin v. Constantineau,*
    400 U.S. 433 (1971)..............................................................................25

*Wounded Knee Legal Def./Offense Comm. v. FBI,*
    507 F.2d 1281 (8th Cir. 1974) .........................................................29, 30

*Xiaomi Corp. v. Dep't of Def.,*
    2021 WL 950144 (D.D.C. Mar. 12, 2021)............................................38

**Youngstown Sheet & Tube Co. v. Sawyer,*
    343 U.S. 579 (1952) (Jackson, J., concurring)........................32, 33, 34

*Zivotofsky ex rel. Zivotofsky v. Kerry,*
    576 U.S. 1 (2015)..................................................................................33

## Constitutions

U.S. Const. amend. I ...................................................................................21

U.S. Const. amend. V ..................................................................................25

U.S. Const. amend. VI ................................................................................29

U.S. Const. art. I, § 9.......................................................................................................35

**Statutes**

42 U.S.C. § 2000e-5(b), (f)........................................................................................27, 34

40 U.S.C. § 121..............................................................................................................33

**Rules & Regulations**

29 C.F.R. pt. 1601.....................................................................................................27, 34

48 C.F.R. § 9.406-3.........................................................................................................27

**Other Authorities**

Am. Law. (Mar. 18, 2025),
    https://www.law.com/americanlawyer/2025/03/18/paul-weissand-big-lawface-
    an-existential-threat-amid-intensifying-trump-administration-pressure...................35

*Addressing Remedial Actions by Paul Weiss*, Exec. Order No. 14,244, § 1 (Mar.
    21, 2025) ....................................................................................................... *passim*

*Bill of Attainder*, Black's Law Dictionary (12th ed. 2024)..........................................35

Daniel Barnes, *How Major Law Firms Are Responding to Trump's Attacks*,
    Politico (Mar. 19, 2025, 5:55 AM EDT), https://perma.cc/2C3P-BD7F...................5

Michael S. Schmidt, *Law Firm Bends in Face of Trump Demands*, N.Y. Times
    (Mar. 20, 2025) ......................................................................................................2

*Musk Takes Aim at Law Firms Involved in Trump Policy Challenges*, Reuters
    (Feb. 11, 2025)........................................................................................................12

Presidential Memorandum, *Preventing Abuses of the Legal System and the
    Federal Court* (Mar. 22, 2025) ...............................................................................8

Presidential Memorandum, *Rescinding Security Clearances and Access to
    Classified Information from Specified Individuals* (Mar. 22, 2025 ........................11

Presidential Memorandum, *Suspension of Security Clearances and Evaluation of
    Government Contracts* (Feb. 25, 2025) ...................................................................5

*Press Conference: Donald Trump Holds a Press Conference in New York—
    September 6, 2024*, Roll Call,
    https://rollcall.com/factbase/trump/transcript/donald-trump-press-conference-
    new-york-september-6-2024...................................................................................11

*Speech: Donald Trump Addresses the Staff at the Department of Justice—March
14, 2025*, Roll Call, https://rollcall.com/factbase/trump/transcript/donald-
trump-speech-department-of-justice-march-14-2025 ............................................................11

Wall Street Journal Editorial Board, *Trump, Perkins Coie and John Adams*, Wall
St. J. (Mar. 11, 2025, 6:59 PM) ....................................................................................2

White House, *Fact Sheet: President Donald J. Trump Addresses Risks from
Jenner & Block* (Mar. 25, 2025) ...............................................................................10

White House, *Fact Sheet: President Donald J. Trump Addresses Risks from
Perkins Coie LLP* (Mar. 6, 2025), www.whitehouse.gov/fact-
sheets/2025/03/fact-sheet-president-donald-j-trump-adresses-risks-from-
perkins-coie-llp ............................................................................................................6

x

## INTRODUCTION

The March 25, 2025 Executive Order—entitled "Addressing Risks from Jenner & Block"—targets Jenner & Block LLP for its representation of clients with cases adverse to the federal government and its prior association with an individual who has criticized the President. The Order threatens not only Jenner, but also its clients and the legal system itself. Our Constitution, top to bottom, forbids attempts by the government to punish citizens and lawyers based on the clients they represent, the positions they advocate, the opinions they voice, and the people with whom they associate.

Since its founding in 1914, Jenner has been renowned for its exceptional representation of clients facing their most difficult challenges. The Firm fiercely and fearlessly pursues its clients' interests at trial, on appeal, in investigations, before federal agencies, and in all manner of corporate transactions. Those clients range from the top ranks of the Fortune 500, large privately held corporations, and institutions of higher education, to emerging companies, family-run businesses, and individuals.

The Order was not the first action targeting a major American law firm—an order targeting Perkins Coie was enjoined as unconstitutional—and it will not be the last, as the March 27, 2025 order targeting WilmerHale has already shown. Like prior executive orders targeting other firms, the Order singles out Jenner for sanction. It purports to restrict access to federal buildings for every one of the Firm's more than 900 attorneys and staff. It tells federal agencies not to meet, or even engage, with Jenner personnel. It directs cancelation of Jenner's government contracts. And it threatens the Firm's clients by requiring them to disclose their business with Jenner regardless of "whether that business is related to the subject of [any] government" contract, (Ex. 10)[1] ("Order")

---

[1] All references to "Ex. _" refer to the Exhibits attached to the Declaration of Michael A. Attanasio, filed concurrently herewith.

§ 3(a), and by directing cancelation of "any contract ... for which Jenner has been hired to perform any service," *id.* § 3(b)(i).

These orders send a clear message to the legal profession: Cease certain representations adverse to the government and renounce the Administration's critics—or suffer the consequences. The orders also attempt to pressure businesses and individuals to question or even abandon their associations with their chosen counsel, and to chill bringing legal challenges at all. As the Wall Street Journal Editorial Board has recognized, the President is taking these actions "to intimidate elite law firms from representing his opponents or plaintiffs who challenge his policies."[2] And the orders are already having their intended effect. Another major law firm subject to a similar order cut a deal to have the order rescinded; as the President has described the deal, the firm agreed to "engage in a remarkable change of course," to align itself with the Administration's priorities and viewpoints, and to denounce a former partner who had investigated the President.[3]

These efforts to single out those who sue the government, to undermine the attorney-client relationship, to deter protected speech adverse to the Administration's policy agenda, and to punish citizens for their associations are irreconcilable with the Constitution. "[T]he First Amendment prohibits government officials from 'relying on the threat of invoking legal sanctions and other means of coercion ... to achieve the suppression of disfavored speech.'" *Nat'l Rifle Ass'n v. Vullo*, 602 U.S. 175, 189 (2024) (internal citation omitted). And it prevents the government from "punish[ing]" citizens for the choice to associate with others for "political, social, economic, educational, religious, and cultural ends." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 606

---

[2] *See* The Editorial Board, *Trump, Perkins Coie and John Adams*, Wall St. J. (Mar. 11, 2025, 6:59 PM), https://www.wsj.com/opinion/donald-trump-perkins-coie-covington-and-burling-executive-order-4b285e8b.
[3] Ex. 7 § 1; *see also* Michael S. Schmidt, *Law Firm Bends in Face of Trump Demands*, N.Y. Times (Mar. 20, 2025), https://perma.cc/AN3S-4G9Q.

(2021). Targeting lawyers, in particular, because of their advocacy on behalf of clients cuts to the core of our constitutional order, for "[a]n informed, independent judiciary presumes an informed, independent bar." *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 545 (2001).

That the Order is the product of unilateral executive action, without any process, only adds to the constitutional violations. The Constitution forbids the Executive to condemn its citizens "without notice, … without opportunity to meet the undisclosed evidence[,] … and without opportunity" to object. *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 161 (1951) (Frankfurter, J., concurring). And the Constitution likewise forbids the Executive to single out citizens for punishment without statutory basis or judicial approval.

The urgency is clear. Every day the Order remains in effect, it causes Jenner escalating and irreparable harm in multiple respects. The violation of the First Amendment rights of Jenner, its attorneys, and its clients is alone irreparable and justifies emergency relief. But the Order further causes irreparable reputational harm, including by branding Jenner and its attorneys as "partisan," "discriminat[ory]," and unable to be trusted to enter federal buildings or engage with government personnel. Order § 1. The Order also aims and threatens to cause Jenner unrecoverable and severe economic losses. The Order has already caused some attorneys' meetings with federal personnel to be canceled. And it targets significant Firm clients—those holding contracts with the federal government—for the express purpose of driving those clients to withdraw their business. Relief is urgently needed.

For these reasons, the Court should temporarily restrain implementation of at least Sections 1, 3, and 5 of the Order.

## BACKGROUND

### A.     Jenner Is A Leading Global Law Firm.

Founded in 1914, Jenner & Block LLP is a leading global law firm with offices in Chicago,

Washington, D.C., New York, Los Angeles, Century City, San Francisco, and London. *See* Declaration of Thomas J. Perrelli in Support of Motion for Temporary Restraining Order ("Perrelli Decl.") ¶ 6. The Firm's more than 500 lawyers (and its more than 900 total personnel) represent clients in high-profile litigation, global investigations, regulatory and government controversies, and sophisticated corporate transactions. *Id*. ¶¶ 7, 10. Over its 111-year history, Jenner and its lawyers have represented clients in federal and state courts across the nation and in tribunals throughout the world. *Id*. ¶ 8. Jenner attorneys have presented dozens of arguments in the U.S. Supreme Court, helping to establish major precedents in federal and constitutional law. *Id*.

Jenner's clients include Fortune 100 companies, large privately held corporations, start-ups and emerging companies, colleges and universities, Native American tribes, and venture capital and private equity investors. *Id*. ¶ 7. These clients span a broad range of industries, from aerospace and defense to energy, food and beverage, telecommunications, technology, hospitality and real estate, finance, transportation, education, and media and entertainment, among others. *Id*.

Jenner's people—past and present—have occupied important roles in government, in the legal field, and in the corporate world. Named partner Albert Jenner served as assistant counsel to the Warren Commission and later as Chief Minority Counsel to the Republican minority on the House Judiciary Committee during its investigation of the Watergate affair. *Id*. ¶ 16. Jenner's chairmen have included Anton Valukas—whom President Reagan appointed as U.S. Attorney for the Northern District of Illinois—and Tom Perrelli, President Obama's Associate Attorney General at the Department of Justice. *Id*. ¶¶ 3, 11. The Firm's alumni have served and are currently serving as state and federal court judges, including as a Justice on the U.S. Supreme Court. *Id*. ¶ 13. And Jenner attorneys have gone on to serve as founders, CEOs, and general counsels of some of the nation's largest companies. *Id*. ¶ 7.

4

Jenner's commitment to its clients extends to those who cannot afford top counsel. The Firm has been rated the #1 law firm for pro bono work by *The American Lawyer* for 12 of the past 15 years. *Id.* ¶ 14. Jenner's pro bono representations include defending individuals in the criminal justice system, advocating for veterans, protecting constitutional rights, aiding victims of domestic violence and sex trafficking, assisting individuals denied social security benefits, and pursuing religious liberty while fighting religious discrimination. *Id.*

**B.    The President Targets Law Firms For Their Representations Of Clients And Their Associations With Administration Critics.**

Through a series of executive actions, the President has targeted law firms that have represented clients with cases or causes adverse to the Administration or had affiliations with individuals who challenge or criticize the President. As the President put it: "We have a lot of law firms that we're going to be going after."[4]

On February 25, 2025, the President issued a memorandum targeting the law firm Covington & Burling LLP, which had represented Jack Smith, the former Special Counsel responsible for overseeing two criminal investigations into the President. The memorandum directed the heads of federal agencies to suspend active security clearances held by "all members, partners, and employees of Covington & Burling LLP who assisted … Jack Smith during his time as Special Counsel." (Ex. 1 (Memo); Ex. 2 (Fact Sheet)). The Memorandum also directed agency heads "to terminate any engagement of Covington & Burling LLP by any agency to the maximum extent permitted by law." Ex. 1.

Nine days later, on March 6, 2025, the President signed an executive order titled "Addressing Risks from Perkins Coie LLP." In that order, the President called Perkins Coie

---

[4] Daniel Barnes, *How Major Law Firms Are Responding to Trump's Attacks*, Politico (Mar. 19, 2025, 5:55 AM EDT), https://perma.cc/2C3P-BD7F.

"dishonest and dangerous" because it had "represent[ed] failed Presidential candidate Hillary Clinton" and "worked with activist donors" to challenge (often successfully) certain "election laws." (Ex. 3 § 1). The Perkins Coie order also faulted the firm's hiring practices from six years earlier—practices that the order acknowledged were no longer operative. *Id*. The accompanying "Fact Sheet" criticized Perkins Coie for "fil[ing] lawsuits against the Trump Administration." (Ex. 4). The Perkins Coie order not only directed agencies to suspend the security clearances of all Perkins Coie employees, but also purported to restrict their access to federal buildings, to instruct federal agencies to refuse to meet or even engage with Perkins Coie lawyers and staff, and to terminate federal contracts held by firm clients for the express purpose of causing clients to sever relationships with Perkins Coie. *Id*. §§ 2-3, 5. Upon signing the Perkins Coie Order, the President stated, again, that he intended to go after additional law firms.[5]

On March 11, 2025, Perkins Coie filed suit in this District, challenging the order as an unconstitutional infringement of the First Amendment and due process rights of the firm, its lawyers, and its clients. *See* Compl., *Perkins Coie LLP v. U.S. Dep't of Just.* (*Perkins Coie*), No. 25-cv-716 (D.D.C. Mar. 11, 2025), ECF No. 1.

The next day, Judge Howell issued a temporary restraining order, blocking implementation and enforcement of Sections 1, 3, and 5 of the Perkins Coie order, directing the defendant agencies to rescind any guidance implementing the order, and requiring them to communicate with entities that had been asked to disclose any relationships with Perkins Coie that such request was rescinded pending further order of the Court. Tr. of Hr'g at 76:12-19, *Perkins Coie*, (Mar. 12, 2025), ECF No. 22 ("Tr."). The Perkins Coie order, Judge Howell stated, sent "chills down my spine." *Id*. at

---

[5] *See* ANI News, *Trump Revokes Security Clearances for Perkins Coie Over DEI Policies* at 1:20, YouTube (Mar. 6, 2025), https://www.youtube.com/watch?v=lY6ougLkFsc.

46:7-15. The court held that the order was a clear "means of retaliating against Perkins Coie" for its litigation positions, "which [the President] does not like," *Id.* at 76:12-19; amounted to "viewpoint discrimination" "using taxpayer dollars and government resources … to pursue what is a wholly personal vendetta, advancing … political payback," *Id.* at 78:20-21, 101:21-25; and threatened to "significantly undermine the integrity of our entire legal system and the ability of all people and groups to access justice," *Id.* at 103:11-13. Judge Howell also found that the order caused irreparable harm to Perkins Coie insofar as it purported to "severe[ly] restrict[]" the firm's ability to represent clients and had "already resulted" in clients taking their business elsewhere. *Id.* at 100:17-21.

On March 14, 2025, the President issued an executive order targeting Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul Weiss"). (*See* Ex. 5) ("Paul Weiss Order"). Paul Weiss's "harmful activity" included (1) hiring a "former leading prosecutor in the office of Special Counsel Robert Mueller" who "brought a pro bono suit against individuals alleged to have participated in the events that occurred at or near the United States Capitol on January 6, 2021, on behalf of the District of Columbia Attorney General"; and (2) hiring a lawyer, Mark Pomerantz, who had previously left Paul Weiss to join the Manhattan District Attorney's office "solely" to prosecute the President. *Id.* § 1. The Paul Weiss order further alleged that the firm discriminates against its employees on the basis of race and sex. *Id.* The order imposed the same sanctions as the Perkins Coie order. *Id.* §§ 2-5.

On March 20, 2025, the President announced on Truth Social that, as part of a "settlement" with the firm, "Paul Weiss will dedicate the equivalent of $40 million in pro bono legal services

over the course of President Trump's term to support the Administration's initiatives."[6] The President stated that he "is agreeing to this action in light of a meeting with Paul Weiss Chairman, Brad Karp, during which Mr. Karp acknowledged the wrongdoing of former Paul Weiss partner, Mark Pomerantz."[7] On March 21, 2025, the President withdrew the prior Executive Order in a new order, "Addressing Remedial Action by Paul Weiss." (Ex. 7 § 1). The Order states that "Paul Weiss indicated that it will engage in a remarkable change of course" and specifies that "Paul Weiss has acknowledged the wrongdoing of its former partner, Mark Pomerantz, and it has agreed to a number of policy changes," including the pro bono services referenced in the President's social media post. Mr. Karp, Paul Weiss's chairman, stated: "We are gratified that the President has agreed to withdraw the Executive Order concerning Paul, Weiss. We look forward to an engaged and constructive relationship with the President and his Administration."[8]

On March 21, 2025, the President issued another memorandum, charging the Attorney General, among other things, "to review conduct by attorneys or their law firms in litigation against the Federal Government over the last 8 years" and "to recommend to the President … additional steps … , including reassessment of security clearances held by the attorney, termination of any contract for which the relevant attorney or law firm has been hired to perform services, or any other appropriate actions." (Ex. 8). The memorandum cited attorney Marc Elias as a "[r]ecent example[]" of misconduct. *Id.*

### C.    The President Targets Jenner.

Now, the President has targeted Jenner. On March 25, 2025, he issued an Executive Order

---

[6] Donald J. Trump (@realDonaldTrump), Truth Social (Mar. 20, 2025, 6:10 PM), https://perma.cc/78M3-JPHY ("Paul Weiss Post").

[7] *Id.*

[8] *See* Paul Weiss Post, *supra* note 7; *see also* Michael S. Schmidt, *Law Firm Bends in Face of Trump Demands*, N.Y. Times (Mar. 20, 2025), https://perma.cc/AN3S-4G9Q.

titled "Addressing Risks From Jenner & Block." (Ex. 10).

The Order directs the heads of agencies to (1) "limit[]" Jenner employees' "official access" to federal buildings "when such access would threaten the national security of or otherwise be inconsistent with the interests of the United States" and "limit[]" Jenner employees' "engag[ement]" with federal employees, Order § 5; (2) require government contractors to "disclose any business they do with Jenner and whether that business is related to the subject of the Government contract" and to "take appropriate steps to terminate any contract[] … for which Jenner has been hired to perform any service," *id.* § 3; and (3) create a new security-clearance review procedure, applicable only to Jenner and other law firms whose activities are deemed disfavored, "suspend[ing] any active security clearances held by individuals at Jenner" and threatening arbitrary revocation, *id.* § 2.

The Order makes explicit that it singles out Jenner for its advocacy on behalf of clients in cases adverse to the federal government and its past association with a critic of the President, as well as its hiring practices. The Order identifies the Firm's "harmful activity" as follows: (1) the Firm's affiliation with former partner Andrew Weissmann, who the Order wrongly suggests remains employed by the Firm; (2) certain of the Firm's litigation adverse to the federal government on matters related to gender identity and immigration, which the Order wrongly suggests was unethically paid for with other clients' funds; and (3) the Firm's purported "discriminat[ion] against its employees based on race and other categories prohibited by civil rights laws," including the supposed use of "targets."

On the same day the President signed the Order, he released a corresponding "Fact Sheet." (Ex. 11). The Fact Sheet suggests that "Jenner has been accused of discriminating against its own employees on the basis of race and other categories prohibited by civil rights laws." *Id.* It provides

9

no supporting evidence; nor does it claim that the Administration conducted any investigation into Jenner's employment practices.

### 1.    Andrew Weissmann

The Order is largely based on Jenner's connection to former partner Andrew Weissmann, who the Order incorrectly suggests still works at the Firm even though he left Jenner nearly four years ago. Perrelli Decl. ¶¶ 52, 62. Section 1 states that "Jenner was 'thrilled' to re-hire the unethical Andrew Weissmann after his time engaging in partisan prosecution as part of Robert Mueller's entirely unjustified investigation"; refers to Mr. Weissmann's involvement in the Arthur Andersen LLP case; and asserts that there are "numerous reports of Weissman's [sic] dishonesty," including the "overt demand that the Federal Government pursue a political agenda against [the President]." Order § 1. Section 5 also purports to limit Mr. Weissmann's access to federal buildings and eligibility for federal employment, apparently on the mistaken belief that Mr. Weissmann is a current employee of Jenner. *Id.* § 5. When he signed the Order, the President made a point of remarking that "Andrew Weissmann is the main culprit."

Mr. Weissmann does not work at Jenner. He was a partner at the Firm from 2006 to 2011, and again from 2020 to 2021. Perrelli Decl. ¶¶ 52, 62. As relevant to the President's targeting of Jenner, prior to his second stint at the Firm, Mr. Weissmann served on the Department of Justice team led by Special Counsel Robert S. Mueller, III, that investigated Russian interference in the 2016 election. *Id.* ¶ 54. Following his work with Special Counsel Mueller, Mr. Weissmann authored a non-fiction book, *Where Law Ends: Inside the Mueller Investigation*, which was highly critical of the President. *Id.* ¶ 54-55. Mr. Weissmann also became a legal analyst for MSNBC, where, again, he was a frequent and vocal critic of the President. *Id.* ¶ 56.

Mr. Weissmann's statements about the President and his role on Special Counsel Mueller's team have drawn frequent criticism from the Administration. The President has called him, for

instance, the "Scum of the Earth" and a "horrible" person.[9] He has suggested that Mr. Weissmann and those affiliated with him "should be sued" for being "a political organization that goes after Trump."[10] In a March 14, 2025 speech at Department of Justice, the President once again accused Mr. Weissmann and others, including Jack Smith, of being "scum" who were participating in a "coordinated … campaign" against him.[11] On March 21, 2025, the President rescinded Mr. Weissmann's security clearance, together with those of Antony Blinken, Alvin Bragg, Hillary Clinton, Elizabeth Cheney, Kamala Harris, President Biden, members of President Biden's family, and others. (Ex. 9).

### 2. Jenner's Litigation Against the Administration

The Order also accuses the Firm of pursuing "obvious partisan representations to achieve political ends" and litigation that purportedly "attacks … women and children based on a refusal to accept the biological reality of sex, and backs the obstruction of efforts to prevent illegal aliens from committing horrific crimes and trafficking deadly drugs within our borders." Order § 1. And the Order falsely suggests that these or other pro bono representations "for destructive causes" were funded by "hundreds of millions of [Jenner's] clients' dollars." *Id.*

Committing the Firm's *own* resources, Jenner has represented clients affected by the Administration's actions—just as it has during prior administrations, including the Biden Administration. Perrelli Decl. ¶¶ 50, 73. As relevant to the Order, the Firm has represented advocacy groups and individual clients in litigation challenging the President's January 28, 2025,

---

[9] Donald J. Trump (@realDonaldTrump), Truth Social (Sept. 5, 2022, 6:07 PM), https://truthsocial.com/@realDonaldTrump/posts/108948071458149558; *Speech: Donald Trump Addresses the Staff at the Department of Justice—March 14, 2025*, Roll Call, https://rollcall.com/factbase/trump/transcript/donald-trump-speech-department-of-justice-march-14-2025 (last visited Mar. 28, 2025) ("DOJ Speech").
[10] *Press Conference: Donald Trump Holds a Press Conference in New York—September 6, 2024*, Roll Call, https://perma.cc/T87G-K27Q (last visited Mar. 27, 2025).
[11] *See* DOJ Speech, *supra* note 9.

executive order directing federal agencies to withhold funds from healthcare institutions and entities that provide gender-affirming care to people under age nineteen. *PFLAG, Inc. v. Trump*, No. 25-cv-337 (D. Md. filed Feb. 4, 2025). Jenner has also represented nonprofits and individual noncitizens challenging the President's abrogation of certain protections from removal that Congress created by statute, including the asylum statute. *Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*, No. 25-cv-306 (D.D.C. filed Feb. 3, 2025).

Jenner's involvement in litigation against the federal government has previously drawn criticism from this Administration. For example, the Firm represents a group of associations and institutions of higher education in a suit against the National Institutes of Health, seeking to enjoin cuts to life-saving NIH research grants. *See Ass'n of Am. Univs. v. Dep't of Health & Human Servs.*, No. 25-cv-10346 (D. Mass. filed Feb. 10, 2025). Following the district court's issuance of a temporary restraining order in that case, Elon Musk wrote on X: "Which law firms are pushing these anti-democratic cases to impede the will of the people?"[12]

### 3.    Jenner's Hiring Practices

The Order also sanctions Jenner because of the Administration's conclusion that the Firm "discriminates against its employees based on race and other categories prohibited by civil rights laws, including through the use of race-based 'targets.'" Order § 1. The Fact Sheet goes further, alleging that "Jenner has been accused of discriminating against its own employees."[13] The Administration cites no evidence for its conclusions, and it provided Jenner no process before issuing the Order—no notice, no ability to present evidence, and no opportunity to be heard.

---

[12] *Musk Takes Aim at Law Firms Involved in Trump Policy Challenges*, REUTERS (Feb. 11, 2025), https://perma.cc/6Z6H-M872.
[13] Ex. 11.

**D.     The Order Threatens Irreparable Harm To Jenner's Active Matters, Its Clients, And Its Business.**

As intended, the Order has caused and continues to cause concrete, significant, and irreparable harm to Jenner and its clients. The Order disparages Jenner's reputation by labeling the firm as "partisan" and "discriminat[ory]," and by questioning Jenner's "values and priorities." Order § 1. Moreover, because of the Order's vague terms, many clients have begun requesting frequent updates about the Order's status to evaluate whether the Firm can continue to represent them. Perrelli Decl. ¶ 68. Some of Jenner's largest clients hold significant government contracts and subcontracts. *Id.* ¶ 69. They want to continue using their chosen counsel at Jenner but are reviewing their relationships, their government contracts, and other government interactions, and they have indicated that they will need to make decisions shortly. *Id.* ¶ 70. If allowed to stand, these irreparable harms will continue and compound.

As relevant here, the Order harms Jenner in two primary ways.

**1.     Access To Federal Buildings And Government Personnel**

First, the Order directs the heads of federal agencies to "limit[]" Jenner employees' "official access" to federal buildings "when such access would threaten the national security of or otherwise be inconsistent with the interests of the United States" and to "limit[]" Jenner employees' "engag[ement]" with federal employees. Order § 5.

Jenner lawyers cannot effectively represent their clients without reliable access to federal buildings or ability to engage with federal employees. Perrelli Decl. ¶¶ 22-44, 70. The Firm's nationally recognized litigators appear constantly in federal courts for hearings or oral arguments—and indeed have done so in every week of 2025 to date. *Id.* ¶ 38. Those litigators also routinely need to communicate with government counsel on these cases, including in person—for example, the Firm's Appellate & Supreme Court practitioners (six of whom have argued before

the Supreme Court in the last four Terms alone) need to access the Department of Justice building to meet with the Office of the Solicitor General. *Id*. ¶¶ 29-30. The Firm's government controversies lawyers—who guide clients through highly complex crises presenting a mix of regulatory, public policy, and legislative challenges—frequently visit federal buildings and communicate with government personnel for important meetings, interviews, and negotiations, many of which are only offered in person given the sensitivity of the matters. *Id*. ¶¶ 31-32. Jenner's Investigations, Compliance, and Defense ("ICD") lawyers are hired to directly interface, including at in-person meetings, with a wide range of federal authorities. *Id*. ¶¶ 33-35.

Jenner's lawyers need access to federal buildings and to communicate with federal personnel to effectively represent their clients. And the Order is already impacting the Firm's ability to do just that. Already, one client has informed Jenner that the Department of Justice notified the client that, pursuant to the Order, the client may not bring their counsel from Jenner to a meeting with the Department of Justice that is scheduled for April 3. *Id*. ¶ 63. Jenner will continue incurring such harms if the Order's enforcement is not enjoined because the Firm's attorneys have numerous upcoming appearances before federal courts and agencies. *Id*. ¶¶ 64–65. The denial of access has concerned Jenner's clients, some of whom have already indicated that their relationship with Jenner could be threatened if Jenner could not enter federal courthouses. *Id*. ¶ 64. And Jenner attorneys have had to expend significant time discussing the impacts of the Order with its clients and developing solutions. *Id*. ¶ 66. The access provision is already tangibly harming Jenner.

### 2. Threats to Jenner's Relationships With Government-Contractor Clients

Second, the Order requires clients that are government contractors to disclose "any business they do with Jenner," regardless of whether that business relates to the client's federal contract, and regardless of whether the services, the client, or the lawyers involved have anything

to do with the President's stated concerns. Order § 3. The consequence of such disclosure is that "the heads of agencies shall[] … take appropriate steps to terminate any contract, to the maximum extent permitted by applicable law … for which Jenner has been hired to perform any service." *Id.*

Many of Jenner's largest clients hold contracts or subcontracts with the federal government. Perrelli Decl. ¶ 67. Over the last five years, more than 40% of the Firm's revenue has come from clients who are government contractors, subcontractors, or affiliates. *Id.* ¶ 69. Last year, again, more than 40% of the Firm's revenue came from government contractors, subcontractors, or affiliates. *Id.*

Jenner has a nationally recognized Government Contracts and Grants practice. *Id.* ¶ 36. The Order seeks to disrupt relationships with clients who have government contracts. What's more, many of Jenner's clients holding government contracts are represented by the Firm for legal matters entirely unrelated to those contracts. *Id.* ¶ 67. And for many of those clients, the fact that the Firm provides them legal advice is not public information. *Id.* The Order would thus seem to require clients to divulge privileged information regarding consultation of counsel to the federal government, again, at risk that the Administration will in turn terminate their government contracts.

Due to the restrictions that the Order imposes on Jenner, and the disclosure and termination provisions directed to the Firm's federal contractor clients, several clients have expressed concerns about government-mandated disclosure of their relationship with the Firm and the impact that may have on the contractor's own relationships with the federal government.

### E.    Further Developments Following The Jenner Order

The President did not stop with Jenner. On March 27, 2025, he issued an executive order targeting Wilmer Cutler Pickering Hale and Dorr LLP ("WilmerHale"). (Ex. 12 (Order); Ex. 13 (Fact Sheet)). The WilmerHale Order targeted WilmerHale for its pro bono representations and its

association with former Special Counsel Mueller and two other attorneys who worked on the Mueller investigation. *Id.* § 1. Like the prior orders, it ordered suspension of security clearances, restricted access to government buildings, and barred federal employment as to all WilmerHale personnel and terminated all contracts involving the firm. *Id.* §§ 2-3, 5.

## LEGAL STANDARD

"The factors that apply in evaluating requests for a TRO are identical to those that apply in evaluating requests for preliminary injunctions." *Shelley v. Am. Postal Workers Union*, 775 F. Supp. 2d 197, 202 (D.D.C. 2011). A plaintiff seeking such relief must demonstrate "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The final two factors "merge when plaintiff attempts to preliminarily enjoin a government action." *Fla. EB5 Invs., LLC v. Wolf*, 443 F. Supp. 3d 7, 13 (D.D.C. 2020).

## ARGUMENT

## I.    JENNER IS LIKELY TO SUCCEED ON THE MERITS.

### A.    The Executive Order Violates the First Amendment.

"[T]he First Amendment prohibits government officials from relying on the threat of invoking legal sanctions and other means of coercion … to achieve the suppression of disfavored speech[,]" *Vullo*, 602 U.S. at 189, and bans "punish[ment]" based on the choice to associate with others for "political, social, economic, educational, religious, and cultural ends[,]" *Ams. for Prosperity*, 594 U.S. at 606. Yet that is exactly what the Order does, sanctioning Jenner for its prior affiliation with an individual who has criticized the President and for its representation of certain clients in cases against the government. It violates the First Amendment in a litany of ways.

1.    **The Order Unlawfully Retaliates.**

The Order violates the First Amendment by taking "'retaliatory actions'" in response to Jenner's "protected speech[,]" *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019) (quoting *Hartman v. Moore*, 547 U.S. 250, 256 (2006)), as well as the speech of a former partner previously affiliated with the Firm. *See Lewis v. Eufaula City Bd. of Educ.*, 922 F. Supp. 2d 1291, 1302 (M.D. Ala. 2012) (collecting cases).

The retaliatory intent is plain. The President has targeted one firm after another based on the clients they have represented, the positions they have advocated, and the individuals with whom they have associated. Perkins Coie "represent[ed] failed Presidential candidate Hillary Clinton," Perkins Coie Order § 1, "worked with activist donors" on election-law litigation, *id.*, and "filed lawsuits against the Trump Administration." (Ex. 4). Paul Weiss filed lawsuits "on behalf of clients, pro bono," challenging government policies and brought "a pro bono suit against individuals alleged to have participated in the events that occurred at or near the United States Capitol on January 6, 2021." Paul Weiss Order § 1. WilmerHale engaged "in obvious partisan representations to achieve political ends," including voting-rights litigation. WilmerHale Order § 1. Each targeted firm has thus represented or associated with individuals the President has deemed his personal or political enemies, including Jack Smith (Covington & Burling), Hillary Clinton, George Soros, and Michael Sussman (Perkins Coie), Mark Pomerantz (Paul Weiss), and Robert Mueller and several others who worked with him as Special Counsel (WilmerHale).

The Jenner Order is of a piece.  It targets the Firm for its association with former partner Andrew Weissmann, its representation of certain clients in cases against the federal government, and misperceptions about its employment practices. Underscoring the Order's retaliatory motive, the sanctions apply to every one of the more than 900 Jenner lawyers and employees, now and going forward, even though the lawyer the President accused of "weaponiz[ing] government,"

Order § 1, *does not work at Jenner*. *See* Perrelli Decl. ¶ 65. That the Order proceeds from the false premise that Mr. Weissmann is currently employed at the Firm only underscores that it amounts to pure retaliation and cannot be justified based on supposed "[r]isks." Order § 1.

This Order, adding to the list of disfavored firms, "cannot be reconciled with the First Amendment." *Joint Anti-Fascist Refugee Comm.*, 341 U.S. at 143-44 (Black, J., concurring). Indeed, the Order "smacks of a most evil type of censorship." *Id.* When the government retaliates against a disfavored viewpoint, it has necessarily violated the First Amendment. *See Perry v. Sindermann*, 408 U.S. 593, 597-98 (1972).

## 2.    The Order Unlawfully Discriminates Based on Viewpoint.

The Order also discriminates based on viewpoint. By its plain terms, the Order targets Jenner for advocating in court on behalf of immigrants and transgender individuals. Order § 1. But Jenner and its clients have a fundamental First Amendment right to express and advocate for their personal and political interests. That the Order targets not just expression of rights but also the legitimate attempt to vindicate rights *through the legal process* makes it all the more troubling.

The Order's brand of speaker- and viewpoint-based sanctions is a "blatant' and 'egregious form of content discrimination'" subject to strict scrutiny. *Reed v. Town of Gilbert*, 576 U.S. 155, 168-71 (2015) (quoting *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995)). A finding that the government has discriminated based on viewpoint "is 'all but dispositive' in a First Amendment challenge[.]" *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, __ F. Supp. 3d __, No. 1:25-cv-00333-ABA, 2025 WL 573764, at *15 (D. Md. Feb. 21, 2025), *appeal docketed*, No. 25-1189 (4th Cir. Feb. 27, 2025) (quoting *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 571 (2011)).

What's more, the viewpoint discrimination here concerns "core political speech," which receives the First Amendment's highest protections. *FEC v. Cruz*, 596 U.S. 289, 313 (2022). And

18

*this* speech was advanced by lawyers in the course of representing clients. Generally, the fact that political speech is expressed through the provision of professional services does not diminish the First Amendment protection. *See Nat'l Inst. of Fam. & Life Advocates v. Becerra*, 585 U.S. 755, 767 (2018) ("Speech is not unprotected merely because it is uttered by 'professionals.'"); *see also, e.g.*, *303 Creative LLC v. Elenis*, 600 U.S. 570, 587-88 (2023). As to lawyers—whose profession often entails helping those with disfavored viewpoints express and vindicate their rights through constitutionally guaranteed due process—First Amendment protection is particularly important. A lawyer is no less protected when expressing her viewpoint through representation of a client than she would be if she expressed that viewpoint through a sign on her front lawn. As the Supreme Court explained in *Legal Services Corp. v. Velazquez*, the First Amendment cannot tolerate attempts to "draw lines around" those arguments that the government "finds unacceptable but which by their nature are within the province of the courts to consider." 531 U.S. at 546, 548-49.

The government cannot possibly satisfy strict scrutiny by proving that the Order "furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed*, 576 U.S. at 171; *see Clingman v. Beaver*, 544 U.S. 581, 586 (2005). "[A] bare … desire to harm a politically unpopular group" is "not [a] legitimate state interest[]," much less a compelling one. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 446-47 (1985) (alteration omitted). The Order's breadth proves that it not about any legitimate state interest the government might attempt to muster and cannot be described as narrowly tailored. *See In re Primus*, 436 U.S. 412, 432, 434 (1978). The Order bars every partner, associate, and staff member from government buildings, government meetings, and government employment, in substantial part on the actions and comments of a single individual who no longer works at the Firm. That alone is unjustified, even aside from the Order's preventing Jenner from "perform[ing] any service" on "any contract" with the government.

19

Moreover, the Order's suggestions of "partisan[ship]," Order § 1, all but acknowledge that the Order's sanctions boil down to disagreement with Jenner's perceived viewpoints.

As the Supreme Court underscored in *Vullo*, "the First Amendment prohibits government officials from relying on 'the threat of invoking legal sanctions and other means of coercion … to achieve the suppression' of disfavored speech." 602 U.S. at 189 (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963)). And "coercive" efforts at "censorship" are "even more dangerous" where the government official who levels the threat occupies a "high position[]." *Murthy v. Missouri*, 603 U.S. 43, 79-80 (2024) (Alito, J., dissenting). The danger is here at its apex.

### 3.    The Order Unlawfully Punishes Protected Association.

Equally offensive to the First Amendment is how the Order trammels the "freedom of association." *Ams. for Prosperity*, 594 U.S. at 606. Like the prior executive orders against firms, the Order targets Jenner for its past association with an attorney who has publicly criticized and previously investigated the President, and for its representation of disfavored clients.

The First Amendment's core guarantees "could not be vigorously protected from interference by the State unless a correlative freedom to" associate "were not also guaranteed." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984). Here, it would be problematic enough were Jenner targeted for its association with a particular individual, but the Firm has been targeted *because of that individual's protected political expression*. Nowhere is the First Amendment danger greater than when "individuals are punished for their political affiliation[s]." *Ams. for Prosperity*, 594 U.S. at 606. As the Supreme Court observed decades ago, if citizens may be punished in their employment and business based on their affiliations, they "will feel a significant obligation to support political positions held by" those in power and "may well feel compelled to engage in whatever political activity is necessary to regain regular paychecks and positions

corresponding to their skill and experience." *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 73 (1990). The Administration's string of orders pose exactly that threat: Sever associations with individuals who have criticized the President, or put your livelihood at risk.

For the same reasons the Order badly fails strict scrutiny, it fails under the exacting scrutiny governing violations of the freedom to associate, including because Mr. Weissmann does not work at Jenner. *See Ams. for Prosperity*, 594 U.S. at 607 (plurality opinion). The Order is thus doomed by its overt targeting of the Firm for its protected past associations.

### 4.     The Order Unlawfully Abrogates The Right To Petition.

The First Amendment separately and specifically protects the "right of the people … to petition the Government for a redress of grievances." U.S. Const. amend. I. The "Petition Clause protects the right of individuals to appeal to courts and other forums established by the government[.]" *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 387 (2011); *see Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972) (noting the right to petition "extends to all departments of the Government"). A petition may "take[] the form of a lawsuit," as well as advocacy before executive agencies and their personnel. *Duryea*, 564 U.S. at 390.

The Order violates the Petition Clause—first and foremost, by burdening Jenner's right to file and defend lawsuits on behalf of clients. The Order expressly penalizes Jenner based on the cases it has litigated on behalf of its transgender and immigrant clients. By penalizing Jenner for this litigation, the Order straightforwardly burdens Jenner's right to petition the government on behalf of all of its clients by invoking the protection of the courts. Independently, the Order violates the Petition Clause by directing agencies to "limit[] … access from Federal Government buildings to employees of Jenner," and to limit "Government employees acting in their official capacity from engaging with [Jenner] employees," Order § 5, thereby restricting Jenner and its clients from petitioning the Executive Branch and the courts alike.

### 5. The Order Unlawfully Compels Disclosures.

The Order, as well, violates the First Amendment by compelling individuals to disclose "affiliation[s] with groups engaged in advocacy." *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958). "[T]he protections of the First Amendment are triggered" by even the "*risk* of a chilling effect on association[.]" *Ams. for Prosperity*, 594 U.S. at 618-19 (emphasis added). And here the Order produces a "chilling effect in its starkest form," including with "threat[s]" of "economic reprisals." *Id.* at 606. The Order "require[s] [g]overnment contractors to disclose *any* business they do with Jenner," regardless of "whether that business is related to the subject of the Government contract." Order § 3 (emphasis added). The very point is to chill Jenner's associations with its clients.

Nor again can the government satisfy "exacting scrutiny." Requiring all "[g]overnment contractors to disclose any business they do with Jenner" irrespective of "whether that business is related to the subject of the Government contract," *id.*, is not the kind of "narrow specificity" that the First Amendment demands, *NAACP v. Button*, 371 U.S. 415, 433 (1963). The government's interest "in amassing sensitive information for its own convenience is" always weak, *Ams. for Prosperity*, 594 U.S. at 618, and it is all the more so where the disclosure requirement's aim is to chill. Many of Jenner's engagements are confidential, and even where they are not, "each governmental demand for disclosure brings with it an additional risk of chill." *Id.* Indeed, even when the government (unlike here) has some nonpretextual interest in investigating "wrongdoing," it cannot impose "[indiscriminate] disclosure requirements" like the one here. *Id.*

Jenner has every right to challenge this unconstitutional requirement. By compelling the disclosure of Jenner's client relationships (many confidential), the Order targets Jenner's business by pressuring its government-contractor clients. In *Patterson*, the Supreme Court's seminal compelled disclosure case, it was common ground that NAACP members would have standing "to

resist official inquiry into [the NAACP's] membership lists"; the only disputed question was whether the NAACP could assert its members' First Amendment rights (and the Court held that the NAACP could do so). 357 U.S. at 458. Here, Jenner is similar to the NAACP members whose information is at stake.

Moreover, Jenner has third-party standing to assert the First Amendment rights of its clients because (i) Jenner's right to freedom of association is burdened by the disclosure requirements and the disclosure requirements threaten to cause Jenner to lose clients; (ii) Jenner has a close relationship with its clients; and (iii) Jenner's clients are hindered from challenging the disclosure requirements and protecting their First Amendment rights because the act of challenging the disclosure requirements would require the clients to disclose their relationship with Jenner. *See Ctr. for Democracy & Tech. v. Trump*, 507 F. Supp. 3d 213, 223-24 (D.D.C. 2020); *accord Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 623 n.3 (1989) (lawyers have third-party standing to raise clients' interests); *U.S. Dep't of Labor v. Triplett*, 494 U.S. 715, 720 (1990) (same).

### 6.    The Order Unlawfully Conditions Government Benefits On Forgoing Protected Rights.

The First Amendment also forbids the government from creating a patronage system whereby it conditions access to government services and benefits on toeing the party line when it comes to matters of speech, advocacy, and association. The Order does just that. It "den[ies] a benefit to a person on a basis that infringes his constitutionally protected" rights—which is illegal "'even if he has no entitlement to that benefit.'" *Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 59 (2006) (quoting *United States v. Am. Library Ass'n*, 539 U.S. 194, 210 (2003)). And it "leverage[s] funding to regulate speech" or other protected conduct "outside the contours of the [government] program itself." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l,*

*Inc.*, 570 U.S. 205, 213-15 (2013).

Indeed, the Order is even more egregious because it largely targets *entitlements* (not benefits), like access to government buildings, government decisionmakers, and government jobs, in common with the public at large. And the Administration has barred Jenner and other disfavored law firms from contracting with the government based on the finding that these firms' advocacy and associations are hereby "inconsistent with the interests of the United States," as defined by today's Executive Branch. Order § 5(a). And the Order compounds the violation with its broad disclosure requirement and vague directives about terminating contracts "for which Jenner has been hired to perform any service," *id.* § 3(b)(i)—a clear attempt to use public contracts to go beyond directing the expenditure of the government's own money to control protected speech and association outside the scope of the contract. *See Agency for Int'l Dev.*, 570 U.S. at 213-15.

Again, Jenner has standing to assert its own constitutional rights, including its First Amendment rights of association and against compelled disclosure. And again, Jenner has third-party standing to assert the First Amendment rights of its clients who are government contractors.

B.    **The Order Violates Due Process.**

"No person shall … be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. During the red scare of the 1950s, the Supreme Court issued its seminal decision in *Joint Anti-Fascist Refugee Committee*, 341 U.S. at 126, condemning the notion that the Attorney General could lawfully designate groups as "subversive" "without notice, … without opportunity to meet the undisclosed evidence[,] … and without opportunity" to object. *Id.* at 161 (Frankfurter, J., concurring). By summarily sanctioning Jenner and other disfavored firms by unilateral executive action, the Order violates those bedrock due process principles.

1.    **The Order Violates Procedural Due Process.**

Before the Executive can "sanction" someone with "findings of wrongdoing" that carry

legal consequences, that person is entitled to notice and opportunity to be heard. *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253-54, 256 (2012). The procedural due process inquiry asks (1) whether the plaintiff faces a deprivation of a protected property or liberty interest, and, if so, (2) whether that plaintiff has received the process that is due. *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982). Under that test, the Firm will succeed on its due process claim.

> ***Jenner Has Protected Liberty And Property Interests.*** Protected "liberty" interests include "the right of the individual to contract, to engage in any of the common occupations of life." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 572 (1972). The Order harms the Firm's and its employees' reputations; undermines the Firm's right to petition the government; and deprives the Firm's and its attorney's right to pursue their profession.

First, the Order and Fact Sheet put the Firm's and its attorneys' "good name, reputation, honor, [and] integrity at stake." *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971). It is blackletter law that "notice and an opportunity to be heard are essential." *Id.* Specifically, the Order calls Jenner "partisan" and suggests that the Firm "has abandoned the profession's highest ideals," "abused its pro bono practice," and cannot be trusted to enter federal buildings or communicate with government officials. Order §§ 1, 5.

Second, the Order deprives the Firm of its "liberty interest in [its] First Amendment right to petition the government," *Trentadue v. Integrity Comm.*, 501 F.3d 1215, 1236-37 (10th Cir. 2007)—for the reasons explained above.

Third, the Order deprives Jenner and its attorneys of their protected liberty interest in the ability to pursue "a chosen profession free from unreasonable governmental interference." *Campbell v. District of Columbia*, 894 F.3d 281, 288 (D.C. Cir. 2018). The Order directly interferes with Jenner's and its attorneys' practice of law by constraining their ability to enter

government buildings or interact with federal personnel, which are essential to any client representation in matters involving the government. These restrictions have already had serious consequences for Jenner attorneys' abilities to do their jobs. Perrelli Decl. ¶¶ 22-44.

*Jenner Received No Notice And No Process.* Sufficient, clear notice of the "forbidden" conduct must be provided "prior" to the imposition of a sanction. *Fox Television*, 567 U.S. at 257.

The Firm received no prior notice of the Order's sanctions, nor does the Order itself provide clear explanation of the bases of punishment. *See* Perrelli Decl. ¶ 20. Jenner never received a chance to challenge the Order's sanctions before they took effect—indeed, it learned it had been singled out for sanction after the Order was signed. *See id.*

The due process violation here, moreover, is yet more egregious given the breadth of the Order's penalties. Because core "first amendment guarantee[s]" are implicated, punishment cannot be meted out "arbitrarily or for less than compelling reasons." *Sherrill v. Knight*, 569 F.2d 124, 129 (D.C. Cir. 1977). But this Order is the height of arbitrariness, targeting Jenner for its past associations—based on the false premise that those associations are *current*—and its representation of clients in cases against the government.

In two more specific respects, as well, the Order violates procedural due process. First, the Order finds that Jenner "discriminates against its employees based on race and other categories . . . including through the use of race-based 'targets'" Order § 1, and based on that finding, imposes severe penalties. Not only did the Order give Jenner no process at all, but the Order was issued in violation of the highly reticulated statutory and regulatory scheme that governs when and how the government may seek to pursue remedies for alleged racial discrimination—a scheme that, again, assures due process. *See, e.g.*, 42 U.S.C. § 2000e-5(b), (f) (requiring notice, an investigation, and attempts at informal resolution before the Equal Employment Opportunity Commission may bring

a civil action); 29 C.F.R. pt. 1601 (detailing those requirements and more). Under that scheme, the government cannot impose the consequences at issue here *at all* for alleged Title VII violations, much less do so with zero process.

Second, the Order violates a government contracting-specific due process rule. Before the government effectively bars a contractor from all government work, "the contractor [must] be given notice of those charges as soon as possible and some opportunity to respond to the charges before adverse action is taken." *Old Dominion Dairy Prods., Inc. v. Sec'y of Defense*, 631 F.2d 953, 955-56 (D.C. Cir. 1980); *see* 48 C.F.R. § 9.406-3 (federal regulations governing disbarment). Here, by contrast, the Order directs agencies to terminate any contract with Jenner and to terminate any contract "for which Jenner has been hired to perform any service." Again, Jenner may assert its own rights to due process and has third-party standing to assert the First Amendment rights of its clients whose contracts are subject to termination under this provision.

### 2.     The Order Is Void For Vagueness.

The Order is void for vagueness because it "fails to provide a person of ordinary intelligence fair notice of what is prohibited" and, indeed, "is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). No one can discern exactly what triggered the Order (and thus may trigger future similar orders), or exactly what the Order prohibits. Jenner is targeted for punishment based on vaguely defined "activities inconsistent with the interests of the United States"; its employees are banished from government buildings when their presence is "inconsistent with the interests of the United States"; and government funding related to Jenner may be limited based on the "goals and priorities of [the President's] Administration." By threatening Jenner with severe *but unclear* penalties, the Order aims to chill Jenner's relationships with its clients. Hence, the Order "impermissibly delegates basic policy matters to [Defendants] for resolution on an ad hoc and subjective basis,

with the attendant dangers of arbitrary and discriminatory application." *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972).

### 3.    The Order Violates Substantive Due Process.

The Due Process Clause also protects rights that are "fundamental to *our* scheme of ordered liberty" and "deeply rooted in this Nation's history and tradition." *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010); *see Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997). If any right is fundamental to our scheme of ordered liberty, it is that no government official may target citizens for punishment or disfavored treatment based on their political views or a perception that their advocacy does not toe the government's line. Moreover, "[a] line of cases that reaches back to *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, … (1951), establishes that … a government blacklist, which when circulated or otherwise publicized to prospective employers effectively excludes the blacklisted individual from his occupation," violates the Due Process Clause. *Olivieri v. Rodriguez*, 122 F.3d 406, 407–08 (7th Cir. 1997); *see Engquist v. Oregon Dep't of Agric.*, 478 F.3d 985, 997-98 (9th Cir. 2007), *aff'd*, 553 U.S. 591 (2008); *Ming Wei Liu v. Bd. of Trs. of Univ. of Ala.*, 330 F. App'x 775, 780-81 (11th Cir. 2009). The Order here and those like it effect exactly that—punishing firms because people with whom they have associated criticized the President or the causes of their clients are adverse to the government.

### C.    The Order Violates Sixth Amendment and Due Process Rights to Counsel.

The Order also violates the Sixth Amendment and due process rights to counsel. The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right … to have the assistance of counsel[.]" U.S. Const. amend. VI. This right includes "the right to the effective assistance of counsel," *Strickland v. Washington*, 466 U.S. 668, 686 (1984), and the "right to choose one's own counsel," *Wheat v. United States*, 486 U.S. 153, 159 (1988). Similarly, in civil cases, clients have due process liberty and property interests in their contractual relationships,

including with counsel. The Order plainly interferes with these rights.

First, by attempting to "interfere[] with [Jenner's] professional obligation[s]" to its criminal defense clients, the Order infringes upon those defendants' rights to *effective* counsel. *Wounded Knee Legal Def./Offense Comm. v. FBI*, 507 F.2d 1281, 1284 (8th Cir. 1974). The Order directs "[t]he heads of all agencies"—including the Department of Justice—to "limit[] Government employees acting in their official capacity from engaging with Jenner employees" and "limit[] official access from Federal Government buildings to employees of Jenner." Order § 5(a). Jenner represents individuals and entities being investigated and prosecuted by the government, and represents clients in numerous other matters that involve the government. The Order threatens to prevent Jenner attorneys from performing the vast array of legal tasks that require interacting with government employees or visiting government buildings, ranging from conferring on discovery and procedural matters to negotiating plea agreements to attending meetings and hearings. Perrelli Decl. §§ 22-44. For example, plea agreements—which are of particular importance in criminal representations, *Lafler v. Cooper*, 566 U.S. 156, 170 (2012); *see also Padilla v. Kentucky*, 559 U.S. 356, 373 (2010) (plea negotiations are "a critical phase of litigation for purposes of the Sixth Amendment right to effective assistance of counsel")—routinely require substantive, intensive, and extended negotiations. Yet the Order threatens to block the Firm's attorneys from engaging in such discussions. Indeed, as noted, one client has already been told by DOJ that they cannot attend a client meeting next week at the Department.

Second, the Order infringes "[t]he right to select counsel of one's choice[.]" *United States v. Gonzalez-Lopez*, 548 U.S. 140, 147-48 (2006). The Order interferes with that selection by imposing restrictions on Jenner that do not generally apply to others, *see* Order §§ 3, 5, and by requiring the Firm's government contractor clients to disclose their relationship with the Firm in

an attempt to chill them from choosing to continue working with Jenner, Order § 3. "[I]f a defendant chooses a particular counsel, the Sixth Amendment prevents [the government] from taking any 'arbitrary action prohibiting the effective use of (a particular) counsel,'" such as the practice restrictions or disclosure requirements threatened here. *United States v. Laura*, 607 F.2d 52, 57 (3d Cir. 1979) (quoting *U.S. ex rel. Carey v. Rundle*, 409 F.2d 1210, 1215 (3d Cir. 1969)).

In addition, the Order also violates the due process right to counsel. Clients enjoy "the right to the aid of counsel when desired and provided by the party asserting the right." *Powell v. Alabama*, 287 U.S. 45, 68 (1932); *accord Doe v. District of Columbia*, 697 F.2d 1115, 1119 (D.C. Cir. 1983). The Order's arbitrary interference with, and chilling of, the attorney-client relationships "would be a denial … of due process in the constitutional sense." *Powell*, 287 U.S. at 69.

Jenner, again, has standing to challenge the Executive Order's infringement of its clients' right to counsel. Defendants' violations cause injury in fact to the Firm's constitutional obligation to provide effective counsel to those who choose it. Restraining and striking the Order would redress those harms. And again, Jenner has prudential, third-party standing to challenge violations of its clients' Sixth Amendment or due process rights to counsel that interfere with the lawyers' practice. *See Caplin & Drysdale*, 491 U.S. at 623 n.3; *Triplett*, 494 U.S. at 720. An attorney's duty to provide effective counsel "may not be fettered by harassment of government officials"; therefore a lawyer has "standing to challenge any act which interferes with his professional obligation to his client and thereby, through the lawyer, invades the client's constitutional right to counsel." *Wounded Knee*, 507 F.2d at 1284.

### D. The Order Violates Equal Protection.

The Order violates equal protection. All legislation "must be rationally related to a legitimate governmental purpose." *City of Cleburne*, 473 U.S. at 446. The government "may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the

distinction arbitrary or irrational." *Id.* Moreover, when the government disfavors individuals without a constitutionally legitimate basis, they may bring "class-of-one" claims when (1) they have "been intentionally treated differently from others similarly situated" and (2) "there is no rational basis for the difference." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000); *see McCrea v. District of Columbia*, No. 16-cv-0808, 2021 WL 1216522, at *8 (D.D.C. Mar. 31, 2021), *on reconsideration in part*, 2023 WL 3995638 (D.D.C. June 14, 2023), *motion to certify appeal denied by* 2024 WL 4227701 (D.D.C. Sept. 18, 2024). When the differential treatment burdens a plaintiff's First Amendment activity, a test "appreciably more stringent than 'minimum rationality'" applies. *News Am. Publ'g, Inc. v. FCC*, 844 F.2d 800, 802 (D.C. Cir. 1988). "The classic class-of-one claim is illustrated when a public official, with no conceivable basis for his action other than spite or some other improper motive … comes down hard" on a citizen. *Swanson v. City of Chetek*, 719 F.3d 780, 784 (7th Cir. 2013).

Here, the Order intentionally targets Jenner for differential treatment based on a bare desire to harm for its associations and client representations. Because "improper motive is usually covert," class-of-one claims ordinarily require showing that "similarly situated individuals[] … received more favorable treatment[.]" *Swanson*, 719 F.3d at 784. Here, though many firms face allegations (like the unfounded allegations against Jenner) that some partner or former partner has acted improperly, only firms that associated with individuals who investigated, prosecuted, criticized, or challenged the President or that have represented clients in particular cases adverse to the government have found themselves targeted. And the Order makes no attempt to hide this fact; to the contrary, the "improper motive" is evident in the plain text of the Order, the accompanying Fact Sheet, and other statements from the White House.

In any case, the government also cannot justify its conduct under rational basis review. The

government must have a "plausible reason" for its differential treatment, *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 313-14 (1993). A "bare … desire to harm a politically unpopular group'" is "not [a] legitimate state interest[]." *Cleburne*, 473 U.S. at 447 (quoting *Moreno*, 413 U.S. at 534); *see also Romer v. Evans*, 517 U.S. 620, 632 (1996) (concluding that a governmental action "lacks a rational relationship to legitimate state interests" where it "seems inexplicable by anything but animus"). Here, the Order is about retaliation and viewpoint discrimination; it is not rationally related to any legitimate interest, and indeed proceeds from false premises about the employment status of Mr. Weissmann, the improper use of client funds for pro bono cases, and Jenner's hiring practices.

### E.     The Executive Order Is *Ultra Vires* and Violates the Separation of Powers.

In addition, the Order is divorced from any statutory or constitutional source of power and improperly attempts to exercise powers vested elsewhere in our system of separated powers. *See generally Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 641 (1952) (Jackson, J., concurring).  It is "black letter law" that the President's power to issue an executive order "'must stem either from an act of Congress or from the Constitution itself.'" *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 188-89 (1999) (quoting *Youngstown*, 343 U.S. at 585). The Supreme Court has therefore held that an executive order with "no express constitutional or statutory authorization" has no legal effect. *Sioux Tribe of Indians v. United States*, 316 U.S. 317, 331 (1942).

Here, the President has not even tried to identify any statutory basis for making the findings in Section 1 or imposing the punishments in Sections 3 and 5. And no such statutory basis exists for the President or heads of agencies to sanction a law firm for its general representation of clients. In short, "[t]he President's order does not direct that a congressional policy be executed in a manner prescribed by Congress—it [improperly] directs that a presidential policy be executed in

a manner prescribed by the President." *Youngstown*, 343 U.S. at 588.

Moreover, the President's authority to issue directives governing federal procurement, contracting, and access to government property stems from the Federal Property and Administrative Services Act of 1949 ("FPASA"), 40 U.S.C. § 121; *see id.* § 101 *et seq.* But FPASA does not authorize the President to enact the Order's retributive measures. Indeed, multiple courts of appeals have recently held that FPASA did authorize measures far more plausibly tethered to procurement. *See, e.g.*, *Nebraska v. Su*, 121 F.4th 1, 7-9 (9th Cir. 2024) (statute did not authorize executive order and implementing rule to raise the minimum wage for federal contractors); *Kentucky v. Biden*, 23 F.4th 585, 589, 606 (6th Cir. 2022) (statute did not support vaccine mandate for federal contractors), *aff'd as modified*, 57 F.4th 545 (6th Cir. 2023); *Georgia v. President of the U.S.*, 46 F.4th 1283, 1298 (11th Cir. 2022) (same).

The Order also cites no express or implied constitutional authority, and none exists. Sanctioning all employees of a law firm because of "partisan[ship]," a prior partner, or the causes of certain clients, is not an enumerated Article II power, nor is it a foreign-affairs power inherent in the "executive Power." *See, e.g.*, *Seila Law LLC v. CFPB*, 591 U.S. 197, 213 (2020); *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 32 (2015). Neither is it consistent with "executive practice, long pursued to the knowledge of the Congress and never before questioned," that helps define the limits of presidential power. *See Youngstown*, 343 U.S. at 610 (Frankfurter, J., concurring); *accord United States v. Midwest Oil Co.*, 236 U.S. 459, 473-74 (1915). And while the Order vaguely (and baselessly) alleges that "[m]any firms take actions that threaten … national security," it does not identify any action that *Jenner* has taken that creates such a risk.

Insofar as the Executive Order penalizes Jenner based on claims of misconduct in legal practice, the Judicial Branch, not the Executive, has the inherent authority to regulate the legal

practice. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991). Indeed, the Executive Branch could not fairly discipline lawyers who represent clients in opposition to prosecutors, executive officials, and agencies. Although the Executive plays a role in effectuating the judiciary's judgments, the President cannot render and execute his *own* judgments, just as he cannot unilaterally make and enforce his own laws. *Youngstown*, 343 U.S. at 587-88. Worse, the Executive Order does all this in a way that the judiciary could not—by pronouncing judgment without any notice, opportunity to be heard, or neutral evaluation of the evidence.

Insofar as the Order penalizes Jenner based on (false) claims that it engaged in "racial discrimination," Order § 3, it violates Title VII. Title VII creates a highly reticulated statutory and regulatory scheme that governs when and how the government may seek to pursue remedies for alleged racial discrimination—a scheme that, again, assures due process. *See, e.g.*, 42 U.S.C. § 2000e-5(b), (f) (requiring notice, an investigation, and attempts at informal resolution before the Equal Employment Opportunity Commission may bring a civil action); 29 C.F.R. pt. 1601 (detailing those requirements and more). The Order unlawfully penalizes Jenner without complying with those procedures.

Indeed, the Order is most analogous to a bill of attainder. Under Article I, Congress may not enact "bills of attainder," acts by which Parliament "named" a particular individual "considered disloyal to the … State" and unilaterally imposed a "wide array of punishments." *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 473-74 (1977); *see also* U.S. Const. art. I, § 9. As with a bill of attainder, the Order is a "special" act "prescribing punishment, without a trial, for a specific person or group." *Bill of Attainder*, Black's Law Dictionary (12th ed. 2024). And insofar as the President cannot issue a "bill" of attainder (because he cannot make any law), *see Korte v. Off. of Pers. Mgmt.*, 797 F.2d 967, 972 (Fed. Cir. 1986), that fact underscores the Order's

unconstitutionality. If the Constitution barred Congress (which generally can enact legislation) from usurping the judicial role by passing legislation depriving individuals of private rights, then it is all the more impermissible for the President do so through executive fiat. Yet here, the President has "pronounce[d] upon the guilt of" Jenner based solely on his "own notions." *Cummings v. Missouri*, 71 U.S. (4 Wall.) 277, 323 (1866). Such actions by a President are wholly foreign to our system of government.

## II.    JENNER WILL SUFFER IRREPARABLE HARM ABSENT IMMEDIATE RELIEF.

Every day the Order remains in effect, it causes Jenner unrecoverable economic losses, irreparable constitutional injury, and profound reputational harm. And that is the point. As Steve Bannon put it: "There's major law firms in Washington, D.C. and … what we are trying to do is put you out of business and bankrupt you."[14] This ongoing injury easily satisfies the requirement for a TRO: irreparable harm that is "'certain and great,' 'actual ... not theoretical,' and 'of such imminence that there is a clear and present need for equitable relief.'" *Drs. for Am.*, 2025 WL 452707, at *8 (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)).

### A.    The Order Is Inflicting Irreparable Economic Injury.

Economic harm can support preliminary relief when "legal remedies after the fact [are] inadequate." *Mann v. Wash. Metro. Area Transit Auth.*, 185 F. Supp. 3d 189, 195 (D.D.C. 2016). For three reasons, the economic injury the Order inflicts on Jenner justify a TRO.

*First*, "significant" financial damages justify emergency relief when those losses are unrecoverable due, as here, to sovereign immunity. *Luokung Tech. Corp. v. Dep't of Def.*, 538 F. Supp. 3d 174, 192 (D.D.C. 2021). Under that principle, Jenner's financial losses are "irreparable

---

[14] Amanda O'Brien & Patrick Smith, *Paul Weiss—and Big Law—Face 'An Existential Threat' Amid Intensifying Trump Administration Pressure*, Am. Law. (Mar. 18, 2025), https://perma.cc/QZ3M-KVG3 (quoting Bannon television appearance).

*per se*" because the United States' sovereign immunity shields all Defendants from monetary liability for the economic harms they have unlawfully imposed on Jenner. *Nalco Co. v. EPA*, 786 F. Supp. 2d 177, 188 (D.D.C. 2011) (citation omitted); *see Luokung*, 538 F. Supp. 3d at 192.

Jenner's economic harms—for which it can never recover—are actual and significant. Already in response to the uncertainty created by the Order, many clients have begun requesting frequent updates relating to the Order to assess whether Jenner can continue to represent them. Perrelli Decl. ¶ 66. The time Jenner's attorneys spend attending to these inquiries is a present and irreparable cost to the Firm, because its lawyers (like most lawyers) are compensated by clients for their time. Every hour spent responding to the Order is an hour that an attorney cannot spend serving his or her clients on their cases or other matters. Both Jenner's clients and its bottom line are harmed every hour the Order remains in effect.

Moreover, while Jenner's largest clients want to maintain their engagements with the Firm, they are reviewing their relationships, their government contracts, and other government interactions. These clients have indicated that they need to make decisions about their representations and their businesses shortly. *Id*. ¶ 68. And public news reports show that clients have fired Perkins Coie and Paul Weiss based on similar executive orders during the days when they were in effect[15]—confirming that the threat is real and imminent. Clarity from this Court is needed to prevent more substantial, permanent, and unrecoverable loss of business to Jenner caused by the Order's vague but draconian threats.

*Second*, relief is warranted due to the Order's clear objective: to "put … out of business" law firms that have associated with the President's personal and political enemies, and that have

---

[15] *See, e.g.,* Richard Vanderford, *Law Firm in Trump's Crosshairs Fired by White-Collar Client*, WALL ST. J. (March 19, 2025), https://perma.cc/DJ8A-LEBS.

advocated for clients whose causes are unpopular with the current Administration. "[M]onetary loss may constitute irreparable harm … where the loss threatens the very existence of the movant's business." *Wis. Gas Co.*, 758 F.2d at 674. In 2024, more than 40% of Jenner's revenue came from clients who are government contractors or subcontractors. Perrelli Decl. ¶ 69. Based on the Order's "chill[ing]" and "indiscriminate" disclosure requirement, and its vague threat to cancel "any contract … for which Jenner has been hired to perform any service," the Order aims to drive business from the Firm and ultimately end the Firm itself.

*Third*, the Order injures Jenner economically by harming the Firm's efforts "to recruit and retain employees to build—or even maintain—its business." *TikTok Inc. v. Trump*, 490 F. Supp. 3d 73, 84 (D.D.C. 2020) (issuing injunction). And it bears repeating: this is precisely the point of the Order—to injure Jenner economically by creating a rift between the Firm and its people.

### B.     The Order Is Irreparably Depriving Jenner of Its Constitutional Rights.

As expounded in the discussion of Jenner's likelihood of success on the merits, *see supra* § I, the Order is causing ongoing constitutional harms to the Firm and its clients, and greater harms will result if the Order stands unrestrained. These constitutional violations constitute irreparable harm necessitating emergency relief. Indeed, "there is a presumed availability of federal equitable relief against threatened invasions of constitutional interests." *Davis v. Dist. of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998); *see also Karem v. Trump*, 960 F.3d 656, 667 (D.C. Cir. 2020) (noting that even "a *prospective* violation of a constitutional right constitutes irreparable injury" for these purposes (emphasis added) (quoting *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013))).

The Order has caused and continues to cause constitutional injuries that are well recognized as irreparable harms warranting emergency relief. In particular, the loss of First Amendment freedoms, including speech and association rights, is irreparable even when the harm is imposed for "minimal periods of time." *Cigar Ass'n of Am. v. U.S. FDA*, 317 F. Supp. 3d 555, 562 (D.D.C.

2018) (alterations omitted) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *see also Bailey v. Fed. Bureau of Prisons*, No. 24-1219, 2024 WL 3219207, at *9 (D.D.C. June 28, 2024) (irreparable harm can be established by showing that "First Amendment freedoms are actually" or "imminently will be" lost). Likewise, "a violation of Fifth Amendment due process rights" establishes irreparable harm. *Karem*, 960 F.3d at 668; *see Gordon*, 721 F.3d at 653. As for the Sixth Amendment interests at stake, infringement of those rights, including "the disclosure of confidential information" related to the privileged attorney-client relationship "is, by its very nature, irreparable." *Robert Half Int'l Inc. v. Billingham*, 315 F. Supp. 3d 419, 433 (D.D.C. 2018).

Any one of these constitutional deprivations standing alone would justify relief; together, they leave no doubt that a TRO is required.

### C.    The Order Is Irreparably Injuring Jenner's Reputation.

The Order strikes, too, at Jenner's reputation, another blackletter irreparable injury. Harm to "reputation or goodwill is not easily measurable in monetary terms," and for that reason "it is typically viewed as irreparable." *Xiaomi Corp. v. Dep't of Def.*, No. 21-280, 2021 WL 950144, at *9 (D.D.C. Mar. 12, 2021); *see Honeywell, Inc. v. Consumer Prod. Safety Comm'n*, 582 F. Supp. 1072, 1078 (D.D.C. 1984). Were preliminary relief denied, Jenner will continue to suffer harm to its good name—harm that can never be fully undone if Jenner is forced to wait months or years for a final judgment.

It is plain that one of the Order's main goals is to tar Jenner as a nefarious actor that distorts the legal system and the democratic process. The Order suggests that Jenner "supports attacks against women and children," seeks to promote drug trafficking and violence, and racially discriminates against its employees. Order § 1. The Order declares "Jenner's values and priorities" to be wayward. *Id.* It suggests that merely allowing a Jenner employee to access a federal building threatens national security. *Id.* § 5(a). And its clear premise is that Jenner is so untrustworthy that

it cannot represent clients in interactions with the federal government. These sorts of broadsides against Jenner's reputation cause exactly the type of irreparable harm that justifies emergency relief. *See, e.g.*, *Safex Found., Inc. v. Safeth, Ltd.*, 531 F. Supp. 3d 285, 300 (D.D.C. 2021) (loss of goodwill constitutes irreparable harm); *Dunkin' Donuts Franchising, LLC v. 14th St. Eatery, Inc.*, 102 F. Supp. 3d 334, 338 (D.D.C. 2015) (same).

## III.    THE EQUITIES AND PUBLIC INTEREST TILT STRONGLY IN FAVOR OF EMERGENCY RELIEF.

Where a movant seeks to enjoin the government, the final two TRO factors merge. *Fla. EB5 Invs.*, 443 F. Supp. 3d at 13. The Court must balance the "competing claims of injury and… consider the effect on each party [and the public] of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (citation omitted). Here, these factors overwhelmingly favor relief.

As just discussed, the injury to Jenner and its clients is ongoing, severe, and worsening. Perrelli Decl. ¶¶ 63-71. In contrast, there is no injury to the United States from a TRO. There is no public interest in implementing an "unlawful" executive order, while there is "substantial public interest" in ensuring that the government "abide[s]" by the law. *See League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). The Order complains that the Firm represented transgender and immigrant clients in suits against the Administration. Order § 1. But representing clients who petition the government in court does not inflict cognizable injury on the United States where, as here, the lawsuits were meritorious or non-frivolous.

And, finally, there is a clear public interest in relief. This Order is part of a larger effort to chill lawyers from practice—to force them to choose between performing their duties and finding favor with the Administration. The Order and those like it threaten to punish lawyers for fulfilling their crucial role within our legal system. The strong public interest in allowing lawyers to act as vigorous advocates, even against the government, requires entry of a TRO.

## CONCLUSION

The motion for a temporary restraining order The Court should hold a hearing as soon as possible, grant the motion for a temporary restraining order, and enter the attached proposed order.

Dated: March 28, 2025                     Respectfully submitted,

*/s/ Michael A. Attanasio*
Michael A. Attanasio
(mattanasio@cooley.com)
Cooley LLP
4401 Eastgate Mall
San Diego, CA  92121-1909
Telephone:     (858) 550-6000
Facsimile:     (858) 550-6420

David E. Mills (DC Bar #401979)
(dmills@cooley.com)
Cooley LLP
1299 Pennsylvania Ave. NW, Suite 700
Washington, D.C. 20004
Telephone:     (202) 842-5000
Facsimile:     (202) 842-7400

Kristine Forderer
(*pro hac vice* application forthcoming)
(kforderer@cooley.com)
Cooley LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111
Telephone:     (415) 693-2000
Facsimile:     (415) 693-2222

John Bostic
(*pro hac vice* application forthcoming)
(jbostic@cooley.com)
Cooley LLP
3175 Hanover Street
Palo Alto, CA 94304
Telephone:     (650) 843-5000
Facsimile:     (650) 849-7400

*Attorneys for Plaintiff Jenner & Block LLP*