**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

JENNER & BLOCK LLP,

   *Plaintiff*,

v.

U.S. DEPARTMENT OF JUSTICE, *et al.*,

   *Defendants*.

Case No. 1:25-cv-00916-JDB

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFF JENNER & BLOCK LLP'S MOTION FOR SUMMARY JUDGMENT AND**
**FOR DECLARATORY AND PERMANENT INJUNCTIVE RELIEF**

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

BACKGROUND ..................................................................................................................4

    A.    Jenner Is a Leading Global Law Firm....................................................4

    B.    The President Targets Law Firms for Their Representations of Clients and Their Associations with Administration Critics...................................5

    C.    The President Targets Jenner. .................................................................7

        1.    Jenner's Litigation Against the Administration.........................8

        2.    Andrew Weissmann. ................................................................8

        3.    Jenner's Hiring Practices. .......................................................10

    D.    The Order Threatens Irreparable Harm to Jenner's Active Matters, Its Clients, and Its Business. ......................................................................10

        1.    Access to Federal Buildings and Government Personnel. ........11

        2.    Threats to Jenner's Relationships with Government-Contractor Clients. ...................................................................................12

        3.    Security Clearance Review ......................................................12

    E.    Further Developments Following the Jenner Order................................13

    F.    Procedural History. ...............................................................................14

LEGAL STANDARD.........................................................................................................16

ARGUMENT .....................................................................................................................16

I.    JENNER IS ENTITLED TO SUMMARY JUDGMENT ON ITS CLAIMS THAT THE ORDER IS UNCONSTITUTIONAL.........................................................17

    A.    The Order Violates the First Amendment..............................................17

        1.    The Order Unlawfully Retaliates Against Jenner's Speech, Association, and Petitioning. ...................................................17

        2.    The Order Unlawfully Discriminates Based on Viewpoint......21

3.      The Order Unlawfully Abridges Jenner and Its Clients from Engaging in Protected Petitioning Activity. ..............................................23

4.      The Order Unlawfully Violates the Associational Rights of Jenner and Its Clients by Compelling Disclosures. ...................................23

5.      The Order Unlawfully Conditions Government Services and Benefits on Forgoing Protected Rights. ....................................................25

B.      The Order Violates the Sixth Amendment and Due-Process Rights to Counsel. ..................................................................................................26

C.      The Executive Order Violates the Separation of Powers and Exceeds the President's Authority. ......................................................................28

D.      The Order Violates Due Process. ............................................................31

E.      The Order Violates Equal Protection. .....................................................33

II.      JENNER'S CLAIMS ARE RIPE AND FULLY JUSTICIABLE ……………...……….34

A.      The Order's Caveating Language Does Not Insulate It from Review ..................34

B.      Section 2's Security-Clearance Review Process Is Justiciable and Unconstitutional. ......................................................................................35

III.     DECLARATORY RELIEF AND A PERMANENT INJUNCTION ARE NECESSARY TO PREVENT ONGOING AND FUTURE IRREPARABLE HARM .............................................................................................................41

A.      The Order Causes Jenner Irreparable Constitutional, Economic, and Reputational Injury that Cannot Be Redressed by Remedies at Law. ..................41

B.      The Balance of Equities and Public Interest Favor a Permanent Injunction. .................................................................................................43

C.      The Order Should Be Declared Unlawful and Its Implementation Permanently Enjoined in Full. ................................................................44

CONCLUSION ................................................................................................................45

TABLE OF AUTHORITIES

**Cases**

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
  570 U.S. 205 (2013) ................................................................................................... 25

*Air Transp. Ass'n of Am., Inc. v. Exp.-Imp. Bank of the U.S.*,
  840 F. Supp. 2d 327 (D.D.C. 2012) ........................................................................... 43

*Allen v. City of Louisiana*,
  103 U.S. 80 (1880) ..................................................................................................... 45

*\*Ams. for Prosperity Found. v. Bonta*,
  594 U.S. 595 (2021) ................................................................................... 3, 17, 23, 24

*Anatol Zukerman & Charles Krause Reporting, LLC v. USPS*,
  64 F.4th 1354 (D.C. Cir. 2023) ............................................................................ 41, 43

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ................................................................................................... 16

*Aref v. Lynch*,
  833 F.3d 242 (D.C. Cir. 2016) ................................................................................... 34

*Atlas Air, Inc. v. Int'l Brotherhood of Teamsters*,
  280 F. Supp. 3d 59 (D.D.C. 2017),
  *aff'd*, 928 F.3d 1102 (D.C. Cir. 2019) ....................................................................... 41

*Bolling v. Sharpe*,
  347 U.S. 497 (1954) ................................................................................................... 33

*Borough of Duryea, Pa. v. Guarnieri*,
  564 U.S. 379 (2011) ................................................................................................... 19

*Cal. Motor Transp. Co. v. Trucking Unlimited*,
  404 U.S. 508 (1972) ................................................................................................... 19

*Campbell v. District of Columbia*,
  894 F.3d 281 (D.C. Cir. 2018) ................................................................................... 31

*Caplin & Drysdale, Chartered v. United States*,
  491 U.S. 617 (1989) ................................................................................................... 28

*Chamber of Com. of the U.S. v. FEC*,
  69 F.3d 600 (D.C. Cir. 1995) ..................................................................................... 34

*Chambers v. NASCO, Inc.,*
  501 U.S. 32 (1991)....................................................................................................... 29

*\*City of Cleburne, Tex. v. Cleburne Living Ctr.,*
  473 U.S. 432 (1985)............................................................................................... 22, 33

*Ctr. for Democracy & Tech. v. Trump,*
  507 F. Supp. 3d 213 (D.D.C. 2020)............................................................................. 24

*Cummings v. Missouri,*
  71 U.S. (4 Wall.) 277 (1866) ....................................................................................... 30

*Davis v. District of Columbia,*
  158 F.3d 1342 (D.C. Cir. 1998).................................................................................... 41

*Dep't of the Navy v. Egan,*
  484 U.S. 518 (1988)...................................................................................................... 36

*Doe v. Gates,*
  981 F.2d 1316 (D.C. Cir. 1993)............................................................................... 35, 39

*Duane v. U.S. Dep't of Def.,*
  275 F.3d 988 (10th Cir. 2002) ..................................................................................... 37

*El-Ganayni v. U.S. Dep't of Energy,*
  591 F.3d 176 (3d Cir. 2010).......................................................................................... 37

*FCC v. Beach Communications, Inc.,*
  508 U.S. 307 (1993)...................................................................................................... 33

*FCC v. Fox Television Stations, Inc.,*
  567 U.S. 239 (2012)...................................................................................................... 31

*FDIC v. Mallen,*
  486 U.S. 230 (1988)...................................................................................................... 31

*Frederick Douglass Found., Inc. v. District of Columbia,*
  82 F.4th 1122 (D.C. Cir. 2023)..................................................................................... 22

*Gill v. U.S. Dep't of Just.,*
  875 F.3d 677 (D.C. Cir. 2017)...................................................................................... 36

*Goodyear Tire & Rubber Co. v. Haeger,*
  581 U.S. 101 (2017)...................................................................................................... 29

*Grayned v. City of Rockford,*
  408 U.S. 104 (1972)...................................................................................................... 32

*Hartman v. Moore,
    547 U.S. 250 (2006) ................................................................................ 17, 20

Heffernan v. City of Paterson, N.J.,
    578 U.S. 266 (2016) ..................................................................................... 19

Holcomb v. Powell,
    433 F.3d 889 (D.C. Cir. 2006) ...................................................................... 16

Hubbard v. EPA,
    949 F.2d 453 (D.C. Cir. 1991) ...................................................................... 25

In re Halkin,
    598 F.2d 176 (D.C. Cir. 1979),
    overruled on other grounds by Seattle Times Co. v. Rhinehart,
    467 U.S. 20 (1984) ........................................................................................ 17

INS v. Chadha,
    462 U.S. 919 (1983) ...................................................................................... 39

Jamil v. Sec'y, Dep't of Def.,
    910 F.2d 1203 (4th Cir. 1990) ...................................................................... 37

Joint Anti-Fascist Refugee Comm. v. McGrath,
    341 U.S. 123 (1951) ........................................................................................ 3

Karem v. Trump,
    960 F.3d 656 (D.C. Cir. 2020) ................................................................ 41, 42

Kiakombua v. Wolf,
    498 F. Supp. 3d 1 (D.D.C. 2020) .................................................................. 43

League of Women Voters of the U.S. v. Newby,
    838 F.3d 1 (D.C. Cir. 2016) .......................................................................... 43

*Lee v. Garland,
    120 F.4th 880 (D.C. Cir. 2024) ................................................. 35, 36, 37, 38

*Legal Services Corp. v. Velazquez,
    531 U.S. 533, 545 (2001) ...................................................................... passim

Logan v. Zimmerman Brush Co.,
    455 U.S. 422 (1982) ...................................................................................... 31

Lozman v. City of Riviera Beach, Fla.,
    585 U.S. 87 (2018) ........................................................................................ 20

*Luokung Tech. Corp. v. Dep't of Def.*,
  538 F. Supp. 3d 174 (D.D.C. 2021) ........................................................ 42

*Maine v. Moulton*,
  474 U.S. 159 (1985) ................................................................................ 26

*Medellín v. Texas*,
  552 U.S. 491 (2008) ................................................................................ 29

*Mills v. District of Columbia*,
  571 F.3d 1304 (D.C. Cir. 2009) .............................................................. 41

*Minnesota v. Mille Lacs Band of Chippewa Indians*,
  526 U.S. 172 (1999) ........................................................................ 29, 45

*N.Y. Times Co. v. Sullivan*,
  376 U.S. 254 (1964) ................................................................................ 20

*\*NAACP v. Alabama ex rel. Patterson*,
  357 U.S. 449 (1958) .......................................................................... 23, 24

*NAACP v. Button*,
  371 U.S. 415 (1963) ................................................................................ 24

*\*Nat'l Fed'n of Fed. Emps. v. Greenberg*,
  983 F.2d 286 (D.C. Cir. 1993) ............................................ 35, 37, 38, 39

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*,
  145 F.3d 1399 (D.C. Cir. 1998) .............................................................. 41

*\*Nat'l Rifle Ass'n of Am. v. Vullo*,
  602 U.S. 175 (2024) ...................................................................... 3, 17, 27

*News Am. Publ'g, Inc. v. FCC*,
  844 F.2d 800 (D.C. Cir. 1988) ................................................................ 33

*Nixon v. Adm'r of Gen. Servs.*,
  433 U.S. 425 (1977) ................................................................................ 30

*Old Dominion Dairy Prods., Inc. v. Sec'y of Def.*,
  631 F.2d 953 (D.C. Cir. 1980) ................................................................ 32

*Rattigan v. Holder*,
  689 F.3d 764 (D.C. Cir. 2012) ................................................................ 37

*Reed v. Town of Gilbert, Ariz.*,
  576 U.S. 155 (2015) .......................................................................... 21, 22

*Robert Half Int'l Inc. v. Billingham*,
    315 F. Supp. 3d 419 (D.D.C. 2018) ...................................................... 42

*Roberts v. U.S. Jaycees*,
    468 U.S. 609 (1984) ........................................................................... 18

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
    592 U.S. 14 (2020) ............................................................................. 42

*Romer v. Evans*,
    517 U.S. 620 (1996) ...................................................................... 33, 40

*Rosenberger v. Rector & Visitors of the Univ. of Va.*,
    515 U.S. 819 (1995) ........................................................................... 21

*Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*,
    547 U.S. 47 (2006) ............................................................................. 25

*Rutan v. Republican Party of Ill.*,
    497 U.S. 62 (1990) ............................................................................. 25

*Safex Found., Inc. v. Safeth, Ltd.*,
    531 F. Supp. 3d 285 (D.D.C. 2021) ...................................................... 43

*Schick v. Reed*,
    419 U.S. 256 (1974) ........................................................................... 38

*SEC v. Jarkesy*,
    603 U.S. 109 (2024) ........................................................................... 29

*Seila Law LLC v. CFPB*,
    591 U.S. 197 (2020) ........................................................................... 30

*Sorrell v. IMS Health Inc.*,
    564 U.S. 552 (2011) ........................................................................... 21

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016) ........................................................................... 28

*Swanson v. City of Chetek*,
    719 F.3d 780 (7th Cir. 2013) .............................................................. 33

*Toxco Inc. v. Chu*,
    724 F. Supp. 2d 16 (D.D.C. 2010) ........................................................ 31

*Trentadue v. Integrity Comm.*,
    501 F.3d 1215 (10th Cir. 2007) ........................................................... 31

*U.S. Dep't of Lab. v. Triplett*,
    494 U.S. 715 (1990)..............................................................................26

*United States v. Cronic*,
    466 U.S. 648 (1984)..............................................................................26

*United States v. Curtiss-Wright Exp. Corp.*,
    299 U.S. 304 (1936)..............................................................................38

*United States v. Gonzalez-Lopez*,
    548 U.S. 140 (2006)..............................................................................27

*United States v. Stein*,
    541 F.3d 130 (2d Cir. 2008).........................................................27, 28

*United States v. Williams*,
    553 U.S. 285 (2008)..............................................................................32

*Unity08 v. FEC*,
    596 F.3d 861 (D.C. Cir. 2010).............................................................34

*Vidal v. Elster*,
    602 U.S. 286 (2024)..............................................................................21

*Village of Willowbrook v. Olech*,
    528 U.S. 562 (2000)..............................................................................33

*Virginia v. Am. Booksellers Ass'n*,
    484 U.S. 383 (1988)..............................................................................34

*Warren v. Mayor of Charlestown*,
    68 Mass. (2 Gray) 84 (1854).................................................................45

*Webster v. Doe*,
    486 U.S. 592 (1988)...............................................................35, 36, 37

*West Virginia v. EPA*,
    597 U.S. 697 (2022)..............................................................................29

*Wheat v. United States*,
    486 U.S. 153 (1988).......................................................................26, 27, 28

*Wis. Gas Co. v. FERC*,
    758 F.2d 669 (D.C. Cir. 1985).............................................................42

*Wisconsin v. Constantineau*,
    400 U.S. 433 (1971)..............................................................................31

*Wounded Knee Legal Def./Offense Comm. v. FBI,*
  507 F.2d 1281 (8th Cir. 1974) ........................................................................ 26, 28

*Xiaomi Corp. v. Dep't of Def.,*
  2021 WL 950144 (D.D.C. Mar. 12, 2021) .............................................................. 43

*Youngstown Sheet & Tube Co. v. Sawyer,*
  343 U.S. 579 (1952) ............................................................................................. 29, 30

*Ziglar v. Abbasi,*
  582 U.S. 120 (2017) .................................................................................................... 30

**Statutes**

42 U.S.C. § 2000e-5(b), (f) ............................................................................................. 30

**Other Authorities**

ANI News, *Trump Revokes Security Clearances for Perkins Coie Over DEI Policies* at 1:20-25,
  YouTube (Mar. 6, 2025), https://www.youtube.com/watch?v=lY6ougLkFsc .......................... 6

*Bill of Attainder*, BLACK'S LAW DICTIONARY (12th ed. 2024) ..................................... 30

Memorandum Order, *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the President*,
  No. 25-cv-917 (D.D.C. Mar. 28, 2025), ECF No. 10 ............................................... 16

Off. of the Dir. of Nat'l Intel.,
  Security Executive Agent Directive 4: National Security Adjudicative Guidelines 6 (June 8,
  2017) ....................................................................................................................... 36

*Perkins Coie LLP v. U.S. Dep't of Just.*, No. 25-cv-716 (D.D.C. Mar. 13, 2025), ECF No. 22,
  Perkins TRO Tr. .................................................................................................... 15

*PFLAG, Inc. v. Trump*,
  No. 25-cv-337 (D. Md. filed Feb. 4, 2025) ............................................................... 8

*Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*,
  No. 25-cv-306 (D.D.C. filed Feb. 3, 2025) ............................................................... 8

**Rules**

Fed. R. Civ. P. 56(a) ................................................................................................... 16

**Regulations**

29 C.F.R. pt. 1601 ......................................................................................................... 30

32 C.F.R. § 147.2(a) ...................................................................................................... 36

48 C.F.R. § 9.406-3 .................................................................................................................. 32

## INTRODUCTION

The March 25, 2025 Executive Order (the "Order")—titled "Addressing Risks from Jenner & Block"—targets Jenner & Block LLP ("Jenner" or the "Firm") for its representation of clients with cases adverse to the federal government and its prior association with an individual who has criticized the President. This Court has enjoined operation of the Order—and two other courts have enjoined similar orders—for straightforward reasons: The Order is a plain violation of the First Amendment. Our Constitution forbids attempts by the government to retaliate against citizens and lawyers based on the clients they represent, the positions they advocate, the opinions they voice, and the people with whom they associate. And the consequences imposed by the Order are severe. No lawyer can effectively represent his client when full-throated advocacy that is not aligned with the government's agenda risks governmental reprisal. Yet "[a]n informed, independent judiciary presumes an informed, independent bar," *Legal Services Corp. v. Velazquez*, 531 U.S. 533, 545 (2001), and "relies on lawyers who advocate zealously for all clients," Tr. 54:4–5.[1] The Order thus threatens not only Jenner, but also Jenner's clients and the entire legal system itself.

The Order is one of a series of actual and threatened executive orders retaliating against law firms for speech and association the government does not like. Like the other executive orders targeting other firms, the Order singles out Jenner for sanction, adopting a comprehensive series of restrictions and attempting to use nearly every lever at the President's disposal to limit Jenner's effective advocacy for its clients. The Order limits access to federal buildings—including courthouses—for every one of the Firm's more than 900 attorneys and staff. It tells federal agencies not to meet, or even engage, with Jenner personnel. It suspends all of Jenner's security clearances, including those required for the representation of clients in their most sensitive matters.

---

[1] Citations to "Tr. _" refer to the transcript of the temporary restraining order ("TRO") hearing held on March 28, 2025. ECF No. 10.

And it directs cancelation of "any contract … for which Jenner has been hired to perform any service." Ex. 19 (the "Order"), § 3(b)(i).[2]

These orders send a clear message to the legal profession: Cease certain representations adverse to the government and renounce the Administration's critics—or suffer the consequences. As the *Wall Street Journal* Editorial Board has recognized, the President is taking these actions "to intimidate elite law firms from representing his opponents or plaintiffs who challenge his policies."[3] And the orders are having their intended effect. One major law firm subject to a similar order cut a deal to have the order rescinded; as the President has described the deal, the firm agreed to "engage in a remarkable change of course," to align itself with the Administration's priorities and viewpoints, and to denounce a former partner who had investigated the President.[4] Other law firms have followed suit, on bended knee. As the President himself observed, the settlements have allowed him to "build an unrivaled network of Lawyers" to advance not the interests of their own clients, but instead the government's chosen agenda.[5]

These efforts to single out those who sue the government, to undermine the attorney-client relationship, to deter protected speech, and to punish citizens for their protected associations are irreconcilable with the Constitution, as every court to have considered the question has recognized. The First Amendment prohibits the government from "relying on the threat of invoking legal

---

[2] All references to "Ex. __" refer to the Exhibits attached to the Declaration of Michael A. Attanasio in support of Plaintiff's Motion for Summary Judgment and for Declaratory and Permanent Injunctive Relief.

[3] *See* Ex. 8, Wall St. J. Editorial Bd., *Trump, Perkins Coie and John Adams*, WALL ST. J. (Mar. 11, 2025, 6:59 PM EDT), https://perma.cc/MYF2-ATM8.

[4] Ex. 15, *Addressing Remedial Action by Paul Weiss*, Exec. Order No. 14,244, § 1 (Mar. 21, 2025); *see also* Ex. 13, Michael S. Schmidt, *Law Firm Bends in Face of Trump Demands*, N.Y. TIMES (Mar. 20, 2025), https://perma.cc/H3U4-7UCX.

[5] Ex. 26, Donald J. Trump (@realDonaldTrump), Truth Social (Apr. 2, 2025, 2:05 PM EDT), https://perma.cc/4EVZ-YNNM ("Milbank Post").

sanctions and other means of coercion ... to achieve the suppression of disfavored speech." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 189 (2024) (alteration in original) (internal quotation marks omitted). And it prevents the government from "punish[ing]" citizens for the choice to associate with others for "political, social, economic, educational, religious, and cultural ends." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 606 (2021) (citation omitted). Targeting lawyers, in particular, because of their advocacy for their clients cuts to the core of the constitutional right to counsel and undermines the "essential role that lawyers play in our polity." Tr. 50:23. It is no wonder, then, that this Court held—consistent with the decision of two other courts—that Jenner is likely to succeed on its claims that the Order "facially retaliates against Jenner because of its speech and association" and "constitutes unconstitutional viewpoint discrimination." Tr. 48:1–9.

That the Order is the product of unilateral executive action, without any process, only adds to its unconstitutionality. The Constitution forbids the Executive from condemning its citizens "without notice, … without opportunity to meet the undisclosed evidence[,] … and without opportunity" to object. *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 161 (1951) (Frankfurter, J., concurring). And the Constitution likewise forbids the Executive from singling out citizens for punishment without statutory basis or judicial approval.

The urgency for this Court to enter judgment for Jenner and a permanent injunction is clear. The Order has caused Jenner escalating and irreparable harm. The deprivation of the First Amendment freedoms of Jenner, its personnel, and its clients is alone irreparable and justifies a permanent injunction. But the Order further causes irreparable reputational harm, including by branding Jenner and its attorneys as "partisan," "discriminat[ory]," and untrustworthy. Order § 1. The Order also aims and threatens to cause Jenner severe and unrecoverable economic losses. The

Order caused a meeting with federal personnel to be canceled, and it targets significant Firm clients—those holding contracts with the government—for the express purpose of driving those clients to withdraw their business.

The public interest, too, strongly demands permanent injunctive relief. The "legal profession as a whole is watching and wondering whether its courtroom activities, in the best tradition of lawyering, will cause the federal government to turn its unwanted attention to them next." Tr. 54:25–55:3. Lawyers in our system cannot be effective and single-minded advocates for their clients—as our profession demands—if they are under the continuous threat of collective punishment for their protected speech and associations. The Court should grant summary judgment in Jenner's favor, declare the entire Order unlawful, and permanently enjoin its implementation.

## BACKGROUND

Jenner sets forth the facts in detail in its attached Statement of Undisputed Material Facts ("SUMF") and summarizes some of the key facts here.

### A.    Jenner Is a Leading Global Law Firm.

Founded in 1914, Jenner is a leading global law firm. SUMF ¶ 1. Its more than 500 lawyers (and its more than 900 total personnel) represent clients in high-profile litigation, global investigations, regulatory and government controversies, and sophisticated corporate transactions. *Id.* ¶ 2. The Firm's clients span a broad range of industries, from aerospace and defense to energy, food and beverage, telecommunications, technology, hospitality and real estate, finance, transportation, education, and media and entertainment, among others. *Id.* ¶ 4. Some prominent examples of Jenner's litigation matters from the last few years include a trial win in the Northern District of Illinois holding the nation's largest egg producers and industry groups liable for conspiring to inflate egg prices, and a groundbreaking win in the Second Circuit on behalf of the family of an American citizen killed when Malaysia Airlines Flight 17 was shot down over eastern

Ukraine in 2014. *Id.* ¶ 27. Jenner's commitment to its clients extends to those who cannot afford top counsel: The Firm is proud to have been rated the #1 law firm for pro bono work by the *American Lawyer* for 12 of the past 15 years. *Id.* ¶ 7.

**B.    The President Targets Law Firms for Their Representations of Clients and Their Associations with Administration Critics.**

Through a series of recent executive actions, the President has targeted law firms that have represented clients with cases or causes adverse to the Administration, as well as those firms having affiliations with individuals who have challenged or criticized the President. As the President has put it: "We have a lot of law firms that we're going to be going after."[6]

The President first targeted Covington & Burling LLP, which had represented Jack Smith, the former Special Counsel responsible for overseeing two criminal investigations of the President. The President's February 25, 2025 memorandum directed agencies to "suspend" security clearances held by Covington personnel "who assisted … Jack Smith during his time as Special Counsel." Ex. 4 (Memorandum); *see* Ex. 5 (Fact Sheet). It also directed agencies "to terminate any engagement of [Covington] by any agency to the maximum extent permitted by law." Ex. 4.

Nine days later, on March 6, 2025, the President signed an executive order titled "Addressing Risks from Perkins Coie LLP." Ex. 6. In that order, the President called Perkins Coie "dishonest and dangerous" because it had "represent[ed] failed Presidential candidate Hillary Clinton" and "worked with activist donors" to challenge (often successfully) certain "election laws." *Id.* § 1. The Perkins Coie order also faulted the firm's hiring practices from six years earlier. *Id.* The accompanying "Fact Sheet" criticized Perkins Coie for "fil[ing] lawsuits against the Trump Administration." Ex. 7. In what would become a familiar template, the Perkins Coie order directed

---

[6] Ex. 12, Daniel Barnes, *How Major Law Firms Are Responding to Trump's Attacks*, POLITICO (Mar. 19, 2025), https://perma.cc/2C3P-BD7F.

agencies to suspend the security clearances of all firm employees, restrict their access to federal buildings, refuse to engage with them, and terminate federal contracts held by firm clients. Ex. 6. It also directed the Chair of the Equal Employment Opportunity Commission ("EEOC") to investigate law firms' compliance with Title VII of the Civil Rights Act of 1964. *Id.* §§ 2–5. Upon signing the Perkins Coie order, the President stated, again, that he intended to go after additional firms.[7]

Next on the President's list was Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul Weiss"). Ex. 10 (Order); *see* Ex. 11 (Fact Sheet). According to a March 14, 2025 executive order, Paul Weiss's "harmful activity" included (1) hiring a "former leading prosecutor in the office of Special Counsel Robert Mueller" who "brought a pro bono suit against" January 6 participants; and (2) hiring a lawyer, Mark Pomerantz, who had previously left Paul Weiss to join the Manhattan District Attorney's office "solely" to prosecute the President. Ex. 10, § 1. The Paul Weiss order further alleged that the firm discriminates against its employees on the basis of race and sex. *Id.* The order imposed the same sanctions as the Perkins Coie order. *Id.* §§ 2–5.

Within days, on March 20, 2025, the President announced an "agreement" with Paul Weiss whereby the firm would "dedicate the equivalent of $40 million in pro bono legal services … to support the Administration's initiatives."[8] The next day, the President withdrew the Paul Weiss order, issuing a new order stating that "Paul Weiss indicated that it will engage in a remarkable change of course" and specifying that "Paul Weiss has acknowledged the wrongdoing of its former partner, Mark Pomerantz, and it has agreed to a number of policy changes." Ex. 15, § 1.

---

[7] *See* ANI News, *Trump Revokes Security Clearances for Perkins Coie Over DEI Policies* at 1:20–25, YouTube (Mar. 6, 2025), https://www.youtube.com/watch?v=lY6ougLkFsc.

[8] Ex. 14, Donald J. Trump (@realDonaldTrump), Truth Social (Mar. 20, 2025, 6:10 PM EDT), https://perma.cc/78M3-JPHY ("Paul Weiss Post").

C.    **The President Targets Jenner.**

Then, on March 25, 2025, the President targeted Jenner with an executive order titled "Addressing Risks from Jenner & Block." Ex. 19 (Order).

Aiming to upend Jenner's advocacy for its clients, the Order directs the heads of agencies to (1) "provide guidance limiting" Jenner employees' "official access" to federal buildings "when such access would threaten the national security of or otherwise be inconsistent with the interests of the United States," *id.* § 5(a); to "provide guidance limiting" Jenner employees' "engag[ement]" with federal employees, *id.*; and, "to the extent permitted by law, refrain from hiring employees of Jenner," *id.* § 5(b); (2) require government contractors to "disclose any business they do with Jenner and whether that business is related to the subject of the Government contract," *id.* § 3(a), and to "take appropriate steps to terminate any contract[] … for which Jenner has been hired to perform any service," *id.* § 3(b)(i); and (3) create a new security-clearance review procedure, applicable only to Jenner, "suspend[ing] any active security clearances held by individuals at Jenner" and threatening arbitrary revocation, *id.* § 2(a). The Order also provides that nothing in it "shall be construed to limit" the language in the Perkins Coie order regarding inquiries into compliance with Title VII. *Id.* § 4.

A corresponding Fact Sheet reiterated that "[s]ecurity clearances held by Jenner employees will be immediately suspended"; that the government will "restrict [Jenner's] employees' access to government buildings"; that "Federal Agencies will also refrain from hiring Jenner employees unless specifically authorized"; that "the Federal Government will terminate contracts that involve Jenner;" and that the "practices of Jenner will be reviewed under Title VII." Ex. 20 (Fact Sheet). The Fact Sheet also suggests, without evidence, that "Jenner has been accused of discriminating against its own employees" on the basis of protected categories. *Id.*

The Order makes explicit that it singles out Jenner for its advocacy on behalf of clients, its

past association with a critic of the President, and its employment practices. According to the Order, Jenner's "harmful activity" includes (1) its litigation adverse to the federal government on matters related to gender identity and immigration, which the Order wrongly suggests was unethically paid for with other clients' funds; (2) its affiliation with former partner Andrew Weissmann, who the Order wrongly suggests remains employed by the Firm; and (3) its purported "discriminat[ion]," including its supposed use of "targets." Order § 1. Each is discussed in turn.

### 1. Jenner's Litigation Against the Administration.

The Order accuses Jenner of pursuing "obvious partisan representations to achieve political ends," including litigation that purportedly "attacks … women and children based on a refusal to accept the biological reality of sex, and backs the obstruction of efforts to prevent illegal aliens from committing horrific crimes and trafficking deadly drugs within our borders." Order § 1. And the Order falsely suggests that these or other pro bono representations "for destructive causes" were funded by "hundreds of millions of [Jenner's] clients' dollars." *Id.*

Committing the Firm's *own* resources, Jenner has represented clients affected by the Administration's actions—just as it has during prior administrations. SUMF ¶¶ 64–65. As relevant to the Order, the Firm has represented advocacy groups and individuals in litigation challenging the President's January 28, 2025 directive that federal agencies withhold funds from healthcare institutions that provide gender-affirming care to people under age nineteen. *See PFLAG, Inc. v. Trump*, No. 25-cv-337 (D. Md. filed Feb. 4, 2025). Jenner has also represented nonprofits and individual noncitizens challenging the President's abrogation of certain statutory protections against removal. *See Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*, No. 25-cv-306 (D.D.C. filed Feb. 3, 2025).

### 2. Andrew Weissmann.

The Order also invokes Jenner's connection to Mr. Weissmann, even though he left Jenner

nearly four years ago. SUMF ¶ 58. Section 1 states that "Jenner was 'thrilled' to re-hire the unethical Andrew Weissmann after his time engaging in partisan prosecution as part of Robert Mueller's entirely unjustified investigation" and asserts that there are "numerous reports of Weissmann's dishonesty," including his "overt demand that the Federal Government pursue a political agenda against [the President]." Order § 1. Section 5 also purports to limit Mr. Weissmann's access to federal buildings and eligibility for federal employment, apparently on the mistaken belief that Mr. Weissmann is a current employee of Jenner. *Id.* § 5. When he signed the Order, the President made a point of remarking that "Andrew Weissmann is the main culprit" and a "bad guy."[9]

Mr. Weissmann does not work at Jenner. SUMF ¶ 58. He was a partner at the Firm from 2006 to 2011, and again from 2020 to 2021. *Id*. Prior to his second stint at the Firm, Mr. Weissmann served on the Department of Justice team that investigated Russian interference in the 2016 election. *Id*. ¶ 59. Following his work with Special Counsel Mueller, Mr. Weissmann authored a non-fiction book, *Where Law Ends: Inside the Mueller Investigation*, which was highly critical of the President. *Id*. Mr. Weissmann also became a legal analyst for MSNBC, where, again, he was a frequent and vocal critic of the President. *Id*.

Mr. Weissmann's statements about the President and his role on Special Counsel Mueller's team have drawn frequent criticism from the Administration. The President has called him, for instance, the "Scum of the Earth" and a "horrible" person.[10] He has suggested that Mr. Weissmann and those affiliated with him "should be sued" for being "a political organization that goes after

---

[9] Ex. 18, Brett Samuels, *Trump Signs Order Targeting Law Firm That Employed Mueller Team Prosecutor*, THE HILL (Mar. 25, 2025), https://perma.cc/6234-SBMW.

[10] Ex. 9, *Speech: Donald Trump Addresses the Staff at the Department of Justice—March 14, 2025*, ROLL CALL, https://perma.cc/5JVA-J9E7 ("DOJ Speech"); Ex. 1. Donald J. Trump (@realDonaldTrump), Truth Social (Sept. 5, 2022, 6:07 PM EDT), https://perma.cc/DC3Z-TJMP.

Trump."[11] In a March 14, 2025 speech at the Department of Justice, the President once again accused Mr. Weissmann and others, including Jack Smith, of being "scum" who were participating in a "coordinated … campaign" against him.[12] On March 22, 2025, the President rescinded Mr. Weissmann's security clearance, together with those of Antony Blinken, Alvin Bragg, Hillary Clinton, Elizabeth Cheney, Kamala Harris, President Biden, and others. Ex. 17.

### 3.    Jenner's Hiring Practices.

The Order additionally singles out Jenner because of the Administration's conclusion that the Firm "discriminates against its employees based on race and other categories prohibited by civil rights laws, including through the use of race-based 'targets.'" Order § 1. The Fact Sheet goes further, alleging that "Jenner has been accused of discriminating against its own employees." Ex. 20. The Administration cites no evidence for its conclusions, and it provided Jenner no process before issuing the Order—no notice, no ability to present evidence, and no opportunity to be heard.

### D.    The Order Threatens Irreparable Harm to Jenner's Active Matters, Its Clients, and Its Business.

As intended, the Order has caused concrete, significant, and irreparable harm to Jenner and its clients. The Order disparages Jenner's reputation, labeling the firm as "partisan" and "discriminat[ory]," and questioning Jenner's "values and priorities." Order § 1. Moreover, because of the Order's vague terms, many clients have requested frequent updates about the Order's status to evaluate whether the Firm can continue to represent them. SUMF ¶ 74. Many of Jenner's largest clients hold significant government contracts. *Id.* ¶¶ 74, 83. They want to continue using their chosen counsel but are fearful of government retribution. *Id.* ¶ 74. If allowed to stand, these

---

[11] Ex. 2, *Press Conference: Donald Trump Holds a Press Conference in New York—September 6, 2024*, ROLL CALL, https://perma.cc/T87G-K27Q.

[12] *See* DOJ Speech, *supra* note 10.

irreparable harms will continue and compound. These and additional harms are discussed in more detail below.

### 1.    Access to Federal Buildings and Government Personnel.

First, the Order directs agencies to "limit[]" Jenner employees' "official access" to federal buildings "when such access would threaten the national security of or otherwise be inconsistent with the interests of the United States," and to "limit[]" Jenner employees' "engag[ement]" with federal employees. Order § 5(a). This restriction imposes significant and irreparable injury.

Jenner lawyers cannot effectively represent their clients without reliable access to federal buildings or the ability to engage with federal employees. SUMF ¶ 75. The Firm's nationally recognized litigators appear constantly in federal courts. *Id*. ¶ 27. Those litigators also routinely need to communicate with government counsel on these cases, including in person. *Id*. ¶¶ 13, 15, 18, 27. The Firm's Government Controversies lawyers frequently visit federal buildings and communicate with government personnel for important meetings, interviews, and negotiations, many of which are only offered in person. *Id*. ¶¶ 19–21. Jenner's Investigations, Compliance, and Defense lawyers are hired to directly interface, including at in-person meetings, with a wide range of federal authorities. *Id*. ¶¶ 22–24.

The Order thus significantly hampers Jenner's ability to effectively represent its clients. Within days of the Order, one client informed Jenner that it was instructed by the Department of Justice not to bring counsel from Jenner to an upcoming meeting. *Id*. ¶ 76. Other clients indicated that their relationships with Jenner could be threatened if Jenner could not enter federal courthouses. *Id*. ¶¶ 75, 78. And Jenner attorneys have spent significant time discussing the impacts of the Order with clients and developing workarounds to its limitations. *Id*. ¶ 80. Jenner will continue incurring such harms so long as the Order is not permanently enjoined.

2.      **Threats to Jenner's Relationships with Government-Contractor Clients.**

Second, the Order requires Jenner's government-contractor clients to disclose "any business they do with Jenner," regardless of whether that business relates to the client's federal contract, and regardless of whether the services, the client, or the lawyers involved have anything to do with the President's allegations. Order § 3(a). Following disclosure that a contractor works with Jenner, agencies "shall" take steps "to terminate any contract, to the maximum extent permitted by applicable law, … for which Jenner has been hired to perform any service." *Id.* § 3(b)(i).

Many of Jenner's largest clients hold contracts with the federal government. SUMF ¶ 83. Over the last five years, more than 40 percent of the Firm's revenue has come from clients who are government contractors, subcontractors, or affiliates. *Id*. The Order intentionally seeks to disrupt Jenner's relationships with those clients. What's more, many of Jenner's clients holding government contracts are represented by the Firm for legal matters entirely unrelated to those contracts. *Id*. ¶ 85. And for many of those clients, the fact that the Firm provides them legal advice is not public information. *Id*. ¶ 86. The Order risks requiring clients to divulge privileged information regarding consultation of counsel, with the concomitant (even more harmful) risk that the Administration will in turn terminate their government contracts. Indeed, following the Order, government-contractor clients quickly expressed concerns about government-mandated disclosure of their relationships with the Firm and the impact that may have on their own relationships with the federal government. *Id*. ¶¶ 74, 88.

3.      **Security Clearance Review.**

Third, the Order establishes a Jenner-specific "Security Clearance Review" process pursuant to which agency heads must "immediately take steps … to suspend any active security

clearances held by individuals at Jenner." Order § 2(a). In the past five years, the Firm has been engaged on at least eight matters that required lawyers to hold clearances. *See* SUMF ¶ 41. At least six Jenner lawyers currently hold active clearances in connection with client representations that required access to classified information, and at least two of those representations are ongoing. *Id.* ¶¶ 40–41. The "Security Clearance Review" undermines the Firm's ability to assist clients in those matters and threatens its ability to attract future clients. *Id.* ¶¶ 81–82.

In addition, several Jenner personnel possess security clearances in connection with ongoing military service, unrelated to their work at the Firm. *Id.* ¶¶ 36, 38. The Order risks forcing these individuals to choose between keeping their jobs and serving their country. *Id.*

### E.    Further Developments Following the Jenner Order.

The orders did not stop with Jenner. On March 27, 2025, the President targeted Wilmer Cutler Pickering Hale and Dorr LLP ("WilmerHale"). Ex. 21 (Order); Ex. 22 (Fact Sheet). That order targeted WilmerHale for its pro bono representations and its association with former Special Counsel Mueller and two other attorneys who worked on the Mueller investigation. Ex. 21 § 1. It imposes the same sanctions as the Order targeting Jenner. *Id.* §§ 2–5.

Since then—including after a temporary restraining order ("TRO") was issued in this case—the President has announced a series of "settlements" to head off similar executive orders. The law firms Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden"), Willkie Farr & Gallagher LLP ("Willkie"), and Milbank LLP ("Milbank") each agreed to provide millions of dollars in pro bono work to causes endorsed by the Administration.[13] The President explained he is "build[ing]

---

[13]  Ex. 23, Daniel Barnes, *Major Law Firm Strikes Preemptive Deal with White House*, POLITICO (Mar. 28, 2025), https://perma.cc/2MWM-LVLR; *see also* Ex. 24, Donald J. Trump (@realDonaldTrump), Truth Social (Mar. 28, 2025, 1:57 PM EDT), https://perma.cc/2EF8-QP5T (Skadden); Ex. 25, Donald J. Trump (@realDonaldTrump), Truth Social (Apr. 1, 2025, 4:47 PM EDT), https://perma.cc/7QK8-D6BD (Willkie); Ex. 26, Milbank Post.

an unrivaled network of Lawyers, who will put a stop to Partisan Lawfare in America."[14]

### F.    Procedural History.

On March 28, 2025, Jenner filed the instant action, seeking (1) a declaration that the Order is unconstitutional; and (2) a permanent injunction of the Order's implementation. ECF No. 1 at 63. This Court granted a TRO the same day.[15] The Court first concluded that "Jenner is likely to succeed on its claim that the Executive Order retaliates against it for its protected speech in violation of the First Amendment," because it "explicitly targets Jenner because of the speech the firm engages in," because of "the viewpoints it represents in litigation," and because "it was associated with[] Andrew Weissmann." Tr. 46:23–25, 47:10–17. The Court explained: The "Order facially retaliates against Jenner because of its speech and association is sufficient to show that the firm is likely to succeed on the merits of the First Amendment retaliation claim." Tr. 48:1–5.

The Court further concluded that "Jenner is likely to succeed on the merits of its claim that the Executive Order constitutes unconstitutional viewpoint discrimination." Tr. 48:7–9. In the Court's view, "[l]ittle need be said to show why the Executive Order places restrictions on Jenner based on the particular views the firm has taken." Tr. 48:20–22. That was because "all that need be said is said by the Executive Order itself," which attacks Jenner's "litigation positions in court" in the course of representations relating to transgender and immigration issues. Tr. 48:22–23, 49:2. The Court found that "[t]here is no cogent argument that these viewpoint-based sanctions are likely

---

[14]  Ex. 26, Milbank Post.

[15] As of the time of this filing, the Department of Justice had not yet complied with the requirement in the TRO that non-defendant agencies receive notice of the TRO specifically from Attorney General Pamela Bondi and Office of Management and Budget Director, Russell Vought. ECF No. 9.  Defendants' Status Report and Further Status Report on March 31, 2025 (ECF Nos. 11 & 12) acknowledge non-compliance, citing "logistical issues" (ECF No. 12).  Counsel have conferred on multiple occasions regarding this issue, however Defendants have not provided a definitive date by which the notice will be circulated.

to pass strict scrutiny," because the Order merely "gives lip service to the interests of public safety and national security" and imposes a sweeping "limit placed on everyone, from managing partners to office staff." Tr. 49:6–50:5. Finally, the Court concluded that the "First Amendment harms the Executive Order inflicts are magnified by its additional Fifth and Sixth Amendment deficiencies," because the Order "target[s] Jenner for its activities" on behalf of clients in both civil and criminal cases. Tr. 50:20–51:4.

The Court then found that Jenner had suffered irreparable economic and constitutional harm, and that the balance of the equities and the public interest favored a TRO. Tr. 51:6–53:21. In particular, the Court concluded that it was "emphatically in the public interest" to issue a TRO because "[o]ur legal system relies on lawyers who advocate zealously for all clients," and the Order's "disturbing" targeting of law firms' pro bono work could "chill[]" them from "representing some of the most vulnerable individuals and social groups." Tr. 53:22–54:13. The Court therefore enjoined Defendants "from implementing or enforcing Sections 3 and 5" of the Order (the substantive provisions from which Jenner had requested emergency relief) and enjoined Defendants from "using the statements laid out in Section 1 of the Executive Order in any interactions with" Jenner or its clients. ECF No. 9 at 1. The Court further directed Defendants to take steps necessary to prevent the implementation of Sections 3 and 5. *Id*. at 1–2. On the parties' consent, the Court extended the TRO until final judgment. ECF Nos. 13, 14.

The Court's approach was consistent with the TROs that Perkins Coie and WilmerHale received in their challenges to similar executive orders. Judge Howell explained that the Perkins Coie order "is a means of retaliating against Perkins Coie for representing individual clients who are the President's political opponents" and for "representing clients in litigation seeking results the President does not like." *See Perkins Coie LLP v. U.S. Dep't of Just.*, No. 25-cv-716 (D.D.C.

Mar. 13, 2025), ECF No. 22, Perkins TRO Tr. at 76:12–17. Judge Leon similarly concluded that the "retaliatory nature of the [WilmerHale order] ... is clear from its face," and that "[t]here is no doubt this retaliatory action chills speech and legal advocacy, or that it qualifies as a constitutional harm." Memorandum Order at 2, *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the President*, No. 25-cv-917 (D.D.C. Mar. 28, 2025), ECF No. 10.

## LEGAL STANDARD

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A dispute is "genuine" only if "the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party." *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006) (citation omitted).

## ARGUMENT

The Order is patently unconstitutional and should be permanently enjoined in full. Section 1 of the Order expressly describes the basis for the President's retaliation against Jenner—the Firm's protected expression and its association with a personal enemy of the President. To operationalize that animus, the remainder of the Order prescribes a series of instructions on how the Executive Branch must exact revenge against Jenner. This is precisely the type of First Amendment retaliation and discrimination that the Constitution forbids, made all the worse for the utter lack of due process it affords. And graver still, the Order targets lawyers—thus implicating the constitutional right to counsel and the separation of powers between the Executive and the Judiciary. Thus, it makes no difference whether the Order's dictates are analyzed seriatim or as a unit. Each of the Order's provisions directs government action for an impermissible purpose, in a manner that burdens constitutional rights, and in excess of the President's authority. Each provision injures Jenner, and each is unconstitutional. The Order should be enjoined in its entirety.

16

I.      **JENNER IS ENTITLED TO SUMMARY JUDGMENT ON ITS CLAIMS THAT THE ORDER IS UNCONSTITUTIONAL.**

      A.      **The Order Violates the First Amendment.**

"[T]he First Amendment prohibits government officials from relying on the 'threat of invoking legal sanctions and other means of coercion ... to achieve the suppression' of disfavored speech." *Vullo*, 602 U.S. at 189 (second alteration in original) (citation omitted). It also bans "punish[ment]" based on the choice to associate with others for "political, social, economic, educational, religious, and cultural ends." *Ams. for Prosperity*, 594 U.S. at 606. The President can say what he wants about Jenner's representation of clients or its affiliation with a prominent critic. But he may not direct agencies to take *actions* against the firm for that protected activity. The Order's retaliation against lawyers acting on behalf of their clients is particularly egregious given the American system relies on zealous, adversarial advocacy to resolve legal disputes and protect legal rights. It thus violates the First Amendment in a litany of ways.

        1.      **The Order Unlawfully Retaliates Against Jenner's Speech, Association, and Petitioning.**

"[T]he First Amendment prohibits government officials from subjecting an individual to retaliatory actions … for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006). Here, the Order retaliates against Jenner for the protected speech of the Firm, its clients, and its former partner; retaliates against Jenner and its clients for engaging in associations that are contrary to the President's views and policies; and retaliates against Jenner for litigation activities protected by the Petition Clause. The Order makes no attempt to hide its retaliatory intent, which is stated on the face of the Order itself. The Order must therefore be held unlawful under the First Amendment.

First, the Order retaliates against the speech of Jenner and its clients. "[A]dvocacy by the attorney to the courts" is speech protected by the First Amendment. *Legal Servs.*, 531 U.S. at 542–43. Because "[l]itigation itself is a form of expression protected by the First Amendment," it is

"indisputable that attorneys and parties retain their First Amendment rights even as participants in the judicial process." *In re Halkin*, 598 F.2d 176, 187 (D.C. Cir. 1979), *overruled on other grounds by Seattle Times Co. v. Rhinehart*, 467 U.S. 20 (1984). The Order states that Jenner engages in "obvious partisan representations to achieve political ends," such as representations on behalf of transgender people and immigrants. Order § 1. The phrase "obvious partisan representations to achieve political ends" is precisely synonymous with "pure speech protected by the First Amendment." Yet the Order imposes harsh sanctions against Jenner and its clients because of their protected expression. That is textbook First Amendment retaliation.

The Order also retaliates against Jenner based on the constitutionally protected speech of a former Jenner partner. Mr. Weissmann has exercised his First Amendment right to criticize the President, including in a book and as a commentator. SUMF ¶ 59. The Order describes Mr. Weissmann's speech as demonstrating "dishonesty" because Mr. Weissman is alleged to have made an "overt demand that the Federal Government pursue a political agenda against [the President]." Order § 1. The Order criticizes Jenner for being "thrilled" to hire Mr. Weissmann, concluding that Jenner's decision to associate with Mr. Weissmann is "a concerning indictment of Jenner's values and priorities." *Id.* A U.S. citizen's demand for action regarding the President is protected speech. The President may not retaliate against that speech based on his viewpoint that it is "dishonest[]" or "political." *Id.*

Nor may the President retaliate based on his view that Jenner's association with Mr. Weissmann casts doubt on Jenner's "values and priorities." *Id.* The Supreme Court has "long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984). The right to expressive association is "especially important in preserving political … diversity and

in shielding dissident expression from suppression by the majority." *Id.* The Order states that Jenner's decision to associate with Mr. Weissmann is "a concerning indictment of Jenner's values and priorities"—an explicit statement that the President views Jenner as having engaged in expressive association. *See Boy Scouts of Am. v. Dale*, 530 U.S. 640, 650 (2000) ("[A]n association that seeks to transmit … a system of values engages in expressive activity."). The First Amendment prohibits the government from punishing Jenner based on that perceived expressive association. *See Heffernan v. City of Paterson, N.J.*, 578 U.S. 266, 273 (2016).

Finally, the Order also retaliates against activity protected by the Petition Clause, which safeguards "the right of individuals to appeal to courts and other forums established by the government." *Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 387 (2011); *see Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972) ("the right to petition extends to all departments of the Government"). Protected petitioning activity can "take[] the form of a lawsuit" as well as advocacy before executive agencies. *Borough of Duryea*, 564 U.S. at 390. Yet the Order expressly penalizes Jenner based on the cases it has litigated.

The President's retaliatory intent—apparent from the face of the Order—is confirmed by the President's other statements and executive orders targeting one firm after another based on the clients they have represented, the positions they have advocated, and the individuals with whom they have associated. The Perkins Coie order emphasizes that the firm "represent[ed] failed Presidential candidate Hillary Clinton," "worked with activist donors" on election-law litigation, and "filed lawsuits against the Trump Administration." Ex. 6 § 1. Paul Weiss filed lawsuits "on behalf of clients, pro bono," challenging government policies, and brought "a pro bono suit against individuals alleged to have participated in the events … o[f] January 6, 2021." Ex. 10 § 1. And WilmerHale (the President says) engaged "in obvious partisan representations to achieve political

ends," including voting-rights litigation. Ex. 21 § 1. Each targeted firm has also represented or associated with individuals the President does not like.

Two further aspects of the Order make the unconstitutional retaliation especially egregious. The first is the Order's focus on alleged *political* speech and petitioning, where First Amendment protection is at its zenith. The First Amendment "was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 269 (1964) (citation omitted). Yet the Order expressly targets perceived political speech: It alleges that "Jenner engages in obvious partisan representations to achieve political ends." Order § 1. Likewise, the Order focuses on Jenner's litigation activities encompassed by the "right to petition," which is "one of the most precious of the liberties safeguarded by the Bill of Rights." *Lozman v. City of Riviera Beach, Fla.*, 585 U.S. 87, 101 (2018) (citation omitted). When the government seeks to retaliate for a "lawsuit" and "criticisms of public officials," it targets speech that is "high in the hierarchy of First Amendment values." *Id.*

In addition, the Order seeks not only to punish political speech in the past, but also to deter political speech in the future. "Official reprisal for protected speech offends the Constitution because it threatens to inhibit exercise of the protected right …." *Hartman*, 547 U.S. at 256 (internal quotation marks and alterations omitted). That is the whole point: To inhibit Jenner's protected advocacy on behalf of its clients and to coerce it to support favored government causes. The Order states that "law firms regularly conduct … harmful activity through their powerful pro bono practices, earmarking hundreds of millions of their clients' dollars for destructive causes." Order § 1. The Order is "committed to addressing" that pro bono activity, *id.*—activity that this Court has noted is "emphatically in the public interest," Tr. 54:9–10. Thus, the Order's goal is to achieve a "remarkable change of course," SUMF ¶ 49, and deter future exercises of core political

speech and petitioning—precisely what the prohibition on retaliation is designed to prevent.

### 2.    The Order Unlawfully Discriminates Based on Viewpoint.

The Order also discriminates based on viewpoint. Viewpoint discrimination is a "'blatant' and 'egregious form of content discrimination'" subject to strict scrutiny. *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 168–69 (2015) (quoting *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995)); *see Vidal v. Elster*, 602 U.S. 286, 293 (2024). A finding that the government has discriminated based on viewpoint is "all but dispositive" in a First Amendment challenge. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 571 (2011). First Amendment protection is particularly important for lawyers, whose very profession is to help people—including those with disfavored viewpoints—express and vindicate their rights through constitutionally guaranteed due process. A lawyer is no less protected when expressing his viewpoint through the choice to represent a particular client than he would be if he expressed his viewpoint on a sign on his front lawn. As the Supreme Court has explained, the First Amendment cannot tolerate attempts to "draw lines around" those arguments that the government "finds unacceptable but which by their nature are within the province of the courts to consider." *Legal Servs.*, 531 U.S. at 546.

Here, "[l]ittle need be said to show why the Executive Order places restrictions on Jenner based on the particular views the firm has taken," because "all that need be said is said by the Executive Order itself." Tr. 48:20–23. The Order expressly targets Jenner for its alleged "obvious partisan representations to achieve political ends." Order § 1. And it further targets Jenner for its litigation positions in court on behalf of transgender and immigrant clients. Transgender rights and immigration are areas of intense social debate, and the Order singles out Jenner because it has advocated for positions on behalf of clients that reflect viewpoints in those debates contrary to those of the current Administration. That is viewpoint discrimination. Indeed, the President's decisions to withdraw the sanction against Paul Weiss based on that firm's promise to do $40

21

million in pro bono work that the President supports, and to preemptively "settle" with Skadden, Willkie, and Milbank for $100 million pro bono commitments to the President's causes, only confirm that the Order discriminates against viewpoints contrary to the Administration's own.

The Order also imputes Mr. Weissmann's viewpoint to Jenner, and then targets Jenner because he was a former partner of the Firm, which purportedly casts doubt on Jenner's "values." *Id.* Put another way, the Order concludes that Jenner has the wrong "values" because it has the wrong (imputed) viewpoint. This is patently unconstitutional viewpoint discrimination.

The Order's viewpoint discrimination cannot withstand strict scrutiny. A regulation that discriminates based on viewpoint can survive only if it "furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed*, 576 U.S. at 171; *see Frederick Douglass Found., Inc. v. District of Columbia*, 82 F.4th 1122, 1141 (D.C. Cir. 2023). But "[t]here is no cogent argument that these viewpoint-based sanctions are likely to pass strict scrutiny." Tr. 49:6–8. After all, "'a bare … desire to harm a politically unpopular group'" is "not [a] legitimate state interest[]," much less a compelling one. *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 446–47 (1985) (citation omitted). And the Order otherwise only "gives lip service" to purported interests in "public safety and national security." Tr. 49:13–16.

Nor, in any case, does the Order make even the slightest effort to narrowly tailor its sanctions. To the contrary, the Order bars every Jenner partner, associate, and staff member from government buildings, government meetings, government employment, and government contracts, and threatens immediate suspension of their security clearances, all because of pro bono representations that most people at the Firm did not work on and because of the speech of a single individual who no longer works there. *Cf.* Tr. 49:16–50:10. The Order's breadth proves that it is not about advancing any compelling state interest the government might attempt to muster.

### 3.    The Order Unlawfully Abridges Jenner and Its Clients from Engaging in Protected Petitioning Activity.

The Order not only punishes Jenner for past petitioning activity, but also directly prevents Jenner from engaging in such activity going forward. The Order directs agencies to "limit[] … access from Federal Government buildings to employees of Jenner," and to limit "Government employees acting in their official capacity from engaging with [Jenner] employees," Order § 5(a), thereby restricting Jenner and its clients from petitioning the Executive Branch and the courts alike. Jenner cannot effectively petition for redress of grievances on behalf of its clients when government officials refuse to speak to its attorneys and bar them from entering government buildings. The Constitution forbids the government from punishing protected past First Amendment activity by inhibiting future First Amendment activity.

### 4.    The Order Unlawfully Violates the Associational Rights of Jenner and Its Clients by Compelling Disclosures.

The Order further violates the First Amendment by compelling individuals to disclose "affiliation[s] with groups engaged in advocacy." *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958). "[T]he protections of the First Amendment are triggered" by even the "*risk* of a chilling effect on association." *Ams. for Prosperity*, 594 U.S. at 618–19 (emphasis added). And here, the Order produces a "chilling effect in its starkest form," including with "threat[s]" of "economic reprisals." *Id.* at 606. The Order "require[s] [g]overnment contractors to disclose *any* business they do with Jenner," regardless of "whether that business is related to the subject of the Government contract." Order § 3(a) (emphasis added). It directs agency heads to conduct an "assessment of contracts … with entities that do business with Jenner." *Id.* § 3(b)(ii). In other words, if a contractor associates with Jenner, it must disclose that association to the government. The "Fact Sheet" explains that the goal is "[t]o ensure taxpayer dollars no longer go to contractors whose earnings subsidize activities not aligned with American interests"—that is, to punish any

23

contractor that associates with Jenner. Ex. 20.

Compelled disclosure of association is subject to "exacting scrutiny." *Ams. for Prosperity*, 594 U.S. at 618. The Order cannot satisfy any standard of scrutiny, much less exacting scrutiny. Requiring all "[g]overnment contractors to disclose any business they do with Jenner" irrespective of "whether that business is related to the subject of the Government contract," Order § 3(a), is not the kind of "narrow specificity" that the First Amendment demands, *NAACP v. Button*, 371 U.S. 415, 433 (1963). The government's interest "in amassing sensitive information for its own convenience is [always] weak," *Ams. for Prosperity*, 594 U.S. at 618, and all the more so where the disclosure requirement's aim is to chill. Many of Jenner's engagements are confidential, and even where they are not, "each governmental demand for disclosure brings with it an additional risk of chill." *Id.* Indeed, even when (unlike here) the government has some non-pretextual interest in investigating "wrongdoing," it cannot impose "[indiscriminate] disclosure requirement[s]." *Id.*

Jenner has standing to bring this claim on behalf of its clients. By compelling the disclosure of Jenner's attorney-client relationships (many confidential), the Order targets Jenner's business by pressuring its government-contractor clients. Indeed, in the Supreme Court's seminal compelled-disclosure case, the Court agreed that the NAACP had standing to "assert, on behalf of its members, a right personal to them to be protected from compelled disclosure by the [government] of their affiliation with the [NAACP]." *Patterson*, 357 U.S. at 458. The same principle permits Jenner to assert its government-contractor clients' right to be free from compelled disclosure. And Jenner's standing to assert this claim for its clients also follows from the usual three-part test governing third-party standing: (i) Jenner is injured by the disclosure requirement (which is designed to cause Jenner to lose clients); (ii) Jenner has a "close relation" with its clients; and (iii) Jenner's clients are "hind[e]r[ed]" from challenging the disclosure requirements and

"protect[ing] [their] own interests" because such a challenge would require clients to disclose their relationship with Jenner, exactly what they have a right not to do. *Ctr. for Democracy & Tech. v. Trump*, 507 F. Supp. 3d 213, 223–24 (D.D.C. 2020) (citation omitted).

### 5.    The Order Unlawfully Conditions Government Services and Benefits on Forgoing Protected Rights.

The First Amendment also forbids the government from creating a patronage system that conditions access to government services and benefits on toeing the party line when it comes to matters of speech, advocacy, and association. Yet the Order "'den[ies] a benefit to a person on a basis that infringes his constitutionally protected'" rights—and that is illegal "'even if he has no entitlement to that benefit.'" *Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 59 (2006) (citation omitted). And the Order further "leverage[s] funding to regulate speech" or other protected conduct "outside the contours of the [government] program itself." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214–15 (2013). By imposing a broad disclosure requirement and including vague directives about terminating contracts "for which Jenner has been hired to perform any service," Order § 3(b)(i), the Order attempts to use public contracts to go beyond directing the expenditure of the government's own money to control protected speech and association outside the scope of the contract. *Id.* Indeed, the Order is even more egregious because it largely targets *entitlements* (not benefits), like access to government buildings, government decisionmakers, and government jobs, in common with the public at large. But the Supreme Court and this Court have been clear that (for example) "conditioning hiring decisions on political belief and association plainly constitutes an unconstitutional condition." *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 78 (1990); *see also, e.g.*, *Hubbard v. EPA*, 949 F.2d 453, 460 (D.C. Cir. 1991). In this manner, too, the Order runs afoul of the First Amendment.

**B.    The Order Violates the Sixth Amendment and Due-Process Rights to Counsel.**

The Order also violates the constitutional rights to counsel of Jenner's clients, as guaranteed by the Fifth and Sixth Amendments. *See* Tr. 50:19–51:5 (concluding that Jenner is likely to succeed on the merits of its right-to-counsel claims). The right to counsel "is essential" because it is "the means through which the *other* rights … are secured." *United States v. Cronic*, 466 U.S. 648, 653 (1984) (emphasis added). And the right to counsel "is indispensable to the fair administration of our adversarial system." *Maine v. Moulton*, 474 U.S. 159, 168 (1985). The Order unconstitutionally seeks to interfere with the attorney-client relationship by applying nearly every lever of governmental authority to impede the ability of Jenner's clients to receive effective counsel and select the counsel of their choice.

First, the Order violates Jenner's clients' right to effective assistance of counsel. Both the Fifth and Sixth Amendments protect litigants' right to counsel when desired and lawyers' corresponding right to maintain that representation free from arbitrary or unjustified governmental interference. *See U.S. Dep't of Lab. v. Triplett*, 494 U.S. 715, 720–21 (1990); *Wheat v. United States*, 486 U.S. 153, 158–59 (1988). The government must "honor" the right to counsel and has an "an affirmative obligation not to act in a manner that circumvents and thereby dilutes the protection afforded by the right to counsel." *Moulton*, 474 U.S. at 170–71. And at minimum, the government may not "interfere[] with [the lawyer's] professional obligation to [the] client and thereby … invade[] the client's constitutional right," including via "harass[ing]" restrictions that "fetter[]" the lawyer's ability to fully and zealously represent the client. *Wounded Knee Legal Def./Offense Comm. v. FBI*, 507 F.2d 1281, 1284 (8th Cir. 1974).

The Order disregards these bedrock constitutional protections. Jenner represents clients in criminal prosecutions, civil enforcement actions, regulatory matters, and government-contracts disputes, as well as in other matters of all stripes. Jenner presently has roughly 540 active matters

pending before federal courts on behalf of clients, as well as numerous matters before dozens of agencies that require access to federal government buildings and officials. SUMF ¶¶ 10, 12, 15, 33. The Order impedes Jenner's clients' right to effective counsel in these matters by barring Jenner attorneys from entering government buildings, engaging with government officials, or perhaps even attending court. In practical terms, that means Jenner could not attend meetings and hearings, confer on discovery and procedural matters, or perform other routine tasks required of counsel. *Id.* ¶¶ 8–34. For example, plea agreements often require substantive and extended negotiations. Yet the Order blocks the Firm's attorneys from engaging in such discussions, and before the TRO issued, clients were told that meetings could not go forward if Jenner lawyers attended. *Id.* ¶ 76.

The Order, moreover, punishes some Jenner clients *because* Jenner's advocacy has been effective. In the two specific areas of litigation referenced in the Order, Jenner obtained preliminary injunctions or TROs. Nothing could be more destructive to the right to effective counsel than allowing the Executive Branch to punish lawyers because they have prevailed in litigation against the federal government. Indeed, the Judiciary depends on the committed advocacy of counsel opposing the government to ensure that the Executive stays within its statutory and constitutional limits.

Second, the Order infringes the "right to choose one's own counsel." *Wheat*, 486 U.S. at 159. This right "has been regarded as the root meaning of the constitutional guarantee." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 147–48 (2006). After all, "the right to counsel in an adversarial legal system would mean little if … counsel could be controlled by the government or vetoed without good reason." *United States v. Stein*, 541 F.3d 130, 154 (2d Cir. 2008). The Order takes square aim at this right. SUMF ¶¶ 74–79, 81.

27

It does not matter that the Order operates by pressure and threat rather than command. A "government official cannot do indirectly what []he is barred from doing directly." *Vullo*, 602 U.S. at 190. And though the right to counsel is of course "qualified" by traditional requirements of bar membership and conflicts rules, *Wheat*, 486 U.S. at 159, the Order does not operate within those recognized limits. To the contrary, the Order falls into the category of impermissible governmental coercion that seeks to pressure particular parties to sever their relationships with particular counsel without a "compelling justification[]." *Stein*, 541 F.3d at 145, 156. The Order therefore unlawfully violates the right to counsel guaranteed by the Fifth and Sixth Amendments.

Jenner has standing to challenge the Order's infringement of its clients' right to counsel. The Order causes Article III injury to Jenner by impeding its ability to provide effective counsel to those who choose it, as well as to the Firm's bottom line. Declaring the Order unlawful and permanently enjoining it would redress those harms. *See, e.g.*, *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). And Jenner has prudential, third-party standing to challenge violations of its clients' rights to counsel given the "special consequence" of the attorney-client relationship and the obvious "obstacle[]" that the threat of, *inter alia*, lost access to federal buildings and personnel poses to Jenner's clients' ability to protect their own interests. *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 623 n.3 (1989); *see Wounded Knee*, 507 F.2d at 1284 ("[A] lawyer has standing to challenge any act which interferes with his professional obligation to his client and thereby, through the lawyer, invades the client's constitutional right to counsel.").

**C.    The Executive Order Violates the Separation of Powers and Exceeds the President's Authority.**

The Order also violates the separation of powers and exceeds the President's statutory and constitutional authority. The Order violates the separation of powers by intruding on the "proper exercise of the judicial power." *Legal Servs.*, 531 U.S. at 545. Courts "depend" on attorneys to

"present all the reasonable and well-grounded arguments necessary for proper resolution of the case." *Id.* The separation of powers therefore bars the Executive from "exclud[ing] from litigation those arguments and theories [it] finds unacceptable but which by their [very] nature are within the province of the courts to consider." *Id.* at 546. Similarly, it is the Judiciary, not the Executive, which has the "inherent power[]" to determine whether an attorney has engaged in litigation misconduct. *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 107 (2017); *see also Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991). And, in any case, the Order identifies no ethical misconduct in the areas of litigation it references—where in fact Jenner attorneys often *prevailed*. The President may not summarily countermand the determinations of judges who presided over those proceedings by deeming Jenner's exemplary litigation conduct as worthy of sanction. To the contrary, the "separation of powers that the Constitution demands" rejects that kind of "concentrat[ion]" of "prosecutor, judge, and jury in the hands of the Executive Branch." *SEC v. Jarkesy*, 603 U.S. 109, 140 (2024).

The Order also exceeds Presidential authority. "[B]lack letter law" provides that the authority to issue an executive order "'must stem either from an act of Congress or from the Constitution itself.'" *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 188–89 (1999) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952)). The President does not have unfettered authority to make law. Quite the opposite: "the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker." *Medellín v. Texas*, 552 U.S. 491, 526–27 (2008) (quoting *Youngstown*, 343 U.S. at 587).

Here, the Order cites no statutory basis for sanctioning an entire law firm for its general representation of clients—and there is none. The need for clear statutory authorization is particularly pressing here under at least two mutually reinforcing doctrines. First, because the

Order seeks to burden Jenner's representation of clients and threatens the cancelation of valuable contracts, it implicates novel questions of broad "economic and political significance" requiring a clear statement from Congress. *West Virginia v. EPA*, 597 U.S. 697, 721 (2022) (citation omitted). Second, because interpreting any statute to authorize the Order would raise serious First, Fifth, and Sixth Amendment concerns, constitutional avoidance counsels against any such construction.[16]

The Order also cites no express or implied constitutional authority, and none exists. Article II does not authorize the President to sanction all employees of a law firm because of "partisan[ship]," the speech of a prior partner, or the causes of certain clients. *See, e.g.*, *Seila Law LLC v. CFPB*, 591 U.S. 197, 213–16 (2020). Such sanctions are also not consistent with "executive practice, long pursued to the knowledge of the Congress and never before questioned," which helps define the limits of presidential power. *Youngstown*, 343 U.S. at 610 (Frankfurter, J., concurring). And while the Order generally alludes to "national security," Order § 1, the government has been unable to identify any action that Jenner has taken that creates such a risk. Tr. 21:14–25:3. The baseless invocation of "national security" does not give the Executive a blank check to violate Jenner's constitutional rights. *Cf. Ziglar v. Abbasi*, 582 U.S. 120, 143 (2017).

The Order is instead most analogous to an unconstitutional bill of attainder. U.S. Const. art. I, § 9, cl. 3. At the Founding, bills of attainder were acts in which Parliament "named" a person "considered disloyal to the … State" and unilaterally imposed a "wide array of punishments." *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 473–74 (1977). Like a bill of attainder, the Order

---

[16] Insofar as the Order purports to sanction Jenner based on claims that it engages in racial discrimination, *see* Order § 1, it also violates Title VII's highly reticulated scheme governing how the government pursues remedies for alleged discrimination. *See, e.g.*, 42 U.S.C. § 2000e-5(b), (f) (requiring notice, investigation, and attempts at informal resolution before the EEOC may bring a civil action); *see also* 29 C.F.R. pt. 1601 (detailing those requirements). The Order unlawfully penalizes Jenner without complying with those procedures.

"prescrib[es] punishment, without a trial, for a specific person or group." *Bill of Attainder*,

BLACK'S LAW DICTIONARY (12th ed. 2024). The President has impermissibly "pronounce[d] upon

the guilt of" Jenner based solely on his "own n[o]tions." *Cummings v. Missouri*, 71 U.S. (4 Wall.)

277, 323 (1866). Such actions by a President are wholly foreign to our system of government.

### D.      The Order Violates Due Process.

The Order is further unconstitutional because it violates due process.

First, the Order violates the Fifth Amendment right to procedural due process. *Logan v.*

*Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982). It deprives Jenner of several protected interests.

The Order deprives Jenner attorneys of their liberty interest in "a chosen profession free from

unreasonable governmental interference," *Campbell v. District of Columbia*, 894 F.3d 281, 288

(D.C. Cir. 2018) (citation omitted), because it constrains their ability to effectively advocate for

clients, and it deprives them of their "liberty interest in [their] First Amendment right to petition

the government." *Trentadue v. Integrity Comm.*, 501 F.3d 1215, 1236–37 (10th Cir. 2007). The

Order also deprives Jenner of its "good name, reputation, honor, [and] integrity." *Wisconsin v.*

*Constantineau*, 400 U.S. 433, 437 (1971). The Executive Branch may only issue "findings of

wrongdoing" that "could have an adverse impact on [one]'s reputation" after affording due

process. *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253–56 (2012). Yet the Order brands

Jenner as unethically "partisan," suggests that the Firm "has abandoned the profession's highest

ideals," states Jenner has "abused its pro bono practice," and finds that Jenner attorneys cannot be

trusted to enter federal buildings or communicate with government officials. Order §§ 1, 5. Finally,

the Order deprives Jenner of its protected property interest in contracts with its clients. *See FDIC*

*v. Mallen*, 486 U.S. 230, 240 (1988); *Toxco Inc. v. Chu*, 724 F. Supp. 2d 16, 27 (D.D.C. 2010).

The Order punishes Jenner's government-contractor clients by requiring them to disclose their

relationships with Jenner and threatening termination of their contracts due to that relationship.

Order § 3. The Order therefore interferes with Jenner's private contracts with its clients by imposing sanctions on those clients that adhere to their contractual obligations with Jenner.

Because the Order burdens Jenner's protected interests, Jenner has a right to sufficient process. Yet here, Jenner received no prior government notice of the Order's sanctions; it learned that it had been singled out for sanction only after the Order was signed. SUMF ¶ 56. Nor did Jenner have any opportunity to challenge the Order's findings. *Id.*[17] And the Order itself nowhere even identifies what laws Jenner purportedly violated or what findings the government made to warrant subjecting Jenner personnel to, *inter alia*, a special security-clearance review process, limits on access to federal buildings, and limits on engagement with federal employees.

Second, the Order is void for vagueness because it "fails to provide a person of ordinary intelligence fair notice of what is prohibited" and, indeed, "is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). It "impermissibly delegates basic policy matters to [Defendants] for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972). For instance, the Order "limit[s]" Jenner "[p]ersonnel" from "access[ing]" federal buildings when such access would "threaten the national security of" or "otherwise be inconsistent with" the "interests of the United States." Order § 5(a). The government itself was unable to say at the TRO hearing whether this language bars access to federal courthouses, Tr. 28:24–29:2, and Jenner and its clients are likewise left to guess at what national-security risks and federal interests the Order has in mind. The same vagueness

---

[17] Section 3 also violates a government-contracting-specific due process rule that "the contractor [must] be given notice of those charges as soon as possible and some opportunity to respond to the charges before adverse action is taken." *Old Dominion Dairy Prods., Inc. v. Sec'y of Def.*, 631 F.2d 953, 955–56 (D.C. Cir. 1980); *see* 48 C.F.R. § 9.406-3.

problem recurs with the Order's limit on "engag[ement]" with federal employees to "ensure consistency with the national security and other interests of the United States." Order § 5(a). This uncertainty is by design. By obscuring the precise nature of the sanctions against Jenner, the Order seeks to create a rift between Jenner and its clients, and thus destroy Jenner's business.

### E.    The Order Violates Equal Protection.

The Order further violates equal protection. *See Bolling v. Sharpe*, 347 U.S. 497, 499 (1954). A disfavored individual may bring an equal protection claim if (1) he has "been intentionally treated differently from others similarly situated," and (2) "there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam). "The classic class-of-one claim is illustrated when a public official, 'with no conceivable basis for his action other than spite or some other improper motive … comes down hard'" on a citizen. *Swanson v. City of Chetek*, 719 F.3d 780, 784 (7th Cir. 2013) (alteration in original) (citation omitted). When the differential treatment burdens First Amendment activity, the test is "appreciably more stringent than 'minimum rationality.'" *News Am. Publ'g, Inc. v. FCC*, 844 F.2d 800, 802 (D.C. Cir. 1988). The Order plainly and intentionally treats Jenner differently from similarly situated entities because of its First Amendment activities: its speech, associations, and client representations. Such differential treatment could not withstand even rational basis review. The government must still have a "plausible reason" for the difference in treatment, *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 313–14 (1993), and, as noted, a "bare … desire to harm a politically unpopular group'" is "not [a] legitimate state interest[]," *Cleburne*, 473 U.S. at 446–47 (alteration in original) (citation omitted); *see also Romer v. Evans*, 517 U.S. 620, 632 (1996). The Order therefore violates equal-protection principles.

**II.    JENNER'S CLAIMS ARE RIPE AND FULLY JUSTICIABLE.**

The government here and in related litigation has sought to raise various threshold barriers with respect to particular provisions. These arguments all fail.

**A.    The Order's Caveating Language Does Not Insulate It from Review.**

The government has suggested that the Order cannot be unlawful because its unconstitutional commands are subject to phrases like "to the extent permitted by law." *See, e.g.*, Order §§ 2(b), 3b(i), 5(a), (b). Similarly, the government has argued that any relief would be premature because some of the Order's provisions, rather than directly impose sanctions, instead call for guidance by agencies. *See* Tr. 25:17–26:24.

These aspects of the Order pose no barrier to this Court's review for the simple reason that the Order—by targeting Jenner and ordering a host of unconstitutional action meant to inhibit Jenner's ability to practice law—already violated Jenner's constitutional rights on the day it issued. For example, as explained, the very existence of the Order's special Jenner-specific processes inflicts harm to Jenner's business. SUMF ¶ 82.

Moreover, there is no real uncertainty as to whether guidance will issue or what form it will take: The Order requires that agencies "shall" issue guidance, and it further requires (to take just one provision) that this guidance must "limit[]" Jenner's access and engagement. *E.g.*, Order § 5(a). And it is black-letter law that pre-enforcement review is appropriate when "First Amendment rights are implicated and arguably chilled by a 'credible threat.'" *Unity08 v. FEC*, 596 F.3d 861, 865 (D.C. Cir. 2010) (quoting *Chamber of Com. of the U.S. v. FEC*, 69 F.3d 600, 603 (D.C. Cir. 1995)). Given the Order's palpable animus, there is no reason to think, and the government has not suggested, that any of the Order's sanctions "will not be enforced." *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988). Indeed, even just the directive to create that guidance is sufficiently chilling to rise to the level of retaliation: it is "sufficient to deter a person

of ordinary firmness in [Jenner's] position from speaking again." *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016) (citation omitted). The settlements by Paul Weiss and others prove as much. And that chilling effect is the very point of the Order. This Court can and must review the Order now.

**B.    Section 2's Security-Clearance Review Process Is Justiciable and Unconstitutional.**

This Court should also declare unconstitutional and permanently enjoin the Order's Jenner-only "Security Clearance Review" process. That provision directs agency heads to "immediately take steps … to suspend any active security clearances held by individuals at Jenner pending a review of whether such clearances are consistent with the national interest." Order § 2(a).

The government has argued in related litigation that challenges to this provision are nonjusticiable because they require second-guessing discretionary judgments about national security. But to proceed here, this Court need not probe or second-guess individual Executive Branch clearance decisions. The D.C. Circuit case the government has invoked, *Lee v. Garland*, 120 F.4th 880 (D.C. Cir. 2024), holds only that claims regarding "the *merits* of any '*particular* employee's security clearance'" are unreviewable. *Id.* at 891, 893 (emphasis added) (citation omitted). But *Lee* itself reaffirmed longstanding D.C. Circuit precedent holding that "not every case touching on" a security clearance "lies beyond judicial cognizance." *Id.* at 891. And both the D.C. Circuit and the Supreme Court have held that courts may adjudicate lawsuits like this one, which involve challenges to policies that treat an entire group differently and to bespoke, abnormal clearance procedures. *See Webster v. Doe*, 486 U.S. 592, 602–04 (1988); *Nat'l Fed'n of Fed. Emps. v. Greenberg*, 983 F.2d 286, 289–90 (D.C. Cir. 1993). And, of course, the Order expressly notes exactly why the President took the actions he took. To hold this Order non-justiciable would give this and future administrations carte blanche to create new suspension-and-review procedures applicable only to groups the President dislikes, whether they be a disfavored law firm, a

disfavored political party, a disfavored race, or a disfavored religion.

First, unlike in *Lee*, Jenner is not seeking review of the merits of any individual's entitlement to a security clearance; it instead challenges a "blanket policy" that paints a whole class of people as disloyal or untrustworthy for unconstitutional reasons. *Doe v. Gates*, 981 F.2d 1316, 1322 (D.C. Cir. 1993). In that setting, important countervailing constitutional considerations come into play and *require* the court to exercise jurisdiction. In *Webster*, for example, the plaintiff, a gay man, was fired from the CIA after being told that homosexuality was a "security concern" and "violated CIA regulations." 486 U.S. at 602. The CIA asserted "unreviewable" authority over employment termination decisions, "even those based on *policies* normally repugnant to the Constitution." *Id*. at 603 (emphasis added). The Court rejected this argument, remanding for consideration of the plaintiff's "colorable constitutional claim." *Id*. at 604–05; *see also Gill v. U.S. Dep't of Just.*, 875 F.3d 677, 685 (D.C. Cir. 2017) (Tatel, J., concurring) (noting that a court could hear equal-protection claims based on a "policy or practice of treating Muslims or naturalized citizens differently" in clearance adjudications). The rule of *Lee* is premised on the notion that individual clearance decisions hinge on sensitive and nuanced "[p]redictive judgment[s]" about one person's "future behavior." *Dep't of the Navy v. Egan*, 484 U.S. 518, 528–29 (1988).[18] But where a plaintiff challenges a "polic[y] [that is] repugnant to the Constitution," *Webster*, 486 U.S. at 603—here, the categorical suspension and review of all Jenner personnel's clearances in retaliation for the firm's protected speech and association—the dispute is justiciable.

---

[18]  *Accord* Off. of the Dir. of Nat'l Intel., Security Executive Agent Directive 4: National Security Adjudicative Guidelines 6 (June 8, 2017) ("Each case must be judged on its own merits, and … [t]he ultimate determination of whether the granting or continuing of national security eligibility is clearly consistent with the interests of national security … is to be evaluated *in the context of the whole person*.") (emphasis added); 32 C.F.R. § 147.2(a) ("Eligibility for access to classified information is predicated upon the *individual* meeting [the applicable] personnel security guidelines.") (emphasis added).

Second, again unlike in *Lee*, the Court here need not probe or "second-guess" the Executive's motivations, 120 F.4th at 894, because the Order fully explains the President's (retaliatory) motivations for his policy. This is not a case where identifying the government's reasons is "unmanageable" and beyond the Judiciary's competence. *Id*. at 893. Rather, the Order itself says "all that need be said" to understand "why [it] places restrictions on Jenner." Tr. 48:22. Judicial review will involve only the application of familiar doctrines well within the Judiciary's proper role; the court need not "rummag[e] around in the [Executive's] affairs" to scrutinize the reasons for the President's assessments. *Webster*, 486 U.S. at 604.

Third, under settled D.C. Circuit precedent that *Lee* preserved, *see* 120 F.4th at 892–93, a court has jurisdiction to review "the constitutionality of the methods used" to inform the adjudication of clearances. *Greenberg*, 983 F.2d at 290. In *Greenberg*, the D.C. Circuit resolved on the merits a constitutional challenge to the propriety of certain questions asked by Defense Department clearance investigators. The court held that even though the ultimate grant or denial of a clearance is nonreviewable, "the judiciary still may properly scrutinize the manner in which the object is to be achieved." *Id*. Courts have consistently maintained this distinction, allowing challenges to the *process* to which individuals are subjected in clearance adjudications. *See, e.g.*, *Rattigan v. Holder*, 689 F.3d 764, 773 (D.C. Cir. 2012) (allowing review of claims based on provision of "knowingly false" inputs to security-clearance decision); *El-Ganayni v. U.S. Dep't of Energy*, 591 F.3d 176, 183 (3d Cir. 2010) ("Article III courts have jurisdiction to hear 'constitutional claims arising from the clearance revocation *process*,' even though the merits of that revocation cannot be reviewed.") (emphasis added) (citation omitted).

Here, Jenner brings a process challenge that is justiciable under *Greenberg*. Jenner does not seek review of "discretionary judgments regarding a particular employee's security clearance,"

*Greenberg*, 983 F.2d at 290, but rather of the bespoke procedure that subjects all firm employees to mass suspension followed by a "skewed" review, Tr. 24:18–19, of whether any suspended clearance is "consistent with the national interest," Order § 2(a). Put another way, Jenner is seeking relief from harms that "exist[] regardless of how the government might … resolve[] any particular" clearance decision. *Lee*, 120 F.4th at 893 (citing *Greenberg*, 983 F.2d at 291–95). Section 2 of the Order singles Jenner's employees out for abnormal security-clearance procedures and publicly tarnishes the Firm as untrustworthy. Regardless of what happens to any one lawyer's clearance, the Order's "Security Clearance Review" will make it harder for the Firm to attract business, particularly on matters involving classified information. SUMF ¶ 82. Jenner has every right to challenge the constitutionality of such a process.

Once the Court resolves justiciability, the merits are straightforward. Although review of security-clearance procedures is deferential, the Order fails even the most deferential standard of review: It is based on retaliatory animus and is patently irrational. The Order announces a blanket policy that all Jenner employees—from the managing partners to the "IT person or the mail person," Tr. 23:4–5—will be subjected to a bespoke and presumptively adverse "Security Clearance Review" procedure. Order § 2(a). That procedure is premised, like every other aspect of the Order, on the President's bald assertion that Jenner has advocated for the wrong causes, championed the wrong clients, and associated with the wrong lawyers. *Id*. § 1.

The President cannot undertake obviously unconstitutional actions merely because "denying or revoking security clearances is … a core Article II power." *Lee*, 120 F.4th at 888. Even in his exercise of plenary executive powers, the President is bound by other provisions of the Constitution, including the Bill of Rights. *See United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 320 (1936) (President's power over foreign affairs, "like every other governmental

power, must be exercised in subordination to the applicable provisions of the Constitution"); *Schick v. Reed*, 419 U.S. 256, 264 (1974) (in exercising the clemency power, the President may not impose "conditions which ... in themselves offend the Constitution"); *INS v. Chadha*, 462 U.S. 919, 940–41 (1983) (Congress must exercise its plenary power over immigration using "constitutionally permissible means"). So too with security clearances. "No one would suggest," for example, that the government "could, despite the Fourth Amendment, conduct random searches without warrants in the hope of uncovering information about employees seeking security clearances." *Greenberg*, 983 F.2d at 290; *see also Gates*, 981 F.2d at 1322 (assuming "blanket [CIA] policy against the employment of homosexuals" would be unconstitutional). Likewise, the President could not announce the creation of a special security-clearance review procedure applicable only to Catholics, or to people of Chinese heritage, or to Democrats.

The President's actions here are no different. Section 2 unconstitutionally retaliates against Jenner for protected speech, discriminates on the basis of viewpoint, punishes protected association, and infringes Jenner's right to petition the government. Just like the rest of the Order, Section 2 deprives the firm of its protected liberty and property interests, such as its interest in continuing to represent clients on matters requiring clearances, without adequate process. And just like the rest of the Order, it burdens the constitutional right to counsel, dictating that only the President's favored lawyers may represent clients (including federal criminal defendants) in cases involving classified information.

And while this Court's review may be deferential, *see, e.g.*, *Trump v. Hawaii*, 585 U.S. 667, 708 (2018), deference is not abdication. When presented with a reviewable question about security clearances, courts continue to scrutinize the "ends and means" of the government's approach. *Greenberg*, 983 F.2d at 290. Section 2 cannot withstand any amount of scrutiny.

As noted, the Order entirely fails to justify the government's purported national-security concerns. Though the Order "gives lip service to the interests of ... national security," Tr. 49:13–14, it "[leaves us] to guess … what's the national security threat posed by Jenner employees," Tr. 21:14–16. The clearest explanation the Order can muster is that Mr. Weissmann's "dishonesty" is a "concerning indictment of Jenner's values and priorities." But as the Court observed, the Government cannot credibly maintain that "having someone employed four years ago poses some kind of national security threat." Tr. 21:23–24. Nor can the government maintain that Section 2 is about protecting national security when the President lifted identical restrictions on Paul Weiss in exchange for *pro bono* services to the Administration's preferred causes without addressing any "national security" concerns at all.

And nothing about the Order's clearance regime is remotely tailored to its purported aims. It suspends the clearances of every Jenner employee—including, for example, a non-lawyer staff member serving in the Illinois Army National Guard, SUMF ¶ 38—regardless of whether such employee has ever worked on a disfavored case or associated with a disfavored lawyer. Here, the only person associated with Jenner that the Order identifies as untrustworthy has not worked at the firm in four years. What is left after that pretextual explanation falls to the side is blatant retaliation and a "'bare … desire to harm'" a law firm for its perceived political transgressions, which necessarily "lacks a rational relationship to legitimate state interests." *Romer*, 517 U.S. at 632, 634 (citation omitted). This Court should thus reach the merits and hold that Section 2 cannot pass constitutional muster.[19]

---

[19] Alternatively, as discussed in Section III.C *infra*, the Court should find that Section 2 is not severable from the remainder of the Order, which is a singular act of unconstitutional retaliation.

III.    DECLARATORY RELIEF AND A PERMANENT INJUNCTION ARE
        NECESSARY TO PREVENT ONGOING AND FUTURE IRREPARABLE HARM.

This Court should declare the Order unlawful and issue a permanent injunction barring the

implementation of the Order in its entirety. A movant entitled to summary judgment may obtain a

permanent injunction by showing "(1) that it has suffered an irreparable injury; (2) that remedies

available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that,

considering the balance of hardships between the plaintiff and defendant, a remedy in equity is

warranted; and (4) that the public interest would not be disserved." *Zukerman v. USPS*, 64 F.4th

1354, 1364 (D.C. Cir. 2023) (citation omitted). That standard is met here.

### A.    The Order Causes Jenner Irreparable Constitutional, Economic, and
###        Reputational Injury that Cannot Be Redressed by Remedies at Law.

The first two permanent injunction factors are readily satisfied. These factors are often

considered together because a showing of "irreparable injury … is merely one possible 'basis for

showing the inadequacy of the legal remedy.'" *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*,

145 F.3d 1399, 1409 (D.C. Cir. 1998) (citation omitted). Classic injuries that satisfy these dual

factors are injuries to constitutional interests, *see Mills v. District of Columbia*, 571 F.3d 1304,

1312 (D.C. Cir. 2009); economic injuries for which sovereign immunity would bar monetary relief,

*see Nat'l Mining*, 145 F.3d at 1408–09; and reputational injuries not easily measurable in monetary

terms, *see Atlas Air, Inc. v. Int'l Brotherhood of Teamsters*, 280 F. Supp. 3d 59, 103–04 (D.D.C.

2017), *aff'd*, 928 F.3d 1102 (D.C. Cir. 2019). All three are present here.

*First*, as this Court has already concluded, *see* Tr. 51:6–53:21, the Order inflicts irreparable

constitutional harms upon Jenner and its clients, and additional harms will ensue if any part of the

Order stands. Indeed, "there is a 'presumed availability of federal equitable relief against

threatened invasions of constitutional interests.'" *Davis v. District of Columbia*, 158 F.3d 1342,

1346 (D.C. Cir. 1998); *see Karem v. Trump*, 960 F.3d 656, 667 (D.C. Cir. 2020) (even "a

*prospective* violation of a constitutional right constitutes irreparable injury") (emphasis added).

The Order, if permitted to go back into effect, will cause severe constitutional injuries. Tr. 53:10–21. As discussed, Jenner has already experienced and will continue to experience violations of its First Amendment speech, association, and petitioning rights. *See Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (per curiam) ("loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury"). Likewise, "a violation of Fifth Amendment due process rights" establishes irreparable harm. *Karem*, 960 F.3d at 667–68. As for the right-to-counsel interests at stake, infringement of that right, including "the disclosure of confidential information" related to the attorney-client relationship "is, by its very nature, irreparable." *Robert Half Int'l Inc. v. Billingham*, 315 F. Supp. 3d 419, 433 (D.D.C. 2018).

*Second*, as this Court has also concluded, the Order inflicts irreparable economic injury on Jenner. Tr. 51:10–53:9. Economic harm supports injunctive relief "where the loss threatens the very existence of the movant's business," *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985), or where, as here, there are "significant" losses unrecoverable due to sovereign immunity, *see Luokung Tech. Corp. v. Dep't of Def.*, 538 F. Supp. 3d 174, 192 (D.D.C. 2021). In 2024, more than 40% of Jenner's revenue came from government-contractor clients. SUMF ¶ 83. The Order, by design, impels even Jenner's longstanding clients to review their relationships, and some have indicated that the Order forces them into difficult decisions about their counsel and their businesses. *Id*. ¶¶ 74, 76, 78. The directive to limit access to federal buildings and engagement with government employees further threatens Jenner's existing client engagements; before the TRO was issued, one client was forced to obtain substitute counsel to replace Jenner at a meeting with the Department of Justice. *Id*. ¶ 76. And the retaliatory "Security Clearance Review" further threatens the Firm's financial position by compromising its representation of clients in matters

involving classified information—including at least two ongoing engagements. *Id.* ¶ 81.

*Third*, the Order strikes at Jenner's reputation, another black-letter irreparable injury. Harm to "reputation or goodwill is not easily measurable in monetary terms" and is therefore "typically viewed as irreparable." *Xiaomi Corp. v. Dep't of Def.*, 2021 WL 950144, at *9 (D.D.C. Mar. 12, 2021) (citation omitted). The Order tars Jenner and its attorneys, suggesting that Jenner "supports attacks against women and children," promotes drug trafficking and violence, and racially discriminates. Order § 1. The Order declares "Jenner's values and priorities" to be wayward. *Id.* And it suggests that merely letting Jenner employees into federal buildings threatens national security. *Id.* § 5(a). These broadsides cause exactly the type of irreparable harm that justifies equitable relief. *See Safex Found., Inc. v. Safeth, Ltd.*, 531 F. Supp. 3d 285, 300 (D.D.C. 2021).

None of these harms can be remedied at law. Jenner's financial losses are likely unrecoverable because sovereign immunity shields Defendants from monetary liability. Tr. 53:2–4; *see, e.g.*, *Air Transp. Ass'n of Am., Inc. v. Exp.-Imp. Bank of the U.S.*, 840 F. Supp. 2d 327, 335 (D.D.C. 2012). And Jenner's other intangible harms are also not remediable absent injunctive relief. The first two permanent-injunction factors are therefore satisfied.

### B.     The Balance of Equities and Public Interest Favor a Permanent Injunction.

Where a movant seeks to enjoin the government, the final two factors typically merge. *See Zukerman*, 64 F.4th at 1364. These factors also overwhelmingly favor a permanent injunction. As just discussed, the injuries to Jenner and its clients are severe and irreparable. SUMF ¶¶ 74–92. In contrast, an injunction would not harm any cognizable interest belonging to any Defendant. *See, e.g.*, *Kiakombua v. Wolf*, 498 F. Supp. 3d 1, 57–58 (D.D.C. 2020) ("[T]he government cannot suffer harm from an injunction that merely ends an unlawful practice.") (citations omitted). And there is no public interest in implementing an "unlawful" executive order, while there is "substantial public interest" in ensuring that the government "abide[s]" by the law. *See League of*

*Women Voters of the U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016).

Indeed, the public interest strongly favors a permanent injunction. The Order is part of a larger effort to chill lawyers from practice—to force them to choose between performing their duties to their clients or finding favor with the Administration. This effort threatens our Nation's bedrock tradition that lawyers are and must be free to zealously advocate for clients of their choosing without fear of retribution. As this Court has recognized, "[i]f law firms are targeted [for] and thus chilled from representing" disfavored clients, "it is those individuals who will suffer the greatest harm." Tr. 54:5–9. Hence, a particularly "disturbing" and "troubling" aspect of the Order is its targeting of law firms' pro bono practices, which serve to assist the most vulnerable populations in the country. *Id.*

Even beyond the harms to any particular clients, the Order—and others like it— fundamentally undermines the Judiciary's ability to carry out its own constitutional role. After all, "[a]n informed, independent judiciary presumes an informed, independent bar," *Legal Servs.*, 531 U.S. at 545, not one that is perpetually looking over its shoulder in every representation out of fear that its litigation positions might incur government retribution. In this Court's words, "[o]ur legal system relies on lawyers who advocate zealously for all clients." Tr. 54:4–5. A permanent injunction is thus in the public interest.

### C.    The Order Should Be Declared Unlawful and Its Implementation Permanently Enjoined in Full.

Finally, the Order should be declared unlawful and permanently enjoined in full because it reflects a single, unified policy sanctioning Jenner for constitutionally protected activity. The Order pulls nearly every lever at the government's disposal to limit Jenner's effective advocacy for its clients. The government has argued that the Order must be analyzed provision by provision. *See* Tr. 17:16–21. The government is wrong that any aspect of the Order is lawful. But in any

event, where provisions of an executive order "are so mutually connected with and dependent on each other" and it is clear "that the [President] intended them as a whole," the entirety of the order must fall with the unconstitutional provisions. *Allen v. City of Louisiana*, 103 U.S. 80, 84 (1880) (quoting *Warren v. Mayor of Charlestown*, 68 Mass. (2 Gray) 84, 99 (1854)); *see Mille Lacs Band*, 526 U.S. at 191 (applying statutory severability analysis to an executive order and deeming it inseverable because it "embodied a single, coherent policy" and must "stand or fall as a whole").

That is the case here. As this Court has already recognized, Section 1 of the Order supplies the basis for the substantive provisions that follow and is therefore critical to federal agencies' implementation of them. As the Court put it, Section 1 "serve[s] as the basis for the operative sections … and is thus critical to their enforcement." Tr. 44:20–23. The Government, too, conceded that the statements in Section 1 are necessary for agencies to understand how to implement the Order's substantive provisions, *see* Tr. 20:8–10, as it plainly gives meaning to those provisions' references to "national security," *e.g.*, Order § 5(a), and the "interests of … the United States," *id.* § 3(b)(ii). The retaliatory animus apparent in Section 1 thus infects the entirety of the Order—including the security-clearance review process ordered by Section 2 and the employment-practice review cross-referenced by Section 4. Those provisions therefore must be enjoined just the same as the already-enjoined Sections 3 and 5. The Court should issue such an injunction to preserve our adversarial system of justice—as well as our Nation's noble tradition that lawyers may and must zealously advocate on behalf of their clients, even when adverse to those who in the moment wield political power.

## CONCLUSION

For the foregoing reasons, Jenner's motion for summary judgment should be granted on all claims, and the Court should enter the proposed order for declaratory and permanent injunctive relief.

Dated: April 8, 2025                         Respectfully submitted,


                                             _/s/ Michael A. Attanasio_
                                             Michael A. Attanasio
                                             (mattanasio@cooley.com)
                                             Cooley LLP
                                             10265 Science Center Drive
                                             San Diego, CA 92121
                                             Telephone:    (858) 550-6000
                                             Facsimile:    (858) 550-6420

                                             David E. Mills (DC Bar #401979)
                                             (dmills@cooley.com)
                                             Cooley LLP
                                             1299 Pennsylvania Ave., NW, Suite 700
                                             Washington, D.C. 20004
                                             Telephone:    (202) 842-5000
                                             Facsimile:    (202) 842-7400

                                             Kristine Forderer (_pro hac vice_)
                                             (kforderer@cooley.com)
                                             Cooley LLP
                                             3 Embarcadero Center, 20th Floor
                                             San Francisco, CA 94111
                                             Telephone:    (415) 693-2000
                                             Facsimile:    (415) 693-2222

                                             John Bostic (_pro hac vice_)
                                             (jbostic@cooley.com)
                                             Cooley LLP
                                             3175 Hanover Street
                                             Palo Alto, CA 94304
                                             Telephone:    (650) 843-5000
                                             Facsimile:    (650) 849-7400

                                             _Attorneys for Plaintiff Jenner & Block LLP_