## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JENNER & BLOCK LLP,

     *Plaintiff*,

v.

U.S. DEPARTMENT OF JUSTICE, *et al.*,

     *Defendants*.

Case No. 1:25-cv-00916-JDB

### PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS

Plaintiff Jenner & Block LLP ("Jenner" or the "Firm"), by and through counsel and pursuant to Local Civil Rule 7(h), hereby respectfully submits this Statement of Undisputed Material Facts to accompany the Firm's Motion for Summary Judgment and for Declaratory and Permanent Injunctive Relief.

**A.     Jenner & Block LLP**

1.     Founded in 1914, Jenner is a global law firm with offices in Chicago, Washington, D.C., New York, Los Angeles, Century City, San Francisco, and London. *See* Declaration of Thomas J. Perrelli in Support of Motion for Summary Judgment and for Declaratory and Permanent Injunctive Relief ("Perrelli Decl.") ¶ 6.

2.     The Firm's more than 500 lawyers (and its more than 900 total personnel) represent clients in high-profile litigation, global investigations, regulatory and government controversies, and sophisticated corporate transactions. *Id*. ¶¶ 6, 7, 10.

3.     Over its 111-year history, Jenner and its lawyers have represented clients in federal and state courts across the nation and in tribunals throughout the world. *Id*. ¶ 8. Jenner attorneys have presented dozens of arguments in the U.S. Supreme Court. *Id.*

4.      Jenner's clients include Fortune 100 companies, large privately held corporations, start-ups and emerging companies, colleges and universities, Native American tribes, and venture capital and private equity investors. *Id*. ¶ 7. These clients span a broad range of industries, from aerospace and defense to energy, food and beverage, telecommunications, technology, hospitality and real estate, finance, transportation, education, and media and entertainment, among others. *Id.*

5.      Jenner's attorneys are drawn from all sides of the political spectrum. *Id*. ¶ 11. Many of Jenner's attorneys joined the firm after service in Democratic or Republican administrations, including in the first Trump administration. *Id*. ¶¶ 11–12.

6.      The Firm's alumni have served and are currently serving as state and federal court judges, including as a Justice on the U.S. Supreme Court. *Id*. ¶ 13. In recent years, five Jenner partners or alumni have been nominated to serve as Article III federal judges—two by President Trump, and three by President Biden. *Id.* And Jenner attorneys have gone on to serve as founders, CEOs, and general counsels of some of the nation's largest companies. *Id*. ¶ 7.

7.      The Firm has also been rated the #1 law firm for pro bono work by *The American Lawyer* for 12 of the past 15 years. *Id*. ¶ 14. Jenner's pro bono representations include defending individuals in the criminal justice system, advocating for veterans, protecting constitutional rights, championing LGBTQ equality, aiding victims of domestic violence and sex trafficking, advocating for noncitizens' asylum rights, assisting individuals denied social security benefits, and pursuing religious liberty while fighting religious discrimination. *Id*. ¶¶ 14, 15.

**B.      Jenner's Interaction with the Federal Government**

8.      As a full-service law firm that represents clients in all sectors of the economy in transactional, litigation, and regulatory matters, Jenner lawyers necessarily interact with the federal government on behalf of their clients in countless ways. *Id.* ¶ 24.

9.      Unlike many other large law firms, the vast majority (nearly 90%) of Jenner's

attorneys focus on litigation, white collar/investigations, and regulatory practices, and the bulk of the Firm's revenue derives from those practices. *Id.* ¶ 25. Many of these lawyers practice in federal court on behalf of their clients in civil and criminal cases, as well as in federal agencies' in-house administrative proceedings. *Id.*

10.     The Firm has an estimated 540 cases pending before federal district, appellate, and bankruptcy courts, including the Supreme Court of the United States and the Court of Federal Claims. *Id.* ¶ 26. This includes three cases pending before the Supreme Court, and approximately 140 cases pending before federal appellate courts, 340 cases pending before federal district courts, 40 matters in bankruptcy court, and 15 matters in the Court of Federal Claims. *Id.*

11.     These matters require regular appearances in federal court. *Id.* For example, the Firm has at least 48 scheduled in-person appearances in federal court in April and May 2025 alone, including trials and pre-trial conferences, oral arguments, and motion hearings. *Id.*

12.     Jenner estimates that the Firm has more than 500 active matters pending before or adverse to federal administrative agencies, including (using approximate numbers) 100 matters involving the Department of Justice; 40 matters involving the Federal Communications Commission; 35 matters involving U.S. Citizenship and Immigration Services; 30 matters involving the Navy; 25 matters involving each of Immigration and Customs Enforcement and the Securities and Exchange Commission; 20 matters involving each of the Department of State and the Department of Homeland Security; 15 matters involving each of the Army, Department of Defense, Department of Health and Human Services, Environmental Protection Agency, Federal Bureau of Investigation, and Federal Energy Regulatory Commission; and 10 matters involving each of the Air Force, Consumer Financial Protection Bureau, Federal Bureau of Prisons, Federal Trade Commission, and Internal Revenue Service. *Id.* ¶ 27.

13.     Jenner also represents many clients who are the targets of pending federal criminal

investigations or have been indicted. *Id.* ¶ 28. Many of these clients retain Jenner to interact with the Department of Justice, the Securities and Exchange Commission, or other federal agencies. *Id.* For example, the Firm currently is engaging with the Department of Justice as to at least five antitrust investigations. *Id.*

14.     The Firm has 17 practice groups, and all of them intersect with the federal government in some way and include clients with business before the federal government. *Id.* ¶ 29. The largest practice groups by headcount are Investigations, Compliance, and Defense (67 attorneys); Corporate (52 attorneys); Funds, Investment, and Financial Litigation (44 attorneys); Business Litigation (32 attorneys); and Government Controversies and Public Policy Litigation (28 attorneys). *Id.*

15.     In the course of their representations, Jenner lawyers frequently meet with federal officials from a range of federal government agencies. *Id.* ¶ 30. Hundreds of the Firm's clients have matters that require Jenner lawyers to interact with federal agencies. *Id.*

16.     Jenner's Appellate & Supreme Court practice has been regularly recognized on *The National Law Journal's* "Appellate Hot List" and rated a top practice by *Chambers USA*. *Id.* ¶ 31. Six different Jenner lawyers have argued before the Supreme Court of the United States in the last four Terms alone, addressing issues of criminal law, tribal sovereignty, social security, and the tax code. *Id.*

17.     Jenner has won significant Supreme Court precedents in cases such as *Haaland v. Brackeen*, 599 U.S. 255 (2023) (upholding the constitutionality of the Indian Child Welfare Act); *Kokesh v. SEC*, 581 U.S. 455 (2017) (holding that a five-year statute of limitations applies to the SEC's disgorgement penalty); *Puerto Rico v. Sanchez Valle*, 579 U.S. 59 (2016) (holding that the federal government and Puerto Rican government are the same sovereign for the purpose of the Double Jeopardy Clause); *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005)

(holding that companies that distribute and promote software to infringe copyrights are liable for the resulting acts of infringement); *Lawrence v. Texas*, 539 U.S. 558 (2003) (holding unconstitutional a Texas law criminalizing consensual, sexual conduct between individuals of the same sex); *Wiggins v. Smith*, 539 U.S. 510 (2003) (holding that defense counsel's failure to conduct a reasonable investigation of mitigating facts violated a defendant's Sixth Amendment right to effective assistance of counsel); and *Witherspoon v. Illinois*, 391 U.S. 510 (1968) (holding death sentence unconstitutional where jurors who opposed the death penalty were dismissed in violation of the Sixth and Fourteenth Amendments). Perrelli Decl. ¶ 31

18.     Representing clients before the Supreme Court requires Jenner lawyers to access federal buildings not only on the day of the argument itself but also for critical meetings with the Office of the Solicitor General in the Department of Justice, at which the parties have an opportunity to discuss the matter with key federal government stakeholders and attempt to persuade the United States to take particular positions in the case. *Id.* ¶ 32.

19.     Jenner also features a Government Controversies and Public Policy Litigation practice, which guides businesses and other large organizations through highly complex crises presenting a mix of litigation, regulatory, public policy, legislative, and communications challenges. *Id.* ¶ 33. These challenges can include Congressional hearings, federal law enforcement investigations, and management of regulatory scrutiny. *Id.* Examples of the types of matters handled by these lawyers include representing major companies in congressional investigations, preparing senior executives for their testimony in Congress, and representing companies in litigation brought by federal agencies including the Department of Justice, Consumer Financial Protection Bureau and the Federal Trade Commission. *Id.*

20.     Thomas Perrelli, Firm Chair and Founder and Co-Chair of the Firm's Government Controversies and Public Policy Litigation practice, also serves as a mediator and settlement master

in cases, including having been asked by the Department of Justice to mediate cases on multiple occasions. *Id.* He is currently serving as a court-appointed settlement master in complex litigation involving veterans exposed to contaminated water at Camp LeJeune. *Id.*

21.     Matters handled by the Government Controversies and Public Policy Litigation group frequently require regular interaction with the federal government and entrance into federal buildings for meetings, interviews, and negotiations. *Id.* ¶ 34. Many of these meetings are only offered in person where parties can speak candidly with federal officials about sensitive matters. *Id.*

22.     Jenner also has an active Investigations, Compliance, and Defense ("ICD") practice. *Id.* ¶ 35. Featuring 16 former federal prosecutors, this team helps clients navigate highly sensitive investigative and compliance challenges. *Id.* When appropriate, they quickly facilitate productive, dispositive interactions with authorities including the Department of Justice, the Securities and Exchange Commission, the Commodity Futures Trading Commission, the Consumer Financial Protection Bureau, and the Financial Crimes Enforcement Network, among other government agencies. *Id.* Jenner's ICD team has led hundreds of jury and bench trials, drawing on decades of first-chair experience to fight for their clients. *Id.*

23.     Jenner's ICD team is currently representing large corporate clients and former employees in, among others, criminal and civil investigations carried out by the Department of Justice, the Securities & Exchange Commission, and the U.S. Postal Service Inspector General. *Id.* ¶ 36. The ICD team also partners with Jenner's Antitrust and Competition law team, which is currently representing clients in five separate antitrust investigations pursued by the Department of Justice. *Id.*

24.     Matters handled by the ICD team require regular interaction with the federal government and entrance into federal buildings for important meetings, interviews, and negotiations. *Id.* ¶ 37. Many of these meetings are only offered in person where parties can speak candidly with

6

federal officials about sensitive matters. *Id.* Some of these matters also involve classified information that can only be viewed, discussed, or electronically processed in a Sensitive Compartmented Information Facility ("SCIF"). *Id.* The need for Jenner personnel to have security clearances in order to access such classified information is discussed further below.

25.     Jenner also includes a Government Contracts and Grants practice featuring Chambers-rated lawyers. *Id.* ¶ 38. Jenner lawyers draw on their industry, government, and litigation experience to help companies successfully avoid or resolve contract disputes with the U.S. Government. *Id.* They also leverage the leadership and unique experience of former government officials, who previously represented the Air Force General Counsel's Office and Government Accountability Office, to help develop effective solutions for clients as they face potential or proactive investigations, seek an experienced approach to combat bid protests, or navigate subcontractor issues. *Id.*

26.     By definition, nearly every matter handled by Jenner's Government Contracts and Grants practice involves work with government contractors. *Id.* ¶ 39. These matters likewise involve frequent interaction with the federal government, entrance into federal buildings, litigation in the Court of Federal Claims, and handling of classified information. *Id.*

27.     Thus far in every week of 2025, Jenner lawyers have appeared for hearings or oral argument in federal court at least once, and often multiple times each week. *Id.* ¶ 40. Some prominent examples of Jenner's litigation matters from the last few years include: a trial win in the Northern District of Illinois holding the nation's largest egg producers and industry groups liable for conspiring to inflate egg prices; a groundbreaking win in the Second Circuit Court of Appeals on behalf of the family of an American citizen killed when Malaysia Airlines Flight 17 was shot down over eastern Ukraine in 2014; a trial win in a trademark infringement suit against a European company that unlawfully pirated the products of its former business partner; and a successful interlocutory appeal

in the Fourth Circuit reversing a class certification order on behalf of a major hospitality company. *Id.*

28.     Jenner also features a number of regulatory practices, including practices in Energy, Communications, and Native American law. *Id.* ¶ 41.

29.     Jenner's Energy group litigates cases at trial and appeal for energy companies at every level of the federal and state court systems, including before the U.S. Supreme Court. *Id.* They handle cases at the Federal Energy Regulatory Commission ("FERC") and at state commissions, and represent clients in regulatory enforcement matters. *Id.* They also represent and counsel clients engaged in energy transactions and many of the nation's largest electric and gas utilities, which service tens of millions of Americans, and the nation's largest nuclear power generator. *Id.*

30.     Jenner's Communications, Internet and Technology ("CIT") practice represents cable/broadband, wireless, Internet, satellite, and technology companies, as well as private equity investors. *Id.* ¶ 42. The CIT group has negotiated industry-leading transactions and prevailed in wide-ranging litigation, regulatory proceedings, and agency enforcement actions, helping their clients pursue large mergers and other transactions, enter new industries, navigate new regulations and government enforcement, and create new products and services. *Id.* Jenner's CIT practice is currently representing numerous clients in enforcement, regulatory, and transactional matters before the Federal Communications Commission ("FCC"). *Id.* Each matter requires the ability to interact with FCC lawyers and professional staff. *Id.*

31.     Jenner's Native American Law practice, led by and primarily composed of enrolled members and descendants of federally recognized tribes, draws on its legal and government experience to counsel Native American tribes navigating the complex government-to-government relationship that Indian Country holds with the United States. *Id.* ¶ 43.

32.     Each of these regulatory practices—Energy, CIT, and Native American Law—

requires near-constant communication with federal regulators about significant client matters. *Id.* ¶ 44. Jenner's electrical utility clients own or operate facilities used in transmission or wholesale of electric energy in interstate commerce, making them subject to FERC's exclusive jurisdiction. *Id.* Jenner's CIT clients in telecommunications and media call on Jenner lawyers to secure regulatory approval for their transactions, to advocate for their interests in rulemaking and policymaking, to handle spectrum allocation, assignment, auctions, licensing, and relocation, and to defend against FCC enforcement actions. *Id.* Jenner's Native American law clients value Jenner for its ability to advocate for tribal interests before a variety of federal regulators, including the Department of the Interior, FERC, and the FCC, among others. *Id.* The Executive Order threatens clients' ability to select Jenner for all of these types of matters and many others as well. *Id.*

33.     At present, by way of non-exhaustive example, Jenner has active civil and criminal matters on behalf of its clients involving at least the following federal agencies, which often require Jenner attorneys either to interact with or appear before federal government officials:

- Air Force

- Army

- Commodity Futures Trading Commission

- Consumer Financial Protection Bureau

- Consumer Product Safety Commission

- Department of Agriculture

- Department of Commerce

- Department of Defense

- Department of Education

- Department of Energy

- Department of Health and Human Services

- Department of Homeland Security

- Department of the Interior

- Department of Justice

- Department of Labor

- Department of State

- Department of Treasury

- Drug Enforcement Administration

- Environmental Protection Agency

- Equal Employment Opportunity Commission

- Federal Aviation Administration

- Federal Bureau of Investigation

- Federal Bureau of Prisons

- Federal Communications Commission

- Federal Deposit Insurance Corporation

- Federal Energy Regulatory Commission

- Federal Railroad Administration

- Federal Trade Commission

- Internal Revenue Service

- John F. Kennedy Center for the Performing Arts

- Marine Corps

- Marshals Service

- National Aeronautics and Space Administration

- National Highway Traffic Safety Administration

- National Labor Relations Board

- Navy

- Office of Management and Budget

- Office of the U.S. Trade Representative

- Postal Service

- Securities and Exchange Commission

- Social Security Administration

- Special Operations Command

*Id.* ¶ 45.

34.    The Firm's pro bono work frequently involves appearances in federal court or before federal agencies, or interactions with federal government officials. *Id.* ¶ 46. For example, Jenner's pro bono work for current clients frequently requires interaction with the Department of Veterans Affairs, U.S. Citizenship and Immigration Services, the Department of Justice, the Federal Bureau of Prisons, and the Internal Revenue Service, among many others. *Id.*

35.    Defendant General Services Administration ("GSA") manages facilities that are owned or leased by the federal government nationwide. *See* 41 C.F.R. pt. 105-53. GSA also formulates and prescribes governmentwide policies relating to real property management. *Id.* § 105-53.112.

**C.    Security Clearances Held by Jenner Personnel**

36.    Multiple Jenner personnel currently possess active security clearances permitting access to classified information. Perrelli Decl. ¶ 66.

37.    Defendant Office of the Director of National Intelligence is responsible for directing the oversight of investigations and determinations of eligibility for access to classified information, as well as developing uniform and consistent policies and procedures to ensure the effective

11

completion of investigations and adjudications relating to determinations of eligibility for access to classified information. *See* Exec. Order No. 13467 § 2.3(c), 73 Fed. Reg. 38103 (July 2, 2008).

38.    Two Jenner personnel possess security clearances in connection with ongoing military service unrelated to their work at the Firm: a staff member who is also a member of the Illinois Army National Guard, and an attorney who is an active drilling reservist and Captain (Major select) in the U.S. Marine Corps Reserve. Perrelli Decl. ¶ 66.

39.    In addition, a Jenner lawyer is currently awaiting adjudication of a security clearance application in connection with that lawyer's service in the U.S. Navy Reserve. *Id.*

40.    Additionally, at least six lawyers—four partners and two other attorneys—hold clearances in connection with their work at Jenner on behalf of clients. *Id.* ¶ 67.

41.    In the last five years, Jenner has been engaged by clients on at least eight matters that have required lawyers working on those matters to hold security clearances. *Id.* At least two such matters are currently ongoing. *Id.* As part of this work, Jenner attorneys must occasionally access classified material in a SCIF, either in a government building or onsite at a client's office. *Id.*

42.    In addition, a Jenner attorney is currently in the process of applying for a security clearance in connection with an ongoing pro bono representation of a federal criminal defendant, which involves classified information. *Id.* ¶ 68.

**D.    Prior Executive Actions Targeting Individual Law Firms**

43.    On February 25, 2025, the President issued a memorandum targeting the law firm Covington & Burling LLP, which had represented Jack Smith, the former Special Counsel responsible for overseeing two criminal investigations into the President. Ex. 4 (Memo); *see also* Ex. 5 (Fact Sheet).[1] The memorandum directed the heads of federal agencies to suspend active security

---

[1] All references to "Ex. __" refer to the Exhibits attached to the Declaration of Michael A. Attanasio in support of Plaintiff's Motion for Summary Judgment and For Declaratory and Permanent

clearances held by "all members, partners, and employees of Covington & Burling LLP who assisted … Jack Smith during his time as Special Counsel." Ex. 1. The Memorandum also directed agency heads "to terminate any engagement of Covington & Burling LLP by any agency to the maximum extent permitted by law." *Id.*

44.     On March 6, 2025, the President signed an executive order titled "Addressing Risks from Perkins Coie LLP." Ex. 6 ("Perkins Coie Order"). In that order, the President called Perkins Coie "dishonest and dangerous" because it had "represent[ed] failed Presidential candidate Hillary Clinton" and "worked with activist donors" to challenge certain "election laws." *Id.* § 1. The Perkins Coie Order also faulted the firm's hiring practices from six years earlier—practices that the order acknowledged were no longer operative. *Id.* The "Fact Sheet" accompanying the Perkins Coie Order criticized Perkins Coie for "fil[ing] lawsuits against the Trump Administration." Ex. 7.

45.     The Perkins Coie Order not only directed agencies to suspend the security clearances of all Perkins Coie employees, but also purported to restrict their access to federal buildings, to instruct federal agencies to refuse to meet or engage with Perkins Coie lawyers and staff, and to terminate federal contracts held by firm clients. Ex. 6 §§ 2–3, 5.

46.     Upon signing the Perkins Coie Order, the President stated that he intended to go after additional law firms. *See* ANI News, *Trump Revokes Security Clearances for Perkins Coie Over DEI Policies* at 1:20, YouTube (Mar. 6, 2025), https://www.youtube.com/watch?v=lY6ougLkFsc.

47.     On March 14, 2025, the President issued an executive order targeting Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul Weiss"). Ex. 10 ("Paul Weiss Order"); *see also* Ex. 11 (Fact Sheet). Paul Weiss's "harmful activity" included (1) hiring a "former leading prosecutor in the office of Special Counsel Robert Mueller" who "brought a pro bono suit against individuals alleged

Injunctive Relief filed herewith.

to have participated in the events that occurred at or near the United States Capitol on January 6, 2021, on behalf of the District of Columbia Attorney General"; and (2) hiring a lawyer, Mark Pomerantz, who had previously left Paul Weiss to join the Manhattan District Attorney's office "solely" to prosecute the President. Ex. 10 § 1. The Paul Weiss Order further alleged that the firm discriminates against its employees on the basis of race and sex. *Id.* The order imposed the same sanctions as the Perkins Coie Order. *Id.* §§ 2-5.

48.    On March 20, 2025, the President announced on Truth Social that, as part of a "settlement" with the firm, "Paul Weiss will dedicate the equivalent of $40 million in pro bono legal services over the course of President Trump's term to support the Administration's initiatives." Ex. 14. The President stated that he "is agreeing to this action in light of a meeting with Paul Weiss Chairman, Brad Karp, during which Mr. Karp acknowledged the wrongdoing of former Paul Weiss partner, Mark Pomerantz." *Id.*

49.    On March 21, 2025, the President withdrew the prior Paul Weiss Order in a new order, "Addressing Remedial Action by Paul Weiss." Ex. 15 § 1. This order states that "Paul Weiss indicated that it will engage in a remarkable change of course" and specifies that "Paul Weiss has acknowledged the wrongdoing of its former partner, Mark Pomerantz, and it has agreed to a number of policy changes," including the pro bono services referenced in the President's social media post. *Id.*

50.    According to the President's announcement on Truth Social, Mr. Karp, Paul Weiss's chairman, stated: "We are gratified that the President has agreed to withdraw the Executive Order concerning Paul, Weiss. We look forward to an engaged and constructive relationship with the President and his Administration." Ex. 14.

51.    On March 22, 2025, the President issued another memorandum, charging the Attorney General, among other things, "to review conduct by attorneys or their law firms in litigation

against the Federal Government over the last 8 years" and "to recommend to the President …
additional steps … , including reassessment of security clearances held by the attorney, termination
of any contract for which the relevant attorney or law firm has been hired to perform services, or any
other appropriate actions." Ex. 16. The memorandum cited attorney Marc Elias as a "[r]ecent
example[]" of misconduct. *Id.*

**E.    The Challenged Executive Order Targeting Jenner & Block**

52.    On March 25, 2025, the President issued an Executive Order titled "Addressing
Risks from Jenner & Block." Ex. 19 (the "Order"); *see also* Ex. 20 (the "Fact Sheet").

53.    The Order directs that the heads of agencies "shall" (1) "provide guidance limiting"
Jenner employees' "official access" to federal buildings "when such access would threaten the
national security of or otherwise be inconsistent with the interests of the United States" and to
"provide guidance limiting" Jenner employees' "engag[ement]" with federal employees, Order § 5;
(2) require government contractors to "disclose any business they do with Jenner and whether that
business is related to the subject of the Government contract" and to "take appropriate steps to
terminate any contract[] … for which Jenner has been hired to perform any service," Order § 3; and
(3) create a new security-clearance review procedure, applicable only to Jenner and other law firms
whose activities are deemed disfavored, "suspend[ing] any active security clearances held by
individuals at Jenner" and threatening arbitrary revocation, *id.* § 2.

54.    The Order identifies the Firm's "harmful activity" as follows: (1) the Firm's
affiliation with former partner Andrew Weissmann, who the Order suggests remains employed by
the Firm; (2) certain of the Firm's litigation adverse to the federal government on matters related to
gender identity and immigration, which the Order suggests was unethically paid for with other
clients' funds; and (3) the Firm's purported "discriminat[ion] against its employees based on race
and other categories prohibited by civil rights laws," including the supposed use of "targets." *Id.* § 1.

55.     On the same day the President signed the Order, he released a corresponding "Fact Sheet." Ex. 20. The Fact Sheet suggests that "Jenner has been accused of discriminating against its own employees on the basis of race and other categories prohibited by civil rights laws." *Id.* It provides no supporting evidence; nor does it claim that the Administration conducted any investigation into Jenner's employment practices.

56.     The Administration provided Jenner no process before issuing the Order—no notice, no ability to present evidence, and no opportunity to be heard. Perrelli Decl. ¶ 20.

### 1.  Andrew Weissmann

57.     Regarding Andrew Weissmann, the Order states that "Jenner was 'thrilled' to re-hire the unethical Andrew Weissmann after his time engaging in partisan prosecution as part of Robert Mueller's entirely unjustified investigation"; refers to Mr. Weissmann's involvement in the Arthur Andersen LLP case; and asserts that there are "numerous reports of Weissman's [sic] dishonesty," including the "overt demand that the Federal Government pursue a political agenda against [the President]." Order § 1. Section 5 also purports to limit Mr. Weissmann's access to federal buildings and eligibility for federal employment, apparently on the mistaken belief that Mr. Weissmann is a current employee of Jenner. *Id.* § 5.

58.     Andrew Weissmann does not work at Jenner. Perrelli Decl. ¶¶ 54, 64. He was a partner at the Firm from March 27, 2006 to October 24, 2011, and again from June 7, 2020 to July 16, 2021. *Id.* ¶ 54. Andrew Weissmann has not worked at or performed legal work for Jenner since his departure on July 16, 2021. *Id.* ¶ 64.

59.     Prior to his second stint at the Firm, Andrew Weissmann served on the Department of Justice team led by Special Counsel Robert S. Mueller, III, that investigated Russian interference in the 2016 election. *Id*. ¶ 56. Following his work with Special Counsel Mueller, Andrew Weissmann authored a non-fiction book, *Where Law Ends: Inside the Mueller Investigation*, which was highly

critical of the President. *Id*. ¶ 57. Mr. Weissmann also became a legal analyst for MSNBC. *Id*. ¶ 58.

60.     The President has suggested that Andrew Weissmann and those affiliated with him "should be sued" for being "a political organization that goes after Trump." Ex. 2.

61.     In a March 14, 2025 speech at the Department of Justice, the President accused Andrew Weissmann and others, including Jack Smith, of being "scum" who were participating in a "coordinated … campaign" against him. Ex. 9.

62.     On March 21, 2025, the President rescinded Andrew Weissmann's security clearance, together with those of Antony Blinken, Alvin Bragg, Hillary Clinton, Elizabeth Cheney, Kamala Harris, President Biden, members of President Biden's family, and others. Ex. 17.

### 2.  Jenner's Litigation Against the Government

63.     The Order characterizes the Firm as pursuing "obvious partisan representations to achieve political ends" and litigation that purportedly "attacks … women and children based on a refusal to accept the biological reality of sex, and backs the obstruction of efforts to prevent illegal aliens from committing horrific crimes and trafficking deadly drugs within our borders." Order § 1. And the Order characterizes these or other pro bono representations "for destructive causes" as having been funded by "hundreds of millions of [Jenner's] clients' dollars." *Id.*

64.     Attorneys at the Firm frequently file litigation on behalf of their clients challenging federal government action. Perrelli Decl. ¶ 47. Just as it has done during previous Democratic and Republican administrations, Jenner has continued to file litigation challenging federal government action subsequent to the January 20, 2025 inauguration of the President. *Id.* ¶ 48.

65.     Jenner's pro bono representations, whether involving litigation against the federal government or otherwise, are carried out with the Firm's own resources, not those of their clients. Perrelli Decl. ¶ 85.

66.     Jenner has represented advocacy groups and individual clients in litigation

challenging the President's January 28, 2025, executive order directing federal agencies to withhold funds from healthcare institutions and entities that provide gender-affirming care to people under age nineteen. *PFLAG, Inc. v. Trump*, No. 25-cv-337 (D. Md. Feb. 4, 2025).

67.    After expedited briefing in *PFLAG*, the district court issued a temporary restraining order restraining Defendants "from conditioning or withholding federal funding based on the fact that a healthcare entity or health professional provides gender affirming medical care to a patient under the age of nineteen." Order, *PFLAG, Inc. v. Trump*, No. 25-cv-337 (D. Md. Feb. 13, 2025), ECF No. 61 (Order granting TRO); *see also PFLAG*, 2025 WL 510050, at *1 (D. Md. Feb. 14, 2025) (opinion memorializing TRO). Plaintiffs then moved for a nationwide preliminary injunction on February 18, 2025, which the district court granted on March 4, 2025. *See PFLAG*, 2025 WL 685124, at *2 (D. Md. Mar. 4, 2025).

68.    Jenner has also represented nonprofits and individual noncitizens challenging the President's abrogation of certain protections from removal that Congress created by statute, including the asylum statute. *Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*, No. 25-cv-306 (D.D.C. Feb. 3, 2025).

69.    Jenner's representation in *Refugee & Immigrant Ctr. For Educ. & Legal Servs.* is part of its tradition of advocating for noncitizens' asylum rights under both Democratic and Republican administrations. For example, representing several of the same clients, Jenner also challenged an Executive Order and rulemaking by the Biden-Harris Administration that sought to impose lesser restrictions on asylum and other forms of protection. *Las Americas Immigrant Advoc. Ctr. v. U.S. Dep't of Homeland Security*, No. 24-cv-01702 (D.D.C. June 12, 2024).

70.    The Firm also represents a group of associations and institutions of higher education in a suit against the National Institutes of Health, seeking to enjoin the imposition of a cap on payments for indirect costs necessary for research conducted pursuant to NIH grants. *See Ass'n of*

*Am. Univs. v. Dep't of Health & Human Servs.*, No. 25-cv-10346 (D. Mass. Feb. 10, 2025). On March

5, 2025, the district court issued a preliminary injunction enjoining NIH from implementing the

guidance. Perrelli Decl. ¶ 49.

71.     Following the district court's issuance of a temporary restraining order in *Ass'n of*

*Am. Univs.*, Elon Musk wrote on X: "Which law firms are pushing these anti-democratic cases to

impede the will of the people?" Ex. 3.

### 3.  Jenner's Hiring Practices

72.     The Order also asserts that Jenner "discriminates against its employees based on race

and other categories prohibited by civil rights laws, including through the use of race-based

'targets.'" Order § 1. The Fact Sheet goes further, alleging that "Jenner has been accused of

discriminating against its own employees." Ex. 11.

73.     The Order cites no evidence for these conclusions. *See generally id.*

### F.  Impact of the Order on Jenner and its Clients

74.     Since the issuance of the Order, many clients have been requesting frequent updates

about the Order's status to evaluate whether the Firm can continue to represent them. Perrelli Decl.

¶¶ 71, 74, 76. Some of Jenner's largest clients hold significant government contracts and

subcontracts. *Id.* ¶ 75. They want to continue using their chosen counsel at Jenner but are reviewing

their relationships, their government contracts, and other government interactions, and they have

indicated that they will need to make decisions shortly. *Id.* ¶ 76.

75.     Jenner lawyers cannot effectively represent their clients without reliable access to

federal buildings or ability to engage with federal employees. *Id.* ¶¶ 24–46, 67. Because the Order

could be interpreted to ban Jenner's access to federal courthouses and other buildings, the Firm's

clients expressed concerns that Jenner could not represent them in federal court or enter federal

buildings to engage with regulatory agencies or senior government officials. *Id.* ¶ 71.

76. One client informed Jenner that the Department of Justice notified the client on March 26, 2025 that the client could not bring their counsel from Jenner to a meeting with the Department of Justice that was scheduled for April 3. *Id.* ¶ 70. After the TRO issued on March 28, 2025, Jenner was again invited to participate in that meeting. *Id.* However, by that point, Jenner's client had already obtained new counsel and educated new counsel on the status of the matter to represent the client at that meeting. *Id.*

77. Jenner and its clients will continue incurring such harm if the Order is allowed to stand because Jenner attorneys have numerous upcoming appearances. *Id.* ¶ 72. Indeed, Jenner has around 540 active matters pending before federal courts, and numerous matters before agencies that require access to federal government buildings and officials. *Id.* Continued refusals by federal officials to meet with Jenner lawyers, or denying Jenner lawyers access to federal agencies and buildings, would harm Jenner's legal practice and its clients. *Id.*

78. Within 24 hours of the issuance of the Order, several clients expressed concerns about Jenner's representation because they did not know whether Jenner personnel would be permitted to enter federal buildings and federal courthouses, negotiate with federal government officials, or participate in meetings with the Department of Justice. *Id.* One client expressed doubts about whether Jenner could represent it in ongoing settlement negotiations with the government. *Id.* Another client expressed concern that Jenner would be prohibited from appearing on their behalf at a trial scheduled for June. *Id.*

79. Because of its ICD, regulatory, and Government Controversies practices, clients rely on Jenner to engage with federal government agencies and officials, a previously routine activity of the Firm's attorneys that is now at risk. *Id.* ¶ 73. Clients have expressed concern about whether the Order could impair the Firm's ability to attend upcoming meetings with government agencies. *Id.*

80. The Order has also required Jenner attorneys to expend significant time to discuss

the impacts with its clients and develop a plan to work together to mitigate and address any impacts in the days and weeks ahead, an evolving situation requiring frequent communications that burdens both the firm and its clients. *Id.* ¶ 74. Many of Jenner's partners with responsibility for client relationships have spent a significant amount of time since the Order was issued communicating with clients about the Order and its impacts and developing plans for the path ahead. *Id.*

81.     Moreover, the Order directs "immediate[]" action to "suspend any active security clearances held by individuals at Jenner." Order § 2(a). Such suspensions threaten to interfere with at least two ongoing client representations in which Jenner attorneys are required to access classified information. Perrelli Decl. ¶ 81. Such representations are regularly undertaken by the Firm's ICD and Government Contracts practices. *Id.*

82.     If allowed to take effect, the Order's creation of a Jenner-specific "Security Clearance Review" process, in addition to the federal government's existing security clearance review process, could undermine the Firm's efforts to bring in matters involving classified information. *Id.* ¶ 69.

83.     Many of Jenner's largest clients hold contracts or subcontracts with the federal government. *Id.* ¶ 75. Over the last five years, more than 40% of the Firm's revenue has come from clients who are government contractors, subcontractors, or affiliates. *Id.* ¶ 77. Last year, more than 40% of the Firm's revenue came from government contractors, subcontractors, or affiliates. *Id.*

84.     Many of Jenner's clients holding government contracts or subcontracts are represented by Jenner in legal matters related to their government contracts. *Id.* ¶ 75.

85.     Many of Jenner's clients holding government contracts or subcontracts are also represented by the Firm for legal matters entirely unrelated to those contracts. *Id.*

86.     For many of the Firm's clients holding government contracts or subcontracts, the fact that the Firm provides them legal advice is not public information. *Id.*

87.     If enforced, the Order would seek to require many of these clients to divulge confidential information regarding their legal representations to the federal government, with whom they may be adverse on the very same matter. *Id.* In addition, the Order threatens the termination of those clients' contracts if Jenner has been hired to perform any service related to the contract. *Id.*

88.     Many of Jenner's pro bono clients are government contractors and fear that a continued relationship with Jenner could jeopardize their own organization in light of the requirements in the Order. *Id.* ¶ 79. One day after the Order was issued, one such client—an association of non-profit employers—terminated Jenner's engagement because of concerns that its members' own government contracts could be placed at risk. *Id.*

89.     The Order has also harmed Jenner's reputation in the market for clients, lawyers, and staff through its false and disparaging characterization of the firm and its attorneys. *Id.* ¶ 84. As discussed above, the Order's false statements include: that Jenner has "earmark[ed] hundreds of millions of [its] clients' dollars" for pro bono work, *id.* ¶ 85; that former partner Andew Weissmann is a current employee of Jenner, *id.* ¶ 86; that "Jenner engages in obvious partisan representations to achieve political ends," *id.* ¶ 87; that the Firm "supports attacks against women and children based on a refusal to accept the biological reality of sex," *id.* ¶ 88; and that the firm "backs the obstruction of efforts to prevent illegal aliens from committing horrific crimes and trafficking deadly drugs within our borders," *id.* ¶ 89.

90.     The Order's directive that agency officials must "refrain from hiring employees of Jenner" would cause irreparable harm to the Firm and its personnel. *Id.* ¶ 82. Jenner employees regularly apply to work in the federal government while working at the Firm. *Id.* Since 2020, at least 22 Jenner attorneys have gone directly from the Firm to serve in the Executive Branch. *Id.*

91.     Jenner attorneys who apply for federal government positions often interface with the U.S. Office of Personnel Management or its USAJobs.com website. *Id.* ¶ 12.

92.     For attorneys who are interested in government service during their careers, the potential opportunity to be hired by the federal government is a significant consideration in choosing a law firm. *Id.* ¶ 83. The Firm's legal recruiting professionals often emphasize in communicating with candidates for employment at Jenner that their experiences at the Firm would situate them well for future government service. *Id.* The Order's hiring restrictions, if allowed to stand, would thus harm the Firm's legal recruiting efforts. *Id.*

### G.     Further Developments Following Issuance of the Order

93.     On March 27, 2025, the President issued an executive order targeting Wilmer Cutler Pickering Hale and Dorr LLP ("WilmerHale"). Ex. 21 (the "WilmerHale Order"); *see also* Ex. 22 (Fact Sheet).

94.     The WilmerHale Order targeted WilmerHale for its pro bono representations and its association with former Special Counsel Mueller and two other attorneys who worked on the Mueller investigation. Ex. 21 (WilmerHale Order § 1). Like the prior orders, it ordered suspension of security clearances, restricted access to government buildings, and barred federal employment as to all WilmerHale personnel and terminated all contracts involving the firm. *Id.* §§ 2–3, 5.

95.     The President next announced what he termed "essentially a settlement" with the law firm Skadden, Arps, Slate, Meagher & Flom ("Skadden"). Ex. 23. To head off an expected executive order, *id.*, Skadden agreed to provide $100 million in pro bono work to causes supported by the Administration and (according to the President) "declared the Firm's strong commitment to ending the Weaponization of the Justice System and the Legal Profession." Ex. 24. The law firms Willkie Farr & Gallagher LLP ("Willkie") and Milbank LLP ("Milbank") have reached similar agreements. *See* Exs. 25-26.

96.     On March 28, 2025, Jenner filed the instant action, seeking (1) a declaration that the Order is unconstitutional; (2) a permanent injunction of the implementation of the Order; and (3) any

other relief the Court deems just and proper. *See* Complaint, ECF No. 1.

97.    The same day, Jenner moved for, and this Court granted, a TRO enjoining Defendants "from implementing or enforcing Sections 3 and 5" of the Order and enjoining Defendants from "using the statements laid out in Section 1 of the Executive Order in any interactions with [Jenner] or [Jenner's] clients, or employee[s] of [Jenner] or [Jenner's] clients." *See* TRO, ECF No. 9 at 1. The Court further directed Defendants to suspend and rescind any guidance issued with respect to Sections 1, 3, and 5 of the Order, to issue guidance that those sections should be disregarded, and to take other steps necessary to prevent the implementation of Sections 3 and 5 of the Order. *Id.* at 1–2.

98.    WilmerHale also brought suit, and Judge Leon issued a TRO enjoining the defendants from implementing or enforcing Sections 3 and 5 of the order targeting that firm. *See* Memorandum Order, *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the President*, No. 25-cv-917 (D.D.C. Mar. 28, 2025), ECF No. 10.

Dated: April 8, 2025                              Respectfully submitted,

                                                  */s/ Michael A. Attanasio*
                                                  Michael A. Attanasio
                                                  (mattanasio@cooley.com)
                                                  Cooley LLP
                                                  10265 Science Center Drive
                                                  San Diego, CA 92121
                                                  Telephone:    (858) 550-6000
                                                  Facsimile:    (858) 550-6420

                                                  David E. Mills (DC Bar #401979)
                                                  (dmills@cooley.com)
                                                  Cooley LLP
                                                  1299 Pennsylvania Ave., NW, Suite 700
                                                  Washington, D.C. 20004
                                                  Telephone:    (202) 842-5000
                                                  Facsimile:    (202) 842-7400

Kristine Forderer (*pro hac vice*)
(kforderer@cooley.com)
Cooley LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111
Telephone:    (415) 693-2000
Facsimile:     (415) 693-2222

John Bostic (*pro hac vice*)
(jbostic@cooley.com)
Cooley LLP
3175 Hanover Street
Palo Alto, CA 94304
Telephone:    (650) 843-5000
Facsimile:     (650) 849-7400

*Attorneys for Plaintiff Jenner & Block LLP*