**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JENNER & BLOCK LLP, | |
| *Plaintiff*, | |
| v. | Case No. 1:25-cv-00916-JDB |
| U.S. DEPARTMENT OF JUSTICE, *et al.*, | |
| *Defendants*. | |

**DECLARATION OF THOMAS J. PERRELLI IN SUPPORT OF**
**PLAINTIFF JENNER & BLOCK LLP'S MOTION FOR SUMMARY JUDGMENT AND**
**FOR DECLARATORY AND PERMANENT INJUNCTIVE RELIEF**

I, Thomas J. Perrelli, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.      I am Firm Chair and a partner at Jenner & Block LLP ("Jenner" or "the firm"). Jenner is an international law firm that conducts its U.S. operations and activities through a limited liability partnership, Jenner & Block LLP, with six offices in the United States and one in the United Kingdom. I have been an attorney at Jenner for more than 25 years. I am a member in good standing of the District of Columbia bar and have been admitted in many federal courts, including the U.S. Supreme Court, as well as the Supreme Court of Virginia. I am very familiar with Jenner's business and operations, and I provide this declaration in response to the March 25, 2025 Executive Order titled "Addressing Risks from Jenner & Block." *See* Ex. 19, Executive Order, "Addressing Risks from Jenner & Block" (March 25, 2025), https://perma.cc/H3GT-BHKL (the "Order").[1] I either have personal knowledge of the facts set forth in this declaration or I know them from

---

[1] All references to "Ex. _" refer to the Exhibits attached to the Declaration of Michael A. Attanasio in Support of Plaintiff's Motion for Summary Judgment and for Declaratory and Permanent Injunctive Relief.

business records and my knowledge of the firm's history and operations.

2.      I initially began to work at Jenner as a summer associate in 1990. After graduating from law school and beginning my legal career as a judicial law clerk, I worked as an associate at Jenner from 1992 to 1997. I thereafter served as a partner at the firm from 2001 through 2009. During that time period, I was the managing partner of the Washington D.C. office and Co-Chair of the firm's Creative Content practice (now known as Content, Media, and Entertainment).

3.      I left the firm in 2009 to serve as Associate Attorney General of the United States, supervising the U.S. Department of Justice's Civil, Antitrust, Civil Rights, Environment and Natural Resources, and Tax Divisions. The U.S. Senate confirmed my nomination to serve as Associate Attorney General by a vote of 72 to 20. In that role, I served as lead federal negotiator on some of the largest settlements in history and oversaw the United States' civil litigation.

4.      I returned to Jenner in 2012. That year, I founded the firm's Government Controversies and Public Policy Litigation Practice to build a multi-disciplinary approach to our clients' most complex problems. I continue to serve as Co-Chair of that practice. The practice helps businesses and large organizations navigate and resolve highly complex crises that require a mix of litigation, regulatory, public policy, legislative, and communications skills. I have also served on the firm's Policy Committee since 2013, and as Firm Chair since early 2020.

5.      I submit this declaration in Support of Jenner's Motion for Summary Judgment and for Declaratory and Permanent Injunctive Relief. I am of the age of majority, and I am competent to make this declaration.

**I.      Jenner & Block LLP**

6.      Jenner was founded in Chicago in 1914. Jenner currently has six offices in the United States—Chicago, Washington, D.C., New York, Los Angeles, Century City, San Francisco—and an office in London. The firm has over 500 lawyers and more than 900 total

personal.

7.     Jenner is known for its prominent and successful litigation practice, global investigations practice, regulatory and government controversies work, and experience handling sophisticated, high-profile corporate transactions. Its clients include Fortune 100 companies, technology companies, large privately held corporations, colleges and universities, emerging companies, Native American tribes, and venture capital and private equity investors. Jenner serves clients across a variety of industries, including aerospace and defense, energy, food and beverage, telecommunications, technology, hospitality and real estate, finance, transportation, education, and media and entertainment, among others. Jenner alumni have been and are serving as state and federal court judges, judicial law clerks, and high-ranking government officials, as well as founders, CEOs, and general counsels of some of the nation's largest and most important companies. We serve clients across a variety of industries, with particular expertise representing clients in highly regulated industries, including aerospace and defense, agriculture, education, energy, food and beverage, healthcare and life sciences, hospitality, telecommunications, technology, transportation, and media and entertainment, among others.

8.     Over our 111-year history, Jenner and its lawyers have represented clients in federal and state courts across the nation, and in tribunals throughout the world. We have presented dozens of arguments in the Supreme Court of the United States, helping to establish major precedent in federal and constitutional law. We are committed to providing excellent service to our clients, helping them achieve their goals and standing by them in good times and bad.

9.     Jenner has been named as an "Am Law 100" firm on The American Lawyer 100 list in every year since that list began in 1987. The firm and its lawyers are regularly recognized for excellence in the legal community by Chambers USA and other respected organizations, including national and local bar associations. Seventy-six Jenner partners have been recognized as

"America's Leading Lawyers" in more than 35 practice areas ranked by Chambers USA 2024. Consistent with our litigation prowess, Jenner boasts nine Fellows of the prestigious American College of Trial Lawyers ("ACTL"), one of the highest percentages of partners in the ACTL among AmLaw 100 firms. Six Jenner lawyers are members of the American Law Institute, a leading independent organization producing scholarly work designed to clarify, modernize, and improve the law.

10. Jenner has more than 900 personnel. Of those, approximately 500 are attorneys and 400 are business professionals, including paralegals, legal assistants, and other professionals. Our employees participate in the communities in which they live. Our partners have included two former Presidents of the Chicago Bar Association and a former President of the New York City Bar Association. They serve on countless boards of legal services, community, and arts organizations. They include former members of the armed forces and a current reservist in the U.S. military.

11. Jenner's attorneys are drawn from all sides of the political spectrum. Many of our attorneys joined the firm after service in Democratic or Republican administrations. Our Chair Emeritus Anton Valukas, who served as Chairman of the firm for a decade until 2017, has been a leading Jenner partner for more than three decades, returning to the firm after being appointed by President Reagan to serve as United States Attorney for the Northern District of Illinois. Other current attorneys include:

- A senior adviser for Congressional Republicans with 14 years of experience at key investigative committees in U.S. Congress, and who, while at Jenner, recently served as special counsel to Chairman Mike Kelly (R-PA) and Republicans on the Task Force on the Attempted Assassination of Donald J. Trump;

- the leader of the Office of the Special Inspector General for the Troubled Asset Relief Program (SIGTARP), appointed by President George W. Bush to head a law enforcement agency that helped protect taxpayers from fraud-related losses;

- the Acting Solicitor General of the United States during the Obama administration;

- a Commissioner of the Federal Energy Regulatory Commission appointed by President George W. Bush;

- a Deputy Associate Director of Cabinet Affairs at the White House during the administration of President George W. Bush;

- the U.S. Ambassador to Hungary during the Biden administration;

- the U.S. Ambassador and Permanent Representative to the United Nations Human Rights Council during the Obama administration;

- a Special Counsel to the Judiciary Committee of the U.S. House of Representatives in connection with the impeachment proceedings of federal district judge Harry Claiborne, leading to the conviction and ultimately the removal of a President Carter appointee; and

- fifteen former Assistant United States Attorneys with experience in eight U.S. Attorney's Offices around the country, who were appointed by the Attorney General in both Republican and Democratic administrations.

12.    In addition, our attorneys have served in federal government agencies as varied as the Department of Justice, Securities and Exchange Commission, Federal Communications Commission, Federal Trade Commission, Department of the Treasury, Department of State, National Security Council, Environmental Protection Agency, Secret Service, U.S. Air Force, U.S. Navy, the Internal Revenue Service, Department of Health and Human Services, and numerous Committees of the U.S. Senate and U.S. House of Representatives. Some of our attorneys served in these federal government agencies during the first Trump administration. As noted below, Jenner attorneys have regularly applied for positions in federal government agencies while working at the firm, often interfacing with the U.S. Office of Personnel Management or its USAJobs.com website.

13.    Many of our attorneys joined the firm after serving as judicial law clerks to judges appointed by both Democratic and Republican Presidents. Thirteen of our attorneys served as law clerks for Justices of the Supreme Court, including Justice Scalia, Justice Kennedy, Justice Souter,

and Justice Kagan. In recent years, five Jenner partners or alumni have been nominated to serve as Article III federal judges—two by President Trump, and three by President Biden. Former U.S. Supreme Court Justice John Paul Stevens, appointed by President Gerald Ford, was a Jenner alumnus. President Nixon appointed Jenner partner Philip Tone first to the U.S. District Court for the Northern District of Illinois and thereafter to the U.S. Court of Appeals for the Seventh Circuit; Judge Tone was a partner at Jenner both before and after his service to the federal judiciary. President Nixon also appointed Jenner partner Prentice Marshall to the U.S. District Court for the Northern District of Illinois, where he served for more than two decades. Former Governor Rick Snyder (R-MI) appointed a Jenner alumnus to the Michigan Supreme Court.

14.    Jenner has a longstanding, industry-leading commitment to pro bono service. Jenner was one of the first law firms nationwide to create a pro bono program, establishing it in the 1950s to represent indigent criminal defendants in Chicago. Those origins launched a culture of public service that has only grown stronger over seven decades. The American Lawyer has ranked the firm its number one pro bono firm 12 times in the past 15 years. In January 2021, the firm launched a five-year pro bono pledge, setting a goal of contributing $250 million in free legal services. The firm exceeded that commitment more than one year early, contributing the equivalent of $305 million in pro bono legal services by the end of 2024. In 2024 alone, the firm dedicated 90,993 hours of attorney time to pro bono work, valued at $103 million. Among other things, this includes defending individuals in our criminal justice system, governments and society; assisting individuals denied social security benefits; advocating for veterans; protecting constitutional rights; assisting victims of domestic violence and sex trafficking; pursuing religious liberty while fighting religious discrimination; and counseling community organizations on issues such as governance, real estate, and intellectual property.

15.    We were early champions for sometimes-controversial issues like prisoners' rights,

criminal defense, and LGBTQ equality, and we continue forging the path, year after year, to provide legal representation to those who cannot afford it. We pursue impact litigation on important constitutional issues such as voting rights and reproductive rights. We pursue pro bono litigation on behalf of Medicaid recipients, challenging onerous policies that threaten their health care. We also do significant pro bono work advocating for servicemembers' and veterans' rights. In partnership with the Veterans Legal Services Clinic at Yale Law School, we represent military veterans seeking veterans benefits and honorable status. We currently represent Black veterans who served in the Vietnam War and who were improperly denied veterans benefits for more than fifty years, as acknowledged by the Department of Veterans Affairs. We also represent Navy and Marine Corps veterans who received less-than-honorable discharges while suffering from post-traumatic stress disorder (PTSD) after service in Iraq and Afghanistan. And we represent adults who were brought to the United States as children, helping them to apply for deferred action status and obtain work authorization.

16.     Jenner attorneys pursue matters of public importance, from a variety of perspectives. We represent our clients on their most significant matters, and we fight for them even in the face of intense public pressure. Named partner Albert Jenner challenged the constitutionality of the House Committee on Un-American Activities ("HUAC"), on behalf of his client, a prominent scientist who had received a subpoena from HUAC. He also served as counsel for Republicans on the House Judiciary Committee during the impeachment proceedings against President Richard Nixon. Later, the firm represented Theodore B. Olson—then President Reagan's Assistant Attorney General for the Office of Legal Counsel—in his challenge to the Independent Counsel statute.

17.     The firm represented MCI Telecommunications Corp. in the historic case that led to the break-up of AT&T. The firm represented the examiner in the bankruptcy proceedings of

Lehman Brothers Holdings, Inc., the largest bankruptcy in U.S. history. More recently, Jenner represents American victims of terrorist attacks, including 9/11 and October 7 victims, in civil actions against Iran, the Taliban, Russian banks, and other malign foreign actors. Jenner represented a major corporation, a university, and a Deferred Action for Childhood Arrivals ("DACA") recipient in successfully challenging the rescission of DACA. A Jenner partner served last year as Special Counsel to Chairman Mike Kelly (R-PA) and House Republicans on the Task Force on the Attempted Assassination of Donald J. Trump.

18.     In short, we are lawyers, and we serve our clients. We are driven by our clients' needs and the firm's values.

19.     Beyond the legal matters we pursue, the firm is often recognized for fostering a work environment in which all lawyers and business professionals can flourish. A 2024 Vault survey ranked Jenner as the #18 Best Law Firm in America to Work For and #14 in Firm Culture. American Lawyer surveys of associate satisfaction consistently rank Jenner among the top firms nationwide.

## II.     The March 25, 2025 Executive Order

20.     On March 25, 2025, the President signed the Executive Order titled "Addressing Risks from Jenner & Block." The Order was accompanied by a "Fact Sheet" issued the same day that purports to explain and support the Order. *See* Ex. 20, White House, "Fact Sheet: President Donald J. Trump Addresses Risks from Jenner & Block" (March 25, 2025), https://perma.cc/CE4L-CZ43 ("Fact Sheet"). Jenner learned of the Order only after it was issued, and was given no opportunity to respond to the false charges in the Order or to explain their inevitable impact.

21.     The Order begins with a "Background" section that discusses purported "harmful activity" undertaken by law firms "through their powerful pro bono practices," to which the Order

refers as "egregious conduct." Order § 1. The Order alleges that Jenner has "abused its pro bono practice," including based on certain client representations adverse to the federal government; that it has engaged in discrimination; and that its "values and priorities" were compromised by the firm's affiliation with former partner Andrew Weissmann. *See id.*

22.　　The Order directs the heads of all agencies to (1) "provide guidance limiting" Jenner's employees' "official access" to federal buildings "when such access would threaten the national security of or otherwise be inconsistent with the interests of the United States" and to "provide guidance limiting" "engage[ment]" between government employees acting in their official capacity and Jenner employees to "ensure consistency with the national security and other interests of the United States," Order § 5; (2) require government contractors to "disclose any business they do with Jenner and whether that business is related to the subject of the Government contract" and to "take appropriate steps to terminate any contract[] … for which Jenner has been hired to perform any service," *id.* § 3; and (3) create a new security-clearance review procedure, applicable only to Jenner and other law firms whose activities are deemed disfavored, "suspend[ing] any active security clearances held by individuals at Jenner" and threatening arbitrary revocation, *id.* § 2.

23.　　On March 28, 2025, Jenner filed the instant action, seeking (1) a declaration that the Order is unconstitutional, and (2) a permanent injunction of the implementation of the Order. Jenner moved for, and this Court granted, a temporary restraining order enjoining Defendants "from implementing or enforcing Sections 3 and 5" of the Order and enjoining Defendants from "using the statements laid out in Section 1 of the Executive Order in any interactions with Plaintiff or Plaintiff's clients, or employee[s] of Plaintiff's clients." Order Granting TRO at 1, *Jenner & Block LLP*, No. 25-cv-00916 (D.D.C. Mar. 28, 2025), ECF No. 9. The Court further directed Defendants to suspend and rescind any guidance issued with respect to Sections 1, 3, and

5 of the Order, to issue guidance that those sections should be disregarded, and to take other steps necessary to prevent the implementation of Sections 3 and 5 of the Order. *Id*. at 1–2.

### III.   Jenner's Interaction with the Federal Government

24.     As a full-service law firm that represents clients in all sectors of the economy in transactional, litigation, and regulatory matters, Jenner lawyers necessarily interact with the federal government on behalf of their clients in countless ways. Those interactions are critical to our ability to practice our profession, and our clients retain us and rely on us in their most sensitive matters to be able to interact with the federal government.

25.     If allowed to stand, the Order's restrictions on Jenner's interactions with the federal government would be devastating and irreparable. Our litigators carry forward more than a century of principled and effective advocacy that continues to serve as the hallmark of our firm. Driven by a commitment to integrity and professionalism, our credibility is our currency, and clients trust Jenner to skillfully defend and pursue their interests in their most contentious matters. Described by *The National Law Journal* as "the Army's Special Forces: highly trained and ready to deploy anywhere at any time," Jenner has been widely recognized for our prowess in high-profile trials and reputation as a "go-to" litigation firm for major corporate clients facing bet-the-company stakes. These trials and litigations require access to the federal courts. Unlike many other large law firms, the vast majority (nearly 90%) of Jenner's attorneys focus on litigation, white collar/investigations, and regulatory practices, and the bulk of the firm's revenue derives from those practices. Many of these lawyers practice in federal court on behalf of our clients in civil and criminal cases, as well as in federal agencies' in-house administrative proceedings.

26.     The firm estimates that it has 540 cases pending before federal district, appellate, and bankruptcy courts, including the Supreme Court of the United States and the Court of Federal Claims. This includes three cases pending before the U.S. Supreme Court, and approximately 140

cases pending before federal appellate courts, 340 cases pending before federal district courts, 40 matters in bankruptcy court, and 15 matters in the Court of Federal Claims. These matters require regular appearances in federal court. For example, the firm has at least 48 scheduled in-person appearances in federal court in April and May 2025 alone, including trials and pre-trial conferences, oral arguments, and motion hearings.

27.     The firm estimates that it has more than 500 active matters pending before or adverse to federal administrative agencies, including (using approximate numbers) 100 matters involving the Department of Justice; 40 matters involving the Federal Communications Commission; 35 matters involving U.S. Citizenship and Immigration Services; 30 matters involving the Navy; 25 matters involving each of Immigration and Customs Enforcement and the Securities and Exchange Commission; 20 matters involving each of the Department of State and the Department of Homeland Security; 15 matters involving each of the Army, Department of Defense, Department of Health and Human Services, Environmental Protection Agency, Federal Bureau of Investigation, and Federal Energy Regulatory Commission; and 10 matters involving each of the Air Force, Consumer Financial Protection Bureau, Federal Bureau of Prisons, Federal Trade Commission, and Internal Revenue Service.

28.     Jenner also represents many clients who are the targets of pending federal criminal investigations or have been indicted. Many of these clients retain us to interact with the Department of Justice, the Securities and Exchange Commission, or other federal agencies. For example, the firm currently is engaging with the Department of Justice as to at least five antitrust investigations.

29.     The firm has 17 practice groups, and all of them intersect with the federal government in some way and include clients with business before the federal government. The largest practice groups by headcount are Investigations, Compliance, and Defense (67 attorneys); Corporate (52 attorneys); Funds, Investment, and Financial Litigation (44 attorneys); Business

Litigation (32 attorneys); and Government Controversies and Public Policy Litigation (28 attorneys).

30.     In the course of their representations, Jenner lawyers frequently meet with federal officials from a range of federal government agencies. Based on a review of our current client list, hundreds of our clients have matters that require Jenner lawyers to interact with federal agencies.

31.     Jenner boasts one of the best Appellate & Supreme Court practices in the country. It has been regularly recognized on *The National Law Journal*'s "Appellate Hot List" and rated a top practice by Chambers USA. Six different Jenner lawyers have argued before the Supreme Court of the United States in the last four Terms alone, addressing issues of criminal law, tribal sovereignty, social security, and the tax code. Jenner has won important U.S. Supreme Court precedents in cases such as *Haaland v. Brackeen*, 599 U.S. 255 (2023) (upholding the constitutionality of the Indian Child Welfare Act); *Kokesh v. SEC*, 581 U.S. 455 (2017) (holding that a five-year statute of limitations applies to the SEC's disgorgement penalty); *Puerto Rico v. Sanchez Valle*, 579 U.S. 59 (2016) (holding that the federal government and Puerto Rican government are the same sovereign for the purpose of the Double Jeopardy Clause); *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005) (holding that companies that distribute and promote software to infringe copyrights are liable for the resulting acts of infringement); *Lawrence v. Texas*, 539 U.S. 558 (2003) (holding unconstitutional a Texas law criminalizing consensual, sexual conduct between individuals of the same sex); *Wiggins v. Smith*, 539 U.S. 510 (2003) (holding that defense counsel's failure to conduct a reasonable investigation of mitigating facts violated a defendant's Sixth Amendment right to effective assistance of counsel); and *Witherspoon v. Illinois*, 391 U.S. 510 (1968) (holding death sentence unconstitutional where jurors who opposed the death penalty were dismissed in violation of the Sixth and Fourteenth Amendments). Its clients before the Supreme Court have included (on the

one hand) major corporations, state governments, and Indian tribes, and (on the other) targets of government enforcement actions, criminal defendants, and civil rights plaintiffs, among many others. In the Court's current term, Jenner has already argued and won *Williams v. Reed*, 145 S. Ct. 465 (2025), wherein the Court held in an opinion by Justice Kavanaugh that Alabama may not enforce a state exhaustion requirement that would effectively immunize state officials from federal Section 1983 claims.

32.     Representing clients before the U.S. Supreme Court requires Jenner lawyers to access federal buildings not only on the day of the argument itself but also for critical meetings with the Office of the Solicitor General in the Department of Justice, at which the parties have an opportunity to discuss the matter with key federal government stakeholders and attempt to persuade the United States to take particular positions in the case.

33.     Jenner also features a strong Government Controversies and Public Policy Litigation practice, which I founded and co-chair. We guide businesses and other large organizations through highly complex crises presenting a mix of litigation, regulatory, public policy, legislative, and communications challenges. These challenges can include Congressional hearings, federal law enforcement investigations, and management of regulatory scrutiny. Examples of the types of matters handled by these lawyers include representing major companies in congressional investigations, preparing senior executives for their testimony in Congress, and representing companies in litigation brought by federal agencies including the Department of Justice, Consumer Financial Protection Bureau and the Federal Trade Commission. I also serve as mediator and settlement master in cases, including having been asked by the Department of Justice to mediate cases on multiple occasions. I am currently serving as a court-appointed settlement master in complex litigation involving veterans exposed to contaminated water at Camp LeJeune.

34.     Matters handled by the Government Controversies and Public Policy Litigation

group frequently require regular interaction with the federal government and entrance into federal buildings for important meetings, interviews, and negotiations. Many of these meetings are only offered in person where parties can speak candidly with federal officials about sensitive matters.

35.    Jenner also offers clients one of the top Investigations, Compliance, and Defense ("ICD") practices in the country. Featuring 16 former federal prosecutors, this team helps clients navigate highly sensitive investigative and compliance challenges. When appropriate, the ICD team can quickly facilitate productive, dispositive interactions with authorities including the Department of Justice, Securities and Exchange Commission, the Commodity Futures Trading Commission, the Consumer Financial Protection Bureau, and the Financial Crimes Enforcement Network, among other government agencies. Jenner's ICD team has led hundreds of jury and bench trials, drawing on decades of first-chair experience to fight for their clients.

36.    Jenner's ICD team is currently representing large corporate clients and former employees in, among others, criminal and civil investigations carried out by the Department of Justice, the Securities & Exchange Commission, and the U.S. Postal Service Inspector General. The ICD team also partners with Jenner's Antitrust and Competition law team, which is currently representing clients in five separate antitrust investigations pursued by the Department of Justice.

37.    Matters handled by the ICD team require regular interaction with the federal government and entrance into federal buildings for important meetings, interviews, and negotiations. Many of these meetings are only offered in person where parties can speak candidly with federal officials about sensitive matters. Some of these matters also involve classified information that can only be viewed, discussed, or electronically processed in a Sensitive Compartmented Information Facility ("SCIF"). (The need for Jenner personnel to have security clearances in order to access such classified information is discussed further below.)

38.    Jenner includes a Government Contracts and Grants practice featuring Chambers-

rated lawyers. Many of the nation's leading government contractors turn to Jenner for sophisticated legal advice as they navigate the complex government contracting landscape. Jenner lawyers draw on a wealth of industry, government, and litigation experience to help companies successfully avoid or resolve contract disputes with the U.S. Government. They also leverage the leadership and unique experience of former government officials, who previously represented the Air Force General Counsel's Office and Government Accountability Office, to help develop effective solutions for clients as they face potential or proactive investigations, seek an experienced approach to combat bid protests, or navigate subcontractor issues.

39.     By definition, nearly every matter handled by Jenner's Government Contracts and Grants practice involves work with government contractors. These matters likewise involve frequent interaction with the federal government, entrance into federal buildings, litigation in the Court of Federal Claims, and handling of classified information—all of which are threatened by the Executive Order.

40.     Jenner has a nationally recognized Litigation Department. The firm litigates on behalf of clients in their most important matters, regularly appearing in federal courts. Thus far in 2025, Jenner lawyers have appeared for hearings or oral argument in federal court at least once, and often multiple times, each week. Jenner lawyers appear in federal court for all kinds of matters for all kinds of clients. Some prominent examples from the last few years include: a trial win in the Northern District of Illinois holding the nation's largest egg producers and industry groups liable for conspiring to inflate egg prices; a groundbreaking win in the U.S. Court of Appeals for the Second Circuit on behalf of the family of an American citizen killed when Malaysia Airlines Flight 17 was shot down over eastern Ukraine in 2014; a trial win in a trademark infringement suit against a European company that unlawfully pirated the products of its former business partner; and a successful interlocutory appeal in the U.S. Court of Appeals for the Fourth Circuit reversing

a class certification order on behalf of a major hospitality company.

41.    Jenner features a number of high-caliber regulatory practices, with particularly strong practices in Energy, Communications, and Native American law. Jenner's Energy practice brings creative and collaborative thinking to cutting-edge issues in which the law is still developing, as the electric and natural gas industries face transformative opportunities as well as daunting challenges. The Energy practice litigates cases at trial and appeal for energy companies at every level of the federal and state court systems, including before the U.S. Supreme Court. The Energy practice handles cases at the Federal Energy Regulatory Commission ("FERC") and at state commissions, and it represent clients in regulatory enforcement matters. It also represents and counsels clients engaged in energy transactions and many of the nation's largest electric and gas utilities, which service tens of millions of Americans, and the nation's largest nuclear power generator.

42.    Jenner's Communications, Internet and Technology ("CIT") practice represents cable/broadband, wireless, Internet, satellite, and technology companies, as well as private equity investors. The CIT group has negotiated industry-leading transactions and prevailed in wide-ranging litigation, regulatory proceedings, and agency enforcement actions, helping their clients pursue large mergers and other transactions, enter new industries, navigate new regulations and government enforcement, and create new products and services. Jenner's CIT group is known for tackling particularly difficult problems and bet-the-company matters that require a unique combination of top legal skills, hands-on Federal Communications Commission ("FCC") experience, and commitment to work wherever and whenever needed to achieve clients' goals. As a result, the team has achieved major successes for clients on some of the most significant communications matters before the FCC, Department of Justice, other agencies, and courts. Jenner's CIT practice is currently representing numerous clients in enforcement, regulatory, and

transactional matters before the FCC. Each matter requires the ability to interact with FCC lawyers and professional staff.

43.    Jenner's nationally recognized Native American Law practice, led by and primarily composed of enrolled members and descendants of federally recognized tribes, is consistently at the forefront of the most significant issues facing Indian Country. The team draws on its deep legal and government experience to provide unparalleled service to Native American tribes navigating the complex government-to-government relationship that Indian Country holds with the United States.

44.    Each of these regulatory practices—Energy, CIT, and Native American Law— requires near-constant communication with federal regulators about clients' most important matters. Jenner's electrical utility clients own or operate facilities used in transmission or wholesale of electric energy in interstate commerce, making them subject to FERC's exclusive jurisdiction. Jenner's CIT clients in telecommunications and media call on Jenner lawyers to secure regulatory approval for their transactions, to advocate for their interests in rulemaking and policymaking, to handle spectrum allocation, assignment, auctions, licensing, and relocation, and to defend against FCC enforcement actions. Jenner's Native American law clients value Jenner for its ability to advocate for tribal interests before a variety of federal regulators, including the Department of the Interior, FERC, and the FCC, among others. The Executive Order threatens clients' ability to select Jenner for all of these types of matters and many others as well.

45.    At present, by way of non-exhaustive example, Jenner has active civil and criminal matters on behalf of its clients involving at least the following federal agencies, which often require them either to interact with or appear before federal government officials:

- Air Force

- Army

- Commodity Futures Trading Commission

- Consumer Financial Protection Bureau

- Consumer Product Safety Commission

- Department of Agriculture

- Department of Commerce

- Department of Defense

- Department of Education

- Department of Energy

- Department of Health and Human Services

- Department of Homeland Security

- Department of the Interior

- Department of Justice

- Department of Labor

- Department of State

- Department of Treasury

- Drug Enforcement Administration

- Environmental Protection Agency

- Equal Employment Opportunity Commission

- Federal Aviation Administration

- Federal Bureau of Investigation

- Federal Bureau of Prisons

- Federal Communications Commission

- Federal Deposit Insurance Corporation

- Federal Energy Regulatory Commission

- Federal Railroad Administration

- Federal Trade Commission

- Internal Revenue Service

- John F. Kennedy Center for the Performing Arts

- Marine Corps

- Marshals Service

- National Aeronautics and Space Administration

- National Highway Traffic Safety Administration

- National Labor Relations Board

- Navy

- Office of Management and Budget

- Office of the U.S. Trade Representative

- Postal Service

- Securities and Exchange Commission

- Social Security Administration

- Special Operations Command

46.     The firm's pro bono service frequently involves work in federal court, before federal agencies, or interacting with federal government officials. For example, our pro bono work for current clients frequently requires interaction with the Department of Veterans Affairs, U.S. Citizenship and Immigration Services, the Department of Justice, the Federal Bureau of Prisons, and the Internal Revenue Service, among many others.

**IV.    Recent Relevant Litigation**

47.    Attorneys at the firm frequently file litigation on behalf of their clients challenging federal government action. Although the Background section of the Order does not specifically identify the alleged "abuse[s]" of Jenner's pro bono practice, it appears to be alluding to certain recent cases filed on behalf of Jenner clients.

48.    Just as it has done during previous Democratic and Republican administrations, Jenner has continued to file litigation challenging federal government action subsequent to the January 20, 2025 inauguration of the President.

49.    Working with co-counsel, the Firm is representing a large number of associations and colleges and universities in litigation against the National Institutes of Health ("NIH") challenging guidance that attempted to impose a cap on payments for indirect costs necessary for research conducted pursuant to NIH grants. *See Ass'n of Am. Univs. v. Dep't of Health & Human Servs.*, No. 25-cv-10346 (D. Mass. Feb. 10, 2025). The lawsuit challenged this guidance as contrary to a statute expressly prohibiting this result; as contrary to the governing regulations; and as arbitrary and capricious pursuant to the Administrative Procedure Act. On March 5, 2025, the district court issued a preliminary injunction enjoining NIH from implementing the guidance.

50.    On February 11, 2025, in response to a post on X about an injunction issued by a judge in the NIH litigation handled by Jenner, Special Government Employee Elon Musk posted on X: "Which law firms are pushing these anti-democratic cases to impede the will of the people?"[2]

51.    Jenner also represents Climate United Fund in a suit against Citibank and the Environmental Protection Agency ("EPA"), seeking to enjoin the termination of its $7 billion grant as part of the Greenhouse Gas Reduction Fund. *Climate United Fund v. Citibank*, No. 25-cv-00698 (D.D.C. Mar. 8, 2025). On March 18, 2025, the district court granted, in part, a temporary

_____

[2] Ex. 3, Elon Musk (@elonmusk), X.com (Feb. 11, 2025, 10:24 AM EDT), https://perma.cc/EB6G-UUUP.

restraining order and held that the plaintiffs had shown a substantial likelihood of success on the merits of their Administrative Procedure Act and due process claims.

52.    The firm has represented several nonprofits and individual noncitizens challenging the Executive Order titled "Guaranteeing the States Protection Against Invasion," which invokes Section 212(f) of the Immigration and Nationality Act ("INA") and the President's constitutional powers to abrogate the protections from removal that Congress created by statute, including the asylum statute. Proclamation 10888, 90 Fed. Reg. 8333 (Jan. 20, 2025); *see Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*, No. 25-cv-306 (D.D.C. Feb. 3, 2025). In 1984, then-Assistant Attorney General for the Office of Legal Counsel, Theodore B. Olson, rejected the argument that Section 212(f) permitted the President to "eliminate the asylum rights of noncitizens" in the United States. 89 Fed. Reg. 81156, 81163 n.53 (Oct. 7, 2024). In 2018, during the President's first term, his Administration recognized that a proclamation under Section 212(f) did not affect asylum rights. 83 Fed. Reg. 55934, 55940 (Nov. 9, 2018). Jenner's representation of clients challenging this Executive Order is part a long tradition of advocacy for noncitizens' asylum rights. Representing several of the same clients, Jenner also challenged an Executive Order and rulemaking by the Biden-Harris Administration that sought to impose lesser restrictions on asylum and other forms of protection. *Las Americas Immigrant Advoc. Ctr. v. U.S. Dep't of Homeland Security*, No. 24-cv-01702 (D.D.C. June 12, 2024).

53.    Working with co-counsel, the Firm has represented two advocacy groups, six transgender people under nineteen, and four parents of minor Plaintiffs, who brought suit on February 4, 2025 against the President, the Secretary of the Department of Health and Human Services ("HHS"), and various HHS subagencies to enjoin enforcement of a January 28, 2025 Executive Order, titled "Protecting Children from Chemical and Surgical Mutilation." That Executive Order directs all federal agencies to "immediately" withhold federal funds from

healthcare institutions and entities that provide gender-affirming care to people under age nineteen. Exec. Order No. 14,187, 90 Fed. Reg. 8771 (Jan. 28, 2025). *See PFLAG, Inc. v. Trump*, 8:25-cv-00337 (D. Md. Feb. 4, 2025). After expedited briefing, the district court issued a temporary restraining order restraining Defendants "from conditioning or withholding federal funding based on the fact that a healthcare entity or health professional provides gender affirming medical care to a patient under the age of nineteen." *See PFLAG*, 2025 WL 510050, at *1 (D. Md. Feb. 14, 2025) (opinion memorializing TRO). Plaintiffs then moved for a nationwide preliminary injunction on February 18, 2025, which the district court granted on March 4, 2025. *See PFLAG*, 2025 WL 685124, at *2 (D. Md. Mar. 4, 2025).

**V.    Former Jenner Partner Andrew Weissmann**

54.    Andrew Weissmann served as a Partner at Jenner from March 27, 2006, to October 24, 2011, and again from June 7, 2020, to July 16, 2021. Mr. Weissmann worked in the Firm's investigations and financial services practices.

55.    Prior to coming to Jenner in 2006, Mr. Weissmann had significant experience as a federal prosecutor. He had successfully tried more than 25 cases, including many against notorious New York organized crime families. During the administration of President George W. Bush, he was appointed to serve as Deputy Director and then Director of the Department of Justice's Enron Task Force.

56.    After completing his first stint at Jenner, Mr. Weissmann served as the General Counsel at the Federal Bureau of Investigation, the chief of the Criminal Fraud Section of the U.S. Department of Justice, and as a member of the team led by Special Counsel Robert S. Mueller, III, who was appointed by Rod Rosenstein, the President's Deputy Attorney General, to investigate Russian interference in the 2016 election.

57.    Following his work with Special Counsel Mueller, Mr. Weissmann authored a non-

fiction book, *Where Law Ends: Inside the Mueller Investigation*, published by Random House on September 29, 2020. The book was highly critical of the President.

58.    Mr. Weissmann also became a legal analyst for MSNBC after his work for Special Counsel Mueller.

59.    As a result of Mr. Weissmann's participation in the Special Counsel team, the publication of his book, and his political commentary, Mr. Weissmann has become a frequent political target of the President.

60.    In a Truth Social Post in 2022, the President reposted a comment describing Mr. Weissmann as "the Scum of the Earth!!!"[3]

61.    On March 14, 2025, during a speech at the Department of Justice, the President accused Mr. Weissmann and others, including Jack Smith, of participating in a "coordinated … campaign" against him, referring to Mr. Weissmann and others as "horrible people" and "scum." He also accused "crooked law firms," referring to "violent, vicious lawyers that we have all over."[4]

62.    Mr. Weissmann has likewise been a frequent target of the President's senior advisers. For example, on March 17, 2025, Stephen Miller called Mr. Weissmann "an absolute moron … a fool and a degenerate."

63.    On March 21, 2025, the President issued a memorandum revoking any active security clearances held by Mr. Weissmann and other individuals.

64.    Although the Order and Fact Sheet falsely imply that Mr. Weissmann is a "Jenner employee[]," Order § 5(a), Mr. Weissmann has not worked at and has not performed legal work for Jenner since his departure on July 16, 2021. All payments associated with his time at Jenner

---

[3] Ex. 1, Donald J. Trump (@realDonaldTrump), Truth Social (Sept. 5, 2022, 6:07 PM EDT), https://perma.cc/DC3Z-TJMP.
[4] *Id.*; Ex. 9, *Speech: Donald Trump Addresses the Staff at the Department of Justice—March 14, 2025*, ROLL CALL, https://perma.cc/5JVA-J9E7.

have been completed. The firm has no current financial obligations to Mr. Weissmann.

**VI.    Jenner Attorneys and Staff Require Security Clearances for Their Legal Work and Military Service**

65.    Section 2 of the Order creates a "Security Clearance Review" process applicable to all individuals associated with Jenner. It directs the Attorney General, the Director of National Intelligence, and the "relevant heads of executive departments and agencies" to "immediately take steps to suspend any active security clearances held by individuals at Jenner pending a review of whether such clearances are consistent with the national interest." Order § 2(a). It also directs agencies to "expeditiously cease" the provision of SCIFs and other services "provided for the benefit of Jenner." *See id*. § 2(b).

66.    Multiple Jenner personnel currently possess active security clearances permitting access to classified information. Two Jenner personnel possess security clearances in connection with ongoing military service unrelated to their work at the firm: a staff member who is also a member of the Illinois Army National Guard and an attorney who is an active drilling reservist and Captain (Major select) in the U.S. Marine Corps Reserve. In addition, a Jenner lawyer is currently awaiting adjudication of a security clearance application in connection with that lawyer's service in the U.S. Navy Reserve.

67.    In addition, at least six lawyers—four partners and two other attorneys—hold clearances in connection with their work at Jenner on behalf of clients. In the last five years, Jenner has been engaged by clients on at least eight matters that have required lawyers working on those matters to hold security clearances. At least two such matters are currently ongoing. As part of this work, Jenner attorneys must occasionally access classified material in a SCIF, either in a government building or onsite at a client's office.

68.    A Jenner attorney is currently in the process of applying for a security clearance in

connection with an ongoing pro bono representation of a federal criminal defendant, which involves classified information. If this lawyer's application is denied as a result of the Order, it would undermine Jenner's ability to effectively represent its client.

69.    The Order's creation of a Jenner-specific "Security Clearance Review" process, in addition to the federal government's existing security clearance adjudication procedures, could also undermine the firm's efforts to bring in matters involving classified information. As noted above, Jenner's ICD and Government Contracts practices are regularly engaged on matters that require lawyers to access classified information.

**VII.    Irreparable Harm Caused by the Order and its Enforcement**

70.    In the wake of the Order, and prior to the Court's entry of a TRO, federal government agencies and personnel changed their approach to Jenner, causing irreparable harm to Jenner and its clients. Although we are constrained by the attorney-client privilege and Rule 1.6 of the Model Rules of Professional Conduct, we can report general facts and facts known to the federal government. For example, one client informed us that the Department of Justice notified the client on March 26, 2025, that the client could not bring their counsel from Jenner to a meeting with the Department of Justice that was scheduled for April 3. After the TRO issued on March 28, 2025, Jenner was again invited to participate in that meeting. However, by that point, Jenner's client had already obtained new counsel and educated new counsel on the status of the matter to represent the client at that meeting.

71.    Because the Order could be interpreted to ban Jenner's access to federal courthouses and other buildings, our clients expressed concerns that we could not represent them in federal court or enter federal buildings to engage with regulatory agencies or senior government officials.

72.    Specifically, within 24 hours of the issuance of the Order, several clients expressed

concerns about our representation because they did not know whether we would be permitted to enter federal buildings and federal courthouses, negotiate with federal government officials, or participate in meetings with the Department of Justice. One client expressed doubts about whether Jenner could represent it in ongoing settlement negotiations with the government. Another client expressed concern that we would be prohibited from appearing on their behalf at a trial scheduled for June. Jenner will continue incurring such harm if the Order is allowed to stand because Jenner attorneys have numerous upcoming appearances. Indeed, Jenner has around 540 active matters pending before federal courts, and numerous matters before agencies that require access to federal government buildings and officials. Continued refusals by federal officials to meet with Jenner lawyers, or denying Jenner lawyers access to federal agencies and buildings, would harm Jenner's legal practice and its clients.

73.    Because of our ICD, regulatory, and Government Controversies practices, clients rely on us to engage with federal government agencies and officials, a previously routine activity of the firm's attorneys that is now at risk. Clients have expressed concern about whether the Order could impair the firm's ability to attend upcoming meetings with government agencies.

74.    The Order has also required Jenner attorneys to expend significant time to discuss the impacts with our clients and develop a plan to work together to mitigate and address any impacts in the days and weeks ahead, an evolving situation requiring frequent communications that burdens both the firm and our clients. Many of our partners with responsibility for client relationships have spent a significant amount of time since the Order was issued communicating with clients about the Order and its impacts and developing plans for the path ahead.

75.    The Order also includes provisions that would require federal agencies to require government contractors to disclose any relationship they have with Jenner, and to terminate government contracts for clients as to which Jenner has been hired to perform any service. 8 of

Jenner's top 15 clients by revenue in 2024—and 23 of Jenner's top 50 clients by revenue in 2024—have contracts or subcontracts with the federal government, either directly or through an affiliate. Many of Jenner's clients holding government contracts or subcontracts are represented by Jenner in legal matters related to their government contracts. Many of those clients are also represented by the firm for legal matters completely unrelated to government-contracting matters. For many of the firm's clients holding government contracts or subcontracts, the fact that the firm gives them legal advice is not public information. If enforced, the Order would seek to require many of these clients to divulge confidential information regarding their legal representations to the federal government, with whom they may be adverse on the very same matter. In addition, the Order threatens the termination of those clients' contracts if Jenner has been hired to perform any service related to the contract.

76.    Due to the restrictions that the Order imposes on Jenner, and the disclosure and termination provisions directed to the firm's federal contractor clients, numerous government contractor clients of the firm have expressed concerns to us about government-mandated disclosure of their relationship with us to federal agencies and the impact that may have on the contractor's own relationships with the federal government. In general, we would describe our government contractor clients as nervous about their relationship with us because of the Order and closely monitoring the evolving situation.

77.    The Order targets Jenner's clients with government contracts. In 2024, Jenner estimates that more than 40% of the firm's revenue came from clients who are government contractors or subcontractors. Jenner estimates the same percentage is true over the last five years. If Jenner lost that business, or even a portion of it, it would be a serious threat to the firm's financial health.

78.    The Order also threatens Jenner attorneys' right to practice their chosen profession.

That threat is not only to revenue-generating practice, but also to the firm's pro bono practice, which frequently requires us to appear in federal court or before federal agencies in criminal, civil or administrative matters. Our pro bono work for current clients frequently requires interaction with the Department of Veterans Affairs, U.S. Citizenship and Immigration Services, the Department of Justice, the Federal Bureau of Prisons, and the Internal Revenue Service, among many others.

79.     Many of our pro bono clients are also government contractors and fear that a continued relationship with us could jeopardize their own organization in light of the requirements in the Order. One day after the Order was issued, one such client—an association of non-profit employers—terminated our engagement because of concerns that its members' own government contracts could be placed at risk.

80.     The Order also interferes with Jenner's employer-employee relationships because the restrictions are broadly written to include Jenner employees, including associates and non-attorney staff.

81.     In addition, as noted above, the Order directs "immediate[]" action to "suspend any active security clearances held by individuals at Jenner." Such suspensions threaten to interfere with at least two ongoing client representations in which Jenner attorneys are required to access classified information, and undermine the firm's efforts to attract future client engagements involving classified information. Such representations are regularly undertaken by our ICD and Government Contracts practices.

82.     Finally, if allowed to stand, the Order's directive that agency officials must "refrain from hiring employees of Jenner" would cause irreparable harm to firm and its personnel. Jenner employees regularly apply to work in the federal government while working at the firm. Since 2020, at least 22 Jenner attorneys have gone directly from the firm to serve in the Executive

Branch.

83.    Moreover, for attorneys who are interested in government service during their careers, the potential opportunity to be hired by the federal government is a significant consideration in choosing a law firm. Our legal recruiting professionals often emphasize in communicating with candidates for employment at Jenner that their experiences at the firm would situate them well for future government service. The Order's hiring restrictions, if allowed to stand, would thus harm the firm's legal recruiting efforts.

## VIII.  False and Disparaging Statements in the Order

84.    The Order has also harmed Jenner's reputation in the market for clients, lawyers, and staff through its false and disparaging characterization of the firm and its attorneys.

85.    The Order and Fact Sheet contain numerous false and inflammatory statements about Jenner, its clients, and its work. For example, the Order implies that Jenner has "earmark[ed] hundreds of millions of [its] clients' dollars" for pro bono work, Order § 1, but the Firm does not spend its clients' money on pro bono matters. Instead, it has committed its own resources and its own attorney time to assisting clients in a wide range of legal areas.

86.    The Order characterizes former partner Andrew Weissmann as a current employee of Jenner. *See* Order §§ 5(a), 5(b). But as discussed above, Mr. Weissmann has neither worked at nor performed legal work for Jenner since 2021.

87.    The Order and Fact Sheet further distort Jenner's work on behalf of its clients. For example, the Order and Fact Sheet asserts that "Jenner engages in obvious partisan representations to achieve political ends," Order § 1, and "pursues partisan goals," *see* Fact Sheet. Rather, Jenner represents its clients, whatever their interests, and has challenged unlawful or unconstitutional governmental actions on behalf of its clients regardless of which major political party is in the White House. *See supra* ¶¶ 16–18.

88.     The Order and Fact Sheet baselessly claim that the firm "supports attacks against women and children based on a refusal to accept the biological reality of sex." Order § 1; *see also* Fact Sheet. This statement grossly misrepresents Jenner's long and proud history of protecting the rights of LGBTQ+ communities, from winning the landmark *Lawrence v. Texas* case more than 20 years ago to more recent litigation to protect transgender individuals. In 2023, Jenner filed a lawsuit challenging an Oklahoma law that bans gender-affirming medical care to transgender adolescents and threatens providers who violate the law with a felony conviction. And this year, the firm helped obtain a preliminary injunction preventing the administration from conditioning or withholding federal funding based on the provision of gender-affirming medical care to a patient under the age of nineteen.

89.     The Order and Fact Sheet also distort Jenner's advocacy for noncitizens' rights, falsely asserting that the firm "backs the obstruction of efforts to prevent illegal aliens from committing horrific crimes and trafficking deadly drugs within our borders." Order § 1. This, too, baselessly distorts the firm's longstanding pro bono work to help those eager to contribute to our country. The firm has a long tradition of representing individuals seeking immigration relief, both in individual representations and impact litigation. We regularly partner with organizations such as Kids in Need of Defense and the National Immigrant Justice Center to protect and preserve American values, such as ensuring that visas are not awarded based on impermissible religious criteria, uncovering the abuses of solitary confinement in immigrant detention centers, and representing families torn apart by broken border policies, in addition to innumerable asylum cases for individuals fleeing human rights abuses abroad. As noted above, Jenner also currently represents clients in a challenge to the President's executive order invoking Section 212(f) of the INA to abrogate protections from removal that Congress created by statute; our clients' position in that litigation is consistent with the positions taken by the Reagan and first Trump

administrations. *See supra* ¶ 52.

* * *

I declare under penalty of perjury, on this 8th day of April, 2025, that the foregoing is true and correct, to the best of my knowledge, information and belief.

Thomas J. Perrelli