**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

JENNER & BLOCK LLP,

               *Plaintiff*,

     v.

U.S. DEPARTMENT OF JUSTICE, *et al.*,

               *Defendants.*

Case No. 1:25-cv-916 (JDB)

---

**BRIEF FOR AMICI CURIAE**
**NATIONAL ASSOCIATION OF CRIMINAL DEFENSE LAWYERS**
**AND NEW YORK COUNCIL OF DEFENSE LAWYERS**
**IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

BROWN GOLDSTEIN & LEVY
1331 Pennsylvania Avenue, NW
Suite 555 South
Washington, DC 20004
Tel: 202.742.5969
Email: kflowers@browngold.com

*Attorneys for Amicus Curiae*
*National Association of*
*Criminal Defense Lawyers*

SHER TREMONTE LLP
90 Broad Street, 23rd Floor
New York, NY 10004
Tel: 212.202.2600
Fax: 212.202.4156
E-mail: nbiale@shertremonte.com

*Attorneys for Amicus Curiae*
*New York Council of*
*Defense Lawyers*

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................. ii

STATEMENT OF INTEREST .........................................................................................1

PRELIMINARY STATEMENT ........................................................................................3

ARGUMENT ...................................................................................................................7

I.     The Executive Order Undermines The Sixth Amendment Right To Select Counsel Of Choice By Impairing Jenner's Ability To Provide Legal Services....................................7

II.    The Executive Order Violates The Sixth Amendment Right To Effective Assistance Of Counsel By Creating Conflicts Of Interest Between The Firm And The Client ...............12

III.   The Executive Order Is Unconstitutional Because It Diminishes The Availability Of Counsel And Chills A Vital Bulwark Against Arbitrary State Action .............................16

CONCLUSION ...............................................................................................................17

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Armienti v. United States*,
   234 F.3d 820 (2d Cir. 2000) ........................................................................... 13

*Briguglio v. United States*,
   675 F.2d 81 (3d Cir. 1982) ............................................................................. 15

*Caplin & Drysdale, Chartered v. United States*,
   491 U.S. 617 (1989) .......................................................................................... 7

*Gideon v. Wainwright*,
   372 U.S. 335 (1963) ........................................................................... 4, 16, 17

*Johnson v. Zerbst*,
   304 U.S. 458  (1938) ....................................................................................... 16

*Luis v. United States*,
   578 U.S. 5 (2016) ............................................................................................... 7

*Nat'l Rifle Ass'n v. Vullo*,
   602 U.S. 175 (2024) ...................................................................................... 9-10

*Perkins Coie LLP v. U.S. Dep't of Justice*,
   No. 25-cv-00716 (D.D.C.) ............................................................................. 2, 6

*Powell v. Alabama*,
   287 U.S. 45 (1932) ............................................................................................. 7

*Solina v. United States*,
   709 F.2d 160 (2d Cir. 1983) ........................................................................... 14

*Strickland v. Washington*,
   466 U.S. 668 (1984) ................................................................................... 10, 12

*United States v. Amlani*,
   111 F.3d 705 (9th Cir. 1997) ...................................................................... 9, 10

*United States v. Fulton*,
   5 F.3d 605 (2d Cir. 1993) ............................................................................... 14

*United States v. Gonzalez-Lopez*,
   548 U.S. 140 (2006) ........................................................................................... 7

*United States v. Levy*,
   25 F.3d 146 (2d Cir. 1994) ............................................................................. 14

*United States v. Lopesierra-Gutierrez*,
   708 F.3d 193 (D.C. Cir. 2013) ................................................................. 13, 14

*United States v. McLain*,
  823 F.2d 1457 (11th Cir. 1987) ...................................................................... 14-15

*United States v. Shelton*,
  No. 23-cr-00258-JSC-1, 2024 WL 4520944 (N.D. Cal. Oct. 17, 2024).................................. 9

*United States v. Stein*,
  541 F.3d 130 (2d Cir. 2008) ...................................................................... 8, 9

*Von Moltke v. Gillies*,
  332 U.S. 708 (1948)............................................................................ 12-13

*Wheat v. United States*,
  486 U.S. 153 (1988)............................................................................ 13

*Wilmer Cutler Pickering Hale and Dorr LLP v. Exec. Off. of the President*,
  No. 25-cv-00917 (D.D.C.) ...................................................................... 2, 6

*Wood v. Georgia*,
  450 U.S. 261 (1981)............................................................................ 12

## Constitutional Provisions

U.S. Const. amend. VI .............................................................................. 7

## Rules

Fed. R. App. P. 29(a)(4)(E)......................................................................... 1

Local Civil R. 7(o) ................................................................................ 1

## Other Authorities

*Addressing Risks from Susman Godfrey*, THE WHITE HOUSE (Apr. 9, 2025),
  https://www.whitehouse.gov/presidential-actions/2025/04/addressing-risks-from-susman-
  godfrey/............................................................................................ 6

Archisa Mehan, *Federal Contract Awards Hit $773.68B in FY24, Small Businesses See $4B
  Increase*, GOVSPEND (Feb. 24, 2025), https://govspend.com/blog/federal-contract-awards-
  hit-773-68b-in-fy24-small-businesses-see-4b-increase. ........................................... 11

*Confirmation Hearing on the Nomination of John G. Roberts, Jr., To Be Chief Justice of the
  United States: Hearing Before The Committee on the Judiciary*, 109th Cong. 254 (2005)
  (statement of John G. Roberts, Jr., Chief Justice of the U.S.) .................................... 6

Exec. Order No. 14230 (Mar. 6, 2025)............................................................... 6

Exec. Order No. 14250 (Mar. 27, 2025).............................................................. 6

George W. Bush White House Archives, *Judicial Nominations: Chief Justice John G. Roberts*,
  https://georgewbush-whitehouse.archives.gov/infocus/judicialnominees/roberts.html ............ 5

John Adams, 1770, *in* 3 The Adams Papers: Diary and Autobiography of John Adams (L.H. Butterfield ed., 1961). ............................................................................................... 5

John Adams, 1773. March 5th. Fryday, *in* 2 The Adams Papers: Diary and Autobiography of John Adams (L.H. Butterfield ed., 1961). ............................................................... 4

Mem. in Supp. of Mot. to Withdraw as Counsel for Def. Steven Schwartz, *United States v. Coburn*, No. 19-cr-00120 (MEF) (D. N.J. Mar. 19, 2025) ...................................................... 12

## STATEMENT OF INTEREST[1]

Amici curiae National Association of Criminal Defense Lawyers ("NACDL") and New York Council of Defense Lawyers ("NYCDL") represent thousands of advocates across the United States who are committed to advancing the interests and protecting the rights of persons accused of crimes.

NACDL is a nonprofit voluntary professional association that works on behalf of criminal defense attorneys to ensure justice and due process for those accused of crimes or misconduct. It has a nationwide membership of many thousands of direct members, and up to 40,000 with affiliates. NACDL's members include private criminal defense lawyers, public defenders, military defense counsel, law professors, and judges. NACDL is the only nationwide professional bar association for public defenders and private criminal defense lawyers. NACDL files numerous amicus briefs each year in the Supreme Court and other federal and state courts in cases that present issues of broad importance to the criminally accused, criminal defense lawyers, and the criminal legal system as a whole.

NYCDL is a nonprofit voluntary professional association of over 300 lawyers, including many former federal prosecutors and federal public defenders, whose principal area of practice is the defense of criminal cases in the federal courts of New York. NYCDL's mission includes protecting the individual rights guaranteed by the Constitution, enhancing the quality of defense representation, taking positions on important defense issues, and promoting the fair administration of criminal justice. NYCDL regularly files amicus curiae briefs each year in the Supreme Court, the Second Circuit Court of Appeals, and other courts in cases that present issues of broad

---

[1] Pursuant to LcR7(o) and FRAP 29(a)(4)(E), no party's counsel authored this brief, in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting this brief. No person other than amici curiae or their counsel contributed money that was intended to fund preparing or submitting this brief.

importance to defendants in criminal cases, defense lawyers, and the criminal legal system as a whole.

This case directly implicates one of amici's core concerns: protecting the Sixth Amendment right to counsel. Amici's participation in this case will offer the Court the perspective of practitioners who are regularly retained by targets, subjects, and witnesses in criminal investigations.[2] Executive Order No. 14246 ("Executive Order" or "EO"), issued on March 25, 2025, and titled "Addressing Risks from Jenner & Block," unlawfully imposes punishments on Plaintiff Jenner & Block LLP ("Jenner") (for example, by suspending attorneys' security clearances and barring them from federal buildings, potentially including courthouses) and its actual and prospective clients (by directing that government contractors disclose their business with Jenner so that those contracts can be reviewed by the Office of Management and Budget). In doing so, it burdens the constitutional right of clients otherwise inclined to retain Jenner to select counsel of their choice and to receive effective, conflict-free assistance of counsel. Clients can now be represented by Jenner only if they are willing to accept that the firm's very ability to represent them is both functionally impaired and opposed by the government, and if they are willing to expose their own government contracts to adverse action.

This burdening of the exercise of a constitutional right to counsel is itself unconstitutional. Additionally, in explicitly attempting to justify its hobbling of Jenner and interference in the rights of the firm's clients by citing the firm's "powerful pro bono practices," its alleged "partisan

---

[2] Amici recently filed substantively similar briefs in support of Perkins Coie LLP's motion for summary judgment pertaining to Executive Order No. 14230, issued on March 6, 2025 and titled, "Addressing Risks From Perkins Coie LLP," *see Perkins Coie LLP v. U.S. Dep't of Justice, et al.*, No. 25-cv-00716 (D.D.C.), ECF No. 76, and in support of Wilmer Cutler Pickering Hale and Dorr LLP's motion for summary judgment pertaining to Executive Order No. 14250, issued on March 27, 2025 and titled "Addressing Risks from WilmerHale," *see Wilmer Cutler Pickering Hale and Dorr LLP v. Exec. Off. of the President, et al.*, No. 25-cv-00917 (D.D.C.), ECF No. 16.

representations to achieve political ends," and its hiring of attorneys, including Andrew Weissmann, who served as a prosecutor in the Special Counsel's Office at the Department of Justice during its investigation of alleged interference in the 2016 presidential election, EO §1, the Executive Order only makes transparent the government's larger aim of quelling legal challenges to its authority and its policies. The Executive Order puts at grave risk not only the fairness and integrity of the criminal justice system but the rule of law itself.

## PRELIMINARY STATEMENT

By punishing Jenner based on its past advocacy on behalf of clients and its hiring of attorneys whom the current administration disfavors, President Donald J. Trump's Executive Order rejects Sixth Amendment principles that are foundational to the American legal system. For centuries, there has been a broad, non-partisan consensus that our adversarial legal system works only when litigants are permitted to hire counsel of their choice to defend their interests, with those counsel able to represent those interests zealously and without fear of punishment.

The Executive Order—the purpose, justification, and terms of which are unprecedented— violates the constitutional right to counsel in three related but distinct ways.

*First*, the Executive Order deprives clients of counsel of choice by impairing the ability of Jenner to provide legal services vital to any criminal defendant. Under the Executive Order, Jenner attorneys cannot effectively confer with federal prosecutors in government buildings and may not even be able to enter federal courthouses.[3] EO §5(a). The Executive Order also punishes clients that opt for Jenner as their counsel by putting their government contracts in jeopardy. *Id.* at §3.

---

[3] As this Court raised in oral argument on Jenner's motion for a temporary restraining order, the Executive Order could be read to bar Jenner attorneys from federal courthouses. ECF No. 10, Tr. of Hr'g, Mar. 28, 2025 ("TRO Tr."), at 29. Counsel for the government responded that the Order merely directs the General Services Administration to provide "guidance to limit access" of Jenner attorneys to courthouses, which response prompted the Court to observe, "I think you're being a little too cute." *Id.* at 30:5, 31:7-8.

3

These sanctions make it virtually impossible for a client or potential client in any federal criminal matter to retain Jenner, unless the client is willing to accept a lawyer hobbled by the limitations imposed by the Executive Order.

*Second*, the Executive Order creates a conflict between the interests of Jenner and its clients, because threatening Jenner's attorneys with retribution for advocating in their clients' best interest forces counsel to choose between providing the best defense to their clients and protecting their own business.  By doing this to Jenner and its clients, the Executive Order creates a conflict of interest between *all* criminal defense lawyers and their clients, as no one knows which firm will be the next one targeted by the administration.

*Third*, the Executive Order signals to the entire legal profession that engaging in advocacy or investigative work that the President regards as against his personal or political interests (or even hiring lawyers who have engaged in such work) will carry professional, financial, and institutional risks—risks that will inevitably discourage lawyers from taking such matters.  The Executive Order in this way, too, reduces the choice of zealous counsel available to accused persons and erodes the independence of the defense function, which in turn safeguards "a fair system of justice."  *Gideon v. Wainwright*, 372 U.S. 335, 344 (1963).

The principles at stake in this lawsuit are older than the Nation itself.  Before there was a Sixth Amendment, John Adams's defense of British perpetrators of the Boston Massacre in their 1770 criminal trial embodied the principles later set forth in the Sixth Amendment.  Adams explained that his decision to take on this controversial matter resulted in "Anxiety, and Obloquy enough."  *1773. March 5th. Fryday [from the Diary of John Adams]*, Founders Online, National Archives,  https://founders.archives.gov/documents/Adams/01-02-02-0003-0002-0002.   Even while Adams's clients were despised as murderers in his Boston community, Adams presented a

strong and persuasive defense that led his clients to be acquitted outright or convicted of lesser offenses, sparing them the death penalty.  Adams regarded his representation of those accused of perpetrating the Boston Massacre as "one of the most gallant, generous, manly and disinterested Actions of my whole Life, and one of the best Pieces of Service I ever rendered my Country." *Id.* He later wrote in his autobiography that "Persons whose Lives were at Stake ought to have the Council they preferred … and that every Lawyer must hold himself responsible not only to his Country, but to the highest and most infallible of all Trybunals for the Part he should Act." *1770 [from the Autobiography of John Adams]*, Founders Online, National Archives, https://founders.archives.gov/documents/Adams/01-03-02-0016-0016.

Chief Justice John G. Roberts carried on this noble tradition when he was in private practice, representing "criminal defendants and indigents" pro bono.  George W. Bush White House Archives, *Judicial Nominations: Chief Justice John G. Roberts*, https://georgewbush-whitehouse.archives.gov/infocus/judicialnominees/roberts.html.  As the future Chief Justice stated at his 2005 confirmation hearing, another important principle vindicated by Adams's representation was that a lawyer who advocates for his client should not be held responsible for the views or actions of his client:

> [I]t's a tradition of the American Bar that goes back before the founding of the country that lawyers are not identified with the positions of their clients.  The most famous example probably was John Adams, who represented the British soldiers charged in the Boston Massacre.  He did that for a reason, because he wanted to show that the Revolution in which he was involved was not about overturning the rule of law, it was about vindicating the rule of law. . . .  [The] principle, that you don't identify the lawyer with the particular views of the client, or the views that the lawyer advances on behalf of the client, is critical to the fair administration of justice.

*Confirmation Hearing on the Nomination of John G. Roberts, Jr., To Be Chief Justice of the United States, Hearing Before The Committee on the Judiciary*, United States Senate, 109th Cong. 254 (2005).

As discussed in this brief, the Sixth Amendment protects the right of the people to retain counsel of choice and to have conflict-free counsel who will not be punished for taking aggressive positions on behalf of their client. It guarantees the right to defend oneself from government accusation without fear of retribution. By contrast, the unprecedented Executive Order undercuts the Sixth Amendment and knocks away the foundational rule-of-law principle that has guided American lawyers from John Adams to John Roberts.

The infringement of constitutional rights is not limited to Executive Order 14246. Similar executive orders have targeted multiple law firms beyond Jenner,[4] notwithstanding the fact that a temporary restraining order was issued on March 12, 2025, with respect to Executive Order 14320 targeting the law firm Perkins Coie LLP.[5] Absent a final order invalidating the Executive Order, other firms already have faced—and likely will continue to face—similar sanctions and retribution. Any form of punishment or retaliation against attorneys who are only doing their job in our adversarial legal system cuts against our Nation's most deeply held values and traditions. It chills both attorney advocacy and court review of legal challenges those attorneys might bring. Amici therefore urge the Court to grant Plaintiff's motion for summary judgment.

---

[4] *See Addressing Risks from Susman Godfrey*, (Apr. 9, 2025), *available at* https://www.whitehouse.gov/presidential-actions/2025/04/addressing-risks-from-susman-godfrey/; *Addressing Risks from WilmerHale*, Exec. Order No. 14250 (Mar. 27, 2025); *Addressing Risks from Perkins Coie LLP*, Exec. Order No. 14230 (Mar. 6, 2025). Like Jenner, other firms targeted in these orders have sued to vindicate their rights. *See Perkins Coie*, No. 25-cv-00716; *Wilmer Cutler Pickering Hale and Dorr LLP v. Exec. Off. of the President, et al.*, No. 25-cv-00917 (D.D.C.).

[5] *See Perkins Coie*, No. 25-cv-00716, ECF No. 21 (Order granting Pl.'s Mot. for TRO).

## ARGUMENT

**I.**     **The Executive Order Undermines The Sixth Amendment Right To Select Counsel Of Choice By Impairing Jenner's Ability To Provide Legal Services**

The Executive Order is unconstitutional because it interferes with the Sixth Amendment rights of potential and existing clients of Jenner to be represented by counsel of their choice. The Order obstructs clients from electing to be represented by Jenner by disparaging the firm, making clear that the government (the client's adversary in a federal criminal case) is ill-disposed toward the firm, and imposing limits on Jenner's ability to provide effective representation. This treatment of Jenner flouts the many decisions safeguarding the Sixth Amendment right of individuals to choose their counsel and holding the government accountable when it improperly interferes with that right. This Court should follow the Sixth Amendment and this line of authority by permanently enjoining the Executive Order.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall . . . have the Assistance of Counsel for his defence." U.S. Const. amend. VI; *see Powell v. Alabama,* 287 U.S. 45, 53 (1932). At the "root . . . of the constitutional guarantee" of the right to counsel is the "right to select counsel of one's choice." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 147–48 (2006). In other words, the accused has "the right to be represented by an otherwise qualified attorney whom that defendant can afford to hire." *Caplin & Drysdale, Chartered v. United States,* 491 U.S. 617, 624 (1989). The Constitution "commands . . . that the accused be defended by the counsel he believes to be best." *Gonzalez-Lopez*, 548 U.S. at 146. This right to counsel of choice is "fundamental" in light of "the necessarily close working relationship between lawyer and client, the need for confidence, and the critical importance of trust." *Luis v. United States*, 578 U.S. 5, 11–12 (2016). Accordingly, courts have closely scrutinized government action

7

that interferes with the right to choose one's own counsel and have often deemed such government action a violation of the Sixth Amendment.

For example, in *United States v. Stein*, 541 F.3d 130 (2d Cir. 2008), the Second Circuit held that prosecutorial actions taken pursuant to the "Thompson Memorandum"—a Department of Justice policy statement setting forth principles for the prosecution of corporations—violated the Sixth Amendment by interfering with the right of corporate employees under criminal investigation to choose their own counsel. The Thompson Memorandum encouraged prosecutors to consider, in determining whether a corporation cooperated with a government investigation, whether the corporation was "protecting its culpable employees and agents" by "advancing . . . attorneys fees." *Id*. at 136. Under pressure from prosecutors acting pursuant to the Thompson Memorandum, a major international accounting firm under investigation for tax-related crimes tightened its policy on paying legal fees for employees under criminal investigation, and after the government indicted several of the accounting firm's employees, the accounting firm stopped advancing legal fees to the indicted employees. *Id*. at 138–40. The employees moved to dismiss the indictment, arguing that the government had violated their Sixth Amendment rights by inducing their employer to withhold legal fees it otherwise would have provided, which in turn interfered with the employees' ability to retain counsel of their choice. *Id*. at 140–42.

The Second Circuit agreed that the government violated the Sixth Amendment and affirmed a district court decision dismissing the indictment as a sanction. It explained that "the right to counsel in an adversarial legal system would mean little if defense counsel could be controlled by the government or vetoed without good reason." *Id.* at 154. It went on to explain that the government's actions amounted to an effective veto of the employees' choice of counsel because the employees could not pay for their preferred counsel without financial support from

the accounting firm, and they would have had the necessary financial support but for the government's pressure campaign. *Id*. at 153, 157. In the years since *Stein*, other courts have reaffirmed its core principle: the Sixth Amendment "prohibits the government from interfering with . . . obligations to fund a defense" to the extent that such interference deprives a defendant of counsel of choice. *See, e.g.*, *United States v. Shelton*, No. 23-cr-00258-JSC-1, 2024 WL 4520944, at *3 (N.D. Cal. Oct. 17, 2024).

Similarly, in *United States v. Amlani*, 111 F.3d 705 (9th Cir. 1997), the Ninth Circuit held that the government may violate the Sixth Amendment by attempting to influence an individual's choice of counsel through a campaign of disparagement. In that case, Amlani alleged that "the prosecutor repeatedly disparaged his original chosen trial counsel . . . in front of him" during pretrial proceedings by claiming that his chosen counsel "did not care about [him], was not competent, and could not prevent [his] conviction." *Id*. at 710. He further claimed that this disparagement campaign "violated the Sixth Amendment because it caused him to change to a different and less competent counsel for trial." *Id*. The Ninth Circuit agreed that this conduct, if proven, would violate the Sixth Amendment. It explained that the government cannot "effectively . . . veto defendant's choice of counsel by intentionally undermining his confidence in the attorney-client relationship through disparagement." *Id*. at 711.

As with the government actions in *Stein* and *Amlani*, which sought to control an individual's choice of counsel indirectly through financial pressure or disparagement, the Executive Order seeks to "control" or "veto," *Stein*, 541 F.3d at 134—albeit similarly indirectly—the choice-of-counsel decisions of Jenner clients through a variety of measures targeted at both Jenner and its clients. But "the government cannot interfere with [the Sixth Amendment] right

directly, and a government official cannot do indirectly what she is barred from doing directly." *Nat'l Rifle Ass'n v. Vullo*, 602 U.S. 175, 190 (2024).

The Order disparages Jenner—unjustifiably—claiming the firm "abandoned the profession's highest ideals" and accusing it of employing a "dishonest[]" lawyer, Andrew Weissmann, whose career, it claims, "has been rooted in weaponized government and abuse of power." EO §1. This sort of disparagement will have the effect of discouraging clients from hiring Jenner or causing clients to sever existing representations, in violation of the Sixth Amendment principles set out in *Amlani*. *See* ECF No. 19-1 (Pl.'s Mem. in Supp. of Mot. for Summ. J.) at 21 (arguing that the "Order disparages Jenner's reputation, labeling the firm as 'partisan' and 'discriminat[ory],' and questioning Jenner's 'values and priorities.'" (quoting EO §1) (alteration in original)).

The Executive Order also obstructs and discourages potential clients from hiring Jenner by prohibiting the firm's attorneys from providing the "*effective* assistance of counsel" guaranteed by the Sixth Amendment. *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (emphasis added). For example, by prohibiting government employees from communicating with Jenner attorneys and barring Jenner attorneys from entering government buildings (potentially including courthouses), the Executive Order prevents Jenner attorneys from accomplishing basic tasks essential to representing clients in federal criminal cases. ECF No. 19-1 (Pl.'s Mem. in Supp. of Mot. for Summ. J.) at 22 (describing how "Jenner lawyers cannot effectively represent their clients without reliable access to federal buildings or the ability to engage with federal employees" given that the firm's lawyers "appear constantly in federal courts" and "routinely need to communicate with government counsel on these cases, including in person").

10

The Executive Order therefore presents Jenner's potential and current clients with a Hobson's choice—either they retain or continue to retain their chosen counsel even after that counsel has been hamstrung by government interference or they forfeit their Sixth Amendment right to counsel of choice and hire another attorney under duress, in the hopes of finding one who has not been barred by the government from providing effective assistance.

There are over 100,000 companies that are federal contractors,[6] who may find themselves in the crosshairs of a corporate prosecution, or even simply need counsel to respond to a grand jury subpoena. Those firms which are clients or potential clients of Jenner also face an impossible dilemma. By requiring federal contractors to disclose their relationships with Jenner and ordering an "assessment of contracts" with federal contractors represented by the firm, EO §3, the Executive Order makes it financially untenable for federal contractors to select counsel of choice. Federal contractors will need to either forgo representation by preferred Jenner counsel or risk losing their potentially lucrative government contracts.[7] *Stein* held that similar kinds of financial pressure, aimed at influencing a person's choice of counsel, are incompatible with the Sixth Amendment.

None of these risks are hypothetical. Jenner's clients have already expressed concerns about the firm's ability to continue to represent them. *See* TRO Tr. 52:19-24 (the Court: "Some of [the firm's clients in its 540 active matters] have already expressed concern that Jenner cannot represent them[.]"). Other firms facing similar executive orders—and their criminal defense clients—have faced similar consequences. For example, a client of another targeted firm who was

---

[6] *See* Archisha Mehan, *Federal Contract Awards Hit $773.68B in FY24, Small Businesses See $4B Increase*, GovSpend (Feb. 24, 2025), https://govspend.com/blog/federal-contract-awards-hit-773-68b-in-fy24-small-businesses-see-4b-increase.

[7] Section 3 of the Executive Order also presents serious problems for the attorney-client privilege. Say Jenner has been hired by a federal contractor to conduct a sensitive and confidential internal investigation that could reveal criminal exposure. Requiring the contractor to disclose its relationship with the firm, a fact that is itself potentially privileged, could expose that information to the government and the public.

facing criminal charges elected to engage new counsel on the eve of trial based on concerns about his lawyers' disfavored status.  *See* Mem. in Supp. of Mot. to Withdraw as Counsel for Def. Steven Schwartz, *United States v. Coburn*, No. 19-cr-00120 (MEF) (D. N.J. Mar. 19, 2025), ECF No. 1012-1.  If the Sixth Amendment means anything, it means that the government cannot pressure a person who is imminently on trial for his liberty to sever his relationship with chosen counsel.

## II.    The Executive Order Violates The Sixth Amendment Right To Effective Assistance Of Counsel By Creating Conflicts Of Interest Between The Firm And The Client

The Executive Order not only infringes upon the right to counsel of choice, but it also dramatically undermines the Sixth Amendment right to the effective assistance of counsel by creating a conflict of interest between the attorney and the client.  By threatening attorneys with potential retribution for acting in their clients' best interest, the Executive Order places criminal defense attorneys in an impossible position, forcing them to choose between zealous advocacy for their clients and self-preservation.  This conflict of interest strikes at the heart of the constitutional right to conflict-free counsel and likewise compromises the attorney's ethical duty of loyalty and the integrity of our adversarial system of justice.

An essential component of the Sixth Amendment right to effective assistance of counsel is the assurance that counsel is free from conflicts of interest.  *See Wood v. Georgia*, 450 U.S. 261, 271 (1981) ("Where a constitutional right to counsel exists, our Sixth Amendment cases hold that there is a correlative right to representation that is free from conflicts of interest."); *Von Moltke v. Gillies*, 332 U.S. 708, 725 (1948) ("The right to counsel guaranteed by the Constitution contemplates the services of an attorney devoted solely to the interests of his client.").

The importance of conflict-free counsel cannot be overstated.  The "duty of loyalty, a duty to avoid conflicts of interest" is "perhaps the most basic of counsel's duties."  *Strickland*, 466 U.S. at 688, 692.  "Undivided allegiance and faithful, devoted service to a client are prized traditions of

the American lawyer." *Von Moltke*, 332 U.S. at 725–26.  Moreover, "guaranteeing conflict-free counsel protects not just defendants' rights, but also the "[f]ederal courts['] ... independent interest in ensuring that criminal trials are conducted within the ethical standards of the [legal] profession and that legal proceedings appear fair to all who observe them." *United States v. Lopesierra-Gutierrez*, 708 F.3d 193, 200 (D.C. Cir. 2013) (quoting *Wheat v. United States*, 486 U.S. 153, 160 (1988)).  When an attorney's interests conflict with a client's interests, the fairness of the justice system—and even the appearance of any fair system—collapses.

The Executive Order creates a dangerous conflict of interest for criminal defense attorneys. By threatening investigation of, and retribution against, law firms that engage in advocacy perceived by the current administration to be against its interests, the Executive Order undermines an attorney's duty of loyalty to her client and creates the most pernicious kind of conflict—alignment with, and potentially loyalty to, the opposing party: namely, the government.  The fear of government reprisal will inevitably lead attorneys to temper advocacy on behalf of their clients. *See, e.g.*, *Armienti v. United States*, 234 F.3d 820, 825 (2d Cir. 2000) ("A lawyer in these circumstance[s], while dealing on behalf of his client with the office that is prosecuting him personally may, consciously or otherwise, seek the goodwill of the office for his own benefit.  A lawyer's attempt to seek the goodwill of the prosecutor may not always be in the best interest of the lawyer's client.").  Lawyers will have reasons to fear pushing too hard against the government on their client's behalf.  They will be forced to weigh their professional and ethical obligations to advance their client's interests against the risk of personal and professional ruin.  This divided loyalty is the essence of a conflict of interest and undermines the adversarial nature of our justice system.

13

Courts have repeatedly emphasized the dangers to the Sixth Amendment right to counsel arising from a criminal defense lawyer's concern about being personally investigated or scrutinized by the government.  Indeed, as the D.C. Circuit has observed, "Whenever an attorney is or is likely to be the subject of a criminal investigation, courts worry that he might attempt to curry general favor with the government by pulling punches."  *Lopesierra-Gutierrez*, 708 F.3d at 201.  Such a conflict of interest prevents a lawyer from providing effective assistance.  For example, in *Solina v. United States*, 709 F.2d 160 (2d Cir. 1983), where defense counsel was engaging in the crime of representing his client without a law license, the court recognized that effective assistance of counsel requires an attorney to "be wholly free from fear of what might happen if a vigorous defense should lead the prosecutor" to investigate the attorney.  *Id.* at 164; *see also United States v. Fulton*, 5 F.3d 605, 613 (2d Cir. 1993) (warning that a conflict arising from an attorney's "powerful self-interest in avoiding criminal charges or reputational damage" violates the Sixth Amendment).

The Executive Order here instills in criminal defense attorneys precisely the type of fear and self-interest that courts warn against.  "[A] criminal defendant is entitled to be represented by someone free from such constraints." *Solina*, 709 F.2d at 164; *see also United States v. Levy*, 25 F.3d 146, 156 (2d Cir. 1994) (holding that a conflict based in part on the attorney's status as a defendant in an unrelated criminal proceeding amounted to an actual conflict of interest because the attorney "may have believed he had an interest in tempering his defense of [the client] in order to curry favor with the prosecution, perhaps fearing that a spirited defense of [the client] would prompt the Government to pursue the case against [the attorney] with greater vigor."); *cf. United States v. McLain*, 823 F.2d 1457, 1463–64 (11th Cir. 1987) (holding that when trial counsel was under investigation by the same United States Attorney's Office that was prosecuting counsel's

14

client, an actual conflict of interest existed); *Briguglio v. United States*, 675 F.2d 81, 82 (3d Cir. 1982) (holding that where trial counsel was under investigation by the same United States Attorney's Office that was prosecuting counsel's client, evidentiary hearing was required to determine if "counsel labored under an actual conflict of interest, whether any such conflict may have affected the adequacy of his representation, or whether [the client's] defense was prejudiced by his counsel's difficulties").

The conflict created by the Executive Order is immediate and sweeping. The Executive Order itself demonstrates that even undertaking to represent any individual or company viewed as a political enemy of the current administration, or in a matter the administration perceives to be against its interests, will cause the firm to labor under a conflict of interest. For any such client or in any such case, the firm can only advocate for the client at risk to its own well-being. The chilling of zealous advocacy–in criminal defense representations and beyond to other challenges to government authority and policies—will be the inevitable effect.

Specific examples of how the conflict of interest risks impairing zealous representation— at all phases of a criminal representation—are numerous. For instance, because of the risk of government retaliation, an attorney may advise a client to accept a plea deal prematurely or on less favorable terms; be hesitant to challenge unlawful searches or seizures or prosecutorial overreach; feel constrained during cross-examination of government witnesses; and be less inclined to argue forcefully for a lower sentence. The core functions of the criminal defense lawyer simply cannot be carried out if the Executive Order is allowed to stand.

The Constitution, the rules of ethics, and the case law recognize that the power of the government is such that lawyers cannot fully represent their clients' interests if they face the

possibility of government reprisal and backlash.  The Executive Order thus unjustifiably injects a conflict of interest into any criminal representation that Jenner might undertake.

III.    **The Executive Order Is Unconstitutional Because It Diminishes The Availability Of Counsel And Chills A Vital Bulwark Against Arbitrary State Action**

Finally, the message that the Executive Order sends to the legal profession at large—and the means by which that message itself dissuades counsel from undertaking representations they might otherwise undertake—is without precedent and represents a fundamental threat to the profession and the rule of law.

The Executive Order warns all lawyers that representing clients out of favor with the current administration, or accepting engagements that the current administration may perceive as controversial, will carry risks to their reputations and livelihoods.  It even punishes Jenner for rehiring a lawyer, Andrew Weissmann, previously involved in the Special Counsel Office's investigation of the 2016 presidential election, on the purported ground that that investigation was "partisan" and "entirely unjustified."  EO §1.  The risks law firms now face will inevitably discourage lawyers from taking on clients and matters the administration disfavors—and to shrink from matters that could prove politically controversial at all.  The Executive Order in this way simply drives counsel—perhaps zealous counsel most of all—out of the pool of attorneys otherwise available to those accused of crimes.

This threat goes beyond individual criminal cases and threatens the legal system as a whole. Criminal defense counsel are far more than a necessary component of the administration of criminal law.  As the Supreme Court has recognized, the Sixth Amendment is one of the constitutional amendments that serve to "insure fundamental human rights of life and liberty," without which justice cannot be achieved. *Gideon*, 372 U.S. at 343 (quoting *Johnson v. Zerbst*, 304 U.S. 458, 462 (1938)).  The right to counsel is—most fundamentally—a bulwark against

arbitrary action by a powerful and resourced state.  *See id.* at 344.  Defense counsel, no less than prosecutors and judges, are necessary to upholding the "noble ideal" of equality before the law and "to protect the public's interest in an orderly society."  *Id*.

The Executive Order's purpose and consequence are to intimidate law firms and lawyers into silence and submission.  The Executive Order accomplishes these aims by violating the Sixth Amendment and undercutting one of the pillars of an orderly society and accordingly should be declared unlawful.

## **CONCLUSION**

The Sixth Amendment right to counsel is the cornerstone of our adversarial system and a vital safeguard against the power of the government.  The Executive Order threatens the integrity of our criminal legal system and should be struck down on that basis alone.  Moreover, the aim and inevitable consequence of the Executive Order—to inhibit those who represent perceived political enemies or investigate politically charged matters from challenging exercises of government authority—is equally insidious and unlawful.  Jenner's motion for summary judgment should be granted.

Dated: April 11, 2025

Respectfully submitted,

/s/ *Kobie Flowers*
Kobie Flowers
BROWN GOLDSTEIN & LEVY
1331 Pennsylvania Avenue, NW
Ste. 555 South
Washington, DC 20004
(202) 742-5969
kflowers@browngold.com

*Attorney for Amicus Curiae*
*National Association of Criminal*
*Defense Lawyers*

/s/ *Noam Biale*
Noam Biale
SHER TREMONTE LLP
90 Broad St., 23rd Fl.
New York, NY 10004
(212) 202-2600
nbiale@shertremonte.com

*Attorney for Amicus Curiae*
*New York Council of Defense Lawyers*

18