**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

JENNER & BLOCK LLP,
    *Plaintiff,*

    v.

U.S. DEPARTMENT OF JUSTICE, et al.,
    *Defendants.*

Case Number: 1:25-cv-00916-JDB

**AMICUS BRIEF ON BEHALF OF SIXTY MEDIA ORGANIZATIONS AND PRESS FREEDOM ADVOCATES IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

**AMICUS BRIEF ON BEHALF OF SIXTY MEDIA ORGANIZATIONS AND PRESS FREEDOM ADVOCATES IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

INTRODUCTION AND SUMMARY OF ARGUMENT ................................................................1

INTERESTS OF *AMICI* .........................................................................................................3

ARGUMENT .......................................................................................................................... 4

    1. A FREE PRESS ALLOWS THE PUBLIC TO CHECK OVERREACHING GOVERNMENT BUT REQUIRES LEGAL

    SUPPORT. ........................................................................................................................ 4

    2. THE OPPOSITIONAL ROLE OF THE PRESS WILL NOT FUNCTION IF THE COURT ALLOWS THIS

    EXECUTIVE ORDER. ........................................................................................................ 9

        a.   *The government will inevitably use this authoritarian power to target the press.*.......... 9

        b.   *The Executive Order will chill lawyers from working with the press.*..............................11

        c.   *The lawyers that remain will be unable to do their jobs.* .................................................16

    3. WITHOUT A ROBUST PRESS, THE PUBLIC WILL LOSE A KEY VINDICATOR OF FIRST AMENDMENT

    RIGHTS.......................................................................................................................18

CONCLUSION .....................................................................................................................19

## TABLE OF AUTHORITIES

**Cases**

*ACLU of Ill. v. Alvarez*, 679 F.3d 583 (7th Cir. 2012) ................................................................. 7

*Associated Press v. Budowich*, No. 25-cv-532, 2025 WL 1039572 (D.D.C. Apr. 8, 2025) ......................10

*Ateba v. Leavitt*, --- F.4th ---, 2025 WL 1036451 (D.C. Cir. Apr. 8, 2025) ............................................12

*Bartnicki v. Vopper*, 532 U.S. 514 (2001) ...................................................................................... 7

*Buehrle v. City of Key West*, 813 F.3d 973 (11th Cir. 2015) ..............................................................16

*CBS, Inc. v. Davis*, 510 U.S. 1315 (1994) ......................................................................................... 8

*Cox Broad. Corp. v. Cohn*, 420 U.S. 469 (1975) ............................................................................. 5

*De Jonge v. Oregon*, 299 U.S. 353 (1937) .........................................................................................19

*Electronic Privacy Info. Ctr. v. NSA*, 87 F. Supp. 3d 223 (D.D.C. 2015) ..................................... 6

*Eng v. Cooley*, 552 F.3d 1062 (9th Cir. 2009) .................................................................................17

*Frederick Douglass Found. Inc. v. District of Columbia*, 82 F.4th 1122 (D.C. Cir. 2023) .......................... 2

*Goyette v. City of Minneapolis*, No. 20-cv-1302, 2022 WL 370161 (D. Minn. Feb. 8, 2022) .................. 7

*Grosjean v. Am. Press Co.*, 297 U.S. 233 (1936) ............................................................................. 5

*Heffernan v. City of Paterson*, 578 U.S. 266 (2016) .........................................................................12

*In re Application for Access to Certain Sealed Video Exhibits*, 546 F. Supp. 3d 1 (D.D.C. 2021) ...............6

*Legal Services Corp. v. Velazquez*, 531 U.S. 533 (2001) .................................................................17

*Lovell v. City of Griffin*, 303 U.S. 444, 451 (1938) ...........................................................................19

*\*Mills v. Alabama*, 384 U.S. 214 (1966) ...................................................................................4, 18

*\*N.Y. Times Co. v. United States*, 403 U.S. 713 (1971) ....................................................1, 2, 4, 8

*Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175 (2024) ..................................................................16

*Nebraska Press Ass'n v. Stuart*, 427 U.S. 539 (1976) .................................................................... 8

*New York Times Co. v. Sullivan*, 376 U.S. 254 (1964) ..............................................................15, 16

*Press-Enterprise Co. v. Superior Ct. of Cal.*, 478 U.S. 1 (1986) .................................................... 6

*\*Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980) ...........................................4, 5, 7

*Sandvig v. Sessions*, 315 F. Supp. 3d 1 (D.D.C. 2018) ...............................................5, 7

*Sherrill v. Knight*, 569 F.2d 124 (D.C. Cir. 1977) ........................................................ 4

*Time, Inc. v. Hill*, 385 U.S. 374 (1967)...........................................................................18

TRO Tr., *Perkins Coie v. U.S. Dep't of Justice*, 1:25-cv-00716 (D.D.C. filed Mar. 11, 2025)................ 9, 17

*Trump v. CBS Broad., Inc.,* 2:24-cv-00236 (N.D. Tex. filed Oct. 31, 2024) ...........................................10

*Trump v. Members of the Pulitzer Prize Board*, 2022-CA-000246 (Fla. Cir. Ct. filed Dec. 14, 2022)....10

*Trump v. Selzer*, 4:24-cv-00449 (S.D. Iowa filed Dec. 17, 2024)...........................................10

*Trump v. Trump*, No. 453299/2021, 2024 WL 133846(N.Y. Sup. Ct. Jan. 12, 2024) ............................10

*Turner v. U.S. Agency for Global Media*, 502 F. Supp. 3d 333 (D.D.C. 2020) ....................................2, 10

*Wessler v. Dep't of Justice,* 381 F. Supp. 3d 253 (S.D.N.Y. 2019)................................................. 8

*Widakuswara v. Lake*, --- F. Supp. 3d ---, 2025 WL 945869 (S.D.N.Y. Mar. 28, 2025).......................11

*Zerilli v. Smith*, 656 F.2d 705 (D.C. Cir. 1981) ....................................................... 7

## Executive Materials

Addressing Remedial Action by Paul Weiss, Exec. Order 14,244, 90 Fed. Reg. 13685 (Mar. 21, 2025)
.............................................................................................................12

Addressing Risks from Jenner & Block, Exec. Order 14,246, 90 Fed. Reg. 13997 (Mar. 25, 2025)
................................................................................................. passim

Addressing Risks from Perkins Coie LLP, Exec. Order No. 14,230, 90 Fed. Reg. 11781 (Mar. 6, 2025)
.............................................................................................................11

Addressing Risks from WilmerHale, Exec. Order 14,250, 90 Fed. Reg. 14549 (Mar. 27, 2025) .......... 9

*Suspension of Security Clearances and Evaluation of Government Contracts*, THE WHITE HOUSE (Feb. 25, 2025)................................................................................................13

## Other Authorities

*Alabama Publisher Charged Over Report on Grand Jury Investigation*, U.S. PRESS FREEDOM TRACKER
(Nov. 20, 2024) ...................................................................................... 7

Andrew DeMillo, *A Mississippi Judge Ordered a Newspaper to Remove an Editorial. Press Advocates are Outraged*, ASSOC. PRESS (Feb. 19, 2025) ................................................................................. 8

Chris Hacker et al., *Shot by A Civilian Wielding a Police Gun*, REVEAL (May 16, 2024) ........................ 6

Christina Koningisor & Lyrissa Lidsky, *First Amendment Disequilibrium*, 100 VA. L. REV. 1 (2024) ..16, 18

Christina Koningisor, *The De Facto Reporter's Privilege,* 127 YALE L.J. 1176 (2018) ..............................15

D. Victoria Baranetsky, Simon Frankel & Thomas R. Burke, *International Charity Planet Aid Pays $1.925 Million to Settle Six-Year Libel Lawsuit,* REVEAL (Oct. 20, 2022) .............................................13

DAVID ENRICH, MURDER THE TRUTH: FEAR, THE FIRST AMENDMENT, AND A SECRET CAMPAIGN TO PROTECT THE POWERFUL (2025)..........................................................................................................15

David Folkenflik, *A Bane for Tyrants Abroad, U.S.-Funded Networks Fear Fate Under Kari Lake*, NPR (Mar. 10, 2025)..........................................................................................................................11

Elaine Chen, Lizzy Lawrence & Isabella Cueto, *After RFK Jr.'s 'Radical Transparency' Pledge, HHS Shutters Much of Its Communications, FOIA Operations*, STAT (Apr. 1, 2025) ..................................16

Floyd Abrams, *Richard S. Salant Lecture on Freedom of the Press* (2013) .................................................. 2

*Groundbreaking Partnership to Develop National Pro Bono Media Law Network*, KNIGHT FOUND. (2021) ..........................................................................................................................................14

Heidi Kitrosser, *Media Leak Prosecutions and the Biden-Harris Administration: What Lies Ahead?,* 2021 U. ILL. L. REV. ONLINE 121 (2021)..................................................................................15

*In Defense of the First Amendment*, KNIGHT FOUND. (Apr. 21, 2016) ..................................................13, 15

Jonas Heese, Gerardo Pérez-Cavazos & Caspar David Peter, *When the Local Newspaper Leaves Town: The Effects of Local Newspaper Closures on Corporate Misconduct*, 145 J. FIN. ECON. 445 (2022) ........ 5

Juan Carols Lara, *FCC Investigates SF Radio Station for ICE Reporting, Sparking Press Freedom Fears*, KQED (Feb. 6, 2025)..................................................................................................................10

Kriston Capps, *The Hidden Costs of Losing Your City's Newspaper*, BLOOMBERG CITYLAB (Mar. 30, 2018) ........................................................................................................................................ 5

*Lawyers for Reporters Connects Local News Outlets with Free Legal Services*, NIEMAN LAB (May 18, 2021) ..................................................................................................................................14

*Letter from Eighteen Civil Society Organizations to Chairman Carr* (Mar. 7, 2025) ...............................11

Luke Morgan, *The Broken Branch: Capitalism, the Constitution, and the Press*, 125 PENN. STATE L. REV. 1 (2020) ...........................................................................................................................................12

MARGARET B. KWOKA, SAVING THE FREEDOM OF INFORMATION ACT (2021) .............................................6, 14

Margaret Strouse, *Getting Laffey Out of Court: Rethinking the Calculation of Reasonable Attorneys Fees in FOIA Cases*, 37 COMM. LAWYER 18 (2022) .........................................................................14

Martha Minow, *The Changing Ecosystem of News and Challenges for Freedom of the Press*, 64 LOYOLA L. REV. 499 (2016) .................................................................................................................18

Michelle Rydell, *No Money to Fight*, QUILL (Oct. 5, 2009) ....................................................................13

*MLRC 2025 Report on Trials and Damages*, MEDIA LAW RESOURCE CENTER BULLETIN (Mar. 2025) .......15

*National Press Club Awards Mississippi Today with its Highest Press Freedom Award,* MISSISSIPPI TODAY (Sep. 25, 2024) ....................................................................................................................13

*Oil and Water*, THE INTERCEPT ...........................................................................................................6

Oliver Darcy, *Trump and His Allies Are Threatening Retribution against the Press. Their Menacing Words Should Not Be Ignored*, CNN (Dec. 7,2023) .............................................................. 9

Penelope Muse Abernathy & Sarah Stonebely, *The State of Local News,* NW. MEDILL LOCAL NEWS INITIATIVE (Nov. 16, 2023).........................................................................................................13

Pengjie Gao, Chang Lee & Dermot Murphy, *Financing Dies in Darkness? The Impact of Newspaper Closures on Public Finance*, 135 J. FIN. ECON. 445 (2020) ...................................................... 5

*Press Photographers Achieve Historic Settlement with New York City Police Department*, DAVIS WRIGHT TREMAINE (Sept. 5, 2023)................................................................................................ 7

*Prior Restraint*, U.S. PRESS FREEDOM TRACKER .................................................................................8, 15

*Protecting Democracy, Accountability, and Freedom of Expression Nationwide Stories of Impact from the Legal Clinic Fund* (2022)......................................................................................................14

RonNell Andersen Jones, *Litigation, Legislation, and Democracy in a Post-Newspaper America*, 68 Wash. & Lee L. Rev. 557 (2011) ...........................................................................................................18

Stephen Gillers, Journalism Under Fire: Protecting the Future of Investigative Reporting (2018) ...............................................................................................................................................................12

Tom Wheeler, *Trump's CBS Lawsuit Ties Media Freedom to FCC's Regulatory Power*, Brookings (Feb. 19, 2025) ...............................................................................................................................................10

**INTRODUCTION AND SUMMARY OF ARGUMENT**

A news organization receives documents from a government source. The documents shed light on government activity, and could have profound consequences for national politics and international relations. But when the organization seeks to publish the documents, it finds itself gagged by a temporary restraining order obtained by the Department of Justice from a district court.

This is the familiar story of the Pentagon Papers case, and its famous conclusion that a claim of national security, especially one that "does not even attempt to rely on any act of Congress," cannot overcome the right of the press to inform the public. *N.Y. Times Co. v. United States* (*Pentagon Papers*), 403 U.S. 713, 718 (1971) (per curiam) (Black, J., concurring).

But the story could have played out differently. Imagine that, despite the fact that the TRO is a prior restraint, the newspaper cannot find legal counsel to challenge the order. "The case is a slam dunk, but we can't take it," the lawyers say, quietly. "The partners don't want to get on the bad side of the current administration." The organization's in-house counsel goes to argue before the court, but hours after she files a notice of appearance, an executive order is issued. She is "dishonest" and her work is "dangerous." Her client is a threat to "national security", and as such, she is no longer able to enter a federal courthouse, nor confer with attorneys from the Department of Justice. The media organization doesn't respond to the TRO and doesn't publish the documents. The courts are never given the chance to balance competing constitutional interests and the documents remain hidden.

Such is the logical result of the Executive Order targeting Jenner & Block. Addressing Risks from Jenner & Block, Exec. Order 14,246, 90 Fed. Reg. 13997 (Mar. 25, 2025) ("Executive Order"). The President seeks the simultaneous power to wield the legal system against those who oppose his policies or reveal his administration's unlawful or unethical acts—who, in many cases, have been members of the press—and then deny them access to the system built to defend their rights. The President could thus "permit one side to have a monopoly in expressing its views," which is the "antithesis of constitutional guarantees." *Frederick Douglass Found. Inc. v. District of Columbia*,

82 F.4th 1122, 1131 (D.C. Cir. 2023) (quoting *City of Madison Joint Sch. Dist. No. 8 v. Wis. Emp. Relations Comm'n*, 429 U.S. 167, 175–76 (1976)).

"Freedom of the press holds an . . . exalted place in the First Amendment firmament," *Turner v. U.S. Agency for Global Media*, 502 F. Supp. 3d 333, 375 (D.D.C. 2020), because the press plays a vital role in the maintenance of democratic governance. To fulfill that function, the press relies on the work of lawyers. Lawyers assist the press in obtaining access to records and government spaces. They advise the press on how to handle sensitive sources and content. And they defend the press against civil and criminal threats for their publications. To publish the Pentagon Papers, the *New York Times* and *Washington Post* employed some of the most famous First Amendment lawyers in American history. These lawyers advocated for the newspapers' editorial right to publish what it chose to, and counseled the newspapers on what they may nevertheless wish to withhold from public view. *See* Floyd Abrams, *Richard S. Salant Lecture on Freedom of the Press* at 22 (2013) (describing such conversations with the *New York Times*).[1] The government's argument that one's right to counsel must yield to the Executive's declaration that such representation impairs public integrity, *see* Mem. in Supp. of Def. Mot. to Dismiss 31–32, ECF No. 20-1, would have prevented the newspapers from receiving such advocates and counsel. If the Executive Order stands, many lawyers will be chilled from taking on work so directly in conflict with the President, out of fear for the harm it would cause to their clients whose relationship with the government is more transactional. For the lawyers that remain, the threat of a similar executive order aimed at them or their law firms would practically prevent them from doing their jobs, by denying their access to the people and places necessary to adjudicate their issues.

This Court should grant Jenner & Block's motion for summary judgment and make clear, in the strongest possible terms, that the Constitution does not allow the President to "wipe out the First Amendment and destroy the fundamental liberty and security of the very people the Government hopes to make 'secure.'" *Pentagon Papers*, 403 U.S. at 719 (Black, J., concurring).

---

[1] Available at https://shorensteincenter.org/wp-content/uploads/2013/10/Salant-2013-Transcript-web.pdf.

**INTERESTS OF *AMICI*[2]**

This *amici curiae* brief represents the view of sixty media organizations and press freedom advocates, spearheaded by Press Freedom Defense Fund (a project of The Intercept Media, Inc.) and the Freedom of the Press Foundation. *Amici* include newsrooms that publish information of public concern, associations that represent individual journalists and publications, organizations that advocate for press freedom, law firms that practice media law, and individual attorneys who collectively have more than five hundred years of practice experience on issues related to the First Amendment and press freedom. Although each signatory's vantage point may be different, *amici* are united by their understanding that the zealous advocacy of counsel is vital to the press's ability to inform the public and hold the government to account.

The Intercept Media, Inc. is a nonprofit news organization that publishes *The Intercept*, an award-winning, nationally recognized news organization with a reputation for in-depth investigations that focus on politics, national security, crime and justice, surveillance, corruption, the environment, science, technology, and the media. One of its projects is the Press Freedom Defense Fund that provides support, training and financial assistance to news organizations, individual journalists, and documentarians when confronted with security and legal threats.

Freedom of the Press Foundation ("FPF") is a nonprofit organization that protects, defends, and empowers public-interest journalism. The organization works to preserve and strengthen First and Fourth Amendment rights guaranteed to the press through a variety of avenues, including the development of technological tools, documentation of attacks on the press, training newsrooms on digital security practices, and advocating for the public's right to know. Many of the journalists and news outlets whose rights FPF helps protect could not do their important work without reliable access to pro bono legal representation.

A list of all other *amici* is provided in Appendix A.

---

[2] Pursuant to LCvR 7(o)(5) and FRAP 29(a)(4)(E), no party's counsel authored the brief in whole or in part; no party or a party's counsel contributed money that was intended to fund preparing or submitting the brief; and no person—other than the *amici curiae*, their members, or their counsel—contributed money that was intended to fund preparing or submitting the brief.

## ARGUMENT

1. **A Free Press Allows the Public to Check Overreaching Government but Requires Legal Support.**

Plaintiff has filed declarations about the harm they have experienced because of the impact of the Executive Order on clients who work as government contractors. *See, e.g.*, Perrelli Decl. ¶ 75–77, ECF No. 19-30. *Amici* represent a constituency facing a second set of harms: those who are, by constitutional design, routinely antagonistic to the government. "The dominant purpose of the First Amendment was to prohibit the widespread practice of governmental suppression of embarrassing information." *Pentagon Papers*, 403 U.S. at 723–24 (Douglas, J., concurring). "The Government's power to censor the press was abolished so that the press would remain forever free to censure the Government. The press was protected so that it could bare the secrets of government and inform the people. Only a free and unrestrained press can effectively expose deception in government." *Id.* at 717 (Black, J. concurring). Against this threat of an overreaching government, "the press serves and was designed to serve as a powerful antidote to any abuses of power by governmental officials and as a constitutionally chosen means for keeping officials elected by the people responsible to all the people whom they were selected to serve." *Mills v. Alabama*, 384 U.S. 214, 219 (1966).

In serving this role, the press acts as the public's proxy, obtaining the information needed for democratic deliberation. *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 572–73 (1980) (the public, "instead of acquiring information . . . by firsthand observation . . . now acquire it chiefly through the print and electronic media"); *Sherrill v. Knight*, 569 F.2d 124, 129–30 (D.C. Cir. 1977) ("Not only newsmen and the publications for which they write, but also the public at large have an interest protected by the first amendment in assuring that restrictions on newsgathering be no more arduous than necessary, and that individual newsmen not be arbitrarily excluded from sources of information."). The press sifts through the chaff to find the information most relevant to listeners. "[I]n a society in which each individual has but limited time and resources with which to observe at first hand the operations of his government, he relies necessarily upon the press to

bring to him in convenient form the facts of those operations." *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 495 (1975). Without such access, "important aspects of freedom of speech and 'of the press could be eviscerated.'" *Richmond Newspapers, Inc.*, 448 U.S. at 580 (quoting *Branzburg v. Hayes*, 408 U.S. 665, 681 (1972)); *see also Grosjean v. Am. Press Co.*, 297 U.S. 233, 250 (1936) ("The newspapers, magazines, and other journals of the country, it is safe to say, have shed and continue to shed, more light on the public and business affairs of the nation than any other instrumentality of publicity; and since informed public opinion is the most potent of all restraints upon misgovernment, the suppression or abridgement of the publicity afforded by a free press cannot be regarded otherwise than with grave concern.").

Threats to the press are therefore threats to the public, in concrete and practical terms. "When local newspapers shut their doors, communities lose out. People and their stories can't find coverage. Politicos take liberties when it's nobody's job to hold them accountable. What the public doesn't know winds up hurting them." Kriston Capps, *The Hidden Costs of Losing Your City's Newspaper*, BLOOMBERG CITYLAB (Mar. 30, 2018).[3] These effects can be measured. Scholarship indicates that when local press closes, corporate misconduct increases. *See* Jonas Heese, Gerardo Pérez-Cavazos & Caspar David Peter, *When the Local Newspaper Leaves Town: The Effects of Local Newspaper Closures on Corporate Misconduct*, 145 J. FIN. ECON. 445, 446 (2022). The cost of governance also increases due to the lack of a public check on waste. *See* Pengjie Gao, Chang Lee & Dermot Murphy, *Financing Dies in Darkness? The Impact of Newspaper Closures on Public Finance*, 135 J. FIN. ECON. 445, 447 (2020) (calculating increase in municipal borrowing costs unconnected to economic conditions when local newspapers close in an area).

To serve this role the press requires access to government information, and that access is often contested. *See Sandvig v. Sessions*, 315 F. Supp. 3d 1, 15 (D.D.C. 2018) ("The First Amendment goes beyond protection of the press . . . to prohibit government from limiting the stock of information from which members of the public may draw." (quoting *First Nat'l Bank of Boston v.*

---

[3] https://www.bloomberg.com/news/articles/2018-05-30/when-local-newspapers-close-city-financing-costs-rise (last visited April 7, 2025).

*Bellotti*, 435 U.S. 765, 783 (1978)). A common forum of this contestation, well known to this Court, is under the Freedom of Information Act. Research by the Society of Professional Journalists showed that one in every five print news stories and one in ten television news stories relied on public records. Margaret B. Kwoka, Saving the Freedom of Information Act 32 (2021). Among news requesters, "new media outlets, online or otherwise nontraditional media, are often the most frequent users of FOIA." *Id.* at 68; *see, e.g.*, *Oil and Water*, The Intercept[4] (a multi-part series on surveillance and policing of the Standing Rock protests, built on a mixture of investigative news techniques, including public records); Chris Hacker et al., *Shot by A Civilian Wielding a Police Gun*, Reveal (May 16, 2024) (an in-depth analysis of gun violence data, built on records released after the reporters prevailed in *Ctr. for Investigative Reporting v. Dep't of Justice*, 14 F.4th 916 (9th Cir. 2021)).[5] The fee-shifting provisions of FOIA help to incentivize the involvement of lawyers in advocating for access to records. *See Electronic Privacy Info. Ctr. v. NSA*, 87 F. Supp. 3d 223, 227 (D.D.C. 2015).

Beyond FOIA, the press and their lawyers often take the lead in ensuring the public preserves its common law and First Amendment rights to access the facilities of the government. Lawyers representing the press will work directly with courts to ensure meaningful public access to court proceedings and records. *See, e.g.*, *In re Application for Access to Certain Sealed Video Exhibits*, 546 F. Supp. 3d 1, 4–5 (D.D.C. 2021) (discussing the Standing Order created with a coalition of press organizations for effectuating public access to video records in the Capitol Riot cases). The tests employed in adjudicating such access often involve balancing multiple constitutional interests and careful calculation around the scope of such privilege to different records and proceedings. *See id.* at 7–8; *Press-Enterprise Co. v. Superior Ct. of Cal.*, 478 U.S. 1, 13–15 (1986). Such processes functionally require counsel.

---

[4] https://theintercept.com/series/oil-and-water/ [https://perma.cc/KZT9-VYMR]
[5] https://revealnews.org/article/shot-by-a-civilian-wielding-a-police-gun/ [https://perma.cc/JEH3-RA5P]

Lawyers also help to advocate for the press when they need to assert their rights to protect their sources who provide information of public significance that has been secreted away. In recognition of "the special nature of a claim of a First Amendment right to gather information," *Richmond Newspapers, Inc.*, 448 U.S. at 586, the Supreme Court has long held that "if a newspaper lawfully obtains truthful information about a matter of public significance then state officials may not constitutionally punish publication of the information, absent a need . . . of the highest order." *Bartnicki v. Vopper*, 532 U.S. 514, 528 (2001) (quoting *Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97, 103 (1979)). But to realize that right, the press must frequently litigate its ability to publish information it has lawfully obtained. *See, e.g.*, *Alabama Publisher Charged Over Report on Grand Jury Investigation*, U.S. Press Freedom Tracker (Nov. 20, 2024) (a publisher who was briefly charged and restrained from publishing lawfully acquired information allegedly from a grand jury investigation).[6] And because "the press' function as a vital source of information is weakened whenever the ability of journalists to gather news is impaired," the press has a qualified right to shield the identity of its sources and work product. *Zerilli v. Smith*, 656 F.2d 705, 711 (D.C. Cir. 1981). Media organizations routinely require the assistance of lawyers in enforcing that privilege.

Similarly, lawyers will advise clients who run into legal issues while engaged in constitutionally protected on-the-street newsgathering activity. *See Sandvig*, 315 F. Supp. 3d at 15–16 (gathering cases); *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 595–96 (7th Cir. 2012). This is especially salient in situations where journalists cover protests, strikes, and other activity with high risk of participant arrest. *See, e.g.*, *Goyette v. City of Minneapolis*, No. 20-cv-1302, 2022 WL 370161 (D. Minn. Feb. 8, 2022). Lawyers sometimes get involved in extended litigation and negotiation with law enforcement to form consent decrees that ensure reporters on the ground are not swept up in any enforcement actions. *See, e.g.*, *Press Photographers Achieve Historic Settlement with New York City Police Department*, Davis Wright Tremaine (Sept. 5, 2023).[7]

---

[6] https://pressfreedomtracker.us/all-incidents/alabama-publisher-charged-over-report-on-grand-jury-investigation/ [https://perma.cc/LF2X-D79J]

[7] https://www.dwt.com/about/news/2023/09/press-photographers-achieve-settlement-with-nypd [https://perma.cc/UA3S-QM38]

Finally, when a court imposes an unlawful prior restraint on a media outlet, they turn to their lawyers to see that such orders are reversed. While a prior restraint has long been held as "the most serious and the least tolerable infringement on First Amendment rights," *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976), the simple fact remains that courts will, all too frequently, allow a prior restraint to issue. *See Prior Restraint*, U.S. PRESS FREEDOM TRACKER.[8] For example, earlier this year a state court judge in Mississippi ordered a local newspaper to remove an editorial criticizing local officials. Andrew DeMillo, *A Mississippi Judge Ordered a Newspaper to Remove an Editorial. Press Advocates are Outraged*, ASSOC. PRESS (Feb. 19, 2025).[9] In these circumstances it takes the rapid action of lawyers to overturn such unconstitutional orders. *See CBS, Inc. v. Davis*, 510 U.S. 1315, 1317–18 (1994) (Blackmun, J., in chambers) (granting a stay of a preliminary injunction enjoining network from broadcasting news program on grounds that delay would cause irreparable harm to the news media).

While this state of affairs often means that the press and the government spar with one another, it is understood that this agon serves a higher purpose. "Investigative reporting . . . far from impeding the public interest, actually enhances it." *Wessler v. Dep't of Justice,* 381 F. Supp. 3d 253, 260 (S.D.N.Y. 2019). And critically, the forum for such disputes is in the judiciary, and cannot be surrendered to the whims of the Executive Branch. *See Sherrill v. Knight*, 569 F.2d 124, 128 n.14 (D.C. Cir. 1977) (in addressing a First Amendment challenge to the issuance of White House press credentials, "[w]e reject at the outset the contention . . . that this case is nonjusticiable" due to the claimed sole discretion of the Executive). This helps to ensure that the "essential role" served by the press is "to serve the governed, not the governors." *Pentagon Papers*, 403 U.S. at 717 (Black, J., concurring).

---

[8] https://pressfreedomtracker.us/prior-restraint/ [https://perma.cc/R483-FEZX]
[9] https://apnews.com/article/mississippi-newspaper-judge-editorial-removed-c0290c731da4e24799c0a62724f5da08 (last visited April 7, 2025).

## 2. The Oppositional Role of the Press Will Not Function if the Court Allows This Executive Order.

The cases above establish a predictable playing field between the press and the Executive Branch, overseen by the Judicial Branch. This Executive Order takes one set of players off the field. Given media's reliance on pro bono and low-cost counsel, the chilling effects of the Executive Order will be substantial, functionally making it impossible for many press organizations to serve as the public's proxy and a check on government abuse.

### a. *The government will inevitably use this authoritarian power to target the press.*

Litigation has already spotlighted how the executive orders against law firms are, in effect, a vehicle for the personal frustrations of the President. *See, e.g.*, TRO Tr. at 101:11-25, *Perkins Coie v. U.S. Dep't of Justice*, 1:25-cv-00716 (D.D.C. filed Mar. 11, 2025) (highlighting how the claims against former Perkins Coie partners were a "personal grievance" and that the executive order could be understood as a "wholly personal vendetta"). Executive orders that followed against additional law firms have confirmed this. *See, e.g.*, Addressing Risks from WilmerHale, Exec. Order 14,250, 90 Fed. Reg. 14549 § 1 (Mar. 27, 2025) (citing Robert Mueller's investigation of members of President Trump's administration as evidence of conduct detrimental to critical American interests).

Given this track record, the press, or more specifically, the press and their attorneys, are logical next targets of these tactics. The current President has long displayed his distaste for the media. Between June 16, 2015 and January 8, 2021, President Trump insulted the media, claimed bias, or threatened to retaliate against members of the press over 2000 times. *See* Stephanie Sugars, *Trump's Negative Tweets About the Press*.[10] Since 2021, President Trump has attacked outlets he viewed as hostile or insufficiently deferential, including saying they should be investigated and "pay a big price." *See* Oliver Darcy, *Trump and His Allies Are Threatening Retribution against the Press. Their Menacing Words Should Not Be Ignored*, CNN (Dec. 7, 2023).[11] President Trump has also sued

---

[10] https://docs.google.com/spreadsheets/d/1uNA6nsgcRhhQ0b6USsMNzhYLMfuDRSMhbGZNZ00WkHk/edit?gid=0#gid=0 [https://perma.cc/NL7S-BVTL]

[11] https://www.cnn.com/2023/12/07/media/trump-threatens-retribution-against-press/index.html [https://perma.cc/3X25-BE8A]

CBS, the *Des Moines Register*, and the Pulitzer Prize Board over speech he disagreed with. *See Trump v. CBS Broad., Inc.,* 2:24-cv-00236 (N.D. Tex. filed Oct. 31, 2024); *Trump v. Selzer*, 4:24-cv-00449 (S.D. Iowa filed Dec. 17, 2024); *Trump v. Members of the Pulitzer Prize Board*, 2022-CA-000246 (Fla. Cir. Ct. filed Dec. 14, 2022).

Like all Americans, President Trump is entitled to his opinions about press coverage, as well as to use the legal system to attempt to vindicate his rights. *See, e.g.*, *Trump v. Trump* , No. 453299/2021, 2024 WL 133846 (N.Y. Sup. Ct. Jan. 12, 2024). However, the government has transformed his personal animus into federal action, routinely using executive power against press organizations that the administration dislikes or disagrees with. As one example, in 2021, this Court examined the behavior of Trump appointees within the U.S. Agency for Global Media (USAGM), finding that journalists were likely to succeed in showing that political appointees had engaged in unconstitutional retaliatory and chilling behavior against staff who were insufficiently deferential to the president, or even just too positive about his opponents. *Turner*, 502 F. Supp. 3d at 378–85. More recently, the White House barred the Associated Press from attending official events, due to its refusal to exclusively call the Gulf of Mexico the "Gulf of America." *See Associated Press v. Budowich*, No. 25-cv-532, 2025 WL 1039572 at *10 (D.D.C. Apr. 8, 2025) ("The Government offers no other plausible explanation for its treatment of the AP."). The Federal Communications Commission, under the leadership of Chairman Brendan Carr, has taken numerous actions in apparent alignment with the President to chill the press and freedom of expression. *See, e.g.*, Tom Wheeler, *Trump's CBS Lawsuit Ties Media Freedom to FCC's Regulatory Power*, Brookings (2025) (discussing a Letter of Inquiry to CBS regarding a "60 Minutes" interview that President Trump claims was edited to favor his former opponent, Kamala Harris);[12] Juan Carols Lara, *FCC Investigates SF Radio Station for ICE Reporting, Sparking Press Freedom Fears*, KQED (Feb. 6, 2025) (describing an investigation of KCBS for coverage of immigration enforcement actions in

---

[12] https://www.brookings.edu/articles/trumps-cbs-lawsuit-ties-media-freedom-to-fccs-regulatory-power/ [https://perma.cc/27YS-EANJ]

California);[13] *Letter from Eighteen Civil Society Organizations to Chairman Carr* (Mar. 7, 2025) (raising several concerns about the FCC's recent actions against the press).[14] And the Trump administration has again targeted the U.S. Agency for Global Media, this time through terminating the majority of USAGM staff, requiring a judge to issue a temporary restraining order. *Widakuswara v. Lake*, --- F. Supp. 3d ---, 2025 WL 945869 (S.D.N.Y. Mar. 28, 2025); *see also* David Folkenflik, *A Bane for Tyrants Abroad, U.S.-Funded Networks Fear Fate Under Kari Lake*, NPR (Mar. 10, 2025) (detailing this and other attacks by the Trump Administration and Elon Musk against USAGM).[15]

This combination of animus and action makes it all but certain that, should this executive order stand, a similar version will be issued against law firms or legal organizations for their representation of the press. Even if that does not happen, firms that have represented outlets that Trump dislikes will take the hint and consider the consequences of doing so going forward.

      *b.   The Executive Order will chill lawyers from working with the press.*

The executive orders targeting law firms will deter lawyers from providing representation to clients that the President disagrees with and redirect legal services to favored causes. In the present case, the Executive Order against Jenner & Block specifically cites to the law firm's advocacy on behalf of immigrants and transgender people, as well as its "partisan representations." Executive Order § 1. Other executive orders and fact sheets against firms have similarly cited litigation against the government. *See, e.g.*, Addressing Risks from Perkins Coie LLP, Exec. Order No. 14,230, 90 Fed. Reg. 11781 (Mar. 6, 2025) (citing Perkins Coie's litigation against voter identification laws). But perhaps the clearest sign of how the executive orders are meant to shape the practice of law is in the agreements that the Trump administration has come to with current and potential targets. Paul, Weiss, Rifkind, Wharton & Garrison LLP, a law firm which was

---

[13] https://www.kqed.org/news/12025977/fcc-investigates-sf-radio-station-for-ice-reporting-sparking-press-freedom-fears [https://perma.cc/D7GS-PU3M]
[14] https://publicknowledge.org/policy/group-letter-to-fcc-chairman-carr/ [https://perma.cc/S7WC-88KH]
[15] https://www.npr.org/2025/03/10/nx-s1-5322493/radio-free-europe-asia-liberty-voice-of-america-usagm-kari-lake-doge [https://perma.cc/65QD-X9FW]

the subject of a similar executive order, had the order targeting it rescinded after agreeing to dedicate the equivalent of $40 million in pro bono legal services to support the Administration's initiatives. Addressing Remedial Action by Paul Weiss, Exec. Order 14,244, 90 Fed. Reg. 13685 (Mar. 21, 2025). There is no principle or rule one can draw from these actions, other than if you litigate against the President's interests, you should expect retaliation. Such an environment gives the Executive power "so broad as to provide no meaningful constraint upon the government's exercise." *Ateba v. Leavitt*, --- F.4th ---, 2025 WL 1036451 at *7 (D.C. Cir. Apr. 8, 2025) (cleaned up).

Lawyers understand the message. *See* TRO Tr. 54:25–55:3 (The "legal profession as a whole is watching and wondering whether its courtroom activities, in the best tradition of lawyering, will cause the federal government to turn its unwanted attention to them next."). "The [action against] one tells the others that they engage in protected activity at their peril." *Heffernan v. City of Paterson*, 578 U.S. 266, 273 (2016). Representation of those who wish to sue the government, or more generally, run afoul of the interests of President Trump, could come at an existential cost to their law firm. It is not realistic to expect for-profit law firms to risk losing paying clients for the sake of preserving their pro bono practice areas. They are far more likely to not represent clients that might be adversarial to the interests of President Trump or the government, like the press.

The press has another disadvantage: Independent media organizations and individual freelance journalists are rarely deep-pocketed clients. The past two decades have required journalism organizations to do more with significantly less. Advertising revenue is at a fraction of what it was, and the number of full-time journalists has fallen by tens of thousands. *See* STEPHEN GILLERS, JOURNALISM UNDER FIRE: PROTECTING THE FUTURE OF INVESTIGATIVE REPORTING 147–48 (2018); Luke Morgan, *The Broken Branch: Capitalism, the Constitution, and the Press*, 125 PENN. STATE L. REV. 1, 7–20 (2020) (collecting statistics on the collapse of the news industry). Local, small, and non-profit media organizations are especially resource constrained—sometimes not even able to afford to pay their contributors, let alone counsel. *See* Penelope Muse Abernathy & Sarah

Stonebely, *The State of Local News,* Nw. Medill Local News Initiative (Nov. 16, 2023);[16] *see also* Michelle Rydell, *No Money to Fight*, Quill (Oct. 5, 2009) ("It's a reluctant sacrifice, but it's a necessary one . . . . Although every news organization I have ever worked with regards public access as an extremely important priority, in a world of limited budgets, something has to give." (quoting Mark Anfinson, a media lawyer)).[17] Even back in 2016, two thirds of editors rated the news industry as "less able" to pursue legal activity around First Amendment-related issues than 10 years ago. Nine out of ten of those editors said this was because of money. *In Defense of the First Amendment*, Knight Found. (Apr. 21, 2016).[18] Things have only worsened since then.

Given these economic conditions, independent press relies upon the time and effort of lawyers working at free and reduced rates, usually because those lawyers believe in the self-governance value of the press. For example, the Center for Investigative Reporting announced in 2022 that it was only able to prevail in a six-year legal dispute with years of expensive discovery because a joint team from Covington & Burling[19] and Davis Wright Tremaine defended it pro bono after its libel insurance was exhausted. D. Victoria Baranetsky, Simon Frankel & Thomas R. Burke, *International Charity Planet Aid Pays $1.925 Million to Settle Six-Year Libel Lawsuit,* Reveal (Oct. 20, 2022).[20] *Mississippi Today*, a nonprofit newsroom based in Jackson, Mississippi, relied on Gibson Dunn to protect privileged documents used in a years-long litigation that followed a Pulitzer Prize-wining investigation. *National Press Club Awards Mississippi Today with its Highest Press Freedom Award*, Mississippi Today (Sep. 25, 2024).[21] Attempting to address this need, foundations

---

[16] https://localnewsinitiative.northwestern.edu/projects/state-of-local-news/2023/ [https://perma.cc/P8MH-635A]

[17] https://www.quillmag.com/2009/10/05/no-money-to-fight/ [https://perma.cc/L3TT-7MH7]

[18] https://knightfoundation.org/reports/defense-first-amendment/ [https://perma.cc/5M2X-XSC4]

[19] Lawyers from Covington & Burling have themselves been the subject of orders limiting their ability to practice. *Suspension of Security Clearances and Evaluation of Government Contracts*, The White House (Feb. 25, 2025), https://www.whitehouse.gov/presidential-actions/2025/02/suspension-of-security-clearances-and-evaluation-of-government-contracts/ [https://perma.cc/45KH-J266].

[20] http://revealnews.org/press/international-charity-planet-aid-pays-1-925-million-to-settle-six-year-libel-lawsuit/ [https://perma.cc/5AHH-5EPK ]

[21] https://mississippitoday.org/2024/09/25/national-press-club-award-freedom-mississippi-today/ (last visited Apr 2, 2025).

and non-profits have partnered to build out more pro bono resources. *See Lawyers for Reporters Connects Local News Outlets with Free Legal Services*, Nieman Lab (May 18, 2021) (describing the work of Lawyers for Reporters in providing pro bono legal services to local news outlets);[22] *Groundbreaking Partnership to Develop National Pro Bono Media Law Network*, Knight Found. (2021) (announcing partnership between Microsoft, Davis Wright Tremaine LLP and the Reporters Committee for Freedom of the Press to provide pro bono resources to independent media);[23] *Protecting Democracy, Accountability, and Freedom of Expression Nationwide Stories of Impact from the Legal Clinic Fund* (2022) [hereinafter *Legal Clinic Fund*] (describing a variety of pro bono support provided to independent journalists).[24] This phenomenon has been especially well documented in the context of FOIA and other public records work. *Legal Clinic Fund*, *supra* at 1 (discussing how The Bangor Daily News and the Portland Press Herald made use of pro bono legal support to obtain public records); *id.* at 6–7 (discussing how pro bono legal support led to a victory at the Puerto Rico Supreme Court and the release of use-of-force reports); *id.* at 8–9 (discussing how pro bono counsel assisted obtaining public records in a child abuse case); *see also* Kwoka, *supra* at 53–4 (discussing reliance on pro bono counsel for FOIA litigation). Law firms that take on FOIA work rely in part on the fee shifting provision it includes, but those fees are not guaranteed and are often calculated far below the cost of their time. Margaret Strouse, *Getting Laffey Out of Court: Rethinking the Calculation of Reasonable Attorneys Fees in FOIA Cases*, 37 Comm. Lawyer 18, 19 (2022).

Public records work is inherently adversarial to the government, and protecting media organizations can be directly adversarial, or at the very least, controversial. Law firms that focus their practices elsewhere will be less likely to take that risk if pro bono or low bono work comes

---

[22] https://www.niemanlab.org/2021/05/lawyers-for-reporters-connects-local-news-outlets-with-free-legal-services/ [https://perma.cc/63TU-CAU8 ]
[23] https://knightfoundation.org/press/releases/groundbreaking-partnership-to-develop-national-pro-bono-media-law-network/ [https://perma.cc/65K6-D75X]
[24] https://localnewslab1.wpengine.com/wp-content/uploads/2022/02/Legal-Clinic-Fund-Impact-Stories.pdf [https://perma.cc/BR6X-PWXY]

along with an existential threat to their practice in the form of an Executive Order forcing their clients to fire them or restricting their access to court.

Lacking pro bono support, the threat to media organizations is substantial. We live in a time where media depends on counsel. The standards articulated in *New York Times v. Sullivan*, 376 U.S. 254 (1964), and progeny find themselves under renewed and relentless attack. "[T]he fates of the current crop of lawsuits designed to kneecap the *Sullivan* precedent … might not be known for years" but will likely include "a damper on investigative journalism," "[g]reater legal risks and higher insurance costs," and "[n]ew dangers for anyone who speaks up about wrongdoing by authority figures or big businesses." DAVID ENRICH, MURDER THE TRUTH: FEAR, THE FIRST AMENDMENT, AND A SECRET CAMPAIGN TO PROTECT THE POWERFUL 266–67 (2025). The federal government has substantially increased the prosecution of those who reveal information to the media. Heidi Kitrosser, *Media Leak Prosecutions and the Biden-Harris Administration: What Lies Ahead?,* 2021 U. ILL. L. REV. ONLINE 121, 123–24 (2021) (observing that the government has increasingly prosecuted such persons under the Espionage Act). There is evidence that judicial sanctions on reporters for refusing to reveal confidential sources are increasing. Christina Koningisor, *The De Facto Reporter's Privilege,* 127 YALE L.J. 1176, 1250 (2018). The median jury damage award against the press has grown fivefold between the 1980s and mid 2010s. *MLRC 2025 Report on Trials and Damages*, MEDIA LAW RESOURCE CENTER BULLETIN at 8–9 (Mar. 2025).[25] The U.S. Press Freedom Tracker has documented 41 instances of prior restraint between 2017 and the filing of this brief. *U.S. Press Freedom Tracker*.[26] In the context of FOIA, an editor reported as far back as 2016 that "[g]overnment agencies are well aware that we do not have the money to fight. More and more, their first response to our records request is 'Sue us if you want to get the records.'" *In Defense of the First Amendment*, KNIGHT FOUND. 27 (Apr. 21, 2016).[27] Despite that, few

---

[25] Available at https://medialaw.org/wp-content/uploads/2025/03/2025-Bulletin-Issue-1-Trials-Damages.pdf.
[26] https://pressfreedomtracker.us/all-incidents/?categories=Prior+Restraint [https://perma.cc/CMU8-XLZW]
[27] https://knightfoundation.org/reports/defense-first-amendment/ [https://perma.cc/5M2X-XSC4]

FOIA requests result in litigation. Christina Koningisor & Lyrissa Lidsky, *First Amendment Disequilibrium*, 100 Vᴀ. L. Rᴇᴠ. 1, 46 n.259 (2024) (finding that only .1% of federal FOIA requests result in a lawsuit). More recently, there is evidence that FOIA offices are being dismantled, making litigation truly the only option for fulfilling statutory rights. *See* Elaine Chen, Lizzy Lawrence & Isabella Cueto, *After RFK Jr.'s 'Radical Transparency' Pledge, HHS Shutters Much of Its Communications, FOIA Operations*, STAT (Apr. 1, 2025).[28]

These trends alone pose a risk to the press's core functions without pro bono counsel. But combine them with the Trump administration's legal attacks, described in section 2.a, and the situation is catastrophic. The Associated Press, CBS, and the journalists at the U.S. Agency for Global Media—all of these members of the media require counsel to defend themselves, counsel that could find themselves on the pointy end of an Executive Order. Those outlets may be able to pay for representation, but many cannot—and firms may be unwilling to represent even paying clients if it risks more lucrative representations. "The government need not ban a protected activity . . . if it can simply proceed upstream and dam the source." *Buehrle v. City of Key West*, 813 F.3d 973, 977 (11th Cir. 2015). As the Supreme Court explained in *National Rifle Association of America v. Vullo*, "[t]he analogy . . . is to killing a person by cutting off his oxygen supply rather than by shooting him." 602 U.S. 175, 197 (2024) (quoting *Backpage.com, LLC v. Dart*, 807 F.3d 229, 231 (7th Cir. 2015)). This analogy is apt here, as the First Amendment gives the press "breathing space." *Sullivan*, 376 U.S. at 271–72. Chilling the flow of pro bono legal services will suffocate the media.

  *c. The lawyers that remain will be unable to do their jobs.*

The chilling effect on pro bono counsel is only one component of the risk to the press. Another is the actual constraints of the Executive Order. "There can be little doubt . . . that state

---

[28] https://www.statnews.com/2025/04/01/hhs-rfk-job-cuts-communications-foia-operations/ [https://perma.cc/RS22-WYXW]

action designed to retaliate against and chill an attorney's advocacy for his or her client strikes at the heart of the First Amendment." *Eng v. Cooley*, 552 F.3d 1062, 1069 (9th Cir. 2009) (cleaned up).

Even lawyers who are dedicated to representing the press in spite of potential threats would not be able to do so effectively if the actions of the Trump administration are deemed constitutional. Under the government's theory of presidential power, there is no check on the limits of the executive to functionally disqualify attorneys, and little ability for courts to meaningfully intervene until it is too late. *See* TRO Tr. 34:3–36:35; Mem. in Supp. of Def. Mot. to Dismiss 28–30, ECF No. 20-1. Media organizations cannot protect against these risks by moving lawyers in-house, as the same logic could apply to sanctioning in-house attorneys as to law firms.

This offends separation of powers. To be an effective adjudicator for the rights of the press and the public, "[a]n informed, independent judiciary presumes an informed, independent bar" and any attempt by the Executive Branch to interfere with this "is inconsistent with the proposition that attorneys should present all reasonable and well-grounded arguments necessary for proper resolution of the case." *Legal Services Corp. v. Velazquez*, 531 U.S. 533, 545 (2001).

The Executive Order prohibits government employees from communicating with attorneys for firms that the President determines run counter to the interests of the United States. Mem. in Supp. of Pl.'s Mot. for Summ. J. 11, ECF No. 19-1. This would effectively prohibit such attorneys from representing media outlets in FOIA litigation, or even in pre-litigation FOIA negotiation. It would prohibit such attorneys from negotiating subpoenas from the Federal Bureau of Investigation, or from appearing in ongoing license investigations in front of the Federal Communications Commission. Under the plain text of the current order, government agencies could prohibit lawyers from attending in-person meetings or even seeking redress before a court. *See id.*; TRO Tr. 28–29.

Furthermore, there is nothing in the government's theory of presidential power that prevents the president from serially taking action against every lawyer and law firm that represents a particular client that the president dislikes. TRO Tr. at 30:6–35:12, *Perkins Coie v. U.S. Dep't of Justice*, 1:25-cv-00716 (D.D.C. filed Mar. 11, 2025); *see also id.* at 45:23–48:11 (explaining the

government's position that "the President has that power, and that it is the right and prerogative of the President as the sole individual vested with Article II authority to exercise that prerogative").

Given the depth of animus this administration has expressed for media organizations, such a campaign does not seem impossible. Any press organization that caught the executive's eye would face the same choice as a law firm: give up or give in. Either way, the media organization could no longer fulfill its role as a check on the government and a proxy for the people.

**3.  Without a Robust Press, the Public will Lose a Key Vindicator of First Amendment Rights.**

This threat does not solely affect *amici*, as risk to the press does not only affect the press. "Suppression of the right of the press to praise or criticize governmental agents and to clamor and contend for or against change . . . muzzles one of the very agencies the Framers of our Constitution thoughtfully and deliberately selected to improve our society and keep it free." *Mills v. Alabama*, 384 U.S. 214, 219 (1966). The press holds a key place in our constitutional order, and "[a] broadly defined freedom of the press assures the maintenance of our political system and an open society." *Time, Inc. v. Hill*, 385 U.S. 374, 389 (1967).

As the press is often the vehicle through which public rights are vindicated, the First Amendment's balances depend upon a viable press ecosystem. Scholars have long warned that the financial state of the media weakens First Amendment rights. *See* RonNell Andersen Jones, *Litigation, Legislation, and Democracy in a Post-Newspaper America*, 68 WASH. & LEE L. REV. 557, 574–76 (2011) (recapping how almost none of the newspapers involved in major media litigation could finance such litigation now); Martha Minow, *The Changing Ecosystem of News and Challenges for Freedom of the Press*, 64 LOYOLA L. REV. 499, 503–18 (2016) (outlining how the Constitution assumes the existence and viability of private news media); Christina Koningisor & Lyrissa Lidsky, *First Amendment Disequilibrium*, 100 VA. L. REV. 1, 44 (2024) (discussing how the decline of the press has led to more limited enforcement of First Amendment rights).

Simply put, the Executive Order is unlawful because "its character is such that it strikes at the very foundation of the freedom of the press by subjecting it to license and censorship." *Lovell v. City of Griffin*, 303 U.S. 444 (1938). The end result of this Executive Order will be a chill on press freedom, less government accountability, and less vindication of First Amendment rights. This should not stand. After all, in the First Amendment "lies the security of the Republic, the very foundation of constitutional government." *De Jonge v. Oregon*, 299 U.S. 353, 365 (1937).

<u>**CONCLUSION**</u>

For the foregoing reasons, *amici* respectfully urge this Court to grant Jenner & Block's motion for summary judgment and a permanent injunction.

Dated: April 11, 2025

Respectfully submitted,

/s/ Mason A. Kortz
_____

Mason A. Kortz
1557 Massachusetts Ave, 4th Floor
Cambridge, MA 02138
Telephone: 617-495-2845
mkortz@law.harvard.edu

Kendra K. Albert*
Andrew F. Sellars*
Albert Sellars LLP
48 Wyman St, Unit 2
Jamacia Plain, MA 02130

Attorneys for *Amici Curiae*

*Admission to D.D.C. pending

**DISCLOSURE OF CORPORATE AFFILIATIONS**

Pursuant to LCvR 26.1, I, undersigned, counsel of record for *amici curiae* certify that to the best of my knowledge and belief, that *amicus curiae* The Daily Beast Company, LLC is owned by IAC, Inc., which is a publicly held corporation.  No other *amici curiae* have parent companies, subsidiaries, affiliates, or companies which own at least 10% of their stock and have any outstanding securities in the hands of the public.

Dated: April 11, 2025                                    /s/ Mason A. Kortz

                                                                  Mason A. Kortz

**CERTIFICATE OF COMPLIANCE**

Pursuant to LCvR 7(o), I hereby certify that this brief conforms to the requirements of LCvR 5.4 and Fed. R. App. P. 29(a)(4) and does not exceed 25 pages in length. I further certify that the brief complies with the typeface requirements of LCvR 5.1(d) because it has been prepared using Microsoft Word in 12-point Crimson Pro font and is double-spaced.

Dated: April 11, 2025                              /s/ Mason A. Kortz

                                                   Mason A. Kortz

**CERTIFICATE OF SERVICE**

I hereby certify that on April 11, 2025, I electronically filed the original of this brief with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to all attorneys of record by operation of the Court's electronic filing system.

Dated: April 11, 2025

/s/ Mason A. Kortz

Mason A. Kortz