**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

JENNER & BLOCK LLP,

      *Plaintiff,*

v.

U.S. DEPARTMENT OF JUSTICE, *et al.,*

      *Defendants.*

---

Case No. 1:25-cv-00916-JDB

**PLAINTIFF JENNER & BLOCK LLP'S MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

Page

INTRODUCTION ..................................................................................1

LEGAL STANDARD.............................................................................5

ARGUMENT ........................................................................................6

I.    ALL OF JENNER'S CLAIMS SHOULD PROCEED.........................................6

    A.    Jenner Has Stated Claims for Myriad Violations of the First Amendment. ............7

        1.    The Complaint States a Claim for First Amendment Retaliation. ...............7

        2.    The Complaint States a Claim for Viewpoint Discrimination..................12

        3.    The Complaint States a Claim for Violation of the Right to Associate. ........................................................................................13

        4.    The Complaint States a Claim Under the Unconstitutional-Conditions Doctrine. ..................................................................14

    B.    Jenner Has Stated a Claim that the Order Violates the Right to Counsel.............15

    C.    Jenner Has Stated a Claim that the Order Is *Ultra Vires* and Violates the Separation of Powers. ...........................................................................16

    D.    Jenner Has Stated Claims for Violations of Due Process. .....................................17

    E.    Jenner Has Stated an Equal-Protection Claim. ......................................................20

II.   JENNER IS ENTITLED TO RELIEF AGAINST EACH AND EVERY SECTION OF THE ORDER. ....................................................................................21

    A.    The Order Must Be Understood Holistically. ........................................................22

    B.    In Any Case, the Government's Section-Specific Arguments Lack Merit............23

        1.    Jenner Is Entitled to Relief as to Section 1 Because It Underpins the Government's Unlawful Action.................................................23

        2.    Jenner Is Entitled to Relief as to Section 2 Because the Order's Security Clearance Provisions Are Reviewable and Unlawful..................25

        3.    Jenner Is Entitled to Relief as to Section 3 Because the President's Authority Over Procurement Does Not Justify the Order's Contracting Provisions..............................................................29

4.      Jenner Is Entitled to Relief as to Section 4's Direction to Investigate
        Jenner. ...................................................................................................34

5.      Jenner Is Entitled to Relief as to Section 5 Because Jenner's
        Challenge Is Ripe Regardless of Whether Any Guidance Is Issued. .........36

III.    THE UNITED STATES IS A PROPER DEFENDANT AND JENNER IS
        ENTITLED TO RELIEF AGAINST ALL FEDERAL AGENCIES. ..............................39

A.      Jenner May Assert Its Claims Against Each Federal Agency by Naming the
        United States as a Defendant. ..................................................................40

B.      The Government's Invocation of the President's Immunity Is a Red Herring
        Because No Relief Is Sought Against the President. .............................................42

C.      Jenner Has Standing to Seek Relief as to Every Agency in the Executive
        Branch Subject to the Order. ....................................................................43

D.      The Court Should Enter the Detailed Proposed Order to Ensure the
        Government's Compliance. .......................................................................44

CONCLUSION ......................................................................................................45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACORN v. United States*,
618 F.3d 125 (2d Cir. 2010)................................................................43

*AFL-CIO v. Kahn*,
618 F.2d 784 (D.C. Cir. 1979)............................................................33

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
570 U.S. 205 (2013).............................................................................15

*Allen v. Louisiana*,
103 U.S. 80 (1880)...............................................................................22

*Am. Fed'n of Gov't Emps. v. District of Columbia*,
2005 WL 1017877 (D.D.C. May 2, 2005)...........................................31

*Am. Meat Inst. v. U.S. Dep't of Agric.*,
760 F.3d 18 (D.C. Cir. 2014)..............................................................14

*\*Ams. for Prosperity Found. v. Bonta*,
594 U.S. 595 (2021).......................................................................13, 14

*\*Aref v. Lynch*,
833 F.3d 242 (D.C. Cir. 2016)..............................................................7

*Armstrong v. Exceptional Child Ctr., Inc.*,
575 U.S. 320 (2015).......................................................................41, 42

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)...............................................................................5

*\*Bd. of Cnty. Comm'rs v. Umbehr*,
518 U.S. 668 (1996)...............................................................15, 31, 32

*Bennett v. Spear*,
520 U.S. 154 (1997).............................................................................30

*Borough of Duryea v. Guarnieri*,
564 U.S. 379 (2011)...............................................................................8

*Campbell v. District of Columbia*,
126 F. Supp. 3d 141 (D.D.C. 2015).....................................................18

*Chamber of Com. v. FEC*,
69 F.3d 600 (D.C. Cir. 1995) ....................39

*Chamber of Com. v. Reich*,
74 F.3d 1322 (D.C. Cir. 1996) ....................33

*Ciralsky v. CIA*,
355 F.3d 661 (D.C. Cir. 2004) ....................5

*City of Cleburne v. Cleburne Living Ctr., Inc.*,
473 U.S. 432 (1985) ....................20

*Contractors Ass'n of E. Pa. v. Sec'y of Lab.*,
442 F.2d 159 (3d Cir. 1971) ....................33, 34

*Ctr. for Biological Diversity v. EPA*,
937 F.3d 533 (5th Cir. 2019) ....................44

*Dep't of Com. v. New York*,
588 U.S. 752 (2019) ....................30

*Dep't of Navy v. Egan*,
484 U.S. 518 (1988) ....................27

*Edwards v. Aguillard*,
482 U.S. 578 (1987) ....................28

*EEOC v. Shell Oil. Co.*,
466 U.S. 54 (1984) ....................12

*Engquist v. Or. Dep't of Agric.*,
553 U.S. 591 (2008) ....................21

*Ervin & Assocs, Inc. v. Dunlap*,
33 F. Supp. 2d 1 (D.D.C. 1997) ....................31

*Ex parte Young*,
209 U.S. 123 (1908) ....................41

*FCC v. Fox Television Stations, Inc.*,
567 U.S. 239 (2012) ....................19

*Foretich v. United States*,
351 F.3d 1198 (D.C. Cir. 2003) ....................43

*Goodyear Tire & Rubber Co. v. Haeger*,
581 U.S. 101 (2017) ....................16

*Goss v. Lopez*,
    419 U.S. 565 (1975)................................................................................18

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972)................................................................................17

*Hartman v. Moore*,
    547 U.S. 250 (2006).................................................................................7

*Holman v. Williams*,
    436 F. Supp. 2d 68 (D.D.C. 2006) ........................................................19

*Hous. Cmty. Coll. Sys. v. Wilson*,
    595 U.S. 468 (2022).................................................................................8

*Joint Anti-Fascist Refugee Comm. v. McGrath*,
    341 U.S. 123 (1951)................................................................................35

*Kowalski v. Tesmer*,
    543 U.S. 125 (2004)................................................................................13

*Kentucky v. Biden*,
    23 F.4th 585 (6th Cir. 2022) ..................................................................33

*\*Lee v. Garland*,
    120 F.4th 880 (D.C. Cir. 2024)................................................25, 26, 27

*\*Legal Servs. Corp. v. Velazquez*,
    531 U.S. 533 (2001).......................................................................5, 8, 16

*Lillemoe v. USDA*,
    344 F. Supp. 3d 215 (D.D.C. 2018) .......................................................20

*Logan v. Zimmerman Brush Co.*,
    455 U.S. 422 (1982)................................................................................17

*Lozman v. City of Riviera Beach*,
    585 U.S. 87 (2018)...................................................................................7

*Massachusetts v. EPA*,
    549 U.S. 497 (2007)................................................................................44

*Matsumoto v. Labrador*,
    122 F.4th 787 (9th Cir. 2024) ................................................................44

*McGowan v. Maryland*,
    366 U.S. 420 (1961)................................................................................32

*Media Matters for Am. v. Paxton*,
    732 F. Supp. 3d 1 (D.D.C. 2024) ................................................................. 35

*Minnesota v. Mille Lacs Band of Chippewa Indians*,
    526 U.S. 172 (1999) ......................................................................... 22, 23

*Nat'l Council of Resistance of Iran v. Dep't of State*,
    251 F.3d 192 (D.C. Cir. 2001) ................................................................. 18

*\*Nat'l Fed'n of Fed. Emps. v. Greenberg*,
    983 F.2d 286 (D.C. Cir. 1993) ............................................................. 25, 26

*Nat'l Park Hospitality Ass'n v. Dep't of the Interior*,
    538 U.S. 803 (2003) .............................................................................. 37

*Navab-Safavi v. Broad. Bd. of Governors*,
    650 F. Supp. 2d 40 (D.D.C. 2009) ............................................................ 31

*News Am. Publ'g, Inc. v. FCC*,
    844 F.2d 800 (D.C. Cir. 1988) ................................................................. 20

*Nieves v. Bartlett*,
    587 U.S. 391 (2019) ........................................................................... 8, 32

*O'Donnell v. Barry*,
    148 F.3d 1126 (D.C. Cir. 1998) ............................................................... 19

*O'Hare Truck Serv., Inc. v. City of Northlake*,
    518 U.S. 712 (1996) .............................................................................. 14

*Old Dominion Dairy Prods., Inc. v. Sec'y of Def.*,
    631 F.2d 953 (D.C. Cir. 1980) ................................................................. 33

*P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*,
    506 U.S. 139 (1993) .............................................................................. 41

*Perkins Coie LLP v. U.S. Dep't of Just.*,
    No. 25-cv-716 (D.D.C. Mar. 12, 2025) ...................................................... 10

*Perry Cap. LLC v. Mnuchin*,
    864 F.3d 591 (D.C. Cir. 2017) ............................................................. 40, 41

*R.A.V. v. City of St. Paul*,
    505 U.S. 377 (1992) .............................................................................. 12

*Rattigan v. Holder*,
    689 F.3d 764 (D.C. Cir. 2012) ................................................................. 26

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015)................................................................12

*Romer v. Evans*,
    517 U.S. 620 (1996)................................................................20

*Rosenberger v. Rector & Visitors of the Univ. of Va.*,
    515 U.S. 819 (1995)................................................................12

*Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*,
    547 U.S. 47 (2006)................................................................14

*Sanders v. District of Columbia*,
    85 F. Supp. 3d 523 (D.D.C. 2015)................................................35

*SEC v. Jarkesy*,
    603 U.S. 109 (2024)................................................................20

*Shelton v. Tucker*,
    364 U.S. 479 (1960)................................................................14

*Shurtleff v. City of Boston*,
    596 U.S. 243 (2022)................................................................24

*Sickle v. Torres Advanced Enter. Sols., LLC*,
    884 F.3d 338 (D.C. Cir. 2018)....................................................5

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014)................................................................37

*Susman Godfrey LLP v. Exec. Office of the President*,
    No. 25-cv-1107 (D.D.C. Apr. 15, 2025)..........................................10

*Swanson v. City of Chetek*,
    719 F.3d 780 (7th Cir. 2013)....................................................20

*Teva Pharms. USA, Inc. v. Sebelius*,
    595 F.3d 1303 (D.C. Cir. 2010)..................................................37

*Thomas v. Union Carbide Agr. Prods. Co.*,
    473 U.S. 568 (1985)................................................................28

*Toolasprashad v. Bureau of Prisons*,
    286 F.3d 576 (D.C. Cir. 2002)................................................23, 32

*Trudeau v. FTC*,
    456 F.3d 178 (D.C. Cir. 2006)................................................40, 42

*Trump v. Vance*,
  591 U.S. 786 (2020)............................................................................................23

*U.S. Dep't of Lab. v. Triplett*,
  494 U.S. 715 (1990).......................................................................................15, 16

*United States v. Burr*,
  25 F. Cas. 30 (C.C.D. Va. 1807).........................................................................23

*United States v. Burton*,
  584 F.2d 485 (D.C. Cir. 1978)...........................................................................16

*United States v. Nat'l Treasury Emps. Union*,
  513 U.S. 454 (1995)............................................................................................31

*United States v. O'Brien*,
  391 U.S. 367 (1968)............................................................................................32

*Unity08 v. FEC*,
  596 F.3d 861 (D.C. Cir. 2010)...........................................................................38

*USPS v. Council of Greenburg Civic Ass'ns*,
  453 U.S. 114 (1981)............................................................................................17

*Util. Air Regul. Grp. v. EPA*,
  573 U.S. 302 (2014)............................................................................................34

*Virginia v. Am. Booksellers Ass'n*,
  484 U.S. 383 (1988)............................................................................................39

*Warren v. Mayor of Charlestown*,
  68 Mass. (2 Gray) 84 (1854)..............................................................................22

*\*Webster v. Doe*,
  486 U.S. 592 (1988).......................................................................................25, 27

*Wheat v. United States*,
  486 U.S. 153 (1988)............................................................................................15

*Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the President*,
  No. 25-cv-917, 2025 WL 946979 (D.D.C. Mar. 28, 2025) ...............................10

*Wisconsin v. Constantineau*,
  400 U.S. 433 (1971)............................................................................................18

**Statutes and Regulations**

8 C.F.R. § 31.205-33............................................................................................13

48 C.F.R.
§ 44.101 ..................................................................................................13
§ 52.249-2(a) ..........................................................................................34

5 U.S.C.
§ 702 ................................................................................................ *passim*
§ 703 ..........................................................................................40, 42, 43

40 U.S.C.
§ 101 .................................................................................................33, 34
§ 121(a) ..................................................................................................33

50 U.S.C. § 3341(b)(2) ...................................................................................26

## Other Authorities

Anna Bower, *Energy Dept. Instructs Employees to Gather Info on Deals with Law Firms*, Lawfare (Apr. 9, 2025, 6:27 PM), https://perma.cc/2JAT-EJGG ...............45

Brett Samuels, *Trump Signs Order Targeting Law Firm that Employed Mueller Team Prosecutor*, The Hill (Mar. 25, 2025, 3:12 PM), https://perma.cc/6234-SBMW ....................................................................................................11

Donald J. Trump (@realDonaldTrump), Truth Social (Apr. 1, 2025, 4:47 PM), https://perma.cc/7QK8-D6BD ..................................................................11

Federal Rules of Civil Procedure

Rule 8 .......................................................................................................5

Rule 12(b)(6) ...........................................................................................5

Kathryn Rubino, *Flying in the Face of Multiple Court Orders, CFTC Wants to 'Ensure Compliance' with Executive Orders Targeting Biglaw*, Above the Law (Apr. 10, 2025, 5:27 PM), https://perma.cc/J36C-H5M3 .................45

Keith Goldberg, *Trump Wants to Use Firms That Cut Deals for Coal Leases* (Apr. 8, 2025), https://perma.cc/8S72-2AJ5 ....................................................2

Off. of the Dir. of Nat'l Intel., *Security Executive Agent Directive 4: National Security Adjudicative Guidelines* 6 (June 8, 2017) .....................................26

*Remarks: Donald Trump Signs Executive Orders in the Oval Office - April 9, 2025*, Roll Call, https://perma.cc/A3RY-STZT .......................................38

*Subcontractor*, Black's Law Dictionary (12th ed. 2024) ...............................13

*Trump Signs Executive Order Targeting Law Firm Susman Godfrey*, Reuters (Apr. 9, 2025, 10:34 PM), https://perma.cc/7ZZ6-3YTY .........................11

U.S. Equal Employment Opportunity Commission, *Press Release: EEOC Acting Chair Andrea Lucas Sends Letters to 20 Law Firms Requesting Information About DEI-Related Employment Practices* (Mar. 17, 2025), https://perma.cc/42QM-M2JC ...............................................................................................21

## INTRODUCTION

The March 25, 2025 Executive Order ("Order") targeting Jenner & Block ("Jenner" or the "Firm") is a patently unconstitutional attack on the Firm, its employees, its clients, and the legal system itself. The Order singles out Jenner's lawyers and staff because of the Firm's association with a former partner who has criticized the President and because of its representation of certain clients who have challenged the government's actions. The Order seeks to silence Jenner and punish its clients by systematically denying Jenner personnel access to the courthouses, government officials, and security clearances they need for effective representation. Perversely, the Order purports to impose these sanctions to advance "bedrock American principles" and the "interests of the United States." Ex. 19 ("Order") § 1.[1] The opposite is true: Our system is grounded on the notion that the government may not retaliate against citizens and lawyers based on the clients they represent, the positions they advocate, the opinions they voice, and the people with whom they associate.

The Order's constitutional infirmities are plain. As this Court has recognized, the First Amendment prohibits government officials from taking "retaliatory actions for protected speech," and the Order "explicitly targets Jenner because of the speech the firm engages in and the viewpoints it represents in litigation." Tr. 47:3–12.[2] Likewise, the First Amendment forbids viewpoint discrimination—a "particularly egregious" abridgement of free speech—yet here the viewpoint discrimination is obvious: "[A]ll that need be said" about the President's targeting of

---

[1] Citations to "Ex. _" refer to the Exhibits attached to the Declarations of Michael A. Attanasio. Exhibits 1 through 26 are attached to his declaration in support of Plaintiff's Motion for Summary Judgment and for Declaratory and Permanent Injunctive Relief. ECF No. 19-3. Exhibits 27 and 28 are attached to the Second Declaration of Michael A. Attanasio filed herewith.

[2] Citations to "Tr. _" refer to the transcript of the temporary restraining order ("TRO") hearing held on March 28, 2025. ECF No. 10.

disfavored viewpoints "is said by the Executive Order itself," and there is "no cogent argument that [its] viewpoint-based sanctions" can be justified. Tr. 48:9–49:8. The Order, too, suffers from "additional Fifth and Sixth Amendment deficiencies," by interfering with Jenner clients' choice of counsel. Tr. 50:21–22. For these reasons and others, the Order is flatly unconstitutional. *See* ECF No. 19-1, at 16–45 ("Jenner Br.").

The government's principal defense is that the Order ensures that any dealings with the Firm "are consistent with the national security of the United States" and "other public interests." ECF No. 20-1, at 1 ("Gov't Br."). But the Order's references to those interests are mere "lip service." Tr. 49:13–16. The Order makes clear that its true interest is punishing Jenner for its association with those who "pursue a political agenda against [the President]" and its representation of clients whose views the President disfavors. Order § 1. It is no coincidence that each of the recent orders targeting law firms has likewise invoked "risks" to the national interest while focusing on each firm's disfavored speech and associations, and it is no coincidence that these purported "risks" vanish as soon as firms agree to advocate for the *President's* preferred causes. Indeed, all this has been admitted by the President himself: Speaking of the settling firms, he recently explained, "I agree, they've done nothing wrong, but what the hell, they give me a lot of money."[3]

The government also clings to the theory that the President issued the Order solely to combat racial discrimination. That purported rationale, however, is belied by the Order's text, which expressly sets out in detail the retaliatory animus and viewpoint discrimination that underpin the Order while making only a conclusory reference to Jenner's employment practices. In any

---

[3] Keith Goldberg, *Trump Wants to Use Firms That Cut Deals for Coal Leases*, Law360 (Apr. 8, 2025), https://perma.cc/8S72-2AJ5.

event, reliance on unsupported assertions of racial discrimination provides no basis for upholding the Order—neither the Constitution nor any law authorizes the President to act as prosecutor, judge, jury, and executioner, simultaneously declaring and punishing alleged employment discrimination purely by fiat. Fundamental doctrines of separation of powers and due process preclude that very thing.

Unable to seriously contest the Order's overarching retaliatory intent, the government seeks to obscure it, moving section by section to distract from the integrated whole. Thus, the government claims unfettered presidential authority with respect to each particular arena in which the Order operates and attempts to downplay the harms that individual provisions inflict. But the Order as a whole takes aim at Jenner for its protected speech and association, and the Order as a whole must therefore fall.

Even section by section, the arguments fail. For instance, the government defends Section 3's retaliatory restrictions on government contracting as the actions of "a private party, not … a sovereign." Gov't Br. 17. But black-letter law establishes that the government may not terminate contracts in retaliation for protected speech of the contractor (or, by necessary implication, the speech of the contractor's *lawyer*). The government also claims that Jenner's challenge to Section 5's restrictions on access to buildings and officials is unripe until additional "guidance" is issued. But Jenner's challenges present pure legal questions: whether the government may "limit[]" Jenner's access to government buildings and employees—burdening the constitutional rights of Jenner and its clients—all because the government disdains Jenner's protected activity. And no "guidance" at all is needed to implement the President's directive that agencies immediately "refrain from hiring" Jenner personnel. In these circumstances, there is no question that postponing judicial review would harm Jenner.

3

With respect to Section 2's Jenner-specific security-clearance process, the government, again, posits a law-free zone. But the Constitution is not so easily discarded. While courts generally lack authority to review *individual* clearance decisions when such review would require the court to probe the minds of the relevant national security decisionmakers, that is not true with respect to policies dictating different procedures or outcomes for groups—such as Asians, Catholics, Republicans, or entire law firms—whose protected activity the government disfavors. Indeed, the Order presents a particularly compelling case for review because the President has laid bare his unlawful reasoning, removing any need to probe his motivation and revealing the lack of any bona fide national-security justification.

The need for a permanent injunction against the entire Order is clear. The Order imposes a package of punishments inflicting immediate and lasting harm on Jenner, hampering the Firm's ability to represent its clients, chilling (and retaliating against) its protected speech, imposing unrecoverable economic harms, and tarnishing the reputations of the Firm and its lawyers. Those effects were felt in the brief period prior to this Court's TRO and would return if any agency were permitted to implement the Order, even in part. Moreover, even in purporting to implement the TRO, the government has sought to undermine agency compliance, describing Jenner as "committed to the weaponization of justice ... and other anti-American pursuits," and maintaining that "agencies are permitted to carry on their ordinary course of business which carries with it the authority to decide with whom to work." ECF No. 21-1. Against that backdrop, the broad and clear injunctive relief Jenner proposes is urgently required.

The stakes of this case extend beyond Jenner. The government is asserting unbridled authority to retaliate against law firms for their advocacy and their associations. Facing down the full coercive weight of the federal government, several firms have already submitted, avoiding

sanctions (at least for now) only through a commitment to support the President's favored causes. Lawyers across the country are presently debating whether to resist this pressure or "settle"—but no lawyer should be put to that choice. Lawyers cannot be the dedicated advocates for their clients that our profession requires if they are threatened with government punishment for their speech and associations. Clients cannot receive the effective representation the Constitution guarantees if their lawyers fear retaliation for defending disfavored positions in court or associating with disfavored individuals. The Judiciary cannot provide the independent judgment the Constitution demands if it cannot find "an informed, independent bar" comprising "lawyers who advocate zealously for all clients." *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 545, 546 (2001); Tr. 54:4–5. Truly, as this Court observed, "the legal profession as a whole is watching." Tr. 54:25. The government's motion to dismiss should be denied, and Jenner's motion for summary judgment should be granted.

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter … to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). When evaluating the sufficiency of a complaint under Rule 12(b)(6), courts must "accept the plaintiff's factual allegations as true and construe the complaint liberally, grant[ing] plaintiff[] the benefit of all inferences that can [reasonably] be derived from the facts alleged." *Sickle v. Torres Advanced Enter. Sols., LLC*, 884 F.3d 338, 344–45 (D.C. Cir. 2018) (alterations in original) (citation omitted).[4]

---

[4] The government's critique of the complaint as a "shotgun pleading" that fails to specify which "claims in the Complaint pertain to which sections of the Executive Order," Gov't Br. 3–4, rests on the false premise that Jenner's challenge to the Order must be pleaded and analyzed section by section. But "Rule 8 does not require a 'short and plain *complaint*,' but rather a 'short and plain statement of the *claim*,'" *Ciralsky v. CIA*, 355 F.3d 661, 670 (D.C. Cir. 2004) (quoting Fed. R.

## ARGUMENT

The motion to dismiss should be denied. All of Jenner's claims should be permitted to proceed. *See infra* Part I. The Order violates the First, Fifth, and Sixth Amendments, is not authorized by statute, and is a grave threat to the separation of powers.

Further, Jenner's suit should be permitted to proceed with respect to the entire Order. *See infra* Part II. The government mounts a section-by-section defense, emphasizing the President's authority over the particular domains covered by each individual provision in isolation. But no section-by-section analysis is necessary, because the Order as a whole is unconstitutional: Its purpose is to retaliate against Jenner for its speech and associations that are protected by the First Amendment, including its representation of clients adverse to the government and its association with a critic of the President. And in any case, even when examined individually, each section of the Order is unconstitutional. Whatever authority the government might have over clearances, or contracting, or access to federal buildings and engagements, that authority does not give it free rein to punish lawyers for their speech and to strip lawyers and their clients of due process.

## I.    ALL OF JENNER'S CLAIMS SHOULD PROCEED.

The government does not meaningfully contest that the First Amendment prohibits retaliation on the basis of protected associations and the (imputed) viewpoints of the Firm. Instead, the government's primary contention is that Jenner has not stated a First Amendment retaliation claim because the impetus for the Order was not Jenner's protected speech and associations, but rather the President's desire to combat what he has unilaterally declared to be employment discrimination. That contention is refuted by the text of the Order itself, which makes plain its

---

Civ. P. 8(a)(2)), and incorporating prior paragraphs of a complaint alongside additional allegations for each count is a routine pleading practice.

retaliatory intent, and by the broader context of the Order—which was issued as part of a series of orders targeting only those law firms whose protected litigation activity and associations offend the President. Otherwise, the government raises a series of unfounded objections to Jenner's remaining claims. And the bulk of the government's motion attempts to offer arguments why certain sections of the Order are lawful, notwithstanding the Order's retaliatory intent. Those meritless arguments are addressed in Part II below.

**A.    Jenner Has Stated Claims for Myriad Violations of the First Amendment.**

Jenner has advanced six First Amendment claims: retaliation (Count I); viewpoint discrimination (Count II); freedom of association (Count III); right to petition (Count IV); compelled disclosure (Count V); and unconstitutional conditions (Count VI). ECF No. 1 ("Compl.") ¶¶ 140–187; Tr. 46:23–50:18. Each of these counts states a claim under the First Amendment.[5]

**1.    The Complaint States a Claim for First Amendment Retaliation.**

"[T]he First Amendment prohibits government officials from subjecting an individual to retaliatory actions ... for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006); *see Lozman v. City of Riviera Beach*, 585 U.S. 87, 90 (2018). To state a claim for First Amendment retaliation, Jenner must show that (1) it "engaged in conduct protected under the First Amendment"; (2) the government "took some retaliatory action sufficient to deter a person of ordinary firmness in [Jenner]'s position from speaking again"; and (3) there is a "causal link between the exercise of a constitutional right and the adverse action." *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016). Jenner adequately alleges each element.

---

[5]  The government advances no basis for dismissing Jenner's claim under the Petition Clause.

As to the first element, the government does not and cannot contest the basic premises of Jenner's claim. Jenner's speech, including its advocacy on behalf of its clients in court, is protected by the First Amendment. *See, e.g.*, *Legal Servs.*, 531 U.S. at 542–49. Likewise, Mr. Weissmann's speech and the expressive association between Jenner and Mr. Weissmann, which supposedly cast doubt on Jenner's "values and priorities," Order § 1, is protected by the First Amendment. And finally, the First Amendment's Petition Clause protects litigation as well as advocacy before Executive Branch agencies. *See Borough of Duryea v. Guarnieri*, 564 U.S. 379, 387 (2011).

As to the second element, it cannot seriously be disputed that the Order "constitutes a sufficiently adverse action" that would deter an entity of "ordinary firmness" and "give rise to an actionable First Amendment claim." *Hous. Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 477 (2022). The Order is a comprehensive package of sanctions that includes (1) branding Jenner as engaging in "conduct detrimental to critical American interests," Order § 1; (2) subjecting Jenner personnel to a bespoke security-clearance review process, *id.* § 2; (3) forcing Jenner clients to disclose their relationship with the Firm and risk termination of contracts, *id.* § 3(a); (4) subjecting Jenner to a sham investigation for compliance with civil-rights laws, *id.* § 4; and (5) limiting Jenner employees' access to federal buildings, officials, and employment, *id.* §§ 2(b), 5. The very purpose of the Order is to chill Jenner from engaging in speech or associations disliked by the government.

Instead, the government primarily contests the third element, regarding causation. *See* Gov't Br. 26–27, 31. This element requires Jenner to show that the government's "retaliatory motive" is a "'but-for' cause" of the injuries the Order inflicts. *Nieves v. Bartlett*, 587 U.S. 391, 398–99 (2019). Pointing to the Order's one-sentence reference to Jenner's allegedly discriminatory hiring practices, the government claims that its motive was not to target Jenner's protected speech but instead to punish employment discrimination. *See, e.g.*, Gov't Br. 9.

That claim is directly contradicted by the Order itself, which makes clear that retaliation is its but-for cause. The Order's self-proclaimed "Background" emphasizes that Jenner has represented the wrong clients (including transgender people and immigrants), taken the wrong sides in "partisan" disputes, pursued "destructive causes," expressed the wrong beliefs (including its alleged "refusal to accept the biological reality of sex"), and associated with the wrong lawyers who have done and said the wrong things (including Mr. Weissmann's participation in a "partisan prosecution" and his advocacy for a "political agenda" against the President). Order § 1. The Fact Sheet reiterates that Jenner is being punished for Mr. Weissmann's "role in engaging in partisan prosecution as part of Robert Mueller's entirely unjustified investigation," and that Mr. Weissmann's former employment by Jenner "is a concerning indictment of Jenner's values and priorities." Ex. 20. And even the recent (and belated) notice issued by the Attorney General and the Director of the Office of Management and Budget accused Jenner of "anti-American pursuits." ECF No. 21-1. These statements make crystal clear that Jenner is being targeted for its representations in court of disfavored entities and positions, and its associations with disfavored individuals. As this Court found, the Order "facially retaliates against Jenner because of its speech and association." Tr. 48:1–5.

Moreover, the government's retaliatory intent is confirmed by the fact that every executive order targeting law firms has expressly cited the targeted firm's legal representations and associations with the President's enemies. The Perkins Coie order and accompanying Fact Sheet emphasize that the firm "represent[ed] failed Presidential candidate Hillary Clinton," "worked with activist donors" on election-law litigation, Ex. 6 § 1, and "filed lawsuits against the Trump Administration," Ex. 7. Paul Weiss filed lawsuits "on behalf of clients, pro bono," challenging government policies, and brought "a pro bono suit against individuals alleged to have participated

in the events [of] January 6, 2021." Ex. 10 § 1. WilmerHale (the President says) engaged "in obvious partisan representations to achieve political ends," including voting-rights litigation. Ex. 21 § 1. And the order targeting Susman Godfrey LLP (issued on April 9, 2025, after this Court's TRO) references that firm's "efforts to weaponize the American legal system" by participating in election-related litigation. Ex. 27 § 1; *see also* Ex. 28 (Fact Sheet). The targeted firms have also nearly all represented or associated with individuals the President does not like. Unsurprisingly, then, three other judges have also found these orders to be facially retaliatory.[6]

The government's theory that the Order targets employment discrimination also makes no sense in light of how the Order arose or what the Order actually does. The Order did not follow any investigation, does not reflect any particular findings about Jenner's employment practices, and cannot be reconciled with the statutory and regulatory scheme that actually governs employment discrimination law. Instead, the Order directs agency heads to develop guidance preventing government personnel from "engaging with Jenner" in order to "ensure consistency with the national security and other interests of the United States." Order § 5(a). Agency officials are likewise directed to "refrain from hiring employees of Jenner" absent a specific finding by multiple high-level government officials that hiring a particular employee "will not threaten the national security of the United States." *Id.* § 5(b). It should be obvious that Jenner's alleged discrimination in employment cannot be what renders every one of its employees—from "managing partners to office staff," Tr. 50:4–7—a presumptive national-security risk. Only

---

[6] *See* Tr. of Hr'g at 75:12–13, *Perkins Coie LLP v. U.S. Dep't of Just.*, No. 25-cv-716 (D.D.C. Mar. 12, 2025), ECF No. 22 ("The retaliatory nature of Executive Order 14230 is clear from its face."); *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the President*, 2025 WL 946979, at *1 (D.D.C. Mar. 28, 2025) ("The retaliatory nature of the Executive Order at issue here is clear from its face[.]"); Tr. of Mot. Hr'g at 44:23–5, *Susman Godfrey LLP v. Exec. Office of the President*, No. 25-cv-1107 (D.D.C. Apr. 15, 2025), ECF No. 19 ("[T]he retaliatory nature of the executive order is plain from the language of the [order].").

retaliation explains the Order's package of sanctions. Indeed, as the government conceded when pressed on the point at the TRO hearing, the Order offers no rationale for *why* Jenner poses these purported risks other than Jenner's protected activity. Tr. 21:14–22:16; *see* Tr. 20:6–9 ("I think any member of the Executive who would be wrestling with how to implement [the Order's substantive provisions] would necessarily be resorting and looking at what was said in Section 1 to guide that decision.").

Moreover, in publicizing the recent orders, the President's and his Administration's communications have continually focused on purported "lawfare" through client representations (otherwise known as protected First Amendment activity).[7] Indeed, when signing the Order here, the President made sure to remark that Jenner was targeted because of its association with Mr. Weissmann (the "main culprit").[8] And despite a recent announcement of investigations into employment practices at twenty law firms, only two of those firms were targeted with executive orders, and neither was singled out on the sole basis of alleged racial discrimination.[9] It is plain that the government is targeting speech, not purported employment discrimination.

For these reasons, the government's arguments that Jenner cannot "demonstrate the requisite causal link" between its protected conduct and the specific retaliatory actions outlined in

---

[7] Order § 1; *Trump Signs Executive Order Targeting Law Firm Susman Godfrey*, Reuters (Apr. 9, 2025, 10:34 PM), https://perma.cc/7ZZ6-3YTY; *see also* Donald J. Trump (@realDonaldTrump), Truth Social (Apr. 1, 2025, 4:47 PM), https://perma.cc/7QK8-D6BD ("The President is delivering on his promises of eradicating Partisan Lawfare in America.").

[8] Compl. ¶ 102 & n.11 (quoting Brett Samuels, *Trump Signs Order Targeting Law Firm that Employed Mueller Team Prosecutor*, The Hill (Mar. 25, 2025, 3:12 PM), https://perma.cc/6234-SBMW).

[9] *See* Ex. 6 § 1 (targeting Perkins Coie because of its representation of Hillary Clinton and "work[] with activist donors"); Ex. 21 § 1 (targeting WilmerHale because of its "abuse[] [of] its pro bono practice" and association with Robert Mueller).

Sections 3, 4, and 5 of the Order also fail. Gov't Br. 27, 31; *see id.* at 20. As noted, that causal link is established on the face of the Order, and the Order operates as a single, unified policy.

### 2.    The Complaint States a Claim for Viewpoint Discrimination.

Viewpoint discrimination is an "egregious form of content discrimination" subject to strict scrutiny. *Reed v. Town of Gilbert*, 576 U.S. 155, 168–69 (2015) (quoting *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995)). The Order targets Jenner for its alleged "obvious partisan representations to achieve political ends," as well as in its litigation positions on behalf of transgender and immigrant clients—areas where the government disfavors the positions of Jenner's clients. Order § 1. In other words, the Order punishes Jenner for adopting viewpoints (through its representation) that the government dislikes. That is viewpoint discrimination and, as this Court has recognized, "[t]here is no cogent argument that these viewpoint-based sanctions"— which broadly apply to all Jenner employees—"are likely to pass strict scrutiny." Tr. 49:6–8.

Here again, the government's attempt to find refuge in its purported employment-discrimination rationale is unavailing. Gov't Br. 20–21. Of course, the President does not have the authority to impose arbitrary sanctions without due process based on his unilateral determination that a law firm engaged in employment discrimination. *See, e.g.*, *EEOC v. Shell Oil. Co.*, 466 U.S. 54, 61–64 (1984) (setting forth Title VII's detailed remedial scheme for addressing allegations of employment discrimination). Moreover, even when acting where the President *does* have authority, viewpoint discrimination is still prohibited. The Supreme Court has made clear that, even in the criminal context, the government cannot treat certain violators more harshly because of their viewpoints. *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 379–80, 380 n.1, 391 (1992). So too here: Jenner's purported employment discrimination could not justify the President's unabashed decision to single out Jenner based on viewpoint.

### 3. The Complaint States a Claim for Violation of the Right to Associate.

The Order abridges Jenner's freedom of association by compelling government contractors to "disclose any business they do with Jenner." Order § 3(a). The government argues that Jenner lacks standing to challenge the compelled disclosure of its clients' confidential information about their retention of the Firm. Gov't Br. 18–20. But even the "*risk* of a chilling effect on association" triggers the "protections of the First Amendment." Jenner Br. 23 (quoting *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 618–19 (2021)). Further, Jenner's clients face the ultimate "hindrance to … [their] ability to protect [their] own interests." *Kowalski v. Tesmer*, 543 U.S. 125, 130–31 (2004). Bringing any claim would require them to disclose their business with the Firm— the precise First Amendment harm Jenner seeks to prevent.

The government is wrong that Defendants are "entitled to monitor" Jenner's work as a subcontractor. Gov't Br. 22. To begin, the government cites nothing to back up its dubious claim that a law firm retained by a contractor in connection with a particular contract is "very likely … a government subcontractor."[10] *Id.* And in any event, Section 3 mandates disclosures of "*any*" business that contractors do with Jenner, not just business that is "related to the subject of the Government contract." Order § 3(a) (emphasis added). As the government concedes, Gov't Br. 22, compelled disclosures are subject to "exacting scrutiny"—meaning that compelled disclosures can be lawful only when there is a "substantial relation between the disclosure requirement and a sufficiently important government interest." *Ams. for Prosperity*, 594 U.S. at 607 (citation omitted). Yet here the government has not even established any "sufficiently important" interest

---

[10] A subcontractor is hired to perform "a portion of an existing contract." *Subcontractor*, *Black's Law Dictionary* (12th ed. 2024); *accord* 48 C.F.R. § 44.101. When a prime contractor retains outside counsel to advise on a contract, the law firm is not itself performing a portion of the contract, and is not classified as a subcontractor. *See* 8 C.F.R. § 31.205-33 (recognizing legal advice as an allowable cost in some cases but not classifying law firms as subcontractors).

that could justify Section 3's blunt sanctions. *See* Jenner Br. 24.

The government cannot avoid exacting scrutiny with its assertion that the disclosures compelled here are "purely factual and uncontroversial," *Am. Meat Inst. v. USDA*, 760 F.3d 18, 27 (D.C. Cir. 2014), and made "only to the Government," Gov't Br. 22. Section 3 requires contractors to disclose sensitive information about their attorney-client relationships—a far cry from the country-of-origin information at issue in *American Meat Institute*. *See* 760 F.3d at 20. And such a disclosure requirement, particularly when coupled with the Order's threats of retribution, "chill[s] association" even absent "'disclosure to the general public.'" *Ams. for Prosperity*, 594 U.S. at 616 (quoting *Shelton v. Tucker*, 364 U.S. 479, 486 (1960)).

### 4. The Complaint States a Claim Under the Unconstitutional-Conditions Doctrine.

The First Amendment forbids the government from conditioning access to government services and benefits on adherence to the government's viewpoint. That is true even where the person "has no entitlement to that benefit." *Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 59 (2006) (citation omitted). On its face, the Order does precisely that.

The government responds that it is just a "fact of life," Gov't Br. 21, that not everyone can contract with the government. This defense is wrong for two reasons. First, the Order does not simply reflect the choice of whom the government will contract with; it directs agencies to "*terminate* any contract" with a Jenner-associated party. Order § 3(b)(i) (emphasis added). It is black-letter law that the government may not terminate its relationships with contractors on the basis of their protected associations. *See O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712, 714–15 (1996) (holding that, "[a]lthough the government has broad discretion in formulating its contracting policies," it may not "retaliate[] against a contractor, or a regular provider of services, for the exercise of rights of political association or the expression of political allegiance");

*Bd. of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668, 677 (1996) (government may not "terminate contracts … in retaliation for protected First Amendment activity").

Second, even when the government has power to choose viewpoint winners and losers through funding decisions made in the context of a government program, the First Amendment prohibits the government from "leverag[ing] funding to regulate speech outside the contours of the program itself." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214–15 (2013). Here, the "program itself"—whatever program is authorizing the contract with *the government contractor*—has nothing to do with the speech being regulated: speech by *Jenner* in the context of unrelated litigation matters as well as Jenner's decision to associate with its ex-partner Andrew Weissmann. Accordingly, the First Amendment prohibits the government from targeting contractors who retain Jenner.

**B.    Jenner Has Stated a Claim that the Order Violates the Right to Counsel.**

Jenner has also properly stated a right-to-counsel claim under both the Fifth and Sixth Amendments. Compl. ¶¶ 227–238 (Counts XI and XII); *see* Jenner Br. 26–28; *see also* Tr. 50:19–51:5 (concluding that Jenner is likely to succeed on the merits of its right-to-counsel claims). The Order undermines Jenner's ability to serve effectively as counsel, leaving clients with a constitutionally impermissible choice—either continue to be represented by their counsel of choice, who may be stopped at the courthouse entrance or barred from engaging with federal regulators, prosecutors, or other federal officials, or cease to be represented by their preferred attorneys. The Fifth and Sixth Amendments do not tolerate this sort of Hobson's choice. *See U.S. Dep't of Lab. v. Triplett*, 494 U.S. 715, 717, 720–21 (1990); *Wheat v. United States*, 486 U.S. 153, 158–59 (1988); Jenner Br. 26–28. Contrary to the government's contention, Gov't Br. 24, when the government punishes lawyers as a means of violating clients' constitutional rights, the lawyers

15

are the proper party to vindicate those constitutional rights in court. *See* Jenner Br. 26, 28 (citing *Triplett*, 494 U.S. at 720).

The government contends that the right to counsel "cannot be insisted upon in a manner that will obstruct an orderly procedure in courts of justice" or where it interferes with the "prompt, effective, and efficient administration of justice." Gov't Br. 7 (quoting *United States v. Burton*, 584 F.2d 485, 489 (D.C. Cir. 1978)); *see also* Gov't Br. 31 (similar). But neither the Order nor the government's brief explains how the Order safeguards the justice system. To the contrary, it is the Order's arbitrary limitation on who may serve as an attorney that eviscerates the constitutional right to counsel and undermines the "prompt, effective, and efficient administration of justice."

### C.   Jenner Has Stated a Claim that the Order Is *Ultra Vires* and Violates the Separation of Powers.

Jenner has stated a claim alleging *ultra vires* action and a violation of the separation of powers. Compl. ¶¶ 239–253 (Count XIII); *see* Jenner Br. 28–31. The Order violates the separation of powers by intruding on the judiciary's role in determining which legal arguments are meritorious, *see Legal Servs.*, 531 U.S. at 546, and which are worthy of sanction, *see Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 107 (2017). Further, the Order exceeds the President's authority. *See* Jenner Br. 29–31. Neither the Order itself nor the government's motion to dismiss identifies a statutory or constitutional basis for targeting a single law firm—and all its attorneys and staff—based on litigation positions taken on behalf of its clients. Indeed, doing so constitutes a bill of attainder that the President has no authority to issue.

The government argues that Jenner's *ultra vires* claim fails because the President generally has authority with respect to each of the domains covered by Sections 2, 3, 4, and 5 of the Order. For example, in the context of Section 5, the government argues Jenner has not properly stated an *ultra vires* claim because that would require Jenner to argue that "Federal agencies lack any

16

authority to control who can enter their buildings or interact with their employees on official business." Gov't Br. 30. But Jenner in no way is asserting a "constitutional right to enter government buildings at will." *Id.* (citing *USPS v. Council of Greenburg Civic Ass'ns*, 453 U.S. 114, 129 (1981)). Jenner is instead claiming that the President has no constitutional or statutory basis to unilaterally target law firms and their employees based on their speech and associations. The Executive's general authority to police access to government buildings is entirely unresponsive to the *ultra vires* claim that Jenner has brought.

### D.    Jenner Has Stated Claims for Violations of Due Process.

The Order violates procedural due process because it deprives Jenner of constitutionally protected property and liberty interests without any process whatsoever. Compl. ¶¶ 188–207 (Counts VII and VIII); *see Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982); Jenner Br. 31–33. Jenner had no government notice of the Order before it issued; there was no process prior to the Order's issuance; and Jenner has no opportunity to participate in the agency review processes the Order commands.

The Order's vagueness also independently violates due process. The Order "impermissibly delegates" policy choices to hundreds of federal agencies "for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972). The Order does not clearly specify how far its sanctions extend. And—by design—it prevents Jenner and its clients from knowing what "national security" risks Jenner poses or what federal buildings are inaccessible to Jenner personnel. Compl. ¶¶ 208–217 (Count IX); *see* ECF No. 19-2 ("SUMF") ¶¶ 75, 78.

The government provides no valid grounds for dismissal of Jenner's due-process claims. As for procedural due process, the government does not dispute that the Order strips Jenner of its

liberty interest in petitioning the government and its property interest in its contractual relationships with its clients. *See* Compl. ¶ 190; Jenner Br. 31–32.

Contrary to the government's contention, the Order also unconstitutionally strips Jenner of its reputational interests. The Supreme Court has long held that "[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971); *see Goss v. Lopez*, 419 U.S. 565, 574–75 (1975); *Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 203–04 (D.C. Cir. 2001). The Order attempts to tar Jenner's reputation at every turn: For instance, it declares that Jenner "undermine[s] bedrock American principles," Order § 1; "has abandoned the profession's highest ideals," *id.*; "supports attacks against women and children," *id.*; promotes violence and drug trafficking, *id.*; is a sufficiently serious national-security risk to justify summary suspension of security clearances and presumptive exclusion from federal buildings, *id.* §§ 2(a), 5(a); and is composed of lawyers too untrustworthy to engage with the government in any capacity, *id.* §§ 3, 5.

In response, the government invokes the inapposite "reputation-plus" line of cases, under which a *government employee* who is terminated must also allege that he was defamed at the same time in order to assert a procedural-due-process claim. Gov't Br. 10–11. But Jenner is not a government employee that the government is exercising its right to terminate; it is a private organization that is the target of government retaliation. And even the cases the government invokes recognize that defamation is not an element of a due-process claim where, as here, the reputational injury is not merely a product of "official *speech*, but [of] a continuing stigma or disability arising from official *action*." *Campbell v. District of Columbia*, 126 F. Supp. 3d 141,

153 (D.D.C. 2015) (quoting *O'Donnell v. Barry*, 148 F.3d 1126, 1140 (D.C. Cir. 1998)); *see Holman v. Williams*, 436 F. Supp. 2d 68, 79 (D.D.C. 2006).

As such, the Order strips Jenner of property and liberty interests protected by the Due Process Clause. Because the process provided here (*i.e.*, none) was constitutionally insufficient, Jenner has stated a due-process claim. *See* Compl. ¶¶ 191–192; SUMF ¶ 56; Jenner Br. 32.

As for vagueness, the Order violates Due Process because of (a) the lack of any detail as to what laws Jenner has allegedly violated and how it can avoid violating them in the future; and (b) the inscrutable direction to hundreds of federal agencies to develop arbitrary guidance addressing pretextual national-security concerns that purportedly exist because a former Jenner employee has criticized the President and because Jenner represents transgender and immigrant plaintiffs in litigation. Contrary to the government's contention (Gov't Br. 12), the vagueness doctrine applies outside the context of criminal statutes. In *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012)—a case that likewise did not involve a criminal statute—the Supreme Court embraced a vagueness challenge to agency action because there was no "fair notice of what was forbidden." *Id.* at 254. And the vagueness concerns in *Fox* were amplified for two reasons: First, "[w]hen speech is involved, rigorous adherence to [fair-notice] requirements is necessary to ensure that ambiguity does not chill protected speech," *id.* at 253–54, and second, the challenged orders were likely to have "an adverse impact on [the target]'s reputation," *id.* at 256. Just so here.

Finally, to the extent the government argues that the Order is actually premised on findings about Jenner's employment practices, that only heightens the due-process concerns. Congress has enacted a comprehensive set of employment-discrimination laws and procedures for enforcement. Before they are enforced, employers get due process. Nothing in our laws or constitutional tradition permits the President to dispense with all due process, declare that a private party has

violated those laws, and then proceed to sanction not only the "guilty" party, but also all of its employees and clients, by imposing a host of punishments that have nothing to do with the alleged employment discrimination. "[C]oncentrat[ing] the roles of prosecutor, judge, and jury in the hands of the Executive Branch" in this fashion "is the very opposite of the separation of powers that the Constitution demands." *SEC v. Jarkesy*, 603 U.S. 109, 140 (2024); *see* Jenner Br. 28–29.

### E.    Jenner Has Stated an Equal-Protection Claim.

The Order violates equal protection by intentionally treating Jenner differently from similarly situated entities without a rational basis. *See* Compl. ¶¶ 218–226 (Count X); Jenner Br. 33. The government urges the Court to apply rational-basis review, but in the context of differential treatment burdening First Amendment rights, heightened scrutiny applies. *See News Am. Publ'g, Inc. v. FCC*, 844 F.2d 800, 802 (D.C. Cir. 1988); *see also Swanson v. City of Chetek*, 719 F.3d 780, 784 (7th Cir. 2013).

Even under rational basis review, it is well established that a "bare … desire to harm a politically unpopular group" does not suffice. *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 446–47 (1985) (alteration in original) (citation omitted); *see also Romer v. Evans*, 517 U.S. 620, 632 (1996). The government emphasizes that plaintiffs must "plead facts that establish that there is not any reasonable conceivable state of facts that could provide a rational basis for the classification." Gov't Br. 7 (quoting *Lillemoe v. USDA*, 344 F. Supp. 3d 215, 229 (D.D.C. 2018)); *see* Gov't Br. 23. As described, Jenner has satisfied that demanding standard here: Jenner is being targeted for protected speech and associations; the government's "national security" rationale is entirely pretextual and unsupported; and, regardless, the "racial discrimination" rationale cannot justify the Order because that unsupported rationale does not even distinguish Jenner from other similarly situated entities that also have been accused of having the same allegedly discriminatory practices.

The government further contends that Jenner's class-of-one claim must fail as to the Order's contracting provisions because Jenner is not "similarly situated" to "other potential government contractors who do not engage in unlawful DEI practices." Gov't Br. 23. But the reference to "unlawful DEI practices" is pretextual because Section 1 makes plain that Jenner is being singled out in retaliation for its protected speech and associations. The EEOC is investigating twenty other law firms for employment discrimination, yet the Order is laser focused on Jenner.[11] And the government's assertion that class-of-one claims are unavailable for "employee grievance[s]," *id.* (quoting *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 609 (2008)), is unavailing. The Order is not analogous to a "subjective, individualized" personnel decision, *Engquist*, 553 U.S. at 603, but rather is a retaliatory threat to Jenner and its clients' ability to contract with the government wholesale.

## II.    JENNER IS ENTITLED TO RELIEF AGAINST EACH AND EVERY SECTION OF THE ORDER.

Instead of contesting the viability of Jenner's claims, the government attempts to salvage the Order by reframing what it is and what it does. Rather than read the Order as a comprehensive package of sanctions targeting Jenner for its representations and its associations, the government urges that this Court treat the Order as a series of independent executive actions apparently divorced from the clear, unifying, retaliatory theme. Gov't Br. 8–35. The Court should read the Order as a single unified whole and find it unconstitutional. And even if the Order could be disentangled into component parts, the government's defenses of those parts fail.

---

[11] U.S. Equal Emp. Opportunity Comm'n, *Press Release: EEOC Acting Chair Andrea Lucas Sends Letters to 20 Law Firms Requesting Information About DEI-Related Employment Practices* (Mar. 17, 2025), https://perma.cc/42QM-M2JC.

### A.    The Order Must Be Understood Holistically.

The Order should be enjoined in its entirety because it suffers from overarching constitutional defects that affect every section. The entire Order was imposed to retaliate against Jenner's protected speech, petitioning, and association. The entire Order was imposed without due process. The entire Order lacks a statutory hook and violates separation-of-powers principles. To ask whether a particular directive within the Order withstands constitutional scrutiny, standing alone, is to be purposefully blind to the context in which that directive arose.

Further, even if a subset of the Order's sections were constitutional (which they are not), the entire Order should still be invalidated because those sections are not severable. Where provisions of an executive order "are so mutually connected with and dependent on each other" and it is clear "that the [President] intended them as a whole," the entirety of the order must fall with the unconstitutional provisions. *Allen v. Louisiana*, 103 U.S. 80, 84 (1880) (quoting *Warren v. Mayor of Charlestown*, 68 Mass. (2 Gray) 84, 99 (1854)); *see Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 191 (1999); Jenner Br. 44–45.

That is the case here. As this Court has recognized, Section 1 of the Order supplies the basis for the substantive provisions that follow and is therefore critical to federal agencies' implementation of each of the Order's directives. In this Court's own words, Section 1 "serve[s] as the basis for the operative sections … and is thus critical to their enforcement." Tr. 44:20–23. Indeed, "without the basis" in Section 1, this Court observed, there would be "nothing to support" the substantive provisions that follow. Tr. 19:25–20:4. The government, too, has conceded that federal agencies implementing the Order's substantive provisions would "necessarily" be guided by the statements in Section 1, Tr. 20:6–10, which plainly give meaning to those provisions' references to "national security," *e.g.*, Order § 5(a), and the "interests of … the United States," *id.*

§ 3(b)(ii). The Order is a single, integrated document that must "stand or fall as a whole." *Mille Lacs Band*, 526 U.S. at 191.

### B.    In Any Case, the Government's Section-Specific Arguments Lack Merit.

Even if the Court were to analyze the Order section by section, Jenner would still be entitled to full relief. Most of the government's motion seeks to establish that the President has great wellsprings of authority over the domains covered by particular sections. But the President's authority (whatever it may be) does not provide a free pass to violate constitutional rights. "The President … does not," after all, "'stand exempt from the general provisions of the constitution.'" *Trump v. Vance*, 591 U.S. 786, 795 (2020) (quoting *United States v. Burr*, 25 F. Cas. 30, 33–34 (C.C.D. Va. 1807) (No. 14,692d)). And even an "ordinarily permissible exercise of discretion may become a constitutional deprivation if performed in retaliation for the exercise of a [F]irst [A]mendment right." *Toolasprashad v. Bureau of Prisons*, 286 F.3d 576, 585 (D.C. Cir. 2002) (alterations in original) (citation omitted).

### 1.    Jenner Is Entitled to Relief as to Section 1 Because It Underpins the Government's Unlawful Action.

The plain purpose of Section 1 is to set forth the grievances that form the basis for the specific sanctions that follow. The government has repeatedly admitted as much. Gov't Br. 8; Tr. 18:5–12. The remainder of the Order directs federal agencies to impose a harsh set of consequences on Jenner and its clients because Jenner has engaged in the (protected) activity described in Section 1, namely, taking litigation positions the government dislikes and affiliating with a disfavored individual. *See* Order §§ 2–5. Section 1, accordingly, is unlawful whether viewed on its own or (more accurately) as part of a wholly unconstitutional order. Its sole purpose is to set forth the grievances masquerading as a basis for the government's retaliation against Jenner. That retaliatory basis is invalid, and this Court has the power—and obligation—to declare it so. Likewise, this

23

Court should enshrine in a permanent order that which the TRO already provides: The federal government is prohibited from taking *any* action based on the retaliatory and viewpoint-discriminatory motives described in Section 1. ECF No. 9.

The government seeks to rescue Section 1 by arguing that Jenner "has no right to silence the Government's own opinions." Gov't Br. 13. That retort reflects a fundamental misunderstanding both of Section 1 and of the relief Jenner seeks. Of course the President has a right to express his views. But when the President (or any public official) purports to set government policy unconstitutionally targeting specific private parties for sanction, he cannot defend the policy simply because it is presidential speech. A government official cannot justify taking actions that violate private parties' constitutional rights on the ground that the *official* is simply exercising his *own* freedom of speech.

The government likewise misses the mark in its invocation of the Supreme Court's "government speech" line of cases. Gov't Br. 13. Those cases stand for the common-sense principle that the government is permitted to engage in expressive speech, even though by expressing certain views, it of necessity must decline to adopt others. *See Shurtleff v. City of Boston*, 596 U.S. 243, 251–52 (2022). That doctrine does not permit government retaliation or hold that courts must preserve "expressive" portions of unconstitutional executive orders.

The government also goes to great lengths to demonstrate the truth of Section 1's assertions about Jenner. Gov't Br. 8–9. Jenner has indeed represented immigrants and transgender persons, and Mr. Weissmann was indeed a partner at the Firm. But it is no answer to a charge of retaliation and viewpoint discrimination to observe that the targeted party really did engage in the protected First Amendment activity for which it is singled out.

### 2.    Jenner Is Entitled to Relief as to Section 2 Because the Order's Security Clearance Provisions Are Reviewable and Unlawful.

The government next argues that Jenner's claims are unreviewable as to Section 2 of the Order, which sets forth a Jenner-specific "Security Clearance Review," and otherwise directs agencies to "cease ... provision" to the Firm of "all Government goods, property, material, and services." Order § 2. As noted, the Court need not specifically address Section 2; it can hold that regardless of whether Section 2 is reviewable and constitutional, it is inseverable from the portions of the Order that are unquestionably unconstitutional.

But if the Court does specifically address Section 2, it should allow Jenner's claim to proceed. Jenner's motion for summary judgment sets forth in detail why there are no barriers to judicial review of a security-clearance policy that—for constitutionally suspect reasons—subjects a class of people to a bespoke suspension-and-review process. Jenner Br. 35–40. Nothing in the government's motion offers any basis to dispute that conclusion.

The government's primary contention is that *Lee v. Garland*, 120 F.4th 880, 893 (D.C. Cir. 2024), renders Jenner's challenge unreviewable. Gov't Br. 14. But Jenner's challenge concerns the highly irregular "manner in which" the Executive Branch has opted to reconsider the security clearances that Jenner personnel hold, *Nat'l Fed'n of Fed. Emps. v. Greenberg*, 983 F.2d 286, 290 (D.C. Cir. 1993), as well as the permissibility of subjecting a whole group of individuals to that irregular process as punishment for protected speech and association. These are justiciable constitutional questions. *See id.*; *see also Webster v. Doe*, 486 U.S. 592, 603–04 (1988). *Lee* thus does not control.

To get around these cases, the government attempts to treat Jenner—a law firm of nearly 1,000 attorneys and staff, Compl. ¶ 6; SUMF ¶ 2—as if it were an individual. Thus, because "*Jenner & Block* publicly praised Weissmann's role in the Mueller investigation," the government

asserts, the President was entitled "to question *Jenner & Block*'s judgment." Gov't Br. 15 (emphasis added). But Jenner is not an individual that holds a security clearance. Rather, some of Jenner's *people* do. And the government offers no support for its claim of unreviewable discretion to subject a whole class of people to more onerous clearance procedures than those applicable to the general public for retaliatory reasons. That is because none exists: To the extent the President has unreviewable authority, it extends only to "the *merits* of [a] '*particular* employee's security clearance,'" *Lee*, 120 F.4th at 893 (emphasis added) (quoting *Greenberg*, 983 F.2d at 290). That is not what Jenner seeks to challenge here, and reaching the merits of Jenner's claim would not require this Court to probe or second-guess discretionary Executive Branch judgments about what national security requires.[12]

Indeed, the legal question presented by Section 2 is "categorically unlike" the unreviewable, individualized "predictive judgment[s]" that underlie normal clearance adjudications. *Rattigan v. Holder*, 689 F.3d 764, 767 (D.C. Cir. 2012) (citation omitted). Under established Executive Branch practice, "[e]ach case must be judged on its own merits," based on "a careful weighing of a number of variables of an individual's life." Off. of the Dir. of Nat'l Intel., *Security Executive Agent Directive 4: National Security Adjudicative Guidelines* 6 (June 8, 2017). Those variables include such "intangible qualities" as a person's "loyalty to the United States, strength of character, trustworthiness, honesty, reliability, discretion, and sound judgment." *Lee*, 120 F.4th at 893 (citation omitted). To determine the constitutionality of Section 2, the Court need not find facts about, or sit in judgment of, any such discretionary assessments. It need only evaluate

---

[12]  The President's creation of a unique clearance procedure just for disfavored law firms further flies in the face of Congress's directive that the Executive "develop[] and implement[] *uniform and consistent* policies and procedures" for clearance adjudications. 50 U.S.C. § 3341(b)(2) (emphasis added); *see also Lee*, 120 F.4th at 891 (recognizing that Congress may "restrict executive discretion in this area").

whether the government may create a separate set of clearance procedures for a disfavored group, in express retaliation for that group's protected First Amendment activity.

Here, too, the government's brief makes this Court's job easier by doubling down on the President's retaliatory motives. The government openly admits that Section 2's sanction on all current Jenner personnel was put in place not because of any bona fide national-security concerns about them but because, five years ago, the Firm "publicly praised" its former partner's role in a Department of Justice investigation. Gov't Br. 15. This echoes the President's own explanation for the Order, which includes that "Jenner was 'thrilled' to re-hire the unethical Andrew Weissmann" notwithstanding his alleged "overt demand that the Federal Government pursue a political agenda" against the President. Order § 1; *see* Compl. ¶ 102 (The President: "Andrew Weissmann is the main culprit."); SUMF ¶ 57. This is textbook retaliation for textbook political speech and association. As Jenner has explained, this Court can apply settled doctrine to evaluate the lawfulness of such retaliation, without probing "sensitive and inherently discretionary judgment calls" as to "a particular employee['s]" entitlement to a clearance, or making "nuanced judgments" about what "motivat[ed]" the President. *Lee*, 120 F.4th at 893 (quoting *Dep't of the Navy v. Egan*, 484 U.S. 518, 527 (1988)); *see* Jenner Br. 37. The national-security context does not render "unreviewable" an action that, like this one, is based on an explicit "polic[y] normally repugnant to the Constitution." *Webster*, 486 U.S. at 603.

Were there any doubt that the Order is not rooted in any bona fide national security rationale, the President's own treatment of the similar Paul Weiss order confirms as much. Despite the similarly vague invocation of "national security" in the initial order targeting Paul Weiss, Ex. 10, the President quickly revoked that order *in full* on the basis of a "settlement" in which Paul Weiss agreed to a suite of "policy changes" that have no conceivable bearing on national security,

Ex. 15. Once the firm agreed to "a policy of political neutrality" and to provide $40 million in pro bono legal services to the President's preferred causes, any purported national-security concern vanished. Ex. 15.

On the merits, the government has offered essentially *no* argument in defense of Section 2. Even in areas where government officials enjoy "considerable discretion," they must exercise their powers "in a manner that comports with the transcendent imperatives of the First Amendment." *Edwards v. Aguillard*, 482 U.S. 578, 583 (1987) (citation omitted). And, even under the most deferential review, the Order's creation of a separate clearance-review process in explicit and categorical retaliation for protected activity cannot possibly pass muster. *See* Jenner Br. 39–40. Moreover, adopting the government's position would give the President unprecedented power to transform his authority over national security into a tool for putting all national-security information into the hands of one political party, one race, one gender, or one religion.

The government's only merits defense as to Section 2 concerns Jenner's due-process claims. The government asserts that because "any individual employee of Plaintiff with a security clearance will receive appropriate process," there can be no due-process violation (and also that the claims are unripe). Gov't Br. 16. But the government once again misunderstands the nature of Jenner's challenge. Jenner does not ask the Court to evaluate any one person's ability to hold a security clearance, or any one person's entitlement to related procedural protections. Jenner challenges the *imposition* of a clearance suspension-and-review regime on the entire Firm, without providing the Firm any notice or opportunity to contest the government's claims. As for ripeness, that regime has already been imposed, and the Order already directs "immediate[]" steps to suspend clearances, making it plain that Jenner can obtain relief now. Order § 2(a); *see Thomas v.*

*Union Carbide Agr. Prods. Co.*, 473 U.S. 568, 581 (1985) (finding ripe an issue that was "purely legal, and [would] not be clarified by further factual development").

>    3.    **Jenner Is Entitled to Relief as to Section 3 Because the President's Authority Over Procurement Does Not Justify the Order's Contracting Provisions.**

With respect to Section 3, the government raises a threshold standing argument and then suggests that the government's authority over procurement justifies the Order's contracting terms. Neither argument succeeds.

Jenner has standing to challenge Section 3 of the Order, which aims to deprive the Firm of clients responsible for 40% of its revenue. *See* Compl. ¶ 129; SUMF ¶ 83. The Order does so by requiring all government contractors to "disclose any business they do with Jenner," Order § 3(a), promising termination of "any contract … for which Jenner has been hired to perform any service," *id*. § 3(b)(i), demanding that agencies undertake an "assessment" of any other contracts held by "entities that do business with Jenner"—regardless of whether that business relates to that contract, § 3(b)(ii); and then directing agencies to "align their … funding decisions" with the President's stated policies, *id*. The President's explicit goal is to "terminate contracts that involve Jenner," Ex. 20, and to threaten all contractors that do any sort of business with Jenner, *see* Tr. 45:4–6, 51:21–52:11. Unsurprisingly, then, prior to the issuance of the TRO, the Order caused government-contractor clients to question whether they should continue to engage Jenner. Compl. ¶¶ 130, 133; *see* SUMF ¶¶ 74, 88.

The government says Jenner lacks standing to challenge Section 3 because any clients' decision to withdraw work from the Firm would not be traceable to the Order. In the government's telling, Jenner has not itself been hired to perform any government contract, and "Section 3 *only* 'terminate[s] any contract … for which Jenner has been hired to perform any service.'" Gov't Br. 19 (quoting Order § 3(b)(i)) (emphasis added). But that is not the "only" thing Section 3 does. The

government ignores Section 3's onerous disclosure requirements (which may compel Firm clients to produce sensitive, nonpublic information, *see* SUMF ¶¶ 86–87), Order § 3(a), as well as its vague directives that agencies must "review" and "assess[]" "contracts … with entities that disclose doing business with Jenner" (even business unrelated to the contract), *id.* § 3(b). The President's evident aim is not merely to terminate Jenner's own contracts but more broadly to deter current and prospective government contractors from retaining Jenner. *See* Ex. 20 (Section 3 will "ensure taxpayer dollars no longer go to contractors whose earnings subsidize activities not aligned with American interests.").

The government cannot defeat standing by denying that the Order will have the effect it is so clearly intended to have. To establish traceability, Jenner need only show that its clients will "likely react in predictable ways" to Section 3, in turn harming the Firm. *See Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019); *Bennett v. Spear*, 520 U.S. 154, 168–69 (1997) (an injury that is "fairly traceable" to the defendant does not require that "the defendant's actions are the very last step in the chain of causation"). And here, it is more than just predictable that Section 3 would cause Jenner's contractor clients to question engaging the Firm; as this Court recognized, Jenner's clients have raised "concerns about government mandated disclosure of their relationship with Jenner"; if those concerns caused a loss of "even a portion" of the Firm's federal-contractor business, it would "amount[] to a serious threat to the [F]irm's financial health." Tr. 51:21–52:11. Jenner thus has standing to challenge Section 3.

On the merits, the government advances various contractor-specific arguments seeking to establish that Section 3's constitutional violations are cured simply because they arise in the contracting context. Those arguments do not hold water. The simple fact is that Section 3 unconstitutionally leverages the government's enormous procurement apparatus to prevent

contractors from doing business with Jenner—all because Jenner has said the wrong things, hired the wrong people, and advocated for the wrong causes (according to the government). And the law is clear that the "basis of a [contracting] decision cannot be retaliation in violation of the First Amendment." *Ervin & Assocs. v. Dunlap*, 33 F. Supp. 2d 1, 7 (D.D.C. 1997).

The government argues that Section 3 is constitutional because "when implementing Section 3 the Government is acting as a private party, not as a sovereign." Gov't Br. 17. But the government-contracting context does not provide a blank check to ignore the First Amendment. To the contrary, the Supreme Court has made clear that "the termination of [a government] contract" may not be "motivated by [the contractor's] speech." *Umbehr*, 518 U.S. at 685. Only under a limited set of circumstances will the government's "legitimate interests as contractor … outweigh the free speech interests at stake," *id.*, such as where the contractor's speech disrupts the workplace or undermines "the efficiency of the public services" being offered, *id.* at 676; *Am. Fed'n of Gov't Emps. v. District of Columbia*, 2005 WL 1017877, at *7 (D.D.C. May 2, 2005). And the government's interest in regulating contractors' speech is at its "lowest ebb" where, as here, the disfavored speech has nothing to do with the subject matter of the contract. *Navab-Safavi v. Broad. Bd. of Governors*, 650 F. Supp. 2d 40, 57 (D.D.C. 2009) (quoting *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 494 (1995) (Rehnquist, C.J., dissenting)), *aff'd*, 637 F.3d 311 (D.C. Cir. 2010). These cases make plain that the government—even when acting as "private party"—may not terminate contracts in retaliation for a contractor's wholly unrelated speech. And, of course, here the speech at issue is primarily that of the contractor's outside *lawyers*, not the contractors themselves.

Nor can the government rely on its "racial discrimination" rationale as a blank check to abuse its procurement power. Gov't Br. 20–21. As an initial matter, it is undeniable that Section 3

is not solely about purported racial discrimination; the section's text references Jenner's broader suite of "activities that are not aligned with American interests," Order § 3(a)—a direct reference to Jenner's disfavored litigation activities and disfavored associations, which are described in Section 1 of the Order as activities undermining "the interests of the United States," *id*. § 1.

Moreover, the government is simply mistaken in its assertion that if even *one* of its motivations for terminating contracts would be valid, Section 3 should stand. The government cites *McGowan v. Maryland*, 366 U.S. 420 (1961), for the proposition that a discriminatory law is valid "if any state of facts reasonably may be conceived to justify it." Gov't Br. 17 (quoting *McGowan*, 366 U.S. at 426). But that portion of *McGowan* applied rational-basis review to the claim that the state law discriminated between alcohol sales (prohibited on Sunday) and gambling (not prohibited)—it did not address retaliation for protected speech or anything remotely similar.[13] In the retaliation context, the relevant question is instead whether the official's retaliatory motive caused him to take the action in question. *Nieves*, 587 U.S. at 399; *see also Toolasprashad*, 286 F.3d at 585 (even an "ordinarily permissible exercise of discretion may become a constitutional deprivation if performed in retaliation for the exercise of" a First Amendment right (citation omitted)). And as explained, the government cannot credibly maintain that the President would have issued Section 3 "regardless of [Jenner's] speech," *Umbehr*, 518 U.S. at 685.

But even accepting the government's (incorrect) premise that its goal is simply to address unlawful discrimination, that would not save Section 3. The government cannot simply declare

---

[13] A different portion of *McGowan*, intermittently relied upon by the government in related litigation, held that the historical religious bases for the state law at issue did not doom it under the Establishment Clause because the law was facially neutral and had evolved to have a secular justification. *See* 366 U.S. at 429–53. The government has also invoked *United States v. O'Brien*, 391 U.S. 367 (1968), which likewise declined to invalidate a facially neutral statute "on the basis of an alleged illicit legislative motive." *Id.* at 383. None of this has any application to the Order, which is retaliatory and discriminatory on its face.

that Jenner discriminates and impose punishment. Instead, "when the Government effectively bars a contractor from virtually all Government work ..., due process requires that the contractor be given notice of those charges as soon as possible and some opportunity to respond to the charges before adverse action is taken." *Old Dominion Dairy Prods., Inc. v. Sec'y of Def.*, 631 F.2d 953, 955–56 (D.C. Cir. 1980). No such notice or opportunity was provided here.

Further, Section 3 is still *ultra vires*. Congress has curtailed the President's discretion to do what he purports to do here. The President's authority to issue directives governing contracting stems from the Federal Property and Administrative Services Act of 1949 ("FPASA"). FPASA permits the President to "prescribe policies and directives," 40 U.S.C. §§ 121(a), to create an "economical and efficient system" for procurement and supply, *id.* § 101. As the statutory text makes clear, FPASA does not authorize targeted, post-procurement actions against individual contractors that have nothing to do with the government's broader "system" or "method of contracting" for services. *Kentucky v. Biden*, 23 F.4th 585, 604 (6th Cir. 2022). And it does not authorize policies that lack a "sufficiently close nexus" to the "values of efficiency and economy." *AFL-CIO v. Kahn*, 618 F.2d 784, 792–93 (D.C. Cir. 1979) (en banc); *see also Chamber of Com. of the U.S. v. Reich*, 74 F.3d 1322, 1330 (D.C. Cir. 1996) (cautioning that FPASA does not "write a blank check for the President to fill in at his will").

The government relies on *Contractors Ass'n of Eastern Pennsylvania v. Secretary of Labor*, 442 F.2d 159 (3d Cir. 1971), for the proposition that the President may wield his control over government contracting to combat racial discrimination. Gov't Br. 17. But that case in no way supports Section 3, for at least two reasons. First, consistent with FPASA's focus on facilitating an "efficient *system*" for procurement, 40 U.S.C. § 101 (emphasis added), the order at issue in that case required "all applicants for federal assistance to include in their construction

contracts specific provisions respecting fair employment practices." *Contractors Ass'n*, 442 F.2d at 163. That the President can establish generalized, forward-looking requirements in contracting does not give him license to dole out one-off, contracting-related punishments to disfavored firms. Second, consistent with FPASA's focus on "econom[y] and efficien[cy]," 40 U.S.C. § 101, the executive order at issue in *Contractors Ass'n* sought narrowly to prevent the "exclusion from the available labor pool of minority tradesmen," so as to advance the government's "financial and completion interests" in federal construction projects. 442 F.2d at 171, 175. No such nexus exists here.[14]

### 4.    Jenner Is Entitled to Relief as to Section 4's Direction to Investigate Jenner.

The government's arguments for dismissal as to Section 4 likewise fail. Section 4 provides that "[n]othing in this order shall be construed to limit the action authorized by section 4 of" the executive order targeting Perkins Coie. Order § 4. That provision, in turn, directs the EEOC to "review the practices of representative large, influential, or industry leading law firms for consistency with Title VII of the Civil Rights Act of 1964." Ex. 6 § 4(a). And it further directs the Attorney General to "investigate the practices of large law firms as described in [Section 4(a)] who do business with Federal entities for compliance with race-based and sex-based non-discrimination laws and take any additional actions the Attorney General deems appropriate." *Id.* § 4(b).

Like the other substantive provisions of the Order, Section 4 must be invalidated because it is one component of the Order's comprehensive effort to bring various levers of governmental authority—here, the investigative authority of the EEOC and the Department of Justice—to bear

---

[14] Nor does the government's "wide latitude to 'terminate performance of work'" authorize Section 3. Gov't Br. 25 (citing 48 C.F.R. § 52.249-2(a)). That regulation derives from FPASA, and thus cannot confer authority beyond that conferred by the statute. *See Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 333–34 (2014).

on Jenner. Subjecting Jenner to a Title VII investigation as retaliation for protected speech and associations violates the First Amendment. The government may not subject entities to investigation simply because they have engaged in speech or associations adverse to the government. *See, e.g.*, *Media Matters for Am. v. Paxton*, 732 F. Supp. 3d 1, 8, 27–29 (D.D.C. 2024), *appeal docketed*, No. 24-7059 (D.C. Cir. Apr. 23, 2024); *Sanders v. District of Columbia*, 85 F. Supp. 3d 523, 535–37 (D.D.C. 2015). Similarly, the Order violates Jenner's due-process rights by directing an investigation into Jenner without adhering to established Title VII procedures for the initiation of such investigations. *See* Jenner Br. 30 n.16. Any investigation that occurs pursuant to an Order that has already dictated the outcome is no more than a transparent sham. *Cf. Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 161 (1951) (Frankfurter, J., concurring).

The government primarily argues that Section 4 must be lawful because it "does nothing at all." Gov't Br. 2; *see id.* at 25. But the only sensible way to read Section 4 is as a command that Jenner is to be one of the "large law firms," Ex. 6 § 4(a), within the EEOC's and Attorney General's sights. And the President presumably did not go to the trouble of including Section 4 if it was meant to "do[] nothing at all." Gov't Br. 2. Further, the Fact Sheet declares that Jenner's "practices … *will be reviewed* under Title VII." Ex. 20 (emphasis added).[15]

Next, the government argues that Jenner cannot identify an injury traceable to the Order because the Order, by directing the EEOC and the Attorney General to investigate Jenner's compliance with civil-rights laws, simply orders them "to do what it was already the[ir] … job to

---

[15] Along similar lines, the government argues that Jenner is "challenging the wrong order," apparently because the particulars of the sham Title VII investigation are set forth in the Perkins Coie order. Gov't Br. 3; *see id.* at 25. But the Order is a proper subject of challenge because it is the government action specifically providing that *Jenner* must be investigated.

do." Gov't Br. 3. But Jenner is not arguing for immunity from investigation. *See id.* at 28. Rather, Jenner objects to being targeted for investigation and review based on its protected First Amendment activity. Jenner's motion for summary judgment was accompanied by a proposed order that seeks relief perfectly tailored to that concern: It would direct the EEOC and the Attorney General to "immediately cease any investigation of Jenner & Block LLP *made pursuant to Section 4 of [the Order]*, and to withdraw any requests for information from Jenner & Block LLP or other investigative steps *made pursuant to Section 4 of [the Order]*." ECF No. 19-31, at 3–4 ("Proposed Order") (emphasis added).

### 5. Jenner Is Entitled to Relief as to Section 5 Because Jenner's Challenge Is Ripe Regardless of Whether Any Guidance Is Issued.

Section 5 of the Order provides that agency heads shall "provide guidance limiting official access from Federal Government buildings to employees of Jenner when such access would threaten the national security of or otherwise be inconsistent with the interests of the United States." Order § 5(a). It also directs "guidance limiting Government employees acting in their official capacity from engaging with Jenner employees." *Id.* And it provides that agencies shall "refrain from hiring employees of Jenner" unless the agency head, in consultation with the Director of the Office of Personnel Management, provides a waiver stating that "such hire will not threaten the national security of the United States." *Id.* § 5(b). Section 5's restrictions on Jenner personnel's access to federal buildings, engagement with federal employees, and eligibility for federal employment are, by their terms, sweeping and severe—and they immediately harmed Jenner when they went into effect. Recognizing these facts, this Court granted a TRO barring enforcement of these restrictions.

Nonetheless, the government seeks dismissal of Jenner's claims as to Section 5 on the grounds that any challenge to Section 5 is unripe until agencies issue the referenced "guidance." This contention is meritless for three reasons. *See* Jenner Br. 34–35.

To start, the government makes no serious effort to grapple with the two-prong test for ripeness, which considers (a) whether the issues are purely legal and thus fit for immediate resolution; and (b) "the hardship to the parties of withholding court consideration." *Teva Pharms. USA, Inc. v. Sebelius*, 595 F.3d 1303, 1308 (D.C. Cir. 2010) (quoting *Nat'l Park Hospitality Ass'n v. Dep't of the Interior*, 538 U.S. 803, 808 (2003)). Both prongs support immediate review here. First, the Order mandates not only that agencies "shall" provide guidance, but also that the guidance must "*limit*[] official access" and "engage[ment]." Order § 5(a) (emphasis added). Even without every last detail filled in, no "further factual development" is needed to answer the "purely legal" question before this Court: whether the government may impose access, engagement, and employment restrictions on Jenner in retaliation for the Firm's protected activity, without any process whatsoever, and with disregard for the rights of Jenner's clients. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 167 (2014) (citation omitted). Nor is there any question as to Jenner's hardship were judicial review to be postponed—this Court has already found that Section 5 of the Order, if not restrained, would cause "irreparable harm" to Jenner. Tr. 52:12–53:9.

In any event, the text of Section 5 itself refutes any ripeness concerns. It is undisputed that Jenner's challenge to the hiring provision in Section 5(b) is ripe because that provision makes no reference to guidance and immediately obligates agencies to "refrain from hiring employees of Jenner," absent waiver. Order § 5(b); *see* Tr. 32:6–10 (concession from government that the Order directly imposes limitations on hiring). And even with respect to the access and engagement provisions in Section 5(a), the text makes clear that Jenner's claim is ripe. Section 5(a) *immediately*

37

commences a process under which Jenner is being treated in discriminatory fashion: Jenner is subject to an unlawful process in which each agency will determine the particular metes and bounds of its unconstitutional discrimination against Jenner, whereas others are not subject to that same process. Because Jenner is immediately subject to that differential treatment, it is entitled to immediate relief, regardless of how the process turns out.[16] And the government's claim that Jenner has not provided "concrete examples of harm," Gov't Br. 29, is simply wrong: The complaint alleges that, in the brief period before the Order was restrained, the Department of Justice instructed a client not to bring Jenner lawyers to an upcoming meeting. Compl. ¶ 124; *see* SUMF ¶ 76.

Nor can the references to caveating phrases like the "interests of the United States" delay immediate judicial review—especially in light of how the President has construed those terms in Section 1 of the Order. As the Court noted during the TRO hearing: "Given what is said in Section 1 with respect to Jenner & Block and its employees, what situation would you present where agency heads would not find access to be inconsistent with the interests of the United States? I mean, how would agency heads, given the Executive Order, possibly say okay to a Jenner & Block employee having access to a federal building? It seems to basically say never." Tr. 25:10–16.

Further, the government's ripeness concern is particularly misguided as to Jenner's First Amendment claims. In the First Amendment context, where just the "credible threat" of government action may chill the exercise of constitutional freedoms, parties are not required to wait until they are subject to government sanction before challenging unlawful activity. *Unity08*

---

[16] Not that it is any great mystery how the process will turn out: As a White House official remarked at the signing of the Susman Godfrey order, "Similar to what we've done previously with other law firms, this is an executive order that … ensure[s] that they can't access government resources [or] government buildings." *Remarks: Donald Trump Signs Executive Orders in the Oval Office - April 9, 2025*, Roll Call, https://perma.cc/A3RY-STZT.

*v. FEC*, 596 F.3d 861, 865 (D.C. Cir. 2010) (quoting *Chamber of Com. of the U.S. v. FEC*, 69 F.3d 600, 603 (D.C. Cir. 1995)). And given the Order's palpable animus against Jenner, there is no reason to think that any of the Order's sanctions "will not be enforced" at some point. *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988). So even if the Order did no more than promise future retribution against Jenner, review would be available and warranted now, because it is already chilling the speech and advocacy of Jenner and its clients.

Indeed, the Order's references to "guidance" and use of vague phrases like "[]consistent with the interests of the United States" only heighten the need for judicial review. Order § 5. The obvious intent of the Order is to raise doubts as to Jenner employees' ability to access federal buildings, engage with federal officials, and secure federal employment. That uncertainty is the point of the Order, because it casts a pall on Jenner's ability to effectively represent its clients. Thus, the fact that Jenner "can only guess the degree to which agency heads will limit government access," Gov't Br. 29, is part of the First Amendment *problem* here, not a reason why Jenner's claim is unripe. For example, to this day, the government has not provided any assurance that the ban on access to federal buildings does not apply to federal courthouses. *Cf.* Tr. 28:13–31:9. This Court's permanent intervention is immediately required to make clear that Jenner shall have access to federal buildings, employees, and employment on the same terms as the general public.

## III.   THE UNITED STATES IS A PROPER DEFENDANT AND JENNER IS ENTITLED TO RELIEF AGAINST ALL FEDERAL AGENCIES.

Finally, the government objects to the complaint's naming of the United States as a defendant in this action. Gov't Br. 32–35. The government theorizes that the United States is an improper defendant, that it is named to achieve improper relief against the President himself, and that Jenner lacks standing to seek relief against federal agencies not specifically named in the complaint. *Id.* The government is wrong across the board.

### A.    Jenner May Assert Its Claims Against Each Federal Agency by Naming the United States as a Defendant.

Jenner's complaint appropriately names the United States as a defendant. Compl. ¶ 79. Contrary to the government's claim, *see* Gov't Br. 32–33, this practice is explicitly authorized by the Administrative Procedure Act ("APA"). *See* 5 U.S.C. §§ 702–703. Under Section 702, "[t]he United States may be named as a defendant" in a case (a) brought in federal court; (b) seeking nonmonetary relief; and (c) challenging agency activity. 5 U.S.C. § 702. In other words, Section 702 explicitly waives the United States' sovereign immunity in *any* suit satisfying these criteria. *See Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 620 (D.C. Cir. 2017) ("We have 'repeatedly' and 'expressly' held in the broadest terms that '[Section 702's] waiver of sovereign immunity applies to any suit whether under the APA or not.'" (quoting *Trudeau v. FTC*, 456 F.3d 178, 186 (D.C. Cir. 2006))). And under Section 702, such a case "shall not be dismissed nor relief therein be denied on the ground that it is against the United States." 5 U.S.C. § 702. Section 703 likewise provides that an "action for judicial review may be brought against the United States, the agency by its official title, *or* the appropriate officer." *Id.* § 703 (emphasis added).

This suit plainly meets the Section 702 criteria: Jenner sued in federal court, seeks declaratory and injunctive relief only, and challenges agency conduct—in particular, Executive Branch agencies' implementation of the Order. *See* Compl. pp. 63–64 (Prayer for Relief); SUMF ¶ 96. It thus follows straightforwardly that Jenner's suit "shall not be dismissed" and that "no[]] relief" sought by Jenner "be denied" just because Jenner has named the United States rather than each agency subject to the Order. 5 U.S.C. § 702. Indeed, the statute explicitly permits "a judgment or decree [to] be entered against the United States," so long as any injunctive order itself "specif[ies] the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance." *Id.* As discussed below, Jenner's proposed order includes

precisely those specifications.

Attacking this straightforward analysis, the government first invokes the principle that "suits alleging unconstitutional action by the Government must be brought 'against officials,' not against" the "'State[]' writ large.'" Gov't Br. 32 (alteration in original) (quoting *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993)). By eliding the word "States" to "State[]," in this quotation, the government seeks to bring principles governing *state* sovereign immunity into the far different context here. States have not waived their sovereign immunity; accordingly, under the *Ex parte Young* doctrine, *see* 209 U.S. 123, 149–56 (1908), prospective relief may be sought only against state officials but not against state agencies or States themselves. But no such principle governs in the context of suits against the *federal* government because the federal government *has* waived its sovereign immunity with respect to suits, like this one, seeking prospective relief. 5 U.S.C. § 702; *see Perry Cap.*, 864 F.3d at 620.[17]

Misreading Section 702, the government also argues that sovereign immunity bars relief with respect to any agencies or officials not named in the complaint. Gov't Br. 32–33. That too is mistaken. Section 702 provides that when the United States is sued, an injunctive *order* (not the complaint) must "specify the Federal officer or officers … personally responsible for compliance." 5 U.S.C. § 702. To facilitate compliance with Section 702, Jenner's proposed order enumerates the federal officials (and their successors) who would be bound by a judgment against the United States. Proposed Order 7–14 (Appendix A).

Finally, the government suggests that "[n]o cause of action exists against" the United

---

[17]  The government cites *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320 (2015), for the false proposition that all principles governing suits against state officials also apply in suits against the federal government. Gov't Br. 32. The piece of *Armstrong* the government cites merely notes that federal courts have power to grant injunctions against both state and federal officials. *See* 575 U.S. at 326–27.

States, requiring its dismissal. Gov't Br. 33. That is wrong. Jenner has a cause of action in equity to challenge unconstitutional conduct by federal agencies. *See Armstrong*, 575 U.S. at 326–27; *Trudeau*, 456 F.3d at 186. And under Section 702, an action against agencies "*shall not be dismissed nor relief therein be denied* on the ground that it is against the United States" and "[t]he United States *may be named as a defendant in any such action*." 5 U.S.C. § 702 (emphases added); *see also id.* § 703 ("[T]he action for judicial review *may be brought against the United States … .*") (emphasis added).

### B.  The Government's Invocation of the President's Immunity Is a Red Herring Because No Relief Is Sought Against the President.

Next, the government asserts that Jenner has "improperly use[d] naming the United States as defendant" as a ploy "to dodge the … prohibition against courts enjoining the President." Gov't Br. 33; *see id.* at 33–34. There is no dodge: Jenner is not seeking an injunction (or any relief) against the President. *See* Compl. pp. 63–64 (Prayer for Relief); Proposed Order 1–5. A judgment for Jenner in this case would not require the President to do or not do anything; it simply would prohibit federal *agencies* from implementing the President's unlawful executive order. The government's lengthy discourse about the impropriety of relief against the President, Gov't Br. 34–35, is wholly irrelevant.

The government argues that because the President holds the executive power under Article II, any relief Jenner seeks from entities within the Executive Branch is actually relief from the President, which is impermissible. Gov't Br. 33–35. This argument refutes itself: By its logic, no relief from any federal agency would *ever* be available. And to be clear, Jenner has not sued the United States as a euphemism for "the President," nor does Jenner's requested relief include "enjoin[ing] the President in his plainly discretionary functions." *Id.* at 34. Instead, Jenner has followed the path explicitly authorized by 5 U.S.C. §§ 702 and 703: In lieu of naming each and

every federal agency engaged in unlawful conduct as a defendant, it has sued the United States.

### C. Jenner Has Standing to Seek Relief as to Every Agency in the Executive Branch Subject to the Order.

The government also argues that Jenner's naming of the United States proves that it is unable to demonstrate Article III standing to obtain relief from unnamed agencies. Gov't Br. 35. This is incorrect. As explained, it is permissible to name the United States as a defendant in lieu of an agency from which relief is sought. *See* 5 U.S.C. §§ 702–703. The government is also wrong as to Article III. Jenner has standing to seek declaratory and injunctive relief from *every federal agency subject to the Order*. This is so for two reasons.

*First*, each federal agency's implementation of the Order causes Jenner a cognizable injury. *Any* agency that adopts a policy calling for the termination of all contracts associated in any way with Jenner, excluding Jenner personnel from agency facilities, prohibiting agency employees from speaking to Jenner attorneys, and barring Jenner staff from government employment causes significant harm to Jenner's reputation—and thus its business. *See* Jenner Br. 10–13, 41–43. Even if Jenner is "not and never will be interested" in practicing before a particular agency or sending alumni to work there, "the fact that the [agency's policy] specifically prohibits [Jenner] and its affiliates from being eligible" to practice before, or even speak to, the agency "affects [Jenner's] reputation with other agencies" and private parties. *ACORN v. United States*, 618 F.3d 125, 134 (2d Cir. 2010); *see id.* at 133–35 (holding that plaintiff had standing on this theory).

Indeed, the D.C. Circuit has held that when a statute is targeted at a specific party and labels it a wrongdoer, that party has standing to bring a challenge without needing to show any additional injury. *See Foretich v. United States*, 351 F.3d 1198, 1212–15 (D.C. Cir. 2003). As the D.C. Circuit has explained, "[c]ase law is clear that where reputational injury derives directly from an unexpired and unretracted government action, that injury satisfies the requirements of Article III standing to

43

challenge that action." *Id.* So too here—unless and until the Order is rescinded, every agency's implementation of the Order causes Jenner a cognizable reputational injury, so Jenner is entitled to relief against them all.

*Second*, Jenner can seek relief from every agency because the Order directs them to act together to implement a similar set of sanctions aimed at making it impossible for Jenner to practice law. When multiple defendants act in concert to inflict injury, a plaintiff has standing to obtain relief from all of them. *See Matsumoto v. Labrador*, 122 F.4th 787, 801–02 (9th Cir. 2024) ("Where a … statute specifically grants enforcement powers to multiple government authorities," a plaintiff can obtain "an injunction against the exercise of those powers by any one of those authorities"); *see also Massachusetts v. EPA*, 549 U.S. 497, 523–26 (2007) (plaintiffs had standing to sue agency even though agency's conduct was not *alone* responsible for plaintiffs' injuries); *Ctr. for Biological Diversity v. U.S. EPA*, 937 F.3d 533, 544–45 (5th Cir. 2019) (a plaintiff has standing to sue over "incremental" activity that makes its "injury worse—even just a little worse").[18]

## D.    The Court Should Enter the Detailed Proposed Order to Ensure the Government's Compliance.

Finally, Jenner emphasizes that, to ensure the government's compliance, it is critical for this Court to enter a detailed remedial order. The government's record of compliance with the TRO has not inspired confidence. For example, at the time Jenner filed its motion for summary judgment, the government still had not complied with its obligation under the TRO that non-

---

[18] Jenner's proposed order lists a large number of agencies that Jenner understands to be subject to the Order, as well as the responsible official (and successor) at each agency. Proposed Order 7–14 (Appendix A); *see* 5 U.S.C. § 702. Jenner has also requested from government counsel a complete list of such agencies. In the event it comes to light that unlisted agencies are subject to the Order, Jenner will, with permission of the Court, submit a revised proposed order.

defendant agencies receive notice from the Attorney General and the Director of the Office of Management and Budget. Jenner Br. 14 n.15; *see also* ECF No. 12 (citing "logistical issues"). Then, when the required notice was finally sent, it all but directed the non-defendant agencies to ignore this Court's TRO, referring to "local district judge[s]" who have "yet again invaded the policy-making and free speech prerogatives of the executive branch"; asserting that "agencies are permitted to carry on their ordinary course of business which carries with it the authority to decide with whom to work"; and declaring that the Order "was necessary policy" because Jenner is "committed to ... anti-American pursuits." ECF No. 21-1.

Perhaps unsurprisingly, public reporting has also revealed that some agencies were still not complying with the TRO more than a week after it issued, with more than one agency seeking disclosures from government contractors regarding their relationships with Jenner and the other targeted firms.[19] To ensure that Jenner receives full relief, this Court should therefore enter a detailed order along the lines of Jenner's proposal. This will ensure that there is no ambiguity as to what the government must do to remedy its blatantly unconstitutional conduct, and it will limit the government's avenues in its continuing effort to evade this Court's orders.

## CONCLUSION

For the foregoing reasons, the Court should deny the government's motion to dismiss, grant Jenner's motion for summary judgment on all claims, and enter the proposed order for declaratory and permanent injunctive relief.

---

[19] Anna Bower, *Energy Dept. Instructs Employees to Gather Info on Deals with Law Firms*, Lawfare (Apr. 9, 2025, 6:27 PM), https://perma.cc/2JAT-EJGG; Kathryn Rubino, *Flying in the Face of Multiple Court Orders, CFTC Wants to 'Ensure Compliance' with Executive Orders Targeting Biglaw*, Above the Law (Apr. 10, 2025, 5:27 PM), https://perma.cc/J36C-H5M3.

Dated: April 17, 2025                          Respectfully submitted,


                                               */s/ Michael A. Attanasio*
                                               Michael A. Attanasio
                                               (mattanasio@cooley.com)
                                               Cooley LLP
                                               10265 Science Center Drive
                                               San Diego, CA 92121
                                               Telephone:     (858) 550-6000
                                               Facsimile:     (858) 550-6420

                                               David E. Mills (DC Bar #401979)
                                               (dmills@cooley.com)
                                               Cooley LLP
                                               1299 Pennsylvania Ave., NW, Suite 700
                                               Washington, D.C. 20004
                                               Telephone:     (202) 842-5000
                                               Facsimile:     (202) 842-7400

                                               Kristine Forderer (*pro hac vice*)
                                               (kforderer@cooley.com)
                                               Cooley LLP
                                               3 Embarcadero Center, 20th Floor
                                               San Francisco, CA 94111
                                               Telephone:     (415) 693-2000
                                               Facsimile:     (415) 693-2222

                                               John Bostic (*pro hac vice*)
                                               (jbostic@cooley.com)
                                               Cooley LLP
                                               3175 Hanover Street
                                               Palo Alto, CA 94304
                                               Telephone:     (650) 843-5000
                                               Facsimile:     (650) 849-7400

                                               *Attorneys for Plaintiff Jenner & Block LLP*