**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| JENNER & BLOCK LLP,<br><br>        Plaintiff,<br><br>     v.<br><br>U.S. DEPARTMENT OF JUSTICE, *et al*.,<br><br>        Defendants. | Civil Action No. 1:25-0916 (JDB) |

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

**INTRODUCTION** …………………………………………………………….. 1

**LEGAL STANDARD**…………………………………………………………….2

**ARGUMENT** …………………………………………………………………….3

    **I.**      **The Court Should Deny Plaintiff's Motion for Summary Judgment as to Section 1 of the Executive Order** …………………………………………3

    **II.**     **The Court Should Deny Plaintiff's Motion for Summary Judgment as to Section 2 of the Executive Order**…………………………………………… 6

    **III.**   **The Court Should Deny Plaintiff's Motion for Summary Judgment as to Section 3 of the Executive Order**……………………………………….. 7

    **IV.**   **The Court Should Deny Plaintiff's Motion for Summary Judgment as to Section 4 of the Executive Order** ……………………………………… 16

    **V.**     **The Court Should Deny Plaintiff's Motion for Summary Judgment as to Section 5 of the Executive Order** …………………………………………..19

**CONCLUSION**………………………………………………………………20

Plaintiff Jenner & Block LLP ("Jenner" or "Plaintiff") has moved for summary judgment (ECF 19) and contends there is no genuine dispute that President Trump's March 25, 2025, Executive Order 14246, titled "Addressing Risks from Jenner & Block," 90 Fed. Reg. 13997 (Mar. 28, 2025) ("Order" or "EO"), violates the First, Fifth, Sixth, and Fourteenth Amendments, as well as the Constitutional separation of powers.  For the reasons set forth herein, the Court should deny Plaintiff's motion and grant Defendants' motion to dismiss (which is incorporated by reference into Defendants' opposition to Plaintiff's motion).

## INTRODUCTION

As noted in the Motion to Dismiss, the Plaintiff has tried and failed to cast Executive Order 14246 (the "Executive Order") as a "punishment" or "sanction." The preamble in Section 1 and the operative sections of the Executive Order, Sections 2, 3, 4, and 5, act within the bounds of established Executive authority.

To begin, Section 1 is simply the speech of the Government itself. There is no First Amendment right to silence the Government.  Crediting Plaintiff's argument carries with it a dangerous risk of the Judiciary muzzling First Amendment protected Executive speech.

Section 2's "review" of "active security clearances" to determine if they "are consistent with the national interest" (EO 14246 § 2) falls well within the area of national security interests where courts have held the President is due great deference.

 Similarly, Section 3 is an example of the use of the procurement power to advance social policy, a practice that stands on firm authority.

Section 4's reference to Executive Order 14230, issued on March 6, 2025 (Addressing Risks from Perkins Coie LLP), also falls within the prerogative of the Executive.

Lastly, as noted in the Motion to Dismiss, Plaintiff's claims against Section 5's call for guidance on access to agency buildings and staff as well as hiring policies are simply unripe as no agency has yet issued anything of the sort. Regardless, issuing guidance on access to Executive Branch staff, offices, and employment are firmly within the prerogatives of the Executive.

The Executive Order directs agencies to do what they should already be doing, declines to contract with entities who act inconsistently with valid social policies regarding discrimination, and calls for the lawful examination of security clearances and government access of employees of Plaintiff's firm. Plaintiff's challenges to the Executive Order fail on the merits, and this Court should deny Plaintiff's Motion for Summary Judgment.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), "[a] party may move for summary judgment, identifying each claim or defense – or part of each claim or defense – on which summary judgment is sought." FED. R. CIV. P. 56(a). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movement is entitled to judgment as a matter of law." *Id.* Once the moving party has met this burden, to defeat the motion, the non-moving party must designate "specific facts showing that there is a genuine issue for trial." *Mount v. Johnson*, 36 F. Supp. 3d 74, 82 (D.D.C. 2014) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). A genuine issue of material fact exists if the evidence, "viewed in a light most favorable to the non-moving party," could support a reasonable jury's verdict for the non-moving party. *Hampton v. Vilsack*, 685 F.3d 1096, 1099 (D.C. Cir. 2012) (quoting *McCready v. Nicholson*, 465 F.3d 1, 7 (D.C. Cir. 2006)).

**ARGUMENT**

Plaintiff asks the Court to hold, as a matter of law, that the EO, which directs a review of Jenner to ensure that the Federal Government's dealings with it are consistent with the national security of the United States and other public interests, is unconstitutional on its face and will cause Jenner grievous harm, both financial and otherwise, if implemented. However, neither the law nor the facts warrant drawing such a conclusion. The law makes plain that the terms of the EO are well within the scope of Presidential prerogative. Further, Jenner's claims of injury are largely speculative and based on a misreading of what the EO actually calls for, as a section-by-section analysis makes clear. In its Memorandum in Support of its Motion (ECF 19-1), Jenner groups its main arguments by specific Constitutional Amendment; however, for the sake of clarity, Defendants will discuss this case by considering the EO section-by-section when weighing the legal merits and factual disputes.

Amid all the furor generated in the press and elsewhere, it is important to recognize the EO for what it is and what it is not. What it is *not* is the Executive Branch of the Federal Government acting in its capacity as sovereign to punish citizens for exercising their First Amendment Rights. What it *is* is the Executive Branch acting as contractor and employer, managing who it does business with and how, based on what it believes to be in the public interest. For these reasons, the Court should deny Plaintiff's motion and instead grant Defendant's Motion to Dismiss (ECF 20), currently pending before the Court.

I.    **The Court Should Deny Plaintiff's Motion for Summary Judgment as to Section 1 of the Executive Order.**

Section 1 of the Executive Order is precatory language describing Jenner's activities as both a law firm and employer, as well as the Executive Branch's policy to ensure that law firm "actions that threaten public safety and national security, limit constitutional freedoms, degrade

3

the quality of American elections, or undermine bedrock American principles" are not "subsidized by Federal taxpayer funds or contracts."  EO § 1.  As to its legal services, Section 1 explains that Jenner was the law firm that "condoned partisan 'lawfare,' and abused its pro bono practice to engage in activities that undermine justice and the interests of the United States."  *Id.*  It also describes how Jenner "engages in obvious partisan representations to achieve political ends, supports attacks against women and children based on a refusal to accept the biological reality of sex, and backs the obstructions of efforts to prevent illegal aliens from committing horrific crimes and trafficking deadly drugs within our borders."  *Id.*  As an employer, the EO spells out that "Jenner discriminates against its employees based on race and other categories prohibited by civil rights laws, including through the use of race-based 'targets.'"  *Id.*

Section 1 is nothing other than a textbook example of protected government speech, and Plaintiff's attempt to enjoin it is as unlawful as it is, quite frankly, absurd.  The Supreme Court has made clear that "the Government's own speech . . . is exempt from First Amendment scrutiny."  *Johanns v. Livestock Marketing Assn.*, 544 U.S. 550, 553 (2005).  Like other governmental entities, the Executive Branch has the right to "speak for itself."  *Bd. of Regents of Univ. of Wis. System v. Southworth*, 529 U.S. 217, 229 (2000).  "When a government entity embarks on a course of action, it necessarily takes a particular viewpoint and rejects others."  *Matal v. Tam*, 582 U.S. 218, 234 (2017).  "Indeed, it is not easy to imagine how government could function if it lacked this freedom."  *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 468 (2009).  "It is the very business of government to favor and disfavor points of view."  *Nat'l Endowment of the Arts v. Finley*, 524 U.S. 569, 598 (1998) (Scalia, J., concurring).  Indeed, "[i]f every citizen were to have a right to insist that no one paid by public funds express a view with which he disagreed, debate over issues of great concern to the public would be limited to those in

4

private sector, and the process of government as we know it radically transformed." *Keller v. State Bar of Cal.*, 496 U.S. 1, 12-13 (1990).

Courts identify government speech by looking to history, the objective expectations of observers, and who has control over the message. *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 210 (2015). Presidents have long used the preambles of Executive Orders to express their own views, including on policies to end racial discrimination. *See, e.g.*, EO 8802 (June 25, 1941) (describing "policy of the United States to encourage full participation in the national defense program by all citizens . . . regardless of race" and referencing "evidence that available and needed workers have been barred from employment . . . solely because of considerations of race"). Everyone recognizes this is the President's own speech. That is because the President alone controls the content of his Executive Orders, which he publicly signs. Section 1 of the EO is a paradigmatic example of government speech promoting a policy to promote and safeguard "bedrock American principles," with which Plaintiff simply disagrees.

When individuals disagree with government speech, there is a constitutionally prescribed remedy. "The Constitution . . . relies first and foremost on the ballot box . . . to check the government when it speaks." *Shurtleff v. City of Boston*, 596 U.S. 243, 252 (2022). Courts are thus on dangerous ground when enjoining the speech of co-equal branches of government. *See, e.g.*, *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 30 (2015) (coordinate branch of government "may not force the President himself to contradict his earlier statement"). The Government is "ultimately accountable to the electorate and the political process for its advocacy," and "[i]f the citizenry objects, newly elected officials later could espouse some different or contrary position." *Pleasant Grove*, 555 U.S. at 468-69. This Court should reject Plaintiff's attempt to short-circuit the democratic process by lawsuit.

5

II.    **The Court Should Deny Plaintiff's Motion for Summary Judgment as to Section 2 of the Executive Order.**

Plaintiff takes aim at Section 2(a) of the Executive Order, claiming that the Court should enjoin the suspension of security clearances mandated by the Order because it is not based on national security interests, it is based on "retaliatory animus and is patently irrational,", and it is allegedly improperly categorical.  *See* Pl.'s Mem. (ECF 19-1) at 35-40.  Plaintiff further claims that the Court should disregard Section 2's suspension of clearances because the Government cannot "maintain that Section 2 is about protecting national security" and "nothing about the Order's clearance regime is remotely tailored to its purported aims."  *Id.* at 40.

Plaintiff's claim should be rejected.  As explained in Defendants' Motion to Dismiss, the process to undertake security clearance suspensions here is directly called for by the President, thereby implicating the concerns reflected in *Dep't of Navy v. Egan*, 484 U.S. 518 (1988), and *Lee v. Garland*, 120 F.4th 880 (D.C. Cir. 2024).  *See* Defs' MTD (ECF 20-1) at 14.  Further, Plaintiff's claim of a lack of any national security nexus is plainly belied by the firm's public praise for Andrew Weissmann's role in the Mueller investigation, which followed the firm rehiring him.

Further, Plaintiff's complain that the security clearance suspension is categorical and, in essence, that is does not take account of attorneys' work assignments or employment status, *see* Pl.'s Mem. at 36.  This not only unreasonably demands that the President have had full knowledge of Plaintiff's personnel status and assignments before issuing the Executive Order, but it also disregards the fact that any clearance suspension will be reviewed individually "consistent with applicable law."   Executive Order 14246 § 2(a).  As explained in Defendants' Motion, any individual employee of Plaintiff with a security clearance that is suspended will receive appropriate process with regard to maintaining or restoring their individual security clearance.  Defs' MTD. at 16.  Indeed, Defendants' Motion outlined the requirements of "applicable law" reflected in

Executive Order 12968, 60 Fed. Reg. 40245 (1995), including the extensive process and procedural guarantees reflected therein and in agency regulations implementing those requirements. Defs' MTD at 15-16. As explained in Defendants' Motion, any clearance suspension is subject to agency review consistent with applicable regulations. And until that happens and a further security clearance determination is made, any dispute on such matters is premature for judicial consideration.

For these reasons and those explained in Defendants' Motion, Plaintiff's challenge to Section 2 of the Executive Order must fail.

### III.    The Court Should Deny Plaintiff's Motion for Summary Judgment as to Section 3 of the Executive Order.

Section 3 of the Executive Order concerns the Federal Government's contracting policies. As relevant, Section 3 issues two directives. First, "to the extent permissible by law," "Government contractors" shall be "require[d] . . . to disclose any business they do with Jenner and whether that business is related to the subject of the Government contract." EO 14246 § 3(a). Second, "the heads of agencies shall . . . take appropriate steps to terminate any contract . . . for which Jenner has been hired to perform any service." *Id.* § 3(b)(i).

Jenner challenges Section 3 of the EO on the grounds that the section is overbroad to the point of being plainly retaliatory and that it unlawfully conditions government services and benefits on political beliefs and association, in violation of the First Amendment. Pl's Mem. at 23-25. It goes on to claim that Section 3, because it failed to provide Jenner the opportunity to respond to the Order's alleged sanctions, also violates the firm's due process rights, including "a government-contracting-specific due process rule that 'the contractor [must] be given notice of those charges as soon as possible and some opportunity to respond to the charges before the adverse action is taken.'" Pl.'s Mem. at 32, n.17 (internal citation omitted). Finally, the firm

argues that Section 3 deprives it of its protected property interest in contracts with its clients by punishing those government-contractor clients for their relationship with Jenner. *Id.* at 31–32.

Jenner's challenge must fail. The Executive Branch, in its role as procurer of goods and services, has a long history of directing funds to its contractors based on its public policy objectives, including social policy. Further, Jenner ignores the safeguard language in the EO that calls not for blanket action on all contracts with Jenner or its clients, but instead for individual review and consideration. Finally, Section 3 is forward looking, simply calling for the establishment of the process of review. As of now, nobody has been deprived of anything.

Once again, it must be emphasized that when implementing Section 3 the government is acting as a private party, not as a sovereign. *Waters v. Churchill*, 511 U.S. 661, 675 (1994) (plurality opinion) ("The government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer."). Furthermore, the effort to combat racial discrimination through the procurement power has been a feature of executive orders since at least the 1940s. *Contractors Ass'n of Eastern Pa. v. Sec'y of Labor*, 442 F.2d 159, 168-71 (3d Cir. 1971). Such orders enjoy the firmest possible constitutional support. *Id.* at 170 ("In the area of Government procurement Executive authority to impose non-discrimination contract provisions falls in Justice Jackson's first category [from *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), discussing varying levels of deference to Executive authority]: action pursuant to the express or implied authorization of Congress.").

The EO calls out Jenner for discriminatory employment activities hidden through deceptive language, an increasingly common practice. *See Students for Fair Admissions, Inc., v. President & Fellows of Harvard College*, 600 U.S. 181, 230 (2023) ("*SFFA*") (admissions

8

programs that lack sufficiently focused and measurable objectives warranting the use of race, unavoidably employ race in a negative manner, involve racial stereotyping, and lack meaningful endpoints, cannot be reconciled with guarantees of the Equal Protection Clause).

Section 3 relies upon Plaintiff's racial discrimination for its authority, which is sufficient to sustain its provisions. For example, in *McGowan v. State of Maryland*, 366 U.S. 420 (1961), employees convicted of violating Sunday business closure regulation challenged the law as violating the First Amendment's prohibition against the establishment of religion. *Id*. at 430-31. The Court held that that the closure law was a valid exercise of the government power to advance the "health, safety, recreation, and general well-being of our citizens." *Id.* at 444. The Court held that whatever may have been the purpose of a legislature in enacting a statute, a "statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it." *Id.* at 426. Similarly, in *United States v. O'Brien*, 391 U.S. 367 (1968), the defendant challenged his conviction for destroying a draft card on the basis that the law infringed on his First Amendment rights; rejecting the argument, the Court held that, "[i]t is a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive." *Id.* at 383. Importantly, both *McGowan* and *O'Brien* involved challenges to improper motives in the enactment of *statutes* which carry true *punitive* sanctions, in other words, where the state is acting as *sovereign*. Not so here. In this instance, the Government seeks to manage its contracts, with an eye towards an undisputed federal interest in stamping out racial discrimination, which the EO states is "not aligned with American interests." EO 14246 § 3(a). This distinction between Government as sovereign and Government as contractor is of critical importance given the Plaintiff's reliance on cases such as *National Rifle Association v. Vullo*, 602 U.S. 175 (2024). *Vullo* addressed a

potential First Amendment violation where the state used its *sovereign* regulatory powers to threaten private actors with enforcement actions in an attempt to discourage disfavored speech. *Id*. This Executive Order carries with it none of the force of the powers exhibited in *Vullo*. The Plaintiff here cannot create a constitutional violation by reframing the Government's actions in forming contracts as punishment.

The Executive's ability to tie its procurement procedures, *i.e.*, to choose with whom it will do business, to the fulfillment of its public policy goals, including those involving national security and civil rights is also plainly displayed in statutory and regulatory texts. For example, Title 40 of the United States Code provides for the management of Federal properties and the organization of the General Services Administration. Section 121(a) of title 40 specifically references the President's ability to prescribe policies necessary to carry out these powers. This Presidential authority has been relied on in the past in the context of shaping social policy, most particularly with respect to President Johnson's Executive Order 11246, which aimed to prevent discrimination and promote equal employment opportunity by federal contractors and subcontractors.

This authority is reflected in other regulations as well, most conspicuously in the Federal Acquisitions Regulations ("FAR") system under Title 48 of the Code of Federal Regulations. Section 1.102(a) specifically states that the purpose of the FAR is to deliver on a timely basis the best value product or service to the customer "while maintaining the public trust and fulfilling public policy objectives." Those regulations additionally emphasize the fulfillment of public policy objectives. *See* 48 C.F.R. § 1.102(b)(4). Again, 48 CFR § 1.102(d) calls on Executive Agency staff to review, among other things, executive orders when determining whether a purchasing policy is valid. Finally, the performance standards under 48 C.F.R. §102-2(d)

10

specifically states that government procurement decisions "must" support the attainment of public policy goals adopted by the Congress and the President.

Regulation of federal contracting decisions is fully applicable downstream to a contractor's subcontractors or clients pursuant to 41 CFR § 60-1. Section 60-1.4(b) specifically binds a contractor's subcontractor or purchase to the same standard to which the contractor itself is bound. Indeed, subpart 8 of this subsection specifically cites to former EO 11246, under which President Johnson forbade Federal contracts to entities debarred for failure to adhere to the equal employment opportunity policies outlined therein.

These regulations confirm that the President possesses wide discretion in managing Federal procurement and contracts based on the President's public policy objectives, including those related to national security and civil rights. This Executive Order is designed to address diversity in the Federal contracting process. Diversity initiatives have always been legally suspect. *See Ricci v. DeStefano*, 557 U.S. 557, 594 (2009) (Scalia, J., concurring) ("Would a private employer not be guilty of unlawful discrimination if he refrained from establishing a racial hiring quota but intentionally designed his hiring practices to achieve the same end? Surely he would."). This is especially true after the Supreme Court's decision in *SFFA*. As the Court explained, it has "time and again forcefully rejected the notion that government actors may intentionally allocate preference to those 'who may have little in common with one another but the color of their skin.'" *SFFA*, 600 U.S. at 220 (citing *Shaw v. Reno*, 509 U.S. 640, 647 (1993)). *SFFA* could not have been clearer that applicants must be judged on their own merits, rather than as ambassadors for various identity groups: "The entire point of the Equal Protection Clause is that treating someone differently because of their skin color is *not* like treating them differently because they are from a city or from a suburb, or because they play the violin poorly or well."

11

*Id.* Furthermore, Courts in this Circuit routinely give great deference to Executive Orders addressing the nexus between social policy and the procurement power. *See, e.g., UAW-Labor Employment & Training Corp. v. Chao*, 325 F.3d 360, 366-67 (D.C. Cir. 2003).

Jenner appears to have fallen short of these principles. Plaintiff has acknowledged that it has "set formal, measurable targets for increasing diversity in recruitment, retention, promotion, and/or leadership" with all partners participating in the firm's Diversity and Inclusion Action Plan, which calls for diversity and inclusion to play a role in "completing specific measurable business development, matter staffing, and recruiting actions throughout the year." *Jenner & Block 2023 Vault Law Firm Diversity Survey* at 7 (Lawson Declaration ¶ 4 & Ex. 2, attached to Defs' Resp. to Pl.'s Statement of Material Facts). *See also* Defs' Mot. to Dismiss at 9; *Jenner & Block 2024 Vault Law Firm Diversity Survey* (Lawson Decl. ¶ 5 & Ex. 3).

Jenner has taken these steps in large part through its adoption of the "Mansfield Rule," a certification process overseen by an organization called "Diversity Labs," which seeks to "diversify the power structure of law firms and legal departments through appointments, elections, and promotions to influential leadership committees and roles." *Diversifying Leadership: How the Mansfield Rule is Driving Change* (Lawson Declaration ¶ 6 & Ex. 4). Jenner was part of Mansfield's initial launch in 2017 and signed the "Mansfield Rule" the same year. The firm continues to abide by the requirements of the yearly certification process. This diversification is achieved "by broadening who is considered" for hire. *Id.* Diversity Lab rewards not only law firms that adhere to the "rigorous annual certification process and report their verified data" but also celebrates the firms that achieve "certification plus" which "evaluates whether they have achieved diversity in leadership, and not only considered it." *Id.* Although the certification criteria "grow increasingly challenging each year," there are a few

"core principles" that firms must satisfy to achieve certification each year.  Diversity Lab, *More than 360 Law Firms Achieve Mansfield Certification for 2023-24, Marking a Double-Digit Increase in the Push for Leadership Diversity* (Lawson Declaration ¶ 8 & Ex. 6) ("Diversity Lab press release").  One of those is the requirement that "at least 30% of the lawyers considered" for a role consist of "underrepresented lawyers across 75% of opportunities." *Id.*  This includes "all high-level leadership committees and roles," and the requirement has expanded to include not only women and historically underrepresented racial and ethnic groups but also LGBTQ+ lawyers and lawyers with disabilities.  *See Diversifying Leadership: How the Mansfield Rule is Driving Change* (Lawson Declaration ¶ 6 & Ex. 4).

Jenner has achieved Mansfield certification every year for nearly a decade, and it was celebrated in 2024 for achieving "certification plus" status.  *See* Diversity Lab press release (Lawson Declaration ¶ 8 & Ex. 6).  Participation in the Mansfield certification process requires significant data sharing, including annual submissions signed by each firm's managing partner. *See id.*  Mansfield also touts the increase in "underrepresented racial and ethnic equity partners" of 16% versus 41% between "Mansfield" and "non-Mansfield" firms, respectively, and the number of "women equity partners at Mansfield Certified firms growing at nearly three times the rate of non-Mansfield firms," meaning that implementing the criteria results in tangible differences in racial and gender demographics of these participating firms, such as Jenner.  *Data Shows Mansfield Firms Are Adding Diverse Leaders Much Faster* (Lawson Declaration ¶ 7 & Ex. 5).  In short, firms that utilize and implement the Mansfield certification process hire and promote more non-white and female attorneys than they otherwise would by taking race, sex, and other protected characteristics into account when making hiring and promotion decisions. Diversity Labs directly cited a New York State Bar Association Task Force report on "advancing

diversity" as a study of the program's efficacy.  Diversity Lab press release (Lawson Declaration

¶ 8 & Ex. 6).  In that very report, the authors acknowledge that Mansfield does increase diversity

in law firm ranks but that there may be some risk associated with diversity programs, such as

Mansfield, in the wake of *SFFA*.  *Report and Recommendations of the New York State Bar*

*Association Task Force on Advancing Diversity* at 74 (Lawson Declaration ¶ 9 & Ex. 7); *see also*

Diversity Lab press release (Lawson Declaration ¶ 8 & Ex. 6) (citing NYSBA report at 2).  In a

"zero-sum" situation, such as hiring, "[a] benefit provided to some applicants but not to others

necessarily advantages the former group at the expense of the latter."  *SFFA*, 600 U.S. at 218–19.

Rather than leveling or equalizing the playing field, Jenner hires and promotes attorneys

on the basis of protected characteristics in service of "diversity, equity, and inclusion."  But the

Supreme Court made clear in *SFFA* that decisionmakers must consider an individual on his or her

own merits and that utilizing race, sex, or any other protected characteristic as a plus factor is

evidence that some applicants are treated worse than others because of that characteristic.  *Id*.

On this basis, the United States is justified in using its procurement power to review such

practices and to decline to contract with those that do.  Contrary to Plaintiff's claims, a review of

employment practices is not a sanction.  This use of the procurement power may be a decision

that Jenner dislikes, but the President's decision to advance the decision in *SFFA* is well within

the prerogative of the Executive Branch.

Second, Jenner's description of contract reviews pursuant to Section 3 as "intentionally

seek[ing] to disrupt Jenner's relationships" with the firm's clients is wildly overblown and flatly

wrong.  Pl.'s Mem. at 12.  The plain language of the Section binds all government contracting

agency decisions within the bounds permitted by law.  Indeed, each separate subpart of the

Section specifically includes such restrictive language, and Section 3(b)(ii) goes further in

directing Agency Heads to align their funding decisions with the Executive's goals and priorities "as they deem appropriate."

Which brings this entire matter around to the third point: ripeness. These provisions call for government contracting agencies to begin the process of review of any contracts between the government and Jenner or entities doing business with it in accordance with the policies and findings set out in Section 1. That process has not started. Again, nobody has been deprived of or denied anything. Allegations of damage or harm at this point are purely speculative. At some future point, the contracting agencies will make their decisions regarding that status of Jenner's contracts.[1] At that point, if Jenner believes that such decisions are not "permissible by law," then it should challenge such decisions at that time.

Finally, Section 3 does not impermissibly burden the speech or association rights of the firm or its clients. Section 3 of the Executive Order applies only to a limited number of government contractors, which are already subject to substantial disclosure requirements as a condition of doing business with the federal government. They must merely identify business with Plaintiff for the limited purpose of facilitating agency review of government contracts with Plaintiff. This is narrowly tailored to Section's stated goal. Nor does Section 3 interfere with attorney-client privilege. As this Court has recognized, generally "the attorney-client privilege does not protect from disclosure the 'identity of the client . . . and the general purpose of the work performed.'" *Cause of Action Inst. v. U.S. Dep't of Justice*, 330 F. Supp. 3d 336, 350 (D.D.C. 2018) (quoting *United States v. Naegele*, 468 F. Supp. 2d 165, 171 (D.D.C. 2007)). Law firms may be required to disclose the identity of a client yet still enjoy the full benefits of

---

[1] In fact, as noted in the MTD, it is unclear if Jenner even *has* any contractual relationship with the Federal government for the provision of goods or services.

attorney-client privilege. *See, e.g.*, *Att'y Gen. of U.S. v. Covington & Burling*, 411 F. Supp. 371 (D.D.C. 1976). Indeed, firms are regularly required to disclose the identity of clients in contexts raising national security concerns. *See, e.g.*, Foreign Agents Registration Act, Pub. L. 75-583, 52 Stat. 631 (codified at 22 U.S.C. §§ 611 *et seq.*). This additional disclosure requirement limited to a subset of government contractors is far afield from the core associational rights at issue in political association and charitable donation cases.

For all these reasons, the Court should reject Plaintiff's challenge to Section 3 of the Executive Order.

### IV.    The Court Should Deny Plaintiff's Motion for Summary Judgment as to Section 4 of the Executive Order.

Jenner does not appear to challenge Section 4 of the Executive Order, except insofar as it argues the entire Order should be overturned. Indeed, it has no basis for such challenge, since the sole directive of Section 4 is that it not be construed to limit the action authorized by Section 4 of EO 14230 (March 6, 2025) ("Addressing Risks from Perkins Coie LLP"), which directs that the EEOC to review the practices of representative large, influential, or industry leading law firms consistent with Title VII of the Civil Rights Act of 1964. The EEOC is empowered to enforce Title VII with respect to private employers, such as Perkins Coie and other large law firms, including Jenner. 42 U.S.C. § 2000e-5(f)(1). The Executive Order is in alignment with that grant of authority, as the Commission's *rasion d'être* is to prevent and address unlawful employment practices. *Id.*

Nevertheless, to the degree Plaintiff claims that Section 4 retaliates against the firm for having previously exercised its First Amendment rights in support of DEI, this claim too must fail.

First, any supposed injury of Plaintiff is not traceable to the Executive Order.  To repeat, Section 4 merely directs the "review" and "investigat[ion]" of "the practices of representative large, influential, or industry leading law firms" for consistency with the civil rights laws.  EO 14230 § 4.  That is *already* what the EEOC is supposed to be doing.  The EEOC is already "empowered . . . to prevent any person from engaging in any unlawful employment practice" under the civil rights laws.  42 U.S.C. § 2000e-5(a).  The EEOC is already required to make "report[s] . . . to the President . . . on the cause of and means of eliminating discrimination," including in any industry the President directs the EEOC to review.  *Id.* § 2000e-4(e).  And members of the EEOC are already authorized to file charges against "employer[s] . . . engaged in an unlawful employment practice."  *Id.* § 2000e-5(b).  In other words, even if the President *never* issued the Executive Order, Plaintiff would *still* be subject to potential inquiries by the EEOC—just like any other employer in the country (although undersigned counsel' understanding is that the EEOC has not addressed an inquiry to Plaintiff in connection with recent outreach to other law firms).

Second, Plaintiff's proposed remedy demonstrates that Jenner's supposed injury is not redressable.  Plaintiff asks for an injunction against EO § 4—that is, Plaintiff wants this Court to enjoin the EEOC from "review[ing] the practices of representative large, influential, or industry leading law firms for consistency with Title VII."  That is a remarkable thing to ask for, yet it is required by Plaintiff's argument.  If Plaintiff is harmed merely because the EEOC is "review[ing]" its employment practices, then the only solution is for Plaintiff to be granted immunity from Title VII liability—or indeed any EEOC inquiry whatsoever.  That is simply not an appropriate form of relief, and Plaintiff's claim fails for this reason as well.

Third, the First Amendment retaliation claim fails on the merits because Plaintiff cannot show the requisite causal link. First Amendment retaliation claims require a plaintiff to show (1)

plaintiff engaged in conduct protected by the First Amendment; (2) defendant took retaliatory action against plaintiff, sufficient to deter an individual in plaintiff's position from speaking again; and (3) a causal connection between the speech and the retaliation. *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016). First Amendment retaliation claims are analyzed under a but-for causation standard. *Houston Community College Sys. v. Wilson*, 595 U.S. 468, 477 (2022).

Plaintiff fails establish this causal link. Even before the Executive Order was issued, this Administration had begun taking steps consistent with the view that certain DEI practices, misapplied, could constitute a violation of Title VII. *See* EO 14173, 90 Fed. Reg. 8633 (Jan. 31, 2025) ("Ending Illegal Discrimination and Restoring Merit-Based Opportunity"). EO 14173, issued more than a month *before* the challenged Executive Order, directed, among other things, Federal agencies to take appropriate action to "advance in the private sector" merit-based opportunity, EO 14173 § 4(a), and to enforce civil rights laws and combat illegal private-sector DEI policies and practices, *id.* § 2; *see also id.* § 4(b) (requiring plan for compliance investigations going after illegal discrimination in large, private entities). The inquiry is also in line with EEOC and DOJ priorities, as both agencies announced, well in advance of the issuance of the EO at issue here, that "rooting out unlawful DEI-motivated race and sex discrimination" was among their top concerns. *See* EEOC, *President Appoints Andrea R. Lucas EEOC Acting Chair* (Jan. 21, 2025) (Lawson Declaration ¶ 10 & Ex. 8); Memorandum from Attorney General, Subject: *Ending Illegal DEI and DEIA Discrimination and Preferences* (Feb. 5, 2025) (Lawson Declaration ¶ 11 & Ex. 9).

To put it simply, Section 4 directs the EEOC to do what it already should be doing. The EEOC's current undertaking into employment practices of law firms would be authorized, with or without the issuance of the EO, as the EEOC has the authority to gather information on a possible Title VII violation. 29 C.F.R. § 1601.6(a). Inquiring into employment practices for consistency

with Title VII is the very point of the EEOC.  This Court should refuse to give Jenner a blanket exemption from the civil rights laws.

**V.    The Court Should Deny Plaintiff's Motion for Summary Judgment as to Section 5 of the Executive Order.**

Finally, Jenner repeats its objection that Section 5 of the EO limits "all" Firm personnel from access to Federal building, engagement with Federal employees, or (absent a waiver), being hired as Federal employees themselves.  Additionally, it alleges that Section 5 impermissibly interferes with Jenner's attorney-client relationships.  Once again, Jenner's objection mischaracterizes the EO's language and claims harm prematurely.

To begin, the text of Section 5 simply does *not* limit any Jenner employee, much less all of them, from such access and activities.  Instead, it calls for agency heads to provide guidance as to whether or when to limit Jenner employees from entering a government building; whether or when to limit Government employees from engaging Jenner personnel in their official capacity; whether or when to bar Jenner employees from being hired into government employment. What is more, such guidance is not arbitrary but is to be consistent with the national security and other government interests articulated throughout the language of the EO and again is limited to the extent "permissible by law."  What that guidance might consist of remains to be seen.  Surely some Federal facilities, contacts, and employment positions require tighter restrictions than others based on national security concerns.  Likewise, depending on relevant factors, the suitability of individual Jenner employees within such contexts likely would differ.  That is what guidance is for.[2]  However, nightmare scenarios such as *all* Jenner attorneys being barred from courtroom practice, *all* staff being banned from going to the post-office, and

---

[2] Thus, Jenner's argument about Section 5 being impermissibly vague is also meritless.  Pl's Mem. at 32.

*no* Jenner employees ever being allowed to join the Federal workforce is currently the stuff of imagination.

Which again goes to the point that Jenner' objections are premature. No such guidance has been issued—and the merits of Jenner's arguments necessarily depend on what that guidance says. No decisions about individual or groups of Jenner employees regarding Federal building access, Federal government contact, or Federal hiring have been reached by any agency heads. When such guidance is issued, when and if Jenner employees are impacted by it, then will be the proper time to weigh the merits of such decisions. And as to Jenner's representation of its clients, Defendant has already pointed out that the constitutional right to choice of counsel is not absolute, but is balanced against the government's interest in the fair, orderly, and effective administration of the courts, and qualified by the need to avoid undermining public confidence in the integrity of the legal system. Def's MTD at 31.

## CONCLUSION

For all the reasons stated herein, the Court should deny Plaintiff's Motion for Summary Judgment and instead grant Defendants' Motion to Dismiss.


Dated: April 17, 2025
     Washington, D.C.

Respectfully submitted,


CHAD MIZELLE
Acting Associate Attorney General

/s/ *Richard Lawson*
RICHARD LAWSON
Deputy Associate Attorney General
950 Pennsylvania Avenue, NW
Washington, DC 20530
Telephone: (202) 445-8042

*Counsel for Defendants*