**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JENNER & BLOCK LLP, <br><br> Plaintiff, <br><br> v. <br><br><br> U.S. DEPARTMENT OF JUSTICE, *et al.*, <br><br> Defendants. | Case No. 1:25-cv-00916-JDB <br><br> Judge John D. Bates |

**BRIEF OF AMICI CURIAE FORMER AND CURRENT GENERAL COUNSEL
SUPPORTING PLAINTIFF JENNER & BLOCK LLP**

OSBORN MALEDON, P.A.
David B. Rosenbaum (*pro hac vice*)
Mary R. O'Grady (*pro hac vice*)
Joseph N. Roth (*pro hac vice*)
Eric M. Fraser (*pro hac vice*)
Andrew G. Pappas (*pro hac vice*)
Joshua J. Messer (*pro hac vice*)
2929 North Central Avenue, 20th Floor
Phoenix, Arizona 85012-2793
drosenbaum@omlaw.com
mogrady@omlaw.com
jroth@omlaw.com
efraser@omlaw.com
apappas@omlaw.com
jmesser@omlaw.com

## Table of Contents

Page

Table of Authorities ................................................................................................................. 3

Identities of Amici Curiae ........................................................................................................ 4

I. Introduction and Interest of Amici ................................................................................ 9

II. The Executive Order hijacks a corporation's relationship with outside counsel .............. 10

    A. Selecting outside counsel plays a vital role in corporate governance .................... 10

    B. The Executive Order suppresses the free selection of outside counsel ................ 10

III. The Executive Order violates corporate America's First Amendment rights ................... 13

IV. The Executive Order will cause lasting real-world harm ................................................ 14

V. Conclusion ................................................................................................................... 16

## Table of Authorities

Page(s)

**Cases**

*Abrams v. United States*,
    250 U.S. 616 (1919)...................................................................................................10

*BE&K Constr. Co v. N.L.R.B.*,
    536 U.S. 516 (2002)...................................................................................................13

*Citizens United v. F.E.C.*,
    558 U.S. 310 (2010)............................................................................................13, 16

*Legal Servs. Corp. v. Velazquez*,
    531 U.S. 533 (2001)......................................................................................9, 13, 15

*Lozman v. Riviera Beach*,
    585 U.S. 87 (2018).....................................................................................................13

*Martinez v. Ryan*,
    566 U.S. 1 (2012).........................................................................................................9

*McIntyre v. Ohio Elections Comm'n*,
    514 U.S. 334 (1995)...................................................................................................14

*N.R.A. v. Vullo*,
    602 U.S. 175 (2024)...................................................................................................14

*NAACP v. Button*,
    371 U.S. 415 (1963)...................................................................................................13

*Polk Cnty. v. Dodson*,
    454 U.S. 312 (1981)...................................................................................................11

**Other Authorities**

*Fact Sheet: President Donald J. Trump Addresses Risks from Jenner & Block*,
    The White House (Mar. 25, 2025), *available at* https://tinyurl.com/38jwj5zy .......................12

*Preventing Abuses of the Legal System and the Federal Court*, Presidential
    Memorandum (Mar. 22, 2025), *available at* https://tinyurl.com/fcmbx6c6............................11

## Identities of Amici Curiae

**Stephanie Adamson King**
Chief Legal Officer and General Counsel to start-ups in the technology sector

**Robert A. Armitage**
Former General Counsel, Eli Lilly and Company

**Michelle Banks**
Former Global General Counsel,
The Gap, Inc.

**Matthew Broad**
Former General Counsel, OfficeMax, Inc.

**Maureen Brundage**
Former Executive Vice President, General Counsel, Chief Ethics Officer and Corporate Secretary of The Chubb Corporation

**Kevin M. Carome**
Former General Counsel, Invesco Ltd.

**Mark Chandler**
Former Chief Legal Officer, Cisco Systems, Inc.

**Robert Chesnut**
Former General Counsel, Airbnb Inc.

**Richard T. Collier**
Former Senior Vice President & General Counsel: Rhône-Poulenc Rorer, Inc.; Pharmacia & Upjohn Company; Pharmacia Corporation; Elan, plc.

**Daniel Cooperman**
Former Senior Vice President, General Counsel and Secretary, Apple, Inc.; Former Senior Vice President, General Counsel and Secretary, Oracle Corporation

**Carolyn L. Cox**
Former General Counsel, Alera Group, Inc.

**Lloyd Norton Cutler Jr.**
Former General Counsel, BlueStar Communications

**Dorian Daley**
Former Executive Vice President and General Counsel, Oracle Corporation

**Sheila Kearney Davidson**
Former Chief Legal Officer, New York Life Insurance Company

**Pierre Donahue**
Former Executive Vice President and General Counsel of a hotel management company

**Maggie Drucker**
Former Chief Legal Officer, Grubhub

**Alinka Flaminia**
Former Chief Legal Officer, Cadence Design Systems, Inc.; Former General Counsel, Mellanox Technologies and PMC-Sierra, Inc.

**Edward Gallagher**
Former Senior Vice President, Secretary and General Counsel, NCR Corporation

4

**Peter J. Ganz**
Former Senior Vice President, General Counsel and Corporate Secretary, Ashland, Inc.

**Jennifer A. Gorman**
Former General Counsel, KCI Technologies, Inc.

**Noah Hanft**
Former General Counsel and Chief Franchise Officer, Mastercard, Inc.

**Michael Harrington**
Former Senior Vice President and General Counsel, Eli Lilly and Company

**Jill Harrison**
Former General Counsel of a medical device company

**Jennifer R. Hart**
Former General Counsel, Tata Consumer Products U.S.

**Lucy Lee Helm**
Former Executive Vice President, General Counsel and Secretary, Starbucks Coffee Company

**Christie Hill**
Former Chief Legal Officer, Aristocrat Leisure Limited; Former Chief Legal Officer and Head of Global Corporate Citizenship, The Dun & Bradstreet Corporation; Former General Counsel, Secretary and Chief Compliance Officer, Primus Telecommunications Group, Inc.

**Jerald S. Howe**
Former General Counsel, TASC, Inc. and Veridian Corporation

**John W. Holleran**
Former Executive Vice President and General Counsel, Boise Cascade Corporation; Former Senior Vice President and General Counsel, Itron, Inc.

**Michael Jacobson**
Former General Counsel, eBay, Inc.

**Seth R. Jaffe**
Former Chief Legal Officer, Levi Strauss & Co.; Former General Counsel, Williams-Sonoma, Inc.

**Shirin Keen**
General Counsel for technology and entertainment companies

**Julie Kinch**
Former Senior Vice President and Chief Legal Officer, Heineken USA

**Bruce Kuhlik**
Former General Counsel, Merck & Co., Inc., and Pathfinder International

**Alison R. Lazerwitz**
Former General Counsel, Daniel Swarovski Corporation; Former Chief Legal Officer, Sodexo, SA

**Michele C. Lee**
Former General Counsel, Pinterest

**Erin Lewin**
Former General Counsel, Avnet, Inc.

5

**J. May Liang**
General Counsel, OpenConcept Systems, Inc.; Former General Counsel, Total Music LLC; Former Associate General Counsel, AOL Inc.

**Doug Luftman**
General Counsel and Former Vice President, General Counsel & Secretary to various technology companies

**David Mann**
Former Senior Vice President, Chief Legal Officer and Secretary, Dunkin' Brands, Inc.

**Michael Malecek**
Chief Legal Officer and Company Secretary

**Michele Mayes**
Former General Counsel, The New York Public Library, Allstate Insurance Company, and Pitney Bowes Inc.

**Teri P. McClure**
Former General Counsel, United Parcel Service

**A. Douglas Melamed**
Former Senior Vice President and General Counsel, Intel Corporation

**Shelley Milano**
Former Senior Vice President and General Counsel, L Brands; Senior Vice President, General Counsel, and Secretary at Eddie Bauer; Executive Vice President and General Counsel, Starbucks Corporation

**Randal S. Milch**
Former Executive Vice President, Public Policy, and General Counsel, Verizon Communications Inc.

**Manas Mohapatra**
General Counsel, Trust Machines

**Karen G. Narwold**
Former General Counsel, Albemarle Corp., Barzel Industries, Inc., and GrafTech International Ltd.

**William H. Neukom**
Former Executive Vice President and General Counsel, Microsoft Corp.

**Laura Nyquist**
Former General Counsel, Teradata Corporation

**William M Ojile, Jr.**
Former Chief Legal Officer, Valor Communications Group, Inc. and Alta Colleges, Inc.

**Amy Fliegelman Olli**
Former Executive Vice President and General Counsel, VMware and Avaya

**Marla S. Persky**
Former Senior Vice President, General Counsel and Corporate Secretary, Boehringer Ingelheim Corporation; Former Acting General Counsel and Corporate Secretary, Baxter International

**Valerie Pierce**
Former General Counsel of several biotechnology and biopharmaceutical companies

**Brett Pletcher**
Former Executive Vice President and General Counsel, Gilead Sciences, Inc.

6

**Karyn S.W. Polak**
Former Chief Legal Officer, Transamerica; Former General Counsel, Citi Private Bank and Citi Investment Research

**Kelli L. Roach**
Former General Counsel, Black Mountain Sand

**Mark Roellig**
Former Chief Legal Officer, General Counsel and Secretary, Massachusetts Life Insurance Company (MassMutual), Fisher Scientific International Inc., Storage Technology Corp. (StorageTek), and US WEST Inc.

**James F Rogers**
Former Chief Legal Officer, Cars.com Inc.; Former Senior Vice President, General Counsel and Secretary, Orbitz Worldwide, Inc.; Former Senior Vice President, General Counsel and Secretary, TLC Vision Corporation

**Edward Ryan**
Former Executive Vice President and General Counsel, Marriott International, Inc.

**Lori A. Schechter**
Former Executive Vice President, Chief Legal Officer & General Counsel, McKesson Corporation

**Katherine E. Schuelke**
Former Senior Vice President, Chief Legal Officer, and Corporate Secretary, Seagate Technology LLC; Former Senior Vice President, General Counsel, and Corporate Secretary, Altera Corporation

**Steven R Secrist**
Former Senior Vice President and General Counsel, Puget Sound Energy

**Margaret K Seif**
Former Senior Vice President and Chief Legal Officer, Analog Devices, Inc.

**Jane Sherburne**
Former General Counsel, Bank of New York

**Savalle Sims**
Former General Counsel for a media company

**Isaac Stein**
Former General Counsel, Raychem Corp.

**Micheal Stern**
Former General Counsel, General Magic

**Kristin Sverchek**
Former President and General Counsel, Lyft

**Monica Winghart**
General Counsel to technology companies

**Irving Yoskowitz**
Former Executive Vice President and General Counsel, United Technologies Corporation

7

**Sharon Zezima**
Former General Counsel, Marketo, GoPro, Pax Labs and Acoustic

**Richard Ziegler**
Former General Counsel, 3M Company

I.      **Introduction and Interest of Amici**[1]

Following the blueprint of Executive Order 14230 against Perkins Coie LLP, Executive Order 14246 now targets Jenner & Block. While Jenner & Block ably demonstrates the Executive Order's illegality, Amici submit this brief because they can speak to the broader harm this Executive Order inflicts on American businesses. The Order does not merely punish a single law firm and its thousands of employees; it erodes the foundation of legal representation by counsel of choice, uses federal contracts to coerce political loyalty, and conscripts private businesses to settle the President's political scores. Its message is clear: hire the wrong lawyers, or take the wrong public stance, and your company will be punished.

Amici are former and current general counsel from a broad cross-section of America's leading companies. They have managed and advised businesses across the corporate landscape—small, growing tech firms and long-established Fortune 50 companies. They have worked with outside counsel on legal issues of every kind, including significant matters adverse to the government. Amici speak for themselves, not their current or former employers.

To be clear, Amici do not speak as supporters or critics of Jenner & Block's advocacy, the work of current or former Jenner & Block lawyers, or the specific corporate policies referenced in the Executive Order. Nor do Amici speak as former or current Jenner & Block clients. Rather, Amici speak because they know that "the right to counsel is the foundation of our adversary system," *Martinez v. Ryan*, 566 U.S. 1, 12 (2012), and a lawyer's advocacy on behalf of a client is "constitutionally protected expression," *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 548 (2001). The rule of law requires that government action be constrained by these principles. The Executive

---

[1] The identities of Amici are listed on page 4. No party's counsel authored this brief in whole or in part, and no person, party or party's counsel contributed money to fund the preparation or submission of the brief.

Order flouts them, suggesting that the President has "no doubt of" his "power" to use such orders to "sweep away all opposition." *Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting) (cleaned up). But the First Amendment embraces a "free trade in ideas," not "persecution for the expression of opinion." *Id*. "That at any rate is the theory of our Constitution," *id*., and the Court should evaluate the Executive Order accordingly.

## II. The Executive Order hijacks a corporation's relationship with outside counsel.

### A. Selecting outside counsel plays a vital role in corporate governance.

Effective corporate governance depends on the ability to select and maintain relationships with outside counsel based on expertise, trust, and proven performance. The modern corporation relies on law firms for a vast array of legal needs, including in highly specialized areas where there may be only a handful of qualified counsel available with adequate knowledge of and experience with the complexities of the industry.

Because of these needs, corporations typically develop long-term, trusted relationships with their counsel to represent them across a range of matters, including in dealings with the government, where the company may sometimes be aligned with and sometimes adverse to the government. These law firms develop institutional knowledge about the company's operations, needs, and legal history. That knowledge and experience are critical to the company's decision to continue hiring the firm.

### B. The Executive Order suppresses the free selection of outside counsel.

The Executive Order violates the right to counsel of choice protected by the Sixth Amendment (in criminal matters) and due process (in all matters), as Jenner & Block demonstrates (Doc. 19-1 at 26-28). At its core, the Order undermines a fundamental premise of the rule of law: when parties challenge the government, their lawyers "oppose[] the designated representatives of

the State," and "[t]he system assumes that adversarial testing will ultimately advance the public interest in truth and fairness." *Polk Cnty. v. Dodson*, 454 U.S. 312, 318 (1981). This safeguard against government overreach fails when attorneys cannot "advance the undivided interests of [their] client[s]" for fear of reprisal from the government. *Id.* at 318-19 (cleaned up).

The Executive Order violates these principles and invades the attorney-client relationship by discouraging lawyers from taking on clients or issues adverse to the President, and by compelling companies to choose counsel to avoid the President's retribution rather than based on independent business judgment, experience, skill, or expertise.

For the many companies with a relationship with Jenner & Block, the harm is direct. But the Executive Order's damage extends well past Jenner & Block. The President has targeted other major law firms with essentially identical orders. *See* Exec. Order Nos. 14237 (Paul, Weiss, Rifkind, Wharton & Garrison, LLP), 14250 (Wilmer Cutler Pickering Hale and Dorr LLP), 14230 (Perkins Coie LLP). And the President has made clear that he will issue similar orders against any law firm who engages in what the administration alone deems to be "frivolous litigation" or "fraudulent practices." *Preventing Abuses of the Legal System and the Federal Court*, Presidential Memorandum (Mar. 22, 2025), *available at* https://tinyurl.com/fcmbx6c6.

Each of these orders has essentially the same terms as the one aimed at Jenner & Block. Section 3(b) instructs agency heads to "submit . . . an assessment of contracts with . . . entities that do business with Jenner . . . and any actions taken with respect to those contracts in accordance with this order." It does not take much to read between those lines: if you do business with Jenner & Block (or another targeted firm), your government contract will be canceled or otherwise negatively impacted. If there was any doubt about the intended effect, the White House's accompanying fact sheet spells it out: "To ensure taxpayer dollars no longer go to contractors

11

whose earnings subsidize activities not aligned with American interests, the Federal Government will terminate contracts that involve Jenner." *Fact Sheet: President Donald J. Trump Addresses Risks from Jenner & Block*, The White House (Mar. 25, 2025), *available at* https://tinyurl.com/38jwj5zy.

Even for companies that do not depend on government contracts, Section 5(a) practically prohibits companies from retaining Jenner & Block (or another targeted firm) in any matter involving the federal government—not just litigation, but also seeking regulatory approval or discussing a government investigation. Under § 5(a), every agency shall limit "access from Federal Government buildings to employees of Jenner" and "limit Government employees . . . from engaging with Jenner employees." Of course, every legal matter requires communication, negotiation, and interaction. So § 5 forces clients to abandon the targeted law firm even when they wish to maintain the relationship.

The Executive Order thus sends a clear message to every company that conducts business with (or has matters against) the government: when selecting a law firm, avoid choosing one that the President may target due to its perceived opposition to the President, his political agenda, or his private businesses. General counsel and other corporate leaders must now assess not just the skill, expertise, and trust they have in counsel, but also whether those lawyers work at law firms that the President may seek to discredit or destroy.

These effects impose severe practical costs on American businesses. The cost of changing counsel is not just inconvenience. Changing counsel requires new counsel to "get up to speed" at significant cost, interrupts and delays ongoing matters, and risks the loss of the former firm's institutional knowledge and particular expertise. In certain specialized areas it may be impossible to find suitable alternative counsel, making the "restriction on speech . . . even more problematic."

12

*Velazquez*, 531 U.S. at 546 (speech restriction of greater concern "in cases where the attorney withdraws from a representation, [and] the client is unlikely to find other counsel"). All of this disrupts business operations and the ability to effectively manage legal risk.

### III.   The Executive Order violates corporate America's First Amendment rights.

As Jenner & Block's motion explains (Doc. 19-1 at 17-25), the Executive Order also violates the First Amendment. The Order is a textbook example of viewpoint discrimination, penalizing speech and association based on the President's disagreement with the positions taken by Jenner & Block lawyers on behalf of clients.

Corporations and their employees have First Amendment rights, including the right to petition the government (through litigation or otherwise) and to associate with counsel of choice for that purpose. *Lozman v. Riviera Beach*, 585 U.S. 87, 101 (2018) (noting the right to petition is "one of most precious of the liberties safeguarded by the Bill of Rights" (quoting *BE&K Constr. Co. v. N.L.R.B.*, 536 U.S. 516, 524 (2002)); *NAACP v. Button*, 371 U.S. 415, 430 (1963) ("Under the conditions of modern government, litigation may well be the sole practical avenue . . . to petition for redress of grievances."); *Citizens United v. F.E.C.*, 558 U.S. 310, 355 (2010) ("The First Amendment protects the right of corporations to petition . . . .").

The Executive Order violates these rights. Section 1, which explains the Order's "purpose," attacks Jenner & Block for its prior advocacy and litigation positions—that is, the firm's protected speech and petition activities undertaken on behalf of its clients. Sections 2-5 impose the consequences: canceled contracts and security clearances, intense agency scrutiny, and exclusion from government employees and buildings. Taken together, the Order's provisions gut "the purpose behind the Bill of Rights, and of the First Amendment in particular . . . to protect

13

unpopular individuals from retaliation—and their ideas from suppression." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 357 (1995).

Although the Executive Order names only Jenner & Block, the Order threatens retaliation for the First Amendment-protected activities of all corporations and their employees. If the government may terminate a company's contracts for hiring a disfavored law firm, what prevents retaliation against the same company for any other protected activities the President alone may deem "harmful" or "detrimental"? Would a company face retribution for litigating against the President's policies, making political donations to support candidates or causes adverse to the President, or having employees or board members who are politically active in their private lives? The warning is clear: companies, their board members, and their employees take these actions at their peril.

This amounts to an unconstitutional "attempt to coerce private parties in order to punish or suppress views that the government disfavors." *N.R.A. v. Vullo*, 602 U.S. 175, 180 (2024). The government—and especially the President—may not "invok[e] legal sanctions and other means of coercion . . . to achieve the suppression" of speech. *Id*. at 188; *id.* at 191-92 ("Generally speaking, the greater and more direct the government official's authority, the less likely a person will feel free to disregard a directive from [an] official.").

### IV.     The Executive Order will cause lasting real-world harm.

Beyond its immediate constitutional violations, the Order will cause lasting harm for American businesses.

*First*, corporations will be reluctant to challenge executive authority, diminishing an essential check on government power. Corporate legal departments must now weigh the risk of presidential retaliation (including contract termination and other punitive measures) when deciding

whether to oppose the government, and law firms will be, and no doubt already are, reluctant to challenge questionable executive actions.  That reluctance harms both clients and the interests of the public in ensuring that the executive branch acts within the bounds of the law and the Constitution.  In essence, this will "draw lines around" legal advocacy based on "those arguments and theories [the President] finds unacceptable but which by their nature are within the province of the courts to consider."  *Velazquez*, 531 U.S. at 546. This offends the First Amendment, is "inconsistent with accepted separation-of-powers principles," *id.*, and weakens the rule of law.

The chilling effect is real.  The composition of Amici, predominantly *former* rather than current general counsel, demonstrates the Executive Order's swift, powerful, and intimidating influence on the legal profession and business community.

***Second***, the Executive Order creates a dangerous precedent for future administrations.  If the Executive Order is deemed lawful, future administrations would have every incentive to use the same tactics to punish their perceived enemies and silence their critics, creating an unstable cycle of retaliation.  Corporations would face the expense and disruption of switching counsel every few years, as one set of favored firms becomes the next administration's targeted firms.

***Third***, the Executive Order's subversion of the rule of law increases costly uncertainty and instability in the American economy.  The rule of law is not only a legal abstraction but an economic necessity.  When harsh sanctions can be imposed based on presidential preference rather than through consistent application of established law, businesses cannot effectively plan for and manage risk.  This uncertainty will require businesses to divert resources toward currying political favor rather than investment, innovation, and growth.

***Fourth***, and relatedly, the Executive Order distorts the free market by encouraging a system where business success depends more on political favor than merit, efficiency, or innovation.  The

15

Executive Order does this explicitly: certain law firms are acceptable to the administration and certain are not. Clients will gravitate toward the "acceptable" firms, regardless of expertise or skill. This reduces competition and the quality of legal representation available to businesses.

*Fifth*, the Executive Order promotes a culture of silence, distrust, and conformity in American business. Companies may conclude it is too risky to hire or retain employees who have spoken out against the President, litigated against him in prior employment, or otherwise made themselves a target of the President. Others may be intimidated into silence knowing that the President has issued executive orders against Jenner & Block and law firms based on the work partners did while not working for the firm. Exec. Order 14246 & 14250 (punishing Jenner & Block and WilmerHale for "engag[ing] in obvious partisan representations to achieve political ends" and for hiring lawyers who had served as prosecutors in the Special Counsel probe during President Trump's first term). Such suppression of competing, dissenting views harms "society as a whole, which is deprived of an uninhibited marketplace of ideas." *Citizens United*, 558 U.S. at 335.

## V.    Conclusion

The Executive Order tramples on corporate independence, the right to counsel, and First Amendment rights, transforming independent business and legal judgments into political calculations about presidential favor. The Order threatens not just Jenner & Block and its clients, but any corporation or law firm that might someday advocate against this or any future president's preferred position. To preserve the rule of law and a vibrant marketplace of ideas, Amici respectfully ask that the Court permanently enjoin the Order.

Dated: April __, 2025                                         Respectfully submitted:

                                                              s/ David B. Rosenbaum

OSBORN MALEDON, P.A.
David B. Rosenbaum (*pro hac vice*)
Mary R. O'Grady (*pro hac vice*)
Joseph N. Roth (*pro hac vice*)
Eric M. Fraser (*pro hac vice*)
Andrew G. Pappas (*pro hac vice*)
Joshua J. Messer (*pro hac vice*)
2929 North Central Avenue, 20th Floor
Phoenix, Arizona  85012-2793
drosenbaum@omlaw.com
mogrady@omlaw.com
jroth@omlaw.com
efraser@omlaw.com
apappas@omlaw.com
jmesser@omlaw.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on April __, 2025, the attached document was served by email upon the following counsel for the parties in the underlying litigation:

Michael A. Attanasio
COOLEY LLP
10265 Science Center Drive
San Diego, CA 92121

David E. Mills
COOLEY LLP
1299 Pennsylvania Ave. NW, Suite 700
Washington D.C. 20004

Kristine Forderer
COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111

John Bostic
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304

*Counsel for Plaintiff Jenner 7 Block LLP*

Richard Lawson
Deputy Associate Attorney General
950 Pennsylvania Avenue, NW
Washington, DC 20530

*Counsel for Defendants*

Respectfully submitted:

s/ David B. Rosenbaum
David B. Rosenbaum

18