IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JENNER & BLOCK LLP,<br><br>　　　　　Plaintiff,<br><br>　v.<br><br>U.S. DEPARTMENT OF JUSTICE, et al.,<br><br>　　　　　Defendants. | No. 1:25-cv-00916-JDB |

BRIEF OF *AMICUS CURIAE* LAW FIRM PARTNERS UNITED INC.
IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Eric Olson*
**Olson Grimsley Kawanabe Hinchcliff & Murray LLP**
700 17th Street, Suite 1600
Denver, CO 80202
(303) 535-9151
eolson@olsongrimsley.com

*pro hac vice*

Eric Citron (D.D.C. Bar # 1001069)
**Zimmer, Citron & Clarke, LLP**
130 Bishop Allen Drive
Cambridge, MA 02139
eric@zimmercitronclarke.com

*Counsel for* Amicus Curiae

**CORPORATE DISCLOSURE STATEMENT**

*Amicus curiae* is a nonprofit professional association. It has no parent corporations and does not issue stock.

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ..................................................................................i

INTEREST OF *AMICUS CURIAE*..................................................................................................1

ARGUMENT ...................................................................................................................................1

      A.      The Executive Order exceeds the President's authority and intrudes on core judicial functions.................................................................................................2

      B.      The Executive Order violates the First Amendment. .........................................7

      C.      The Executive Order violates the Fifth and Sixth Amendments. ...................9

CONCLUSION................................................................................................................................11

CERTIFICATE OF COMPLIANCE .............................................................................................13

## TABLE OF AUTHORITIES

**Cases**

*303 Creative LLC v. Elenis,*
  600 U.S. 570 (2023) ............................................................................................................... 8

*BE & K Const. Co. v. N.L.R.B.,*
  536 U.S. 516 (2002) ............................................................................................................... 8

*Collins v. Yellen*,
  594 U.S. 220 (2021) ............................................................................................................... 3

*Ex parte Garland*,
  71 U.S. 333 (1866) ......................................................................................................... 3, 4, 5

*Forsyth Cnty., Ga. v. Nationalist Movement,*
  505 U.S. 123 (1992) ............................................................................................................... 8

*Goldsmith v. United States Bd. of Tax Appeals*,
  270 U.S. 117 (1926) ............................................................................................................... 9

*Greenlaw v. United States,*
  554 U.S. 237 (2008) ............................................................................................................... 3

*In re Snyder*,
  472 U.S. 634 (1985) ............................................................................................................... 4

*Jenner & Block LLP v. Dep't of Just.*,
  No. 25-cv-916, 2025 WL 946993 (D.D.C. Mar. 28, 2025) ................................................... 8

*Joint Anti-Fascist Refugee Comm. v. McGrath,*
  341 U.S. 123 (1951) .......................................................................................................... 6, 10

*Legal Servs. Corp. v. Velazquez,*
  531 U.S. 533 (2001) ........................................................................................................... 3, 7

*Leis v. Flynt,*
  439 U.S. 438 (1979) ............................................................................................................... 4

*Lozman v. Riviera Beach,*
  585 U.S. 87 (2018) ................................................................................................................. 8

*Marbury v. Madison,*
  5 U.S. 137 (1803) ................................................................................................................... 4

*Martinez v. Ryan,*
  566 U.S. 1 (2012) ................................................................................................................. 10

*Minnesota v. Mille Lacs Band of Chippewa Indians*,
  526 U.S. 172 (1999) ............................................................................................................... 6

*Nat'l Rifle Ass'n v. Vullo,*
  602 U.S. 175 (2024) ............................................................................................................... 7

*Powell v. Alabama,*
  287 U.S. 45 (1932) ............................................................................................................... 10

*Roadway Exp., Inc. v. Piper*,
 447 U.S. 752 (1980 ..................................................................................................................5

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
 515 U.S. 819 (1995)..................................................................................................................7

*United States v. Brown*,
 381 U.S. 437 (1965)..................................................................................................................6

*W. Va. State Bd. of Educ. v. Barnette*,
 319 U.S. 624 (1943)..................................................................................................................8

*Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Office of the President*,
 No. 25-cv-917, 2025 WL 946979 (D.D.C. Mar. 28, 2025) ......................................................8

**Other Authorities**

37 C.F.R. Part 11..............................................................................................................................5

Alison Knezevich, *BigLaw Shying Away From Some Pro Bono Work 'Out of Fear'*,
 LAW360, Apr. 10, 2025..............................................................................................................4

Matthew Goldstein and Jessica Silver-Greenberg, *Some Giant Law Firms Shy Away From Pro Bono Immigration Cases*,
 NEW YORK TIMES, May 6, 2025 ................................................................................................4

Michael Birnbaum, *Law Firms Refuse to Represent Trump Opponents in the Wake of His Attacks*,
 WASHINGTON POST, Mar. 25, 2025 ...........................................................................................4

Ryan Lucas, *Trump Attacks on Law Firms Begin to Chill Pro Bono Work on Causes He Doesn't Like*,
 NPR, Apr. 13, 2025 ...................................................................................................................3

TRO Hr'g Tr. (ECF No. 22) at 74:7-21,
 *Perkins Coie LLP v. Dep't of Just.*, No. 1:25-cv-716 (D.D.C. Mar. 12, 2025) .........................8

U.S. Const. art. I, § 10....................................................................................................................6

U.S. Const. art. I, § 9......................................................................................................................6

**INTEREST OF *AMICUS CURIAE***

Law Firm Partners United Inc. ("LFPU") is a professional association that includes over 800 partners and shareholders at law firms often called the "AmLaw 200" and includes the individuals identified in Exhibit A. The members of LFPU are acting in their personal capacity and not on behalf of any firm or in their role as law firm partners or shareholders. LFPU is a nonpartisan organization bound by a commitment to the rule of law and opposition to fundamentally unconstitutional attacks against lawyers and law firms. LFPU's members represent a broad range of practices in every quartile of the AmLaw 200 and have served as firm chairs, global practice group leaders, office managing partners, and equity partners. Many of its members are globally recognized leaders in their respective fields.[1]

**ARGUMENT**

*Amicus*'s members are hundreds of individuals who are partners or shareholders at the nation's top law firms, and who have diverse and bipartisan views on matters of law and policy. But the members are united by the principle that our Constitution protects the right of lawyers to choose their cases and to zealously represent their clients without fear of reprisal by the government.

The Executive Orders targeting Jenner & Block and other law firms threaten the legal profession, the judiciary, and the rule of law itself. Jenner was singled out because the Executive branch disapproves of some of its representations in civil litigation—work that nearly all law firms engage in—and work that a former lawyer performed before he joined Jenner. Orders like this tell the

---

[1] In accordance with Federal Rule of Appellate Procedure 29(a)(4)(E), *amicus* certifies that (1) this brief was authored entirely by counsel for *amicus* and not by counsel for any party, in whole or part; (2) no party or counsel for any party contributed money to fund preparing or submitting this brief; and (3) apart from counsel for *amicus*, no other person contributed money to fund preparing or submitting this brief.

1

entire profession that taking on cases and clients—or hiring lawyers—that are out of favor with the current administration may result in severe retaliation.

Throughout the legal industry, clients who previously had no difficulty finding representation are now being turned away by those who worry that taking the cases might risk Presidential disapproval. And many clients now worry that *they* will be targeted for retribution if they hire law firms who are or might become targets of a similar executive order. This fear erodes the independence of the bar and the protection of those seeking vindication of Constitutional rights. And because courts cannot decide cases that lawyers do not bring, these executive orders undermine our system of justice itself.

The Court should reject this unconstitutional Executive Order quickly, definitively, and with the forceful permanent injunctive relief the wrong requires. The Executive Order intrudes on the courts' Article III power to decide cases based on zealous adversarial presentation, while exceeding the President's limited Article II authority. It violates Jenner's First Amendment rights by retaliating against Jenner for the views it and its clients have expressed and for its protected activity petitioning the courts on behalf of its clients. And by punishing both Jenner and its clients through executive fiat, the orders violate the Fifth Amendment's guarantee of due process as well as the Fifth and Sixth Amendments' right to counsel.

### A. The Executive Order exceeds the President's authority and intrudes on core judicial functions.

The Executive Order and others like it undermine the legal profession and the judiciary that depends on it. The prospect of being the next target of an unconstitutional order looms large over any law firm that might wish to represent causes or clients disapproved of by the administration. By deterring zealous advocacy of disfavored positions, the executive orders undermine the adversarial process on which Article III courts depend. In doing so, the executive orders assert a power to punish

2

lawyers by extrajudicial decree—a power nowhere given to the President expressly or by implication in Article II.

Attorneys "are officers of the court," *Ex parte Garland*, 71 U.S. 333, 378 (1866), and the independence of the legal profession is a foundation on which Article III rests. "An informed, independent judiciary presumes an informed, independent bar." *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 545 (2001). That is because our "adversary system" follows "the principle of party presentation." *Greenlaw v. United States*, 554 U.S. 237, 243 (2008). Attorneys determine which claims have enough merit to present in court, and which arguments to make in support of them.

If lawyers are unwilling to take on certain cases or clients due to the threat of retribution, those clients' cases may never reach a court—effectively stripping those clients of the rights the law protects. And because "[c]ounsel almost always know a great deal more about their cases than [courts] do," *id.*, zealous presentation by counsel is needed to ensure that courts can dispense justice to parties that petition the courts for redress. Indeed, adversarial presentation is so crucial to the judicial function that the U.S. Supreme Court frequently appoints counsel to defend potentially meritorious positions that the parties have abandoned. *See, e.g., Collins v. Yellen*, 594 U.S. 220, 236 (2021). Given the importance of adversarial presentation, restrictions on the positions lawyers may take in court are "inconsistent with accepted separation-of-powers principles" and "threaten[] severe impairment of the judicial function." *Velazquez*, 531 U.S. at 546 (invalidating law prohibiting recipients of legal services funds from challenging welfare laws in court).

Unless courts act quickly, these orders may bend the bar—and through it, the judicial system—to the will of the Executive. Since these executive orders were announced, numerous nonprofit organizations have reported a reduction in *pro bono* support and willingness to tackle representations that may be at odds with the preferences of the President. *See* Ryan Lucas, *Trump Attacks on Law Firms Begin to Chill Pro Bono Work on Causes He Doesn't Like*, NPR, Apr. 13, 2025. And lawyers have hesitated

3

to take positions not currently in favor with the Executive branch—whether challenging administrative regulations on behalf of businesses, taking on *pro bono* representation of immigrants seeking asylum, or advocating positions that may seem controversial. *See, e.g.*, Matthew Goldstein and Jessica Silver-Greenberg, *Some Giant Law Firms Shy Away From Pro Bono Immigration Cases*, NEW YORK TIMES, May 6, 2025; Michael Birnbaum, *Law Firms Refuse to Represent Trump Opponents in the Wake of His Attacks*, WASHINGTON POST, Mar. 25, 2025; Alison Knezevich, *BigLaw Shying Away From Some Pro Bono Work 'Out of Fear'*, LAW360, Apr. 10, 2025. Some of *amicus*'s members have seen that litigants whose interests run counter to the administration are now being turned away by lawyers that would ordinarily handle these cases with zeal. If the independent bar is cowed into submission by the threat of retaliation, clients will be unable to obtain the representation they need to challenge Executive action in court. And Article III courts, in turn, will be unable to play their role in the Constitutional framework: to "say what the law is." *Marbury v. Madison*, 5 U.S. 137, 177 (1803).

It is precisely because the bench depends on the bar that courts—not the President—have the power to discipline attorneys for their litigation activities. Article III bestows federal courts with "inherent authority" to discipline lawyers that appear before the court, which "derives from the lawyer's role as an officer of the court which granted admission." *In re Snyder*, 472 U.S. 634, 643 (1985).[2] When appearing before a court, attorneys "engag[e] in the exercise of . . . judicial functions." *Ex parte Garland*, 71 U.S. at 379. The attorney holds office "by the solemn judicial act of the court," and not "as a matter of grace and favor." *Id.* Thus, "[t]he right" to "appear for suitors, and to argue causes, is something more than a mere indulgence, revocable at the pleasure of the court, or at the command of

---

[2] For federal courts, the power to discipline attorneys is a feature of the judiciary's Article III obligation to adjudicate Cases and Controversies. And for cases in state court, "[s]ince the founding of the Republic, the licensing and regulation of lawyers has been left exclusively to the States and the District of Columbia within their respective jurisdictions." *Leis v. Flynt*, 439 U.S. 438, 442 (1979).

4

the legislature. It is a right of which he can *only* be deprived by the judgment of the court, for moral or professional delinquency." *Id.* (emphasis added).[3]

An order that punishes lawyers and law firms for their clients or legal positions usurps this core judicial function. The Executive Order targets Jenner for what it claims was "egregious conduct" such as handling lawsuits that reflect supposedly "partisan representations to achieve political ends," that "refus[e] to accept the biological reality of sex," and that represent "illegal aliens." EO § 1. It also targets Jenner for hiring an attorney that the President accuses of "unethical" behavior for participating in Robert Muller's investigation. *Id.* The Executive Order purports to punish Jenner for this protected activity without any of the procedural safeguards that attend court-imposed sanctions of attorneys. Judicially imposed sanctions require a showing that the attorney has engaged in bad faith, vexatious, or otherwise unethical conduct—as well as notice and an opportunity to be heard on those allegations. *See, e.g., Ex parte Garland*, 71 U.S. at 378 (disbarment requires a "judgment of the court after opportunity to be heard has been afforded"); *Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 767 (1980) (attorney fee sanctions against lawyers "should not be assessed lightly or without fair notice and an opportunity for a hearing on the record"). The Executive Order contains none of these safeguards. It simply declares, by executive fiat, that Jenner's representation of its clients involved "egregious conduct." EO § 1.

The Executive Order fails to present evidence to support any assertion of wrongdoing by Jenner. And that is precisely the point. As opposed to judicial regulation that carries with it established due process rights, the Executive Order resembles a bill of attainder—a bare and unreviewable

---

[3] Executive agencies that perform quasi-judicial functions also have historically exercised limited authority to regulate the conduct of attorneys when they appear before those agencies. *See, e.g.,* 37 C.F.R. Part 11 (concerning practice of law before the United States Patent and Trademark Office). But any such authority would not permit the President to commandeer the role of Article III courts in regulating attorneys for their conduct as officers of those courts.

5

declaration of wrongdoing followed by punishment. U.S. Const. art. I, §§ 9, 10; *see United States v. Brown*, 381 U.S. 437, 442-44 (1965).

The Executive Branch lacks constitutional or statutory authority to punish disfavored law firms by decree. It is "black letter law" that "[t]he President's power, if any, to issue [an executive order] must stem either from an act of Congress or from the Constitution itself." *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 188-89 (1999) (quotation omitted). The Executive Order points to no federal statute authorizing punishment of law firms for the positions they take in court. Nor can any such authority be gleaned from even the most aggressive reading of Article II. Rather, the Constitution's blanket prohibitions on bills of attainder by both the federal and state government reveal that no part of our government is entrusted with the power to make extra-judicial proclamations of guilt. *See* Art. 1 §§ 9, 10. To be sure, the Constitution's attainder clauses explicitly mention only legislative rather than executive action. But that was surely because the Founders understood that, in the absence of attainder legislation, nothing in Article II permits the President to impose attainder by executive fiat. As Justice Black wrote in condemning anti-Communist blacklists established by executive order: "I cannot believe that the authors of the Constitution, who outlawed the bill of attainder, inadvertently endowed the executive with power to engage in the same tyrannical practices that had made the bill such an odious institution." *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 143 (1951) (Black, J., concurring).

The Executive Order and those like it resurrect that same "odious institution"—and represent an Executive branch intrusion on powers given to the judiciary. These orders would erode the courts' Article III power to hear Cases and Controversies by intimidating lawyers who zealously advocate for causes that the administration disapproves. And they do so without any Article II or statutory authority. The Court should reject this violation of foundational separation-of-powers principles.

6

### B. The Executive Order violates the First Amendment.

By punishing Jenner for defending the views of its clients and petitioning the government on their behalf, the Executive Order violates a litany of independent First Amendment guarantees. *See Velazquez*, 531 U.S. at 542 (upholding First Amendment claim of "lawyer" who "speaks on behalf of his or her . . . client"). Those include the bar on retaliation for protected speech, the prohibition on viewpoint discrimination, and the right to petition government. By putting law firms' speech in the crosshairs, the executive orders have chilled the ability of lawyers and their clients to exercise their First Amendment right to seek redress through the courts.

The Executive Order violates the First Amendment's bar on retaliation because it "rel[ies] on the threat of invoking legal sanctions and other means of coercion . . . to achieve the suppression of disfavored speech." *Nat'l Rifle Ass'n v. Vullo*, 602 U.S. 175, 189 (2024) (quotation omitted). Just last year in *Vullo*, the Supreme Court unanimously found that the National Rifle Association stated a First Amendment claim by alleging that a state officer "pressured regulated entities to help her stifle the NRA's pro-gun advocacy by threatening enforcement actions against those entities that refused to dissociate from the NRA." *Id.* at 180. That is exactly what the Executive Order does here. It targets Jenner for its prior litigation and advocacy activities, *see* EO § 1, and then threatens those clients who "refuse to dissociate from" Jenner with the termination of their government contracts, *id.* § 3.

So too does the Executive Order target Jenner because of the views Jenner has expressed on behalf of its clients. *See Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995) (viewpoint discrimination is a "blatant" First Amendment violation) By its own terms, the Order targets Jenner for speech that the President claims is "egregious," such as engaging in "partisan" litigation, handling cases that reflect a view of sex or gender with which the President disagrees, and representing "illegal aliens." *See* EO § 1. But "no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *W. Va. State Bd. of Educ. v.*

7

*Barnette*, 319 U.S. 624, 642 (1943). That is true even where some might insist censoring the speech is "essential for the welfare of the state." *303 Creative LLC v. Elenis,* 600 U.S. 570, 601-02 (2023) (quoting *Barnette*, 319 U.S. at 642, 662-663).

The Executive Order also undermines the First Amendment's right "to petition the Government for a redress of grievances"—which is "one of the most precious of the liberties safeguarded by the Bill of Rights." *BE & K Const. Co. v. N.L.R.B.*, 536 U.S. 516, 524 (2002) (quotation omitted). "[T]he right of access to the courts" is, of course, "one aspect of the right to petition." *Id.* at 525. Thus, when the government retaliates against someone for filing "a lawsuit against the [government]" or for "his criticism of public officials," the government infringes an interest that falls "high in the hierarchy of First Amendment values." *Lozman v. Riviera Beach*, 585 U.S. 87, 101 (2018). Yet the Order does just that, retaliating against Jenner for its prior (successful) litigation on behalf of its clients. The Order also impedes Jenner's ability to petition the government for clients in the future. It purports to restrict Jenner's access to federal government buildings (including federal agencies and even federal courthouses) whenever the government determines such access would be "inconsistent with the interests of the United States." EO § 5(a). Jenner's First Amendment right to petition government for clients cannot rise or fall on the "unbridled discretion" of executive branch bureaucrats and their subjective political assessment of the national interest. *Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123, 133 (1992).

When the government targets protected speech as these executive orders do, the chilling effect is severe. Indeed, these orders have suppressed speech *even though* every court to consider them has held them to be unconstitutional. *See Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Office of the President*, No. 25-cv-917, 2025 WL 946979, at *2 (D.D.C. Mar. 28, 2025); *Susman Godfrey LLP v. Exec. Off. of the President*, No. 25-cv-1107, 2025 WL 1113408 (D.D.C. Apr. 15, 2025); *Perkins Coie LLP v. Dep't of Just.*, No. 25-cv-716, 2025 WL 1276857 (D.D.C. May 2, 2025). Despite that, some of *amicus*'s

8

members have continued to observe many lawyers declining representations they would otherwise take on, out of concern that those representations might trigger retaliation. *See supra* at 3-4. They have also continued to observe clients hesitate about hiring law firms that might become the President's next target. The orders are having their intended effect.

This Court should act quickly to restore confidence that lawyers, their clients, and most importantly the public, may petition the courts for redress—including redress *against* the government—without threat of retribution.

**C.    The Executive Order violates the Fifth and Sixth Amendments.**

By punishing both Jenner and its clients by executive decree, the Executive Order also tramples upon the Fifth and Sixth Amendment's guarantees of due process and right to counsel.

Without providing Jenner with any semblance of notice or due process, the Executive Order seeks to restrict Jenner's ability to practice law and do business. *Goldsmith v. United States Bd. of Tax Appeals*, 270 U.S. 117, 123 (1926) (due process requires notice, hearing, and opportunity to respond before limiting an attorney's ability to practice law through suspension or disbarment). The Order purports to deprive Jenner and its attorneys of security clearances, any government goods or services provided for the benefit of Jenner, the ability to petition the government, and access to government buildings including the very federal courthouses where Jenner's attorneys advocate for their clients. EO §§ 2, 5. The Executive Order requires government agencies to terminate any contracts held by Jenner and even reaches beyond the government's own dealings with Jenner to require any government contractors to disclose business *they* do with Jenner—regardless of whether that business is related to the government contract or not. EO § 3. Such conduct through executive order, taken "without notice, without disclosure of any reasons justifying it, without opportunity to meet the undisclosed evidence or suspicion on which [the action] may have been based, and without opportunity to establish [innocence]" before a neutral arbiter offends the Due Process Clause of the

9

Fifth Amendment and cannot stand. *Joint Anti-Fascist Refugee Comm.*, 341 U.S. at 161 (Frankfurter, J. concurring).

By threatening to punish Jenner's clients for their choice of counsel, the Order also interferes with the right to counsel guaranteed by the due process clause of the Fifth Amendment as well as, in criminal cases, the Sixth Amendment. *See, e.g. Powell v. Alabama*, 287 U.S. 45, 60, 53, 69 (1932) (due process, in civil and criminal cases, requires "a fair opportunity to secure counsel of [the party's] own choice"). "The right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel." *Id.* at 68-69. Yet the Executive Order disrupts the attorney-client relationship: if a Jenner client does business with the government, the government now claims they must choose between either endangering that business relationship or abandoning their counsel of choice. And a potential client who wishes for Jenner to represent them may balk at the prospect of hiring an attorney who may face arbitrary restrictions on their ability to interact with federal employees or enter federal courthouses. Stated plainly, a party has the right to disagree with the government and to use lawyers in court to have their grievances heard fairly and impartially. The Executive Order impairs this basic right fundamental to our system of government and interfere with the checks and balances our Constitution holds so dear.

The effects of the Executive Order's interference in the attorney-client relationship are far-reaching and significant. The reputational stigma of being named by the President as a law firm acting against critical American interests cannot be overstated. This stigma impairs a client's selection of counsel and warns both current and prospective clients that these attorneys may not be able to adequately represent their interests if those interests run afoul of the Executive's wishes. In so doing, the Order undermines "the right to counsel [that] is the foundation for our adversary system." *Martinez v. Ryan*, 566 U.S. 1, 12 (2012). And the Order seeks to intrude into the representation an attorney may provide by discouraging arguments and positions perceived to conflict with the administration. If

10

clients believe attorneys will refrain from making certain arguments on their behalf due to fear of retribution, their trust in the attorney-client relationship would be eroded. Undermining a client's right to the counsel of their choice undermines their ability to rely on the law in defense of their interests, their rights, and their communities.

## CONCLUSION

Representing unpopular clients has always come with risks for lawyers. But having the government impose serious consequences on lawyers for conducting zealous advocacy does not reflect who we are as a nation. *Amicus* respectfully urges the Court to swiftly and decisively invalidate the Executive Order. The Constitution and the rule of law require nothing less.

Dated: May 8, 2025                                  Respectfully submitted,

/s/ Eric Olson

Eric Olson*
**Olson Grimsley Kawanabe Hinchcliff & Murray LLP**
700 17th Street, Suite 1600
Denver, CO 80202
(303) 535-9151
eolson@olsongrimsley.com

Eric Citron (D.D.C. Bar # 1001069)
**Zimmer, Citron & Clarke, LLP**
130 Bishop Allen Drive
Cambridge, MA 02139
eric@zimmercitronclarke.com


*pro hac vice

## CERTIFICATE OF COMPLIANCE

      I hereby certify that the foregoing complies with Local Civil Rule 7(o)(4) and does not exceed 25 pages. I further certify that the attached *amicus* brief complies with the typeface and type style requirements of Local Rule 5.19(d) because it has been prepared in a proportionally spaced typeface using Microsoft Word and 12-point Garamond font.

Dated: May 8, 2025                                                                  */s/ Eric Olson*

## CERTIFICATE OF SERVICE

I hereby certify that on May 8, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to all attorneys of record by operation of the Court's electronic filing system.

/s/ Eric Olson

**Exhibit A**

| | | |
|---|---|---|
| Jennifer L Achilles | William L Greene | Karen O'Malley |
| Rahul Agarwal | Jack Hamilton | Shane O'Neill |
| Ariel Anaba | Joshua Hartman | Andrew Ong |
| Rena Andoh | Sami Hasan | Charles Palella |
| Saurish Appleby-Bhattacharjee | Alex E Hassid | Neil Popovic |
| Christine K. Au-Yeung | Aaron D. Hendelman | David Quirolo |
| Gurpreet Bal | Seth B. Herring | Jennifer G Redmond |
| Katherine M Basile | Julia R Hesse | Maura L. Rees |
| Alexander Bau | Steven P Hollman | Robert B Remar |
| Elizabeth A. Bawden | Kristin P Housh | Nicholas R. Rodriguez |
| David Berger | James Hsiao | Aaron P Rubin |
| Steve Berkman | Eric Hsu | Manja Sachet |
| Monique N Bhargava | Caroline W Hudson | Daniel A Sasse |
| Beth Boland | Caitlin L.D. Hull | Eric A. Savage |
| R Lance Boldrey | Sam Hyde | Elizabeth Sbardellati |
| Charanjit Brahma | Patricia Jeng | Anthony Sbardellati |
| Eric Breitman | David H Kaufman | Dr. Jan Schinköth |
| Thomas W Brooke | Sarah Kelly-Kilgore | Shail P. Shah |
| Tamara Bruno | Hwan Kim | Jack Sholkoff |
| Patrick J Cain | Marc A. Kushner | Jennifer A Short |
| Diana L. Calla | Heather M Lambert | S Montaye Sigmon |
| Andrew Carlon | Natalie G Lashinsky | Stosh M Silivos |
| David J. Carrier | Marc D Latman | David L Simons |
| Dominique L Casimir | Bonnie Lau | Nancy Sotomayor |
| Gerald G Chacon Jr | Jessica B. Lee | Julie A. Sullivan |
| Suman Chakraborty | Todd E. Lundell | John T. Sullivan |
| Neel Chatterjee | Ethan Lutske | Myra Sutanto Shen |
| Martin S. Chester | Matthew Macdonald | Shane Swindle |
| Jascha Clark | Angela M. Machala | Vanessa J. Szalapski |
| Anthony L. Cochran | Roger J Maldonado | Trevor N Templeton |
| Sarah Columbia | Kevin J Malone | Lyman Thai |
| Paul Cowie | James W Matthews | Robert P Tiplady II |
| Ben Crosson | Heidi E Mayon | Stuart Tochner |
| Colin Dang Delaney | James R. McGuire | Michael J Tuteur |
| Sanjeet Dutta | Mark Melodia | John T Van Der Tuin |
| Maria B Earley | Jonathan E Meyer | Nisha Verma |
| Elizabeth A Falcone | Wells W. Miller | Edward S Weil |
| Jennifer Fang | Melissa Mills | Brian C. Wheeler |
| Kyle R. Freeny | Alejandro E Moreno | Lauren Gallo White |
| Brian K. French | Haley Morrison | Bryan Wilson |
| Scott Y French | Brian Moskal | Alyssa M. Worsham |
| Marc A. Fuller | Alysha M. Naik | Lynne Xerras |
| Aaron D. Goldstein | Annaka Nava | Babak Yousefzadeh |
| David J. Goldstein | Peter A Nyquist | RJ Zayed |