**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**JENNER & BLOCK LLP,**

    **Plaintiff,**

    **v.**

**U.S. DEPARTMENT OF JUSTICE, et al.,**

    **Defendants.**

**Civil Action No. 25-916 (JDB)**

## <u>MEMORANDUM OPINION</u>

In our constitutional order, few stars are as fixed as the principle that no official "can prescribe what shall be orthodox in politics." <u>W. Va. State Bd. of Educ. v. Barnette</u>, 319 U.S. 624, 642 (1943). And in our constitutional order, few actors are as central to fixing that star as lawyers.

This case arises from one of a series of executive orders targeting law firms that, in one way or another, did not bow to the current presidential administration's political orthodoxy. Like the others in the series, this order—which takes aim at the global law firm Jenner & Block—makes no bones about why it chose its target: it picked Jenner because of the causes Jenner champions, the clients Jenner represents, and a lawyer Jenner once employed. Going after law firms in this way is doubly violative of the Constitution. Most obviously, retaliating against firms for the views embodied in their legal work—and thereby seeking to muzzle them going forward—violates the First Amendment's central command that government may not "use the power of the State to punish or suppress disfavored expression." <u>Nat'l Rifle Ass'n of Am. v. Vullo</u>, 602 U.S. 175, 188 (2024). More subtle but perhaps more pernicious is the message the order sends to the lawyers whose unalloyed advocacy protects against governmental viewpoint

becoming government-imposed orthodoxy. This order, like the others, seeks to chill legal representation the administration doesn't like, thereby insulating the Executive Branch from the judicial check fundamental to the separation of powers. It thus violates the Constitution and the Court will enjoin its operation in full.

### Background

Jenner & Block is a 900-person litigation-focused law firm with offices in Chicago, Washington, D.C., New York, Los Angeles, Century City, San Francisco, and London. See Pl.'s Statement of Undisputed Material Facts [ECF No. 19-2] ("SUMF") ¶¶ 1, 9. Its clients span a wide spectrum; what's important to this case is that representing them requires frequently—dozens of times per month—appearing in federal court, entering federal buildings, interacting with federal employees, and the like. See, e.g., id. ¶¶ 8, 11, 14–15, 18, 24, 26–27. Jenner also has a leading and diverse pro bono practice, having been rated the number one law firm for pro bono work by The American Lawyer 12 of the past 15 years. Id. ¶ 7.

As a prominent law firm, Jenner is no stranger to executive orders. But it has more experience representing their targets than being a target itself. Executive Order 14246 flipped the script. Issued on March 25, 2025 and titled "Addressing Risks from Jenner & Block," Executive Order 14246 took aim at Jenner, singling out the firm for disfavored treatment. See 90 Fed. Reg. 13997 (Mar. 25, 2025) ("E.O.")

The order wastes no time saying why. Its first section begins by articulating the President's view that many major law firms "take actions that threaten public safety and national security, limit constitutional freedoms, degrade the quality of American elections, or undermine bedrock American principles"—in large part "through their powerful pro bono practices." E.O. § 1. Jenner, it says, is one such firm. According to the order, Jenner "undermine[s] . . . the

interests of the United States" in three main ways: partisan case selection, pro bono representation the President dislikes, and past association with an attorney of whom the President disapproves.  Id.

On partisanship, Section 1 accuses Jenner of "condon[ing] partisan 'lawfare'" by "engag[ing] in obvious partisan representations to achieve political ends."  Id.  It does not elaborate.

On pro bono representation, Section 1 accuses Jenner of "support[ing] attacks against women and children based on a refusal to accept the biological reality of sex, and back[ing] the obstruction of efforts to prevent illegal aliens from committing horrific crimes and trafficking deadly drugs within our borders."  Id.  Aside from its vague reference to Jenner's "powerful pro bono practice[]," on this, too, the order is coy.  Id.  In context, however, the order refers to Jenner's ongoing challenges to two other executive orders issued by this administration, one on behalf of transgender individuals and the other on behalf of asylum-seekers—both of which have resulted in favorable preliminary outcomes for Jenner's clients.  See Compl. [ECF No. 1] ¶¶ 114–16; SUMF ¶¶ 66–69; Defs.' Mem. Supp. Mot. to Dismiss [ECF No. 20-1] ("MTD") at 8 (confirming this understanding).[1]

And on attorney association, Section 1 laments that Jenner "was 'thrilled' to re-hire the unethical Andrew Weissmann."  E.O. § 1.  Weissmann, a former federal prosecutor, was a partner at Jenner from 2006 to 2011 and from 2020 to 2021; he has not worked there since.  See SUMF ¶ 58.  In the interim, he served the federal government in various capacities, including investigating Russian interference in the 2016 election as a member of the team led by Special Counsel Robert Mueller.  Id. ¶ 59.  Weissmann's participation on the Mueller team, plus his

---

[1] See PFLAG, Inc. v. Trump, Civ. A. No. 25-337 (D. Md. Feb. 4, 2025); Refugee & Immigr. Ctr. for Educ. & Legal Servs. v. Noem, Civ. A. No. 25-306 (D.D.C. Feb. 3, 2025).

public criticism of President Trump—including, per Section 1, his "overt demand that the Federal Government pursue a political agenda against" President Trump, E.O. § 1, and his authorship of a nonfiction book critical of the President, SUMF ¶ 59—has drawn the President's ire, see id. ¶¶ 60–62. And so Jenner's relationship with Weissmann "is a concerning indictment of Jenner's values and priorities." E.O. § 1.

Separately (and briefly), the order accuses Jenner of "discriminat[ing] against its employees based on race and other categories prohibited by civil rights laws, including through the use of race-based 'targets.'" E.O. § 1. Again, the order does not elaborate. An accompanying "fact sheet" says only: "Jenner has been accused of discriminating against its own employees on the basis of race and other categories." Fact Sheet [ECF No. 19-23] at 2. Like the order itself, the fact sheet does not provide any evidence of the accusations or of their truth.

With that background set, the order's four following sections direct action against Jenner with respect to security clearances (Section 2), government contracts (Section 3), antidiscrimination law enforcement (Section 4), and access to government buildings, personnel, and employment (Section 5).

Section 2, titled "Security Clearance Review," instructs the Attorney General and other agency heads to "immediately take steps consistent with applicable law to suspend any active security clearances held by individuals at Jenner pending a review of whether such clearances are consistent with the national interest." E.O. § 2(a). It also directs the Office of Management and Budget to "identify all Government goods, property, material, and services, including Sensitive Compartmented Information Facilities, provided for the benefit of Jenner," and instructs agency heads to "expeditiously cease such provision." E.O. § 2(b). The fact sheet makes clear that both actions are to happen "immediately." Fact Sheet at 1.

Section 3, titled "Contracting," seeks to end all contractual and subcontractual relationships connecting (however tenuously) Jenner and the federal government, in order "[t]o prevent the transfer of taxpayer dollars" to Jenner.  E.O. § 3(a); see also Fact Sheet at 1 ("To ensure taxpayer dollars no longer go to contractors whose earnings subsidize activities not aligned with American interests.").  It instructs "Government contracting agencies" to "require Government contractors to disclose any business they do with Jenner and whether that business is related to the subject of the Government contract."  Id.  With that information in hand, agency heads are to "review all contracts with Jenner or with entities that disclose doing business with Jenner," "terminate any contract, to the maximum extent permitted by applicable law, . . . for which Jenner has been hired to perform any service," and "otherwise align their agency funding decisions with the interests of the citizens of the United States."  E.O. § 3(b); see also Fact Sheet at 1 ("[T]he Federal Government will terminate contracts that involve Jenner.").

Section 4, titled "Racial Discrimination," is a bit more opaque.  It instructs that the order shall not "be construed to limit the action authorized by section 4 of" an earlier executive order—one targeting Perkins Coie, another major law firm.  E.O. § 4; see 90 Fed. Reg. 11781 (Mar. 6, 2025) ("Perkins Coie E.O.").  That order, in turn, instructed the chair of the Equal Employment Opportunity Commission ("EEOC") to "review the practices of representative large, influential, or industry leading law firms for consistency with" antidiscrimination law.  Perkins Coie E.O. § 4.  Of course, it would be difficult to read this order to "limit" any action against Jenner.  So the fact sheet confirms what Section 4 really means: "The practices of Jenner will be reviewed under Title VII to ensure compliance with civil rights laws against racial bias."  Fact Sheet at 2.[2]

---

[2] The Perkins Coie order to which Section 4 refers has since been permanently enjoined.  See Perkins Coie LLP v. U.S. Dep't of Just., Civ. A. No. 25-716 (BAH), 2025 WL 1276857, at *23–24, *49–51 (D.D.C. May 2,

Finally, Section 5, titled "Personnel," takes aim at every Jenner employee.  It instructs agency heads, "to the extent permitted by law, [to] provide guidance limiting official access [to] Federal Government buildings to employees of Jenner when such access would threaten the national security of or otherwise be inconsistent with the interests of the United States."  E.O. § 5(a).  It instructs agency heads to "provide guidance limiting Government employees acting in their official capacity from engaging with Jenner employees, including but not limited to Andrew Weissmann"—not a Jenner employee, see SUMF ¶ 58—"to ensure consistency with the national security and other interests of the United States."  E.O. § 5(a).  And it instructs agencies to "refrain from hiring employees of Jenner, including but not limited to Andrew Weissmann, absent a waiver from the head of the agency, made in consultation with the Director of the Office of Personnel Management, that such hire will not threaten the national security of the United States."  E.O. § 5(b).  The fact sheet confirms: "Federal Agencies will . . . refrain from hiring Jenner employees unless specifically authorized."  Fact Sheet at 1.

According to undisputed evidence in the record, the order quickly had its intended effect.  Department of Justice lawyers instructed a Jenner client not to bring its counsel from Jenner to a meeting with the Department of Justice scheduled for April 3.  SUMF ¶ 76.  Many other clients have contacted Jenner with concerns about Jenner's ability to represent them moving forward, "indicat[ing] that they will need to make decisions shortly" about their retention of the firm.  Id. ¶¶ 74, 78.  And more severe harms are in the offing.  More than forty percent of Jenner's revenue comes from government contractors, subcontractors, or affiliates, id. ¶ 83; the order puts that revenue at grave risk.

---

2025).  Neither party suggests, however, that the Perkins Coie injunction would prevent Section 4 of this executive order from operating as intended.

Executive orders like this one have become something of a modus operandi for the President.  Both before and after this order, the administration trained similar orders on other large law firms, including Covington & Burling; Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul Weiss"); Perkins Coie; WilmerHale; and Susman Godfrey.[3]  The orders follow the same recipe: other than personalized touches in their first sections, they generally direct the same adverse actions towards each firm and decry the threat each firm poses to national security and the national interest.

It will not come as a spoiler that Jenner opted to sue.  But not everyone did.  Paul Weiss, for instance, negotiated.  See Schmidt, <u>Law Firm Bends in Face of Trump Demands</u>, N.Y. Times (Mar. 20, 2025) [ECF No. 19-16]; SUMF ¶ 49.  The negotiation ended in "a remarkable change of course" from both Paul Weiss and the administration.  90 Fed. Reg. 13685 (Mar. 21, 2025) ("Second Paul Weiss E.O.").   According to the President, Paul Weiss "acknowledged the wrongdoing of its former partner" who, like Weissmann, had drawn the President's anger, and agreed to "adopt[] a policy of political neutrality with respect to client selection and attorney hiring; tak[e] on a wide range of pro bono matters representing the full political spectrum; commit[] to merit-based hiring, promotion, and retention, instead of 'diversity, equity, and inclusion' policies"; and "dedicat[e] the equivalent of $40 million in pro bono legal services," <u>id.</u>, "to support the Administration's initiatives," <u>see</u> Donald J. Trump (@realDonaldTrump), Truth Social (Mar. 20, 2025, 3:10 PM) [ECF No. 19-17] at 2.  In exchange, the administration revoked the executive order aimed at Paul Weiss.  <u>See</u> Second Paul Weiss E.O. § 2.

---

[3] <u>See</u> White House, Suspension of Security Clearances and Evaluation of Government Contracts (Feb. 25, 2025), https://perma.cc/8G3A-N82P (Covington); 90 Fed. Reg. 13039 (Mar. 14, 2025) ("First Paul Weiss E.O."); 90 Fed. Reg. 11781 (Mar. 6, 2025) (Perkins Coie); 90 Fed. Reg. 14549 (Mar. 27, 2025) (WilmerHale); 90 Fed. Reg. 15615 (Apr. 15, 2025) (Susman Godfrey).

Other firms skipped straight to negotiations.  Without ever receiving an executive order, these firms preemptively bargained with the administration and struck deals sparing them.  The deals largely mirror Paul Weiss's, though the price continues to rise: instead of $40 million, these firms have pledged $100 million or more in pro bono legal services the administration has a hand in choosing.[4]  And in public statements, the President has floated the prospect of deploying the firms to work on the administration's own projects, rather than traditional pro bono causes, while acknowledging the firms' lack of wrongdoing: "I agree, they've done nothing wrong," the President said at a recent event.  "[B]ut what the hell, they give me a lot of money considering they've done nothing wrong."  See Keith Goldberg, Trump Wants to Use Firms that Cut Deals for Coal Leases, Law360 (Apr. 8, 2025), https://perma.cc/8S72-2AJ5.[5]

## Procedural History

Rather than negotiate, Jenner sued three days after the order's issuance and sought a temporary restraining order ("TRO") the same day.  See Compl. [ECF No. 1]; Mot. TRO [ECF No. 2].  The complaint challenged the executive order in its entirety and raised 13 counts: violations of the First Amendment six times over; violations of due process thrice over; a violation of the equal protection component of the Fifth Amendment; violations of the Fifth and Sixth Amendments' protections of the right to counsel; and a violation of the separation of powers.  See Compl. ¶¶ 140–253.

---

[4] See, e.g., Donald J. Trump (@realDonaldTrump), Truth Social (Mar. 28, 2025, 10:57 AM) [ECF No. 19-27] (Skadden Arps); Donald J. Trump (@realDonaldTrump), Truth Social (Apr. 1, 2025, 1:47 PM) [ECF No. 19-28] (Willkie Farr & Gallagher); Donald J. Trump (@realDonaldTrump), Truth Social (Apr. 2, 2025, 11:05 AM) [ECF No. 19-29] (Milbank).

[5] In addition to Jenner, three firms have challenged similar executive orders in court.  Each order has been either permanently enjoined, see Perkins Coie, 2025 WL 1276857, or temporarily enjoined in large part pending final resolution, see Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the President, Civ. A. No. 25-917 (RJL), 2025 WL 946979 (D.D.C. Mar. 28, 2025); Temporary Restraining Order, Susman Godfrey LLP v. Exec. Off. of the President, ECF No. 15, Civ. A. No. 25-1107 (LLA) (Apr. 15, 2025).

The TRO motion raised the same sweeping arguments but sought narrower relief more tailored to Jenner's immediate harm, asking the Court to temporarily enjoin Sections 1, 3, and 5 of the order.  See Mot. TRO at 3.  Following a hearing held the same day, the Court largely obliged.  The Court concluded that Jenner's challenge would likely succeed because the order "retaliates against [Jenner] for its protected speech" and "constitutes unconstitutional viewpoint discrimination"—problems that were "magnified by the order's additional Fifth and Sixth Amendment deficiencies" reflected in its attempts to undermine "the essential role that lawyers play in our polity."  TRO Hr'g Tr. [ECF No. 10] at 46, 48, 50.  It then found that Jenner faced imminent and irreparable harm: the order's economic impacts "threaten[ed] the existence of the firm," id. at 51, and its constitutional impacts "deprive[d] Jenner of its First Amendment freedoms," id. at 53 (citing Pursuing Am.'s Greatness v. FEC, 831 F.3d 500, 511 (D.C. Cir. 2016)).  And the public interest and balance of the equities easily favored relief, as "the legal profession as a whole [was] watching and wondering" whether "the federal government [would] turn its unwanted attention to them next."  Id. at 54–55.

Accordingly, the Court entered a TRO restraining the defendants from enforcing Sections 3 or 5 of the executive order and from using the statements in Section 1 to punish Jenner, its clients, or its employees.  See Order Granting TRO [ECF No. 9].  By consent of the parties, the TRO has remained in place pending final judgment.  See Joint Status Report [ECF No. 13].  The defendants then moved to dismiss, while the plaintiffs moved for summary judgment and a permanent injunction.  See MTD; Mot. for Summ. J. [ECF No. 19] ("MSJ").  The Court held a hearing on April 28, and now resolves the competing dispositive motions.

**Standards**

The defendants filed a motion to dismiss; Jenner filed a motion for summary judgment. The traditional difference between these two types of motions is the discovery that follows the one and enables the other.  See Convertino v. U.S. Dep't of Just., 684 F.3d 93, 99 (D.C. Cir. 2012) ("[S]ummary judgment is premature unless all parties have 'had a full opportunity to conduct discovery.'" (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986))). Here, though, both parties "agreed that they do not anticipate needing discovery," see Joint Status Report, and the defendants submitted evidence of their own in response to Jenner's motion for summary judgment, see Decl. of Richard Lawson [ECF No. 95-2].   Since the defendants have "responded to the submission of exhibits with evidence of [their] own," Pintro v. Wheeler, 35 F. Supp. 3d 47, 52 n.5 (D.D.C. 2014), and had an opportunity "to either conduct discovery or come forward with additional evidence" to the extent they wished, Colbert v. Potter, 471 F.3d 158, 168 (D.C. Cir. 2006) (internal quotation marks omitted), the Court will construe the defendants' motion to dismiss as one for summary judgment.

That leaves the parties with dueling cross-motions for summary judgment.   In that posture, each party receives the benefit of favorable factual inferences for purposes of the other party's motion.  See N.S. ex rel. Stein v. District of Columbia, 709 F. Supp. 2d 57, 65 (D.D.C. 2010).  Summary judgment is appropriate if "there is no genuine issue as to any material fact" and either movant "is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

If it prevails, Jenner seeks a declaratory judgment and permanent injunction.  In addition to a meritorious case, securing a permanent injunction requires Jenner to have (1) irreparable injury that it will suffer absent injunctive relief; (2) no available remedy at law, such as monetary damages, adequate to compensate its injury; and (3) an upper hand considering the balance of

hardships and the public interest.  See Anatol Zukerman & Charles Krause Reporting, LLC v. USPS, 64 F.4th 1354, 1364 (D.C. Cir. 2023) (citing eBay Inc. v. MercExchange, LLC, 547 U.S. 388, 391 (2006)); Nken v. Holder, 556 U.S. 418, 435 (2009) (explaining that the inquiries into the balance of hardships and public interest merge when the government is the defendant).

## Analysis

### I.    The executive order violates Jenner's First Amendment rights.

The challenged executive order targets Jenner for what it has said and thereby attempts to dampen what it might yet say.  That is unconstitutional under any view of the First Amendment, but two additional features of this order magnify its offensiveness to the freedoms the First Amendment guarantees: its viewpoint discrimination and its targeting of lawyers in particular. And none of the order's sections can be salvaged by the Executive Branch's discretion in guarding the nation's secrets (Section 2); in contracting (Section 3); in investigating discrimination (Section 4); or in landlording and hiring (Section 5).

### A.  The executive order retaliates for and seeks to silence Jenner's protected speech.

Jenner's primary claim—and its most straightforward winner—is the First Amendment retaliation claim.  To prevail, Jenner "must show (1) that it engaged in protected conduct, (2) that the government took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again, and (3) that there exists a causal link between the exercise of a constitutional right and the adverse action taken against him."  Scahill v. District of Columbia, 909 F.3d 1177, 1185 (D.C. Cir. 2018) (cleaned up).  At prong three, "[t]he improper motive must be a but-for cause of the government action, meaning that the adverse action . . . would not have been taken absent the retaliatory motive."  Comm. on Ways & Means, U.S.

House of Reps. v. U.S. Dep't of Treasury, 45 F.4th 324, 340 (D.C. Cir. 2022) (internal quotation marks omitted).

The first two prongs are easy. Begin with an area of significant agreement: of the activity for which Section 1 denounces Jenner, nearly all enjoys robust First Amendment protection. This elementary and unchallenged point need not occupy much space. Jenner's "partisan representations to achieve political ends," E.O. § 1, is another way of saying courtroom advocacy on behalf of its chosen causes—that is, the very core of the First Amendment's protection of "litigation as a vehicle for effective political expression and association." In re Primus, 436 U.S. 412, 431 (1978); see also, e.g., In re Halkin, 598 F.2d 176, 187 (D.C. Cir. 1979) ("Litigation itself is a form of expression protected by the First Amendment."), abrogated on other grounds by Seattle Times Co. v. Rhinehart, 467 U.S. 20, 29–33 (1984).[6] The same goes for Jenner's pro bono representation of transgender people and asylum-seekers. See E.O. § 1 ("refusal to accept the biological reality of sex" and "obstruction of efforts to prevent illegal aliens from committing horrific crimes and trafficking deadly drugs"). Whether best captured by the "freedom of speech, petition or assembly," this is precisely the sort of "vigorous advocacy . . . against governmental intrusion," NAACP v. Button, 371 U.S. 415, 429–30 (1963), that has long "made lawyerdom proud," Sacher v. United States, 343 U.S. 1, 4 (1952). As for Jenner's employment of Weissmann, it is evidently Weissmann's criticisms of the President and participation in a legitimate investigation of election interference that drew presidential disdain; and it is Jenner's erstwhile association with Weissmann that extended that disdain to the firm. But Weissmann's activity falls easily within the First Amendment's muscular protection for "criticism of government and public officials," N.Y. Times Co. v. Sullivan, 376 U.S. 254, 276 (1964), and

---

[6] It matters not whether Jenner is in fact a "partisan" actor, or whether its litigation activity expresses its own views or simply channels the interests of its clients. What matters is the administration's motive, whether resting on fact or falsehood. See Heffernan v. City of Paterson, 578 U.S. 266, 271–73 (2016).

that criticism can no more bring Jenner into the administration's crosshairs than it can bring Weissmann himself into the administration's crosshairs, cf. Hobson v. Wilson, 737 F.2d 1, 28 (D.C. Cir. 1984) ("Government cannot constitutionally punish individual or group advocacy of any position, unless it amounts to incitement to lawless action."), overruled in part on other grounds by Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit, 507 U.S. 163 (1993).

The second prong poses no more difficulty.  Usually, figuring out whether retaliation would chill a speaker of ordinary firmness—and ascertaining just how much a speaker would have to trim her advocacy to avoid reprisal—requires some guesswork.[7]  Not here.  The serial executive orders targeting law firms have produced something of an organic experiment, control group and all, for how firms react to the orders and how they might escape them.  Over the course of that experiment, several firms of (presumably) ordinary firmness have folded rather than face similar executive orders.  Indeed, it appears to take extraordinary firmness to resist. And the experiment has shown what folding entails: compromising speech.  See, e.g., Second Paul Weiss E.O. § 1 (Paul Weiss agreeing to "adopt[] a policy of political neutrality," accept pro bono matters "representing the full political spectrum," and dedicate $40 million in pro bono services to causes of which the President approves).

The third prong—the "causal link between the exercise of a constitutional right and the adverse action," Aref v. Lynch, 833 F.3d 242, 258 (D.C. Cir. 2016)—requires more analysis. Section 1 of the order leaves no question that there is some causal link, as that section proudly identifies Jenner's protected activity as a reason—indeed, the primary reason—Jenner has earned

---

[7] That said, the bar is not a high one.  See Tao v. Freeh, 27 F.3d 635, 639 (D.C. Cir. 1994) ("[A]s the Supreme Court has noted, the First Amendment protects government employees from 'even an act of retaliation as trivial as failing to hold a birthday party for a public employee . . . when intended to punish her for exercising her free speech rights." (quoting Rutan v. Republican Party of Ill., 497 U.S. 62, 76 n.8 (1990))).

the President's disdain. And the defendants make no attempt to dispel the impression that Section 1 leaves, as they in fact double down on Section 1's accusations in their briefing. See, e.g., MTD at 8–9 (defendants highlighting that Jenner "does not and cannot seriously contest" that it "is providing pro bono representation in a challenge to the President's executive order designed to protect children from chemical and surgical mutilation" or that it "hosted an event interviewing" Weissmann).

To prevail on its retaliation claim, however, Jenner must show not only that its speech was a cause of the executive order but that it was a but-for cause. That requires showing that the order would not have issued "absent the retaliatory motive." Comm. on Ways & Means, 45 F.4th at 340. If the defendants can point to unprotected activity that would have justified the same actions, then the factfinder at trial, not the Court at summary judgment, would have to resolve that credibility dispute. See, e.g., Borgo v. Goldin, 204 F.3d 251, 258 (D.C. Cir. 2000); Tao v. Freeh, 27 F.3d 635, 639 (D.C. Cir. 1994).

This final showing is complicated by the one aspect of Section 1's accusations the First Amendment leaves unprotected: discrimination. See, e.g., Runyon v. McCrary, 427 U.S. 160, 176 (1976). So the defendants attempt to save sections 3 and 4 of the order by clinging to Jenner's supposedly discriminatory employment practices, insisting that they would have taken the steps those sections direct even absent any retaliatory motive.[8] And they attempt to save

---

[8] This is a generous construction of the defendants' argument. Apparently not eager to face a jury, they disclaim any "genuine issues of material fact that would necessitate a trial." See Defs.' Resp. to Pl.'s SUMF [ECF No. 95-1] at 1. So they style most of this argument not as a factual dispute but as a legal argument that the First Amendment disappears or retreats to mere rationality review so long as the defendants identify any non-retaliatory motive at all, leaving no need to assess the retaliatory motive. See MTD at 17. For this they cite McGowan v. State of Maryland, 366 U.S. 420 (1961), which upheld against Establishment Clause challenge a state law requiring certain businesses to close on Sundays because the laws were justified by legitimate purposes like "providing a Sunday atmosphere of recreation, cheerfulness, repose and enjoyment." Id. at 442, 448.

There is a long answer and a short answer. The long answer would observe that McGowan says no such thing; that McGowan in fact concluded that the challenged Sunday-closure laws had evolved away from their religious origins, id. at 433–34; that they now held "a secular rather than [] a religious character" such that they no

Section 2's security-clearance suspension by vague reference to national security, another facially legitimate motive. These are doubtful propositions given the order's persistent emphasis on Jenner's speech and comparatively scanty treatment of discrimination and security concerns. But this is summary judgment, and the Court is not a jury; it cannot weigh competing motives via word count. Instead, the Court must determine whether Jenner prevails as a matter of law. So it will investigate whether "non-retaliatory grounds are in fact []sufficient to provoke the adverse consequences" prescribed by any of the order's sections. <u>Nieves v. Bartlett</u>, 587 U.S. 391, 398 (2019) (quoting <u>Hartman v. Moore</u>, 547 U.S. 250, 256 (2006)).[9]

Keep in mind, however, that this is no run-of-the-mill retaliation case, for several reasons bearing mention. Although retaliation connotes retrospective punishment, its greatest danger lies in its prospective silencing effect: "The reason why . . . retaliation offends the Constitution is that

---

longer bore any "relationship to establishment of religion," <u>id.</u> at 444; and that it was only after concluding that "the core values of the Establishment Clause [were] <u>not</u> at stake," <u>Anderson v. Laird</u>, 466 F.2d 283, 292 n.51 (D.C. Cir. 1972), that the Supreme Court applied the rational-basis standard that the government so desires here, <u>see</u> <u>Woodson v. Attorney General</u>, 990 F.2d 1344, 1350 (D.C. Cir. 1993) (relying on <u>McGowan</u> to apply rational basis to an equal protection claim involving no fundamental right).

The short answer is that the First Amendment is asked every day to shield speech against laws with legitimate purposes. The classic formulation of strict scrutiny in the First Amendment context, after all, asks whether a law is "narrowly tailored to serve compelling state interests"; intermediate scrutiny, too, compares the "important governmental interests unrelated to the suppression of free speech" to the amount of speech burdened. <u>TikTok Inc. v. Garland</u>, 145 S. Ct. 57, 67 (2025) (internal quotation marks omitted). A First Amendment that disappears in the face of governmental interests would be both impotent and foreign to American jurisprudence.

So it will come as no surprise that the law is not as the defendants see it, and that the First Amendment is not so easily circumvented. In fact, "the mere assertion of a content-neutral purpose" is not enough to save government action "which, on its face, discriminates based on content"—let alone viewpoint, which, as the Court will explain, this order does. <u>See</u> <u>Turner Broad. Sys. v. FCC</u>, 512 U.S. 622, 642–43 (1994); <u>see also</u> <u>Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.</u>, 502 U.S. 105, 117 (1991); <u>Frederick Douglass Found., Inc. v. District of Columbia</u>, 82 F.4th 1122, 1144–45 (D.C. Cir. 2023).

[9] Jenner would have the Court skip this section-by-section analysis and view the order "as a single, integrated document." Pl.'s Mem. of L. in Opp'n to Defs.' MTD [ECF No. 94] at 23. The Court agrees that retaliatory motive infects the entire order and that the entire order—accounting for the array of tools it brings to bear against Jenner—is the relevant adverse action that must suffice to chill a speaker of ordinary firmness (though any of the sections would suffice standing alone). But it is difficult to discern whether non-retaliatory reasons justify the actions taken without analyzing the actions taken, and that requires a dive into each operative section. In any event, the Court is unpersuaded by Jenner's contention that the order's sections "are not severable," <u>id.</u> at 22–23, because the President "intended the . . . order to stand or fall as a whole," <u>Minnesota v. Mille Lacs Band of Chippewa Indians</u>, 526 U.S. 172, 191 (1999). The order directs a number of distinct actions, none of which depend on the others for their operation. So the President would likely have wanted as much of the order to survive as possible even if some of it must fall.

it threatens to inhibit exercise of the protected right." Crawford-El v. Britton, 523 U.S. 574, 588 n.10 (1998); see also, e.g., McIntyre v. Ohio Elections Comm'n, 514 U.S. 334, 357 (1995) ("[T]he First Amendment . . . protect[s] unpopular individuals from retaliation—and their ideas from suppression."). That forward-looking threat looms especially large here, not only for other law firms but for Jenner itself. The administration has shown a repeated willingness to haggle, sending the message loud and clear that Jenner can spare itself—if it compromises its speech. So whereas retaliation usually punishes once and moves along, the retaliation here is ongoing and avoidable. In this context, retaliation amounts to something akin to the impermissible "scheme of informal censorship" that arises when government actors use the "threat of invoking legal sanctions and other means of coercion to achieve the suppression of disfavored speech." Vullo, 602 U.S. at 188–89 (cleaned up). Such threats present an especially harmful sort of retaliation, analogous to (though less absolute than) the prior restraints that are "the most serious and the least tolerable" of all First Amendment violations. Neb. Press Ass'n v. Stuart, 427 U.S. 539, 559 (1976).

Then there is the fact that we deal here with lawyers. In this context, the forward-looking censorship scheme threatens not only the First Amendment but also the right to counsel's promise of a conflict-free attorney "devoted solely to the interests of his client." Penson v. Ohio, 488 U.S. 75, 86–87 (1988) (internal quotation marks omitted). A firm fearing or laboring under an order like this one feels pressure to avoid arguments and clients the administration disdains in the hope of escaping government-imposed disabilities. Meanwhile, a firm that has acceded to the administration's demands by cutting a deal feels the same pressure to retain "the President's ongoing approval." Br. of Legal Ethics Profs. as Amici Curiae in Supp. of Pl. [ECF No. 113] at 6. Either way, the order pits firms' "loyal[ty] to client interests" against a competing interest in

pleasing the President.  See Nat'l Sec. Counselors v. CIA, 811 F.3d 22, 30 (D.C. Cir. 2016).  The Constitution shields clients from lawyers caught in such a "struggle to serve two masters." Cuyler v. Sullivan, 446 U.S. 335, 349 (1980) (internal quotation marks omitted).

That this order targets lawyers magnifies its threat to the Constitution in other ways, too. Lawyers and the firms they comprise are not, it goes without saying, immune from the legitimate exercise of state power.  Cf. Hishon v. King & Spalding, 467 U.S. 69, 77–78 (1984).  But neither is the Constitution blind to lawyers' importance in upholding our democracy.  Indeed, at least four constitutional amendments afford counsel-specific protection in view of the "foundation[al]" nature of the right to counsel.  Martinez v. Ryan, 566 U.S. 1, 12 (2012); see U.S. Const. amends. I, V, VI, XIV.[10]  This is because "[t]he right to sue and defend in the courts" is "the right conservative of all other rights, and lies at the foundation of orderly government."  Chambers v. Baltimore & O.R. Co., 207 U.S. 142, 148 (1907).  Our society has entrusted lawyers with something of a monopoly on the exercise of this foundational right—on translating real-world harm into courtroom argument.  Sometimes they live up to that trust; sometimes they don't.  But in all events, their independence is essential lest they shrink into "nothing more than parrots of the views of whatever group wields governmental power at the moment."  Cohen v. Hurley, 366 U.S. 117, 138 (1961) (Black, J., dissenting).

For that reason, Executive Order 14246 implicates also the Fifth and Sixth Amendment guarantees of the "right to choose counsel without interference by officialdom."  Am. Airways Charters, Inc. v. Regan, 746 F.2d 865, 872 (D.C. Cir. 1984); see also United States v. Gonzalez-Lopez, 548 U.S. 140, 144–46 (2006).  Section 5 of the order in particular—with its threatened (and, in at least one case, consummated) bar of Jenner employees from, say, negotiating with

---

[10] See, e.g., Legal Servs. Corp. v. Velazquez, 531 U.S. 533, 548 (2001); Minnick v. Mississippi, 498 U.S. 146, 152–53 (1990); United States v. Gonzalez-Lopez, 548 U.S. 140, 144 (2006); see also Perkins Coie, 2025 WL 1276857, at *41–43.

federal prosecutors and agencies and even entering federal courthouses—could hamstring Jenner's ability to represent its clients, and thus its clients' right to choose Jenner without interference. So the First, Fifth, and Sixth Amendments speak in unison here, all eyeing skeptically the administration's attempt "to stifle any voice" Jenner and its clients "might wish to raise before the courts in protest." Am. Airways Charters, 746 F.2d at 876.

Next, there is the interdependence of bench and bar. "An informed, independent judiciary presumes an informed, independent bar." Legal Servs. Corp. v. Velazquez, 531 U.S. 533, 545 (2001). So limitations on lawyers' speech must be examined with care, as such limitations threaten not only the lawyers and their clients but also the ability of a coequal branch of government to function. Cf. Penson, 488 U.S. at 82 (noting that a lawyer's failure "deprived the court of the assistance of an advocate" of its own).[11] Official attempts to "draw lines around" lawyers' advocacy and thereby "exclude from litigation those arguments and theories [the President] finds unacceptable but which by their nature are within the province of the courts to consider" threaten a deep and irreparable rift in the constitutional order because they seek "to insulate the Government's [acts] from judicial inquiry." Legal Servs. Corp., 531 U.S. at 546. When the government draws legal scrutiny, its response must be to defend itself in court, not to intimidate those who would force it to do so.[12]

---

[11] Of course, there are certain contexts in which lawyers' speech may be curtailed in ways that would be unacceptable outside, say, a courtroom. See, e.g., Gentile v. State Bar of Nev., 501 U.S. 1030, 1071 (1991) (Op. of Rehnquist, C.J.) ("It is unquestionable that in the courtroom itself, during a judicial proceeding, whatever right to 'free speech' an attorney has is extremely circumscribed."); id. at 1081–82 (O'Connor, J., concurring) ("Lawyers are officers of the court and, as such, may legitimately be subject to ethical precepts that keep them from engaging in what otherwise might be constitutionally protected speech."). This case presents nothing like the circumstances where the "right of lawyers to free speech" can "conflict" with "the right of litigants to fair trials." Chicago Council of Lawyers v. Bauer, 522 F.2d 242, 248 (7th Cir. 1975). Far from ensuring the integrity of the legal process, this order attempts to deter law firms from offering their services to disfavored clients and from making disfavored arguments. "[W]e should be extremely skeptical about any" action in this vein. In re Halkin, 598 F.2d at 187 (quoting Chicago Council of Lawyers, 522 F.2d at 258).

[12] But see Presidential Memorandum, Preventing Abuses of the Legal System and the Federal Court (Mar. 22, 2025) (directing the Attorney General to, among other things, "review conduct by attorneys or their law firms in

Last, the order targets Jenner not merely for the fact of its speech but for the specific views it expresses thereby. It is Jenner's "partisan representations," its "support[]" and "back[ing]" for transgender people and asylum-seekers, and its tenuous connection to "a political agenda against me"—that is, against President Trump—that drew this executive order. E.O. § 1. The order thus engages in the "egregious form of content discrimination" known as "viewpoint discrimination," making its inconsistency with the First Amendment "all the more blatant." Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 829 (1995); see also, e.g., Frederick Douglass Found., Inc. v. District of Columbia, 82 F.4th 1122, 1141 (D.C. Cir. 2023) ("viewpoint discrimination is poison" (internal quotation marks omitted)).

In short, the order raises constitutional eyebrows many times over. It punishes and seeks to silence speech "at the very center of the First Amendment," Gentile v. State Bar of Nev., 501 U.S. 1030, 1034 (1991); does so via the most "egregious form of content discrimination— viewpoint discrimination," Vidal v. Elster, 602 U.S. 286, 293 (2024) (internal quotation marks omitted); all in an unacceptable attempt to "insulate the Government's laws from judicial inquiry," Legal Servs. Corp., 531 U.S. at 546.

The remainder of this opinion will investigate whether the order—or any of its sections— can nevertheless survive.

---

litigation against the Federal Government over the last 8 years" for purported "misconduct" and recommend responses "including reassessment of security clearances held by the attorney, termination of any contract for which the relevant attorney or law firm has been hired to perform services, or any other appropriate actions").

This is not the first time powerful government officials have attempted to silence lawyers and thereby cut off the courts as an avenue of redress for unconstitutional action. "In too many countries and instances to name, regimes have disbarred, prosecuted and jailed lawyers who dared to represent opposition figures or challenge government actions, with predictable results for the rule of law and the integrity of the legal profession." Br. of Amici Curiae 807 Law Firms in Supp. of Pl. [ECF No. 105] at 4. And while most examples might come from abroad, there are also cautionary tales from within our borders—for instance, southern states' targeting of civil rights lawyers during the civil rights movement and the ACLU's initial reluctance to represent Fred Korematsu for fear of angering President Roosevelt. See Br. of Amici Curiae Fred T. Korematsu Center for Law & Equality, et al. in Supp. of Pl. [ECF No. 104] at 2–3, 5–7; Br. of Amicus Curiae NAACP Legal Def. & Educ. Fund, Inc. in Supp. of Pl. [ECF No. 109] at 2–11.

**B.  Section 2: Security Clearance Review.**

Section 2(a) directs the Attorney General and other relevant officials to "immediately take steps consistent with applicable law to suspend any active security clearances held by individuals at Jenner pending a review of whether such clearances are consistent with the national interest."  E.O. § 2(a).  The fact sheet confirms that suspensions will happen "immediately."  Fact Sheet at 1.  Suspensions will impact Jenner employees both in their work for Jenner and outside of it: three Jenner employees possess or are awaiting adjudication of security clearances in connection with ongoing military service unrelated to their work at the firm; at least six others hold clearances related to their work at the firm; and another is currently applying for a clearance to enable pro bono representation of a federal criminal defendant.  SUMF ¶ 38–42.  Jenner "regularly" handles cases that require access to classified information, including two currently underway.  SUMF ¶ 81.  This section's directives have already begun to take effect and impact Jenner attorneys' ability to represent criminal defendants.  <u>See</u> Notice of Recent Development [ECF No. 137].

i.    <u>Jenner's challenge to Section 2 is justiciable.</u>

Jenner's challenge to this provision encounters an immediate obstacle: courts may not second-guess "an Executive Branch decision to deny or revoke a security clearance."  <u>Lee v. Garland</u>, 120 F.4th 880, 891 (D.C. Cir. 2024).  Such decisions, the D.C. Circuit held just last year, are non-justiciable political questions because they belong exclusively to the Executive Branch, <u>id.</u> at 891, and because they lack judicially manageable standards, turning as they do on "'predictive judgments' about whether individuals are likely to divulge sensitive information" and whether individuals possess "intangible qualities such as 'loyalty to the United States, strength of character, trustworthiness, honesty, reliability, discretion, and sound judgment,'" <u>id.</u>

at 893 (quoting 60 Fed. Reg. 40245, 40250 (Aug. 2, 1995)). "The grant of a security clearance to a particular employee," in sum, is "a sensitive and inherently discretionary judgment call" bound up with "concerns of national security" and thus "committed by law to the appropriate agency of the Executive Branch." Dep't of Navy v. Egan, 484 U.S. 518, 527 (1988).

In the same breath, though, Lee made clear that a dispute is not rendered nonjusticiable "simply because it tangentially relates to a security clearance." 120 F.4th at 892. For instance, the D.C. Circuit held justiciable constitutional challenges to the "methods used to gather information" for clearance decisions and thus reviewed an argument that the Fifth Amendment prohibited asking clearance applicants about their use of illegal drugs or their mental health. Nat'l Fed'n of Fed. Emps. v. Greenberg, 983 F.2d 286, 290 (D.C. Cir. 1993). And the D.C. Circuit also held justiciable Title VII retaliation claims involving security-clearance revocation resulting from a government employee's knowing provision of false information. Rattigan v. Holder, 689 F.3d 764, 770 (D.C. Cir. 2012).

In short, while the merits of any individual security clearance decision are unreviewable, courts may hear "constitutional claims arising from the clearance revocation process." El-Ganayni v. U.S. Dep't of Energy, 591 F.3d 176, 183 (3d Cir. 2010) (emphasis added). This balance is not unique to the security clearance context. Courts may probe (if with a light touch) other processes that culminate in "non-justiciable . . . determinations," such as the President's assessment that a certain transaction "threatens to impair the national security of the United States" and thus must be blocked under the Defense Production Act of 1950. Ralls Corp. v. Comm. on Foreign Inv. in U.S., 758 F.3d 296, 303, 314 (D.C. Cir. 2014). Despite the sensitive national-security context and the concession that courts may not question the presidential determination that a transaction would threaten national security, the Ralls court held that it

could investigate the process behind the determination: "whether the Due Process Clause entitles" a would-be transactor "to have notice of, and access to, the evidence on which the President relied and an opportunity to rebut that evidence before he reaches his non-justiciable (and statutorily unreviewable) determinations"—a question the court answered in the affirmative. Id. at 314, 316; accord El-Shifa Pharm. Indus. Co. v. United States, 607 F.3d 836, 843 (D.C. Cir. 2010) (en banc).

Section 2(a) is susceptible to characterization as either a merits determination or a process. In one sense, its immediate revocation of all security clearances held by Jenner employees is "an Executive Branch decision to . . . revoke a security clearance." Lee, 120 F.4th at 891. On the other hand, it enacts what Jenner aptly dubs a "bespoke," "Jenner-specific" "suspension-and-review process." Pl.'s Mem. of L. in Opp'n to Defs.' MTD [ECF No. 94] ("MTD Opp'n") at 23, 25; see El-Ganayni, 591 F.3d at 183 (claim "that the decision to suspend and then revoke [a] security clearance was made in retaliation for the exercise of his First Amendment rights" was a reviewable process-based claim). At the first step, the order immediately revokes all clearances without individualized explanation, consideration, or opportunity to be heard; at the second, it permits reinstatement upon "a review of whether such clearances are consistent with the national interest." E.O. § 2(a).

Reviewing this process raises none of the concerns that make individual security-clearance determinations nonjusticiable. The immediate and blanket suspension involves no "predictive judgment[s]" about an "individual['s]" threat to national security—indeed it doesn't even permit them. See Lee, 120 F.4th at 893 (emphasis added) (quoting Egan, 484 U.S. at 528–29). And reviewing the suspension does not override decisions "made by trained Security Division personnel," which is the only sort of decision the "absolute bar on judicial review

covers." Rattigan, 689 F.3d at 768; see Egan, 484 U.S. at 529 ("[p]redictive judgment[s]" about who can be trusted with classified information "must be made by those with the necessary expertise"). Instead, Jenner only asks this Court to question the special suspend-then-review process the order imposes on a categorical basis. Refusing to do so would equally bless blanket security-clearance suspensions for all Muslims, Catholics, or disabled people. Cf. Gill v. U.S. Dep't of Just., 875 F.3d 677, 685 (D.C. Cir. 2017) (Tatel, J., concurring) (a claim "that the government has a policy or practice of treating Muslims or naturalized citizens differently . . . , like the claims at issue in Greenberg, would not be barred"). The Constitution does not tolerate such judicial abdication. So Jenner's claim does not ask a political question; it asks a legal one. Accord Perkins Coie LLP v. U.S. Dep't of Just., Civ. A. No. 25-716 (BAH), 2025 WL 1276857, at *19–22 (D.D.C. May 2, 2025) (reaching same conclusion).

      ii.      Section 2(a) impermissibly aims to manipulate speech.

On the merits, there's no doubt that the President ordered the Jenner-specific process in retaliation for Jenner's protected speech. But, given the national security importance of security clearances, that alone may not be enough to deem Section 2 unconstitutional. Any review of a security-clearance process must afford significant deference to the Executive's assessment of what processes will best allow it to make the predictive national security judgments necessary. See Greenberg, 983 F.2d at 290. And for that reason, discriminating on the basis of speech and belief, verboten almost everywhere else, is routine in the security-clearance context. See, e.g., Lee, 120 F.4th at 893 ("Clearance decisions involve an assessment of intangible qualities such as 'loyalty to the United States.'" (quoting 60 Fed. Reg. at 40250)); cf. Aref, 833 F.3d at 260–61 (permissible to consider a prisoner's "language used during [a] prayer meeting" where it bore on

a "legitimate security interest" related to prisoner's place of confinement). So the conclusion that Section 2 retaliates for speech doesn't sting quite the same in this context as in others.

Jenner's challenge to Section 2, however, clears this additional hurdle. To begin, Section 2's process implicates no national security concern to speak of. Security clearance decisions merit judicial deference because of their deep importance to the national security. See, e.g., Greenberg, 983 F.2d at 296 (Sentelle, J., concurring); Egan, 484 U.S. at 527 (presumption of judicial review of agency action "runs aground when it encounters concerns of national security"); Lamb v. Millennium Challenge Corp., 498 F. Supp. 3d 104, 112 (D.D.C. 2020) (noting the "national security concerns animating" security clearance deference). But as far as national security justification, all the defendants have to offer is that Jenner's "public praise for" and rehiring of Weissman after his "role in the Mueller investigation" shows a "national security nexus" supporting Section 2(a). Defs.' Opp'n to Pl.'s Mot. for Summ. J. [ECF No. 95] ("MSJ Opp'n") at 6.

This speech-based justification doesn't even feign at national security, nor do the defendants articulate a cogent argument that it does. Weissmann hasn't worked at Jenner in four years, and the defendants offer no reason that a firm's "public praise for" a figure the administration dislikes could generate a national security need to subject every employee of that firm to a special (and skewed) security clearance review process.[13] Note too that Section 2 permits reinstatement of Jenner employees' security clearances only as consistent with "the national interest," E.O. § 2(a)—a far broader term than national security, and something that Section 1 already concluded Jenner "undermine[s]," E.O. § 1. And if any doubt remains as to the sincerity of the invocation of national security, take a look at the Paul Weiss saga. Paul

---

[13] Twenty-seven former high-level government officials agree that the order invokes "no valid national security concern" and that any gestures towards national security merely provide cover for a "punitive, retributive, ad hominem order." See Br. of Former Senior Gov't Officials as Amici Curiae Supp. Pl. [ECF No. 98] at 1–2.

Weiss's executive order imposed the same tailored process on its employees' security clearances. See First Paul Weiss E.O. § 2. What it took to escape that process—denouncing a former partner, changing client selection and hiring practices, and pledging pro bono work to the President's liking—had not even a glancing relationship to national security.

Put simply, this blunderbuss of an order does not engage in the sort of "legitimate consideration of speech," Reichle v. Howards, 566 U.S. 658, 668 (2012), that might sometimes be necessary to keep classified information in safe hands. Rather than ensuring that national secrets remain with those who will keep them, Section 2's process "seek[s] to leverage" the Executive's control over security clearances as a way to change speech. See Agency for Int'l Dev. v. All. for Open Soc'y Int'l, 570 U.S. 205, 214–15 (2013). Section 2, in other words, is about using another lever in the President's arsenal to extinguish speech he dislikes. Cf. id. at 218 ("This case is not about the Government's ability to enlist the assistance of those with whom it already agrees. It is about compelling a grant recipient to adopt a particular belief as a condition of funding."). The First Amendment forbids that sort of speech manipulation by the government, even in an arguably national security-related setting.

    iii.    <u>Section 2(b) violates the First Amendment.</u>

Section 2(b) received almost no attention from the parties and warrants only brief discussion here. It does either a great deal or very little. Either way it violates the First Amendment.

Situated under the same "Security Clearance Review" heading as Section 2(a), Section 2(b) reads:

> The Office of Management and Budget shall identify all Government goods, property, material, and services, including Sensitive Compartmented Information Facilities, provided for the benefit of Jenner. The heads of agencies providing

such material or services shall, to the extent permitted by law, expeditiously cease such provision.

E.O. § 2(b).  Sensitive Compartmented Information Facilities, or SCIFs, are secure rooms used to view classified information.

Construed broadly and out of context, this directive has a breathtaking sweep, as it could exclude Jenner from all government-provided "services" and "property." (The Postal Service? The Library of Congress?)  If understood in this manner, Section 2(b) would be more similar to Section 5 than to Section 2(a), and would violate the First Amendment as plainly as Section 5 violates it.  See infra § I.E.

Both parties, however, agree that Section 2(b) is best read much more narrowly and with its context in mind.[14]  On this reading, Section 2(b) revokes Jenner's access to SCIFs and other similar mechanisms and materials of the security state.  If this is so, Jenner's challenge to Section 2(b) prevails for the same reasons its challenge to Section 2(a) prevails.

## C.  Section 3: Contracting.

Section 3, recall, aims "[t]o prevent the transfer of taxpayer dollars to Federal contractors whose earnings subsidize, among other things, activities that are not aligned with American interests."  E.O. § 3(a).  To achieve this goal, Section 3 prescribes three steps.  The first ferrets out any contractual connection, however tenuous, between Jenner and the federal government by instructing "Government contracting agencies" to "require Government contractors to disclose any business they do with Jenner and whether that business is related to the subject of the Government contract."  Id.

---

[14] See Tr. of Mots. Hr'g [ECF No. 118] at 20–21; Tr. of Mots. Hr'g, Perkins Coie LLP v. U.S. Dep't of Just., ECF No. 169 at 50, Civ. A. No. 25-716 (Apr. 24, 2025).  But see United Transp. Union v. State Bar of Mich., 401 U.S. 576, 581 (1971) ("We cannot assume that, in its subsequent enforcement, ambiguities will be resolved in favor of adequate protection of First Amendment rights." (cleaned up) (quoting Button, 371 U.S. at 438)).

The second step severs some of those connections and insinuates that agencies must sever the rest. Agency heads shall "terminate any contract . . . for which Jenner has been hired to perform any service." Id. § 3(b)(i). Such contracts could involve Jenner as a government subcontractor or in a capacity adverse to the government, as many of Jenner's government-contractor clients hire Jenner to "avoid or resolve contract disputes with the U.S. Government." SUMF ¶ 25. The second step also calls for agency heads to "otherwise align their agency funding decisions with the interests of the citizens of the United States." E.O. § 3(b)(ii). This instruction threatens to sever ties with contractors that do business with Jenner unrelated to their government work.

The third step ensures follow-through. Within a month of the order, agencies were instructed to report back with "an assessment of contracts with Jenner or with entities that do business with Jenner . . . and any actions taken with respect to those contracts." Id.

i.    Jenner has standing to challenge Section 3 and its challenge is ripe.

The defendants first question Jenner's standing to challenge Section 3. See MTD at 18. Standing "asks whether a case pairs a proper plaintiff with a proper defendant," Indus. Energy Consumers of Am. v. FERC, 125 F.4th 1156, 1164 (D.C. Cir. 2025) (Henderson, J., concurring), requiring that Jenner (1) have suffered or be at imminent risk of suffering an injury in fact (2) that is fairly traceable to the defendants' challenged conduct and (3) that is likely to be redressed by a favorable judicial decision, Ass'n of Am. Physicians & Surgeons, Inc. v. Schiff, 23 F.4th 1028, 1032 (D.C. Cir. 2022) (citing Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016)).

Jenner does not have any direct contracts with the federal government, see Tr. of Mots. Hr'g [ECF No. 118] at 28, so Section 3 operates on Jenner through third-party government contractors that have hired Jenner. Briefly stated, Jenner's theory of standing is that government

contractors will jettison Jenner—both as to government contracts and as to unrelated ones—in an effort to keep their own government business.  See MTD Opp'n at 30.  Because approximately forty percent of Jenner's revenue comes from representation of government contractors, subcontractors, or affiliates, SUMF ¶ 83, the loss of even a fraction of this business would inflict no small injury on Jenner.

The defendants first argue that any fear of injury "at this point [is] purely speculative." See MSJ Opp'n at 15.  Though styled as a contention that Jenner's challenge is unripe, the argument sounds more in imminence.  Cf. Indus. Energy Consumers of Am., 125 F.4th at 1164– 65 (Henderson, J., concurring) (discussing the interplay between Article III standing and prudential ripeness).  Either way it is unpersuasive, as the threat Section 3 poses is clear and imminent.  Before the TRO froze much of the order, Jenner's clients, many of whom "hold significant government contracts and subcontracts," began "requesting frequent updates about the Order's status to evaluate whether the Firm can continue to represent them" and "indicated that they will need to make decisions shortly."  SUMF ¶ 74.  In other words, they must decide "shortly" whether to keep their contracts and lose Jenner or keep Jenner and risk losing their contracts.  Assuming they choose the former, Jenner will be injured imminently.

But will they choose the former?  Seizing on the standing doctrine's general skepticism of "speculation about the decisions of independent" third-party actors, Clapper v. Amnesty Int'l USA, 568 U.S. 398, 414 (2013), the defendants also challenge standing's second prong, arguing that Jenner cannot trace any forthcoming loss in business to the executive order, see MTD at 19; see also, e.g., Murthy v. Missouri, 603 U.S. 43, 57–58, 72 (2024).  The argument is peculiar in its self-deprecation.  It requires the defendants to disclaim the order's potency at accomplishing its stated aim: to prevent taxpayer dollars from flowing to government contractors "whose

earnings subsidize" Jenner's purportedly unamerican activities.  See E.O. § 3(a).  The President, in other words, apparently believed Section 3 would cause Jenner "a classic pocketbook injury," Tyler v. Hennepin Cnty., 598 U.S. 631, 636 (2023); his lawyers now say otherwise.

On this, the Court agrees with the President.  It is entirely predictable that, given the choice between keeping their contracts and keeping Jenner, government contractors will choose the former.  This in any event is the rational choice; Jenner is doubtless a very able law firm, but plenty of able law firms come without the accompanying loss of government business.  Thus, Jenner's "theory of standing thus does not rest on mere speculation about the decisions of third parties; it relies instead on the predictable effect of Government action on the decisions of third parties." Dep't of Com. v. New York, 588 U.S. 752, 768 (2019); see also, e.g., FDA v. All. for Hippocratic Med., 602 U.S. 367, 383 (2024); Energy Future Coal. v. EPA, 793 F.3d 141, 144 (D.C. Cir. 2015); PFLAG, Inc. v. Trump, Civ. A. No. 25-337 (BAH), 2025 WL 685124, at *12 (D. Md. Mar. 4, 2025).  Once faced with the ultimatum Section 3 issues, self-preservation is the likely choice.

And all that is just the cold economics.  But economic injury is not the only sort the Constitution recognizes, and the injury to Jenner's constitutional right to express itself without fear of government reprisal itself confers standing.  As discussed below—and as made clear by other firms' negotiations (and capitulations)—the mere existence of the order chills Jenner's expression.  Jenner has standing to challenge the order casting that chill.  See Chamber of Com. of U.S. v. FEC, 69 F.3d 600, 603–04 (D.C. Cir. 1995); Act Now to Stop War & End Racism Coal. v. District of Columbia, 589 F.3d 433, 435 (D.C. Cir. 2009); Action for Children's Television v. FCC, 59 F.3d 1249, 1258 (D.C. Cir. 1995).

ii.    <u>Section 3 is not sustainable on unprotected grounds.</u>

On the merits, the Supreme Court's recent decision in <u>Vullo</u> and less recent decision in

<u>Bantam Books</u> govern—and defeat the defendants' attempt to deflect a retaliation claim by

pointing to accusations of racial discrimination.  By promising to cancel all contracts for which

Jenner has been hired to perform any service and threatening to cancel contracts with any entity

that contracts with Jenner even on non-government matters, Executive Order 14246 does

precisely what the Supreme Court said just last year is forbidden: it engages in "coercion against

a third party to achieve the suppression of disfavored speech."  <u>Vullo</u>, 602 U.S. at 180 (internal

quotation marks omitted).

The defendants try to escape <u>Vullo</u> by pointing out that the coercive weapon wielded here

is different than the coercive weapon wielded there: Vullo flexed her regulatory might where the

defendants simply flex their procurement power.  This softer sort of governmental influence, the

defendants believe, does not implicate the First Amendment because "when implementing

Section 3 the government is acting as a private party, not as a sovereign,"[15] <u>see</u> MSJ Opp'n at 8,

and is not engaged in "punishment" but merely discretionary contract-selection, <u>see</u> MTD at 21.

But the First Amendment binds the government not only "as sovereign" but also as "employer,

educator, . . . licensor," and more, <u>Hous. Cmty. Coll. Sys. v. Wilson</u>, 595 U.S. 468, 480–81

(2022), and the First Amendment does not concern itself only with "direct restraint or

punishment," <u>Am. Commc'ns Ass'n, C.I.O v. Douds</u>, 339 U.S. 382, 402 (1950).  "Under some

circumstances, indirect 'discouragements' undoubtedly have the same coercive effect upon the

exercise of First Amendment rights as imprisonment, fines, injunctions or taxes."    <u>Id.</u>

---

[15] This quotation could be taken to mean that the defendants believe themselves entirely exempt from the strictures of the First Amendment (or, for that matter, nearly the whole of the Constitution) because when government agencies act as employers or contractors rather than as "sovereign," they do not engage in state action. Such a suggestion would be frivolous and the defendants don't really make it.  But their tendency to veer into such untenable rhetoric might say something about the weakness of their position.

Government manipulation need not be "heavy-handed" to be unconstitutional; the First Amendment protects as well against "more subtle governmental interference." Bates v. City of Little Rock, 361 U.S. 516, 523 (1960).

It is for this reason that Vullo simply reiterated what had been established at least "[s]ix decades" prior when it announced "that a government entity's 'threat of invoking legal sanctions and other means of coercion' against a third party 'to achieve the suppression' of disfavored speech violates the First Amendment." 602 U.S. at 180 (emphasis added) (quoting Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 67 (1963)). So the government's discretion in selecting its contractors is beside the point: "An ordinarily permissible exercise of discretion may become a constitutional deprivation if performed in retaliation for"—or to suppress—"the exercise of a First Amendment right." Toolasprashad v. Bureau of Prisons, 286 F.3d 576, 585 (D.C. Cir. 2002) (cleaned up). Thus, the government may regulate but it may not regulate in retaliation for speech. See Vullo, 602 U.S. at 190. The government may transfer prisoners but it may not transfer prisoners in retaliation for speech. Toolasprashad, 286 F.3d at 585. The government may tax but it may not tax based on speech's content without withstanding strict scrutiny. Ark. Writers' Proj., Inc. v. Ragland, 481 U.S. 221, 230 (1987). And the government may "terminate contracts" but it may not terminate contracts "in retaliation for protected First Amendment activity." Bd. of Cnty. Comm'rs v. Umbehr, 518 U.S. 668, 677 (1996); see also, e.g., Houston Cmty. Coll. Sys., 595 U.S. at 477 (commenting that it is "easy to identify . . . a dismissal from governmental employment" as an impermissible adverse action under the First Amendment). It should go without saying, in other words, that the First Amendment is in the everyday business of doing just what the defendants say it may not: limiting government discretion.

31

So the defendants fail to escape the First Amendment's strictures.  But even if the First Amendment applies, the defendants insist they did not violate it.  They turn to their alternative explanation—that they seek to stem government funds from flowing not to a speaker but to a discriminator.  Pointing out that government may avoid discriminatory employers when it procures contracts, cf. AFL-CIO v. Kahn, 618 F.2d 784, 788, 790–92 & n.40 (D.C. Cir. 1979); Chamber of Com. of U.S. v. Reich, 74 F.3d 1322, 1332–33 (D.C. Cir. 1996),[16] the defendants insist that they would have taken the steps outlined in Section 3 even absent the retaliatory intent that infects the order.

Though this case presents no occasion to determine the lawfulness of Jenner's employment practices, it is worth pausing to examine the defendants' bases, factual and legal, for accusing Jenner of discrimination.  Factually there is very little.  The order and accompanying fact sheet simply say Jenner has been "accused" of discrimination, and the materials the defendants submit in opposition to summary judgment show that Jenner participates in diversity, equity, and inclusion ("DEI") programs in which a large slice of the nation's private sector also participates.  See Diversity Lab, More than 360 Law Firms Achieve Mansfield Certification for 2023–24, Marking a Double-Digit Increase in the Push for Leadership Diversity (Oct. 2, 2024) [ECF No. 95-2 at *110–15].  Legally there is not much more.  The defendants point to no case holding such diversity initiatives illegal.  Instead they expand the Supreme Court's recent decision in Students for Fair Admissions, Inc. v. President and Fellows of Harvard College, 600 U.S. 181 (2023), beyond its own bounds.  See MSJ Opp'n at 11.  In fact they recognize as much, saying that they "raise[] legitimate legal issues of just how far DEI policies and programs can go and whether such policies cross the line into illegal discrimination."  MTD at 28.  Whether or not

---

[16] But see, e.g., Commonwealth v. Biden, 57 F.4th 545, 553 (6th Cir. 2023).  Note that Jenner is not a government contractor, making this premise potentially irrelevant.

the defendants accurately predict the future of antidiscrimination law, the point is that they bank on their predictions of the future. The defendants thus seek unilaterally to effectuate their novel legal theory on untested factual accusations, all while evading the due process that would normally accompany such a step.

Bantam Books and Vullo both rebuffed similar—indeed less ambitious—attempts to sidestep due process. First consider Bantam Books. The case involved a state commission tasked with investigating and recommending the prosecution of the distribution of obscene artwork to juveniles. See Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 59–61 (1963). That goal did not implicate the First Amendment since, like discrimination, "'obscenity is not within the area of constitutionally protected speech or press' and may therefore be regulated." Id. at 65 (quoting Roth v. United States, 354 U.S. 476, 485 (1957)). But the commission's mode of enforcement was another story. The commission achieved its aims by sending letters to booksellers subtly threatening enforcement action if the sellers continued distributing books the commission had deemed obscene. Id. at 62–64. Booksellers, fearing the consequences, generally complied, and thus the commission enjoyed a handy tool to suppress speech. See id. at 63–64.

The commission's threats vested it with an authority inconsistent not only with the First Amendment, but also with the Fourteenth, whose promise of due process would otherwise have ensured that only unprotected content could be suppressed. The commission's unilateral suppression of speech using "the threat of invoking legal sanctions and other means of coercion, persuasion, and intimidation," id. at 67, gave it a shortcut to avoid the procedural protections that would normally attach:

> Herein lies the vice of the system. The Commission's operation is a form of effective state regulation superimposed upon the State's criminal regulation of

> obscenity and making such regulation largely unnecessary. In thus obviating the need to employ criminal sanctions, the State has at the same time eliminated the safeguards of the criminal process. Criminal sanctions may be applied only after a determination of obscenity has been made in a criminal trial hedged about with the procedural safeguards of the criminal process. The Commission's practice is in striking contrast, in that it provides no safeguards whatever against the suppression of nonobscene, and therefore constitutionally protected, matter. It is a form of regulation that creates hazards to protected freedoms markedly greater than those that attend reliance upon the criminal law.

Id. at 69–70. The commission could not claim for itself the unchecked power to separate protected from unprotected speech and enforce that power using the "informal censorship" tool of threatened reprisal. Id. at 71. So too here, the government has simply decreed that Jenner discriminates without affording any due process.

Now consider Vullo. In that case, a New York state official took aim at the National Rifle Association ("NRA"), a group whose pro-gun advocacy state officials disliked. See 602 U.S. at 180–81. The state official oversaw a department that regulates insurance companies doing business in New York, and she used her influence to "threaten enforcement actions against" insurance companies unless they disengaged commercially from the NRA. Id. at 181, 187. Crucially, the case involved conceded violations of law: the NRA contracted with an insurance company to offer insurance policies that all agree ran afoul of New York insurance law. Id. at 181–82, 187. Given those legal infirmities, the defendant argued—and the Second Circuit held—that when the official encouraged insurance companies to avoid business with the NRA she "was merely carrying out her regulatory responsibilities." Id. at 186 (quoting NRA v. Vullo, 49 F.4th 700, 718–19 (2d Cir. 2022)).

The Supreme Court didn't buy it. To be sure, the defendant "was free to . . . pursue the conceded violations of New York insurance law." Id. at 187. "She could not wield her power, however, to threaten enforcement actions against []regulated entities in order to punish or

suppress the NRA's gun-promotion advocacy." Id.  That the NRA and its insurers had violated the law, in other words, did not give New York officials a blank check to disadvantage the NRA and its message—or to pursue violations of law outside the law enforcement process.

Like the defendants Bantam Books and Vullo, the defendants here have identified a speaker they don't like; have threatened action against third parties unless the third parties disassociate from the speaker; and have tried to evade First Amendment scrutiny by recasting their actions not as speech suppression but as law enforcement.  Like the Supreme Court in Bantam Books and Vullo, this Court will not allow the defendants to evade the procedural protections that would normally attend law enforcement by instituting "a scheme of state censorship effectuated by extralegal sanctions." Bantam Books, 372 U.S. at 72.

And make no mistake: like the plaintiffs in those cases, Jenner is entitled to due process. "Suspending a contractor is a serious matter." Com. Drapery Contractors, Inc. v. United States, 133 F.3d 1, 6 (D.C. Cir. 1998).  Thus "[a]n agency may not impose even a temporary suspension without providing the 'core requirements' of due process: adequate notice and a meaningful hearing." Id.; see also, e.g., Reeve Aleutian Airways, Inc. v. United States, 982 F.2d 594, 598 (D.C. Cir. 1993); Liff v. Off. of the Inspector Gen. for the U.S. Dep't of Lab., 156 F. Supp. 3d 1, 21 (D.D.C. 2016), rev'd on other grounds, 881 F.3d 912 (D.C. Cir. 2018).  And if the government must provide due process before terminating a contractor of its own, surely it must do the same before blacklisting an entity from all its contractors' Rolodexes—a more drastic move that precludes Jenner not only from government employment but from the forty percent of its business it gets from entities that themselves contract with the government.  Whatever precise process is due, the executive order does not afford it: Sections 1 and 3, coupled with the fact

sheet's unambiguous instruction that "contracts that involve Jenner" will be "terminate[d]," Fact Sheet at 1, preordain the outcome.

So Section 3 is an act of retaliation not sustainable on non-speech grounds.  Still, the analysis must go on, as government coercion of or retaliation for speech does not invariably violate the First Amendment.  Consider government speech.  When government speaks, it necessarily chooses viewpoints.  Shurtleff v. City of Boston, 596 U.S. 243, 251–52 (2022).  And being made up, in the end, of people, the government must be able to channel those viewpoints through employees; thus it may "impose restraints on the job-related speech of public employees that would be plainly unconstitutional if applied to the public at large."  United States v. Nat'l Treasury Emps. Union, 513 U.S. 454, 465 (1995).  That is, it may in some circumstances coerce its employees to speak as it wishes while on the job, on pain of dismissal.  Relatedly, the government may make "viewpoint-based funding decisions" where it "use[s] private speakers to transmit specific information pertaining to its own program."  Legal Servs. Corp., 531 U.S. at 541 (discussing Rust v. Sullivan, 500 U.S. 173 (1991)).

But the government may not "seek to leverage" its power—whether regulatory, spending, or otherwise—"to regulate speech" outside of those parameters.  All. for Open Soc'y Int'l, 570 U.S. at 214–15.  Jenner falls easily outside those parameters, as it could not be further from the sort of government mouthpiece or policymaker that would open it to government control of its speech.  Even if Jenner contracted directly with the government, the government would have a heavy burden to bear.  Cf. O'Hare Truck Serv., Inc. v. City of Northlake, 518 U.S. 712, 719 (1996).  But Jenner holds no direct government contracts.  Instead, the harm to Jenner from Section 3 is to Jenner's contracts with government contractors—some related to the government contracts, some not.  See SUMF ¶¶ 84–85.  And at this extra level of remove, Jenner becomes

even less like a government mouthpiece and "more like ordinary citizens whose viewpoints on matters of public concern the government has no legitimate interest in repressing." Umbehr, 518 U.S. at 680; cf. Navab-Safavi v. Glassman, 637 F.3d 311, 317 (D.C. Cir. 2011).

In fact, most of Jenner's work for government contractors places Jenner adverse to the government: its Government Contracts and Grants practice "help[s] companies successfully avoid or resolve contract disputes with the U.S. Government." SUMF ¶ 25. Section 3, then, employs retaliatory means against lawyers engaged in litigation opposing the government. A use of the procurement authority more offensive to the First Amendment is difficult to imagine. Cf. United States v. Am. Library Ass'n, Inc., 539 U.S. 194, 213 (2003) (explaining that the funding conditions in Legal Services Corporation offended the First Amendment because the job of the lawyers there was "to advocate against the Government, and there was thus an assumption that counsel would be free of state control"). In sum, Section 3 retaliates for speech the government has no business regulating.

### D. Section 4: Racial Discrimination.

Section 4 is an odd section that, on its face, does nothing at all. The section reads in full: "Nothing in this order shall be construed to limit the action authorized by section 4 of Executive Order 14230 of March 6, 2025 (Addressing Risks from Perkins Coie LLP)." E.O. § 4. That order, in turn, instructed the chair of the EEOC to "review the practices of representative large, influential, or industry leading law firms for consistency with" antidiscrimination law. Perkins Coie E.O. § 4(a). As discussed, it would be difficult to read this order to "limit" any action against Jenner. So the fact sheet confirms what Section 4 really means: "The practices of Jenner will be reviewed under Title VII to ensure compliance with civil rights laws against racial bias." Fact Sheet at 2.

After briefly (and implausibly) protesting that Section 4 does "nothing," see MTD at 25, the defendants turn again to standing—traceability and redressability in particular, id. at 26. They point out that Jenner was "subject to review by the EEOC" before the order and will remain subject to review no matter what this Court does. Id. But Jenner does not complain of being vulnerable to investigation on equal terms with the rest of the country. It objects to being a guaranteed subject of investigation because of its speech. That injury is easily traceable. And it is redressable by the order Jenner seeks: not immunity from investigation, but immunity from investigation "made pursuant to Section 4." Proposed Order [ECF No. 132-1] at 3–4.

The defendants' merits defense parallels their standing objection. Per the defendants, Jenner cannot show that it wouldn't have been subjected to an EEOC investigation "absent the retaliatory motive," Comm. on Ways & Means, 45 F.4th at 340, because the EEOC investigates; that's what it does. MSJ Opp'n at 17.

But the defendants fail to offer any reason that would justify singling Jenner out for investigation aside from its speech. The defendants' sole support for their belief that Jenner unlawfully discriminates is Jenner's "adoption of the 'Mansfield Rule,'" a certification process that seeks to "diversify the power structure of law firms and legal departments." Id. at 12–14. Jenner is among more than 360 law firms that earned the Mansfield Certification in 2023–24. See [ECF No. 95-2 at *110]. So in this sense Jenner is entirely unremarkable. What is remarkable is the shared characteristic of the firms now threatened with EEOC investigations: speech the President dislikes. See Perkins Coie LLP, 2025 WL 1276857, at *36–37 (cataloging the President's speech-based targeting of other firms).

If Jenner discriminates, the EEOC will doubtless receive a charge to that effect, at which point it will be free, indeed obligated, to investigate. See EEOC v. Shell Oil Co., 466 U.S. 54, 64

(1984) ("[T]he EEOC's investigative authority is tied to charges filed with the Commission; unlike other federal agencies that possess plenary authority to demand to see records relevant to matters within their jurisdiction, the EEOC is entitled to access only to evidence 'relevant to the charge under investigation.'" (quoting 42 U.S.C. § 2000e–8(a))); McLane Co. v. EEOC, 581 U.S. 72, 75 (2017).  But the President may not evade the "extensive regulation" governing EEOC proceedings, Am. Ctr. for Int'l Lab. Solidarity v. Fed. Ins. Co., 548 F.3d 1103, 1104–05 (D.C. Cir. 2008), and single out Jenner for investigation in retaliation for its speech.  See, e.g., Sanders v. District of Columbia, 85 F. Supp. 3d 523, 535 (D.D.C. 2015); see also Bantam Books, 372 U.S. at 67 (prohibiting the "threat of invoking legal sanctions" levied to suppress speech).  After all, EEOC investigations can have "serious consequences for their targets."  Am. Ctr. for Int'l Lab. Solidarity, 548 F.3d at 1105.

### E.  Section 5: Personnel.

The order's final operative section is perhaps its most sweeping.  Section 5 seeks to keep all Jenner employees out of federal buildings, away from federal employees, and forever off the federal payroll.  First, Section 5(a) instructs agency heads to "provide guidance limiting official access [to] Federal Government buildings to employees of Jenner when such access would threaten the national security of or otherwise be inconsistent with the interests of the United States" and to "provide guidance limiting Government employees acting in their official capacity from engaging with Jenner employees . . . to ensure consistency with the national security and other interests of the United States."  E.O. § 5(a).  Section 5(b), meanwhile, instructs agencies to "refrain from hiring employees of Jenner . . . absent a waiver from the head of the agency, made in consultation with the Director of the Office of Personnel Management, that such hire will not threaten the national security of the United States."  Id. § 5(b).

i.    <u>Section 5 is ripe.</u>

The defendants primarily combat Jenner's Section 5 challenge on ripeness grounds, arguing that the Court ought to hold off on enjoining Section 5 until guidance is issued. MTD at 28–29. Note at the outset that even this threshold argument does not apply to § 5(b)'s hiring ban, which takes effect immediately, no guidance needed. In any event, Jenner's challenge to the entire section is ripe.

Ripeness turns on "the fitness of the issues for judicial review and the hardship to the parties of withholding court consideration." <u>Full Value Advisors, LLC v. SEC</u>, 633 F.3d 1101, 1106 (D.C. Cir. 2011). "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." <u>In re Al-Nashiri</u>, 47 F.4th 820, 826 (D.C. Cir. 2022) (cleaned up).

The defendants point out that Section 5 may not play out "as anticipated":

> [Section 5] calls for agency heads to provide guidance as to whether or when to limit Jenner employees from entering a government building; whether or when to limit Government employees from engaging Jenner personnel in their official capacity; whether or when to bar Jenner employees from being hired into government employment.

MSJ Opp'n at 19.[17]

In one sense the defendants are right: just <u>how</u> devastating Section 5 is to Jenner's ability to function remains to be seen. Without the anticipated guidance, we don't know whether Jenner is in for the "nightmare" scenario, <u>id.</u>—barred from federal courthouses and post offices, from negotiating with federal prosecutors, and the like—or just a fitful night's sleep.

But this is a question of degree, nothing more. The order compels guidance not on "whether" to limit Jenner's access to government buildings and officials but simply on how to do

---

[17] "[W]hether or when to bar Jenner employees from being hired into government employment" is not in fact awaiting guidance; absent the TRO, that directive would have taken effect immediately.

so.  See E.O. § 5(a).  The Court can imagine no exclusion of Jenner employees from federal buildings, no bar of Jenner employees from interacting with federal employees, and no federal hiring ban on Jenner employees that would pass constitutional muster.  So, barring Executive Branch disobedience of the executive order, this is not a scenario in which the illegality "may not occur at all."  In re Al-Nashiri, 47 F.4th at 826.  Indeed, it is occurring now.  Department of Justice employees have already told a Jenner client that Jenner cannot attend meetings at the Department of Justice; by the time they reversed course following this Court's TRO, the client had obtained substitute counsel.  SUMF ¶ 76.

In any event, the injury Jenner fears is not only one that will result from actual exclusion from government buildings.  The injury is also the coercion it feels now to change its speech to avoid impending consequences; the mere fact that the defendants are weighing things like "limiting Government employees" from engaging with Jenner personnel, E.O. § 5(a), exemplifies the speech-based discrimination Jenner is experiencing.  And the current injury extends, too, to the strong incentive the order gives Jenner's clients and potential clients to choose other firms that can come and go from federal buildings as they please.  In other words, "the mere existence of the Order" harms Jenner.  See Reich, 57 F.3d at 1100.

ii.    Section 5 violates the First Amendment and threatens to violate the Fifth and Sixth Amendments.

The defendants have nearly nothing to say for Section 5 on the merits.  That is not surprising.  Even more than the order's other sections, Section 5 is inexplicable by anything other than a pure desire to inflict pain on Jenner.  Unlike Sections 3 and 4, whose adverse actions—terminating contractual ties and investigating employment practices—at least bear some purported (although ultimately failing) connection to suspicions of discrimination, the same cannot be said for Section 5.  This section, which directs an astonishingly broad range of

actions against Jenner employees past, current, and future, has no plausible legitimate rationale and thus cannot stand.

The order's retaliatory nature suffices to deem it unconstitutional under the First Amendment. Still, a brief exploration of the order's Fifth and Sixth Amendment deficiencies is worthwhile and fits nicely here because, while the full order threatens the protections afforded by those amendments, Section 5 does so most directly.

The Sixth Amendment's guarantee that a criminal defendant "have the Assistance of Counsel for his defense," U.S. Const. amend. VI, embraces a defendant's concomitant right "to choose who will represent him," Gonzalez-Lopez, 548 U.S. at 144 (citing Wheat v. United States, 486 U.S. 153, 159 (1988)). And the Fifth Amendment's due process guarantee protects a civil litigant's "right to choose counsel without interference by officialdom." Am. Airways Charters, 746 F.2d at 872. While these rights are of course qualified—by "the authority of trial courts to establish criteria for admitting lawyers to argue before them" for one, see Gonzalez-Lopez, 548 U.S. at 151, and the imperative of avoiding conflicts of interest for another, see Wheat, 486 U.S. at 162—at the very least they may not be deprived in an "arbitrary" manner, see Morris v. Slappy, 461 U.S. 1, 11 (1983); Ky. W. Va. Gas Co. v. Pa. Pub. Util. Comm'n, 837 F.2d 600, 618 (3d Cir. 1988).

If Section 5 plays out as intended, it would arbitrarily stymie Jenner's ability to represent its clients and, alongside it, Jenner's clients' rights to choose their lawyers. A lawyer without the ability to negotiate with federal agencies, appear in court, and the like is hardly a lawyer at all. Cf. Missouri v. Frye, 566 U.S. 134, 143–44 (2012) ("defense counsel have responsibilities in the plea bargain process" necessary "to render the adequate assistance of counsel that the Sixth Amendment requires"). Section 2's security clearance process would also impose a similar

42

disability on Jenner in cases, civil and criminal, involving classified information.  See SUMF ¶¶ 36–42, 81; Notice of Recent Development.  And Section 3 penalizes Jenner clients for their choice of counsel by revoking government contracts.  See Perkins Coie, 2025 WL 1276857, at *42.

The Court need not determine whether these Fifth and Sixth Amendment problems are in fact Fifth and Sixth Amendment violations, as the order's incompatibility with the First Amendment suffices to invalidate it.  And whereas the defendants' Section 5 ripeness argument lacks merit with respect to the First Amendment, it might have a bit more meat with respect to Jenner's right to counsel claims, as those claims might turn on the degree to which the contemplated "guidance" kneecaps Jenner's ability to fulfill its obligations to its clients.  But the Court would be remiss to let this opinion conclude without the observation that Executive Order 14246 at least threatens to metastasize from a violation of the First Amendment to a violation of others as well.

## II.    The remaining factors support an injunction.

Executive Order 14246 is an unconstitutional act of retaliation.  Jenner therefore prevails on the merits and is entitled to summary judgment in its favor.  To win a permanent injunction, however, Jenner still must show that no available remedy at law, such as monetary damages, is adequate to compensate its injury, and that the balance of hardships and the public interest support an injunction.  See Anatol Zukerman, 64 F.4th at 1364 (citing eBay, 547 U.S. at 391); Nken, 556 U.S. at 435 (balance of hardships and public interest inquiries merge when the government is the defendant).  The defendants put forth no argument on these factors, and the Court concludes they are easily met.

**A. The order will cause Jenner irreparable harm not compensable at law.**

Absent court intervention, the order puts Jenner to a choice the Constitution protects it from having to make: change its speech or suffer a serious injury to its livelihood. If it opts for the former, it will suffer irreparable harm, as "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Roman Cath. Diocese of Brooklyn v. Cuomo, 592 U.S. 14, 19 (2020) (quoting Elrod v. Burns, 427 U.S. 347, 373 (1976) (plurality op.)).

If it opts for the latter, Jenner puts a large amount of income at grave risk, as every action directed by the order would strangle Jenner's ability to attract and retain clients and personnel. Section 3 alone threatens the forty percent of Jenner's income that comes from government contractors, subcontractors, or affiliates. See SUMF ¶ 83. Sections 2 and 5 will pile on top of that, making it impossible for Jenner to represent clients whose cases involve sensitive information or—as innumerable cases do—interacting with government employees and entering government buildings. And that's just accounting for Jenner's current clients; prospective clients will doubtless choose law firms without government-imposed disabilities and a government-inscribed scarlet letter, and prospective employees will doubtless choose law firms whose appearance on their resume will not bar them from future government employment. As 807 law firms tell the Court, an executive order like this one "would threaten the survival of any law firm." Br. of Amici Curiae 807 Law Firms in Supp. of Pl. [ECF No. 105] at 2.

Of course, economic injury traditionally is not irreparable, as what is lost can be returned. See Wis. Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985). But "significant" economic loss unrecoverable due to sovereign immunity can be irreparable. See Luokung Tech. Corp. v. Dep't of Def., 538 F. Supp. 3d 174, 192 (D.D.C. 2021); cf. Dep't of Educ. v. California, 145 S. Ct. 966,

968–69 (2025) (irreparable harm to the government where it was "unlikely to recover" funds it was ordered to disburse). That is so here: even if Jenner had a cause of action for damages, but see Egbert v. Boule, 596 U.S. 482, 498 (2022) (no Bivens cause of action for First Amendment retaliation claim), sovereign immunity would bar their collection.

Only a permanent injunction can prevent these significant harms. Jenner has thus established "irreparable injury that the proposed injunction would avert." Taylor v. Resol. Tr. Corp., 56 F.3d 1497, 1508 (D.C. Cir. 1995); accord Xiaomi Corp. v. Dep't of Def., Civ. A. No. 21-280 (RC), 2021 WL 950144, at *10–11 (D.D.C. Mar. 12, 2021) ("exodus of lucrative contracts" coupled with sovereign immunity supported irreparable harm); Luokung Tech. Corp., 538 F. Supp. 3d at 192–93 ("difficulty recruiting and retaining talent" supported irreparable harm).

### III.    The equities and the public interest definitively favor an injunction.

The defendants offer nothing on their side of the equities scale, perhaps because they have little. "[E]nforcement of an unconstitutional [order] is always contrary to the public interest." Karem v. Trump, 960 F.3d 656, 668 (D.C. Cir. 2020) (quoting Gordon v. Holder, 721 F.3d 638, 653 (D.C. Cir. 2013)).[18] And Jenner's side of the balance is much weightier, both as to Jenner itself and as to the greater public. This opinion has already outlined the grave harm the order will inflict on Jenner, but the harm extends well beyond this one firm. This case illustrates why "there is always a strong public interest in the exercise of free speech rights otherwise abridged by an unconstitutional" action. Pursuing Am.'s Greatness, 831 F.3d at 511. Retaliation

---

[18] The Court admits to some brief hesitation in enjoining Section 2 given the national security implications of security clearances, but, as explained, this case implicates no national security concern at all. Cf. Luokong Tech. Corp., 538 F. Supp. 3d at 194–95 (recognizing the "undoubtedly important public interest[]" in national security but giving the interest little weight because the court was "skeptical that weighty national security interests are actually implicated" (quoting Xiaomi Corp., 2021 WL 950144, at *12)).

against Jenner—and Covington & Burling, and Paul Weiss, and Perkins Coie, and WilmerHale, and Susman Godfrey—threatens retaliation against all.  Cf. Heffernan v. City of Paterson, 578 U.S. 266, 273 (2016) (retaliatory action "against one . . . unquestionably inhibits protected belief and association of all" (cleaned up)).  It casts a chill over the whole of the legal profession, leaving lawyers around the country weighing the necessity of vigorous representation against the peril of crossing the federal government.

The order's chilling effect is uniquely harmful for its focus on pro bono work.  When law firms volunteer to represent vulnerable individuals and groups without pay, they embody the best of the profession.  Cf. Mallard v. U.S. Dist. Ct. for S. Dist. of Iowa, 490 U.S. 296, 310 (1989); id. at 313 (Stevens, J., dissenting) ("The lawyer's duty to provide professional assistance to the poor is part of the ancient traditions of the bar.").  This order and the others like it seek not only to prevent that noble undertaking but to manipulate it.  The orders strongarm firms into redirecting their uncompensated services to work the President prefers—or even perhaps to work for the President himself.  See Goldberg, Trump Wants to Use Firms that Cut Deals for Coal Leases, supra.  So when this order retaliates for (and endeavors to steer) Jenner's "powerful pro bono practice[]," E.O. § 1, it sullies a tradition that instructs lawyers to pursue ideals higher than profit.  The public will suffer.

And the chill does not end with the legal profession.  As various amici point out, what the President does to the bar he can equally do to other pillars of our constitutional order—the press,[19] non-governmental organizations,[20] and more.  Retaliatory action against one profession

_____

[19] See Amicus Br. of Sixty Media Orgs. & Press Freedom Advocs. [ECF No. 107] at 9 ("[T]he press and their attorneys[] are logical next targets of these tactics."); see also Associated Press v. Budowich, Civ. A. No. 25-532 (TNM), 2025 WL 1039572, at *1 (D.D.C. Apr. 8, 2025) (granting preliminary injunction to end viewpoint discrimination in access to Oval Office press pool events).

[20] See Br. of Amici Curiae 24 NGOs [ECF No. 102] at 1–2 (this "unvarnished viewpoint discrimination against law firms sends a clear message to Amici: Do not challenge the President or you will be next").

thus "tells the others that they engage in protected activity at their peril."  Heffernan, 578 U.S. at

273.  A republic overcast with such a pervasive chill would not long endure, "for what is at stake

is the equilibrium established by our constitutional system."  Youngstown Sheet & Tube Co. v.

Sawyer, 343 U.S. 579, 638 (1952) (Jackson, J., concurring).

## IV.    Scope of injunction.

Having concluded that a permanent injunction must issue, the questions remain against

whom and in what form.  On the first, the defendants urge the Court to dismiss the United States

as a defendant and enjoin only the individually named agency and official defendants; the Court

holds otherwise.  On the second, Jenner urges the Court not only to enjoin enforcement of the

order's operative sections (2–5), but also to enjoin any future governmental actions inspired by

the order's derogatory findings in Section 1; the Court declines to do so.

### i.    The United States is a proper defendant.

Jenner's complaint named a great many defendants.  See Compl. ¶¶ 32–79.  It did not,

however, name every agency and agency head subject to the executive order; instead it added as

a defendant the "United States of America," "to ensure that the relief ordered by the Court will

apply on a government-wide basis, including to federal agencies that are not specifically listed as

Defendants."  Id. ¶ 79.  The defendants object to the inclusion of the United States as a

defendant.  They insist that Jenner may sue federal officials tasked with implementing the order

but may not sue the United States because it "retain[s] [its] immunity against all suits in federal

court."  MTD at 32 (quoting Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc., 506

U.S. 139, 146 (1993)) (cleaned up).[21]  And they see in the inclusion of the United States a ploy

---

[21] The defendants also suggest that Jenner may not sue an "agency" because, like the government, it too
enjoys sovereign immunity.  See MTD at 32 (quoting Puerto Rico Aqueduct, 506 U.S. at 146).  The defendants'
failure to move to dismiss the many agency defendants named in this case betrays their halfhearted belief in that
argument.

to "enjoin the President by another name," id. at 34, in derogation of the judiciary's general reluctance to bring its injunctive powers to bear directly against the President rather than against a subordinate official, see McCray v. Biden, 574 F. Supp. 3d 1, 8–11 (D.D.C. 2021).

The argument makes a hash of two distinct principles, but it is answered by reference to one statute.  The first principle is sovereign immunity, which shields governments (state and federal) from suit absent waiver.  See, e.g., United States v. Dalm, 494 U.S. 596, 608 (1990); Bd. of Trs. of Univ. of Ala. v. Garrett, 531 U.S. 356, 363 (2001).  This principle has no application here.  As the defendants themselves appear to recognize, the United States has waived sovereign immunity for purposes of suits just like this one, in which an entity "suffering legal wrong because of agency action" seeks "relief other than money damages."  5 U.S.C. § 702; see also Perry Capital LLC v. Mnuchin, 864 F.3d 591, 620 (D.C. Cir. 2017) ("[T]he APA's waiver of sovereign immunity applies to any suit whether under the APA or not." (quoting Trudeau v. FTC, 456 F.3d 178, 186 (D.C. Cir. 2006)); MTD at 32–33.

The second principle is the separation of powers, which counsels courts to avoid enjoining the President.  See Swan v. Clinton, 100 F.3d 973, 978 (D.C. Cir. 1996).  This principle, too, has no application here because Jenner has not sued the President.  Instead it has sued, in addition to "subordinate officials," id., the United States.  To see why this is permissible, look again to 5 U.S.C. § 702, which provides that "[t]he United States may be named as a defendant in any" action to which the APA's waiver of sovereign immunity applies, "and a judgment or decree may be entered against the United States."  See also § 703 ("[T]he action for judicial review may be brought against the United States, the agency by its official title, or the appropriate officer."); Cohen v. United States, 650 F.3d 717, 723 (D.C. Cir. 2011) (en banc).

Section 702 does require Jenner eventually to list the individual federal officers it seeks to enjoin; it just need not do so in the caption of the complaint. The statute insists "[t]hat any mandatory or injunctive decree" resulting from a lawsuit against the United States "shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance." 5 U.S.C. § 702. Jenner has complied, attaching to its proposed injunction a lengthy list of agencies and agency heads subject to the executive order. See Proposed Order at 7–20. And Jenner has standing to obtain an injunction against those agencies and agency heads for the same reasons it has standing to challenge the order generally. The defendants offer no reason that harm from these additional agencies is any more speculative than harm from the agencies named as defendants.

    ii.    <u>The Court will not enjoin future actions taken pursuant to Section 1.</u>

It should be clear by now that, in this case, the Court will enjoin any actions taken pursuant to the order's operative sections, Sections 2 through 5. Section 6's boilerplate language aside, that leaves Section 1.

Section 1 does not direct any action. It represents instead something of a screed airing the President's grievances with Jenner. In the executive order as issued, the screed played an essential role: it both supplied a rationale for Sections 2 through 5 and answered any questions those operative sections purported to leave open, like whether engaging with Jenner is in the "national interest."

But once this opinion and the accompanying order issue, the executive order will no longer stand. Sections 2 through 5 will not direct agencies to ask the questions Section 1 largely answers. And shorn of its enforcement mechanisms, Section 1 is nothing more than the Executive Branch "say[ing] what it wishes." <u>Vullo</u>, 602 U.S. at 187. Jenner has no more right to

silence the Executive Branch than the Executive Branch has to silence Jenner: the government is "free to criticize" Jenner all it wants "in the hopes of persuading others" through "the merits and force of [its] ideas, the strength of [its] convictions, and [its] ability to inspire." Id. at 187–88.  It simply may not back up that criticism with "the power of the State." Id. at 188; see also, e.g., Kennedy v. Warren, 66 F.4th 1199, 1207 (9th Cir. 2023) ("[P]ublic officials may criticize practices that they would have no constitutional ability to regulate, so long as there is no actual or threatened imposition of government power or sanction.").

Recognizing Section 1's status as government speech, Jenner does not exactly seek to enjoin it.  See MTD Opp'n at 24.  But Jenner fears further action pursuant to Section 1, and so seeks to enjoin federal officials "from using or considering in any way or for any purpose the statements laid out in Section 1."  Proposed Order at 2.

The Court is very sympathetic to Jenner's request.  The President has displayed a great deal of animosity towards Jenner.  Further adverse actions would not be shocking—and could very well offend the Constitution as plainly as Executive Order 14246 does.  And the defendants' own conduct during this litigation does not ease the concern: even in complying with the TRO, the defendants persisted in disparaging Jenner, implied that federal agencies may "decide with whom to work" notwithstanding the First Amendment, and "reserve[d] the right to take all necessary and legal actions" against Jenner.  See Memorandum from Pamela Bondi, Att'y Gen., & Russell Vought, Dir., Off. of Mgmt. & Budget to Heads of Exec. Dep'ts & Agencies [ECF No. 21-1].  Rather than leave the possibility open, Jenner would prefer to head it off at the pass.

But such a step would require the Court to enjoin all uses of Section 1 "in the abstract," "apart from any concrete application that threatens imminent harm to [Jenner's] interests." Summers v. Earth Island Inst., 555 U.S. 488, 494 (2009).  Neither standing doctrine nor equity

generally permits such judicial prophylaxis. Jenner lacks standing to challenge hypothetical future actions taken pursuant to Section 1; unlike actions taken pursuant to Sections 2 through 5, these are purely "conjectural or hypothetical" because agencies have not been instructed to take them. See Anatol Zukerman, 64 F.4th at 1362 (quoting City of L.A. v. Lyons, 461 U.S. 95, 101–02 (1983)). With no standing to challenge such actions, the injunction shrinks accordingly, as a "remedy must of course be limited to the inadequacy that produce[s] the injury in fact." DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 353 (2006) (quoting Lewis v. Casey, 518 U.S. 343, 357 (1996)). And equitable principles provide the same thing standing doctrine demands, as an injunction may not issue "without adequate proof of a threatened injury." Taylor, 56 F.3d at 1508. Whether best viewed as a shortcoming of standing, ripeness, or a "basis in equity for an injunction," the guesswork entailed in enjoining all future uses of the sentiments expressed in Section 1 would exceed the Court's proper role. See id.; Trump v. New York, 592 U.S. 125, 133–34 (2020).

If this conclusion results in more federal action taken against Jenner, those actions could very well be equally unconstitutional. But Article III requires this Court to place its faith in future courts to prevent harm from befalling Jenner if and when that occurs. At this juncture, the Court cannot take that role for itself.

### Conclusion

Jenner raises many more claims of unconstitutionality. These present interesting, difficult, and potentially meritorious questions about the scope of presidential power and more. What has been said here of the First Amendment (and in passing of the Fifth and Sixth), however, is sufficient to declare Executive Order 14246 unlawful and enjoin its operation, eliminating the need to explore those other questions. So the Court need not break new ground:

Executive Order 14246 violates settled First Amendment law and its operation must be enjoined in full.  Jenner's motion for summary judgment is granted; the defendants' motion is denied.  A separate order will issue.


_____/s/_____
JOHN D. BATES
United States District Judge

Dated: <u>May 23, 2025</u>